UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

REGINA DANIELS,                         )
                                        )
                Plaintiff,              )
                                        )
vs.                                     )        Case No.:  09-CV-2304-JAR-KGS
                                        )
UNITED PARCEL SERVICE, INC.,            )
                                        )
                Defendant.              )

**DEFENDANT'S REPLY MEMORANDUM IN
<u>SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

ARMSTRONG TEASDALE LLP

BY: <u>*/s/ Jennifer Arendes*_____</u>
        Jennifer Arendes,  KS#77944
        Narcisa Przulj,  KS#78179
        7700 Forsyth Blvd, Suite 1800
        St. Louis, Missouri 63105
        (314) 621-5070
        (314) 621-5065 (Facsimile)
        jarendes@armstrongteasdale.com
        nprzulj@armstrongteasdale.com

        and

        Laurence R. Tucker, #70074
        2345 Grand Boulevard, Suite 2000
        Kansas City, Missouri 64108-2617
        (816) 221-3420
        (816) 221-0786 (Facsimile)
        lrtucker@armstrongteasdale.com

        ATTORNEYS FOR DEFENDANT
        UNITED PARCEL SERVICE, INC.

**TABLE OF CONTENTS**

I.      INTRODUCTION .............................................................................................1

II.     FACTS ...........................................................................................................3

        A.      UPS' REPLY TO PLAINTIFFS' RESPONSES TO UPS' FACT
                STATEMENTS.....................................................................................3

        B.      DEFENDANT'S RESPONSE TO PLAINTIFF'S ADDITIONAL
                STATEMENT OF MATERIAL FACTS...............................................72

III.    ARGUMENT ...............................................................................................159

        A.      PLAINTIFF'S FAILURE TO PROMOTE AND DENIAL OF TRAINING
                CLAIMS ARE TIME-BARRED ........................................................161

        B.      PLAINTIFF'S PROMOTION CLAIMS FAIL AS A MATTER OF LAW.......164

        C.      PLAINTIFF'S SHIFT CHANGE CLAIM FAILS AS A MATTER OF
                LAW ..................................................................................................176

        D.      PLAINTIFF FAILED TO PLEAD AND CANNOT NOW ASSERT A
                CLAIM OF UNEQUAL PAY UNDER ANY LAW BUT THE EQUAL
                PAY ACT...........................................................................................179

        E.      PLAINTIFF CANNOT ESTABLISH AN EQUAL PAY ACT CLAIM ...........180

        F.      PLAINTIFF CANNOT ESTABLISH A RETALIATION CLAIM...................184

        G.      PLAINTIFF'S CONTRACT/PROMISSORY ESTOPPEL CLAIM FAILS ......186

IV.     CONCLUSION.............................................................................................189

## I.       INTRODUCTION

Now pending before the Court is Defendant UPS' Motion for Summary Judgment and Memorandum in Support, and Plaintiff's Memorandum in Opposition to Defendant's Motion ("Plaintiff's Opposition").  Plaintiff has asserted a number of claims in her lawsuit and, in an attempt to obscure the lack of merit to these claims, has filed a massive and confusing response to UPS' Motion for Summary Judgment, replete with irrelevant information, unsubstantiated speculation and conclusory allegations.  Plaintiff has failed, however, to show that the actions and decisions about which she complains constitute actionable conduct or were motivated by her age or her sex, rather than by entirely legitimate nondiscriminatory business reasons.

Plaintiff first attempts to create the illusion that multiple fact issues exist by responding "Disputed" to nearly all of UPS' statements of fact, thus giving the appearance that they are in dispute, *without then actually disputing or controverting them*.  Instead, Plaintiff offers lengthy, self-serving and conclusory statements that do not comply with Fed.R.Civ. P. 56 and Local Rule 56.1, because they are, for the most part, (1) not based on a declaration or other testimony that is competent, admissible or based on personal knowledge; (2) without support in the record;  (3) contrary to the record evidence, including at times, Plaintiff's own sworn deposition testimony; and/or (4) constitute improper argument.  Similarly, Plaintiff's Statement of Additional Material Facts ("AMF") consists largely of purported "facts" which are based largely on irrelevant/ immaterial, self-serving and conclusory allegations, rather than on competent, admissible evidence supported by the record.

But it is the Argument section of plaintiff's Response that perhaps best illustrates her attempts to obscure and confuse the issues.   Plaintiff's legal argument is nothing short of a labyrinth, seemingly constructed more to obfuscate than to illuminate the basis for her claims. She conflates unrelated claims, legal theories and discrete employment decisions/actions.  She

repeatedly discusses the same claims in different sections of her Argument, repeating vague, confusing allegations, repeatedly re-characterizing her claims, and attempting to assert claims she has not properly asserted in this lawsuit.  All this is done in a transparent effort to create the illusion of a significant number of extremely complicated legal and factual issues where none exist.

Yet, despite plaintiff's efforts to overwhelm, confuse and misdirect, despite frequent exaggerations, misleading statements and outright misrepresentations and contradictions of the record, despite Plaintiff's repeated reliance on speculation and conjecture, self-serving characterizations and "facts" and "evidence" wholly inadmissible and irrelevant to the claims in this lawsuit, plaintiff has failed to demonstrate that any genuine issue of material fact exists that precludes summary judgment in favor of UPS.

Despite Plaintiff's Herculean effort to complicate, confuse and obscure, this is not a complicated case.  Plaintiff complains, for example, despite those claims being barred because she failed to timely file a charge of discrimination, about not being promoted to unidentified supervisor positions in 2005 and 2006 but fails to establish that she was the most qualified applicant or otherwise demonstrate that a genuine issue of fact exists as to whether those decisions were motivated in any way by her age or gender.  She also alleges UPS discriminated against her by not giving her a week of certain training and by changing her shift, neither of which constitute actionable adverse conduct, nor is there any evidence of age or sex discrimination.  She complains about not being paid as much as certain full-time male supervisors, even though the record clearly shows those with whom she compares herself, among other differences, worked the more difficult twilight dispatch, which plaintiff acknowledged in her deposition she had never performed and could not perform, and also, as an example, had

other demanding job duties and experience superior to plaintiff's.  She also alleges that she was

retaliated against because her manager asked her to record her time accurately after seeing her

leave early, or allegedly sent her less email correspondence – neither of which are adverse

actions, nor is there any evidence those actions were in retaliation for her complaint of

discrimination.  Accordingly, for these and reasons set forth more fully below and in UPS'

Memorandum in Support of Summary Judgment ("Memorandum"), UPS respectfully requests

that this Court grant summary judgment in its favor and against plaintiff as to all claims and

issues.

## II.      FACTS

### A.      UPS' REPLY TO PLAINTIFFS' RESPONSES TO UPS' FACT STATEMENTS

In Plaintiff's Responses to UPS' Statement of Uncontroverted Facts (Pls. Mem. at 250-

348), Plaintiff claims that certain facts are disputed, but has not pointed to a single disputed issue

of material fact supported by competent, admissible evidence.  Although Plaintiff purports to

controvert many of UPS' fact statements, she has not set forth facts with citations to the record to

dispute the material facts in UPS' Statements of Facts which are relevant to Plaintiff's claims.

Rule 56(c) Fed.R.Civ.P., provides in pertinent part:  "A party asserting that a fact cannot

be or is genuinely disputed must support the assertion by: citing to particular parts of materials in

the record, including depositions, documents, electronically stored information, affidavits, or

declarations, stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials; or showing that the materials cited do not establish the

absence or presence of a genuine dispute, or that an adverse party cannot produce admissible

evidence to support the fact."  Local Rule 56.1(a) states:  "All material facts set forth in the

statement of the movant will be deemed admitted for the purpose of summary judgment unless

specifically controverted by the opposing party."  The Supreme Court and Tenth Circuit have

repeatedly held that, in responding to a summary judgment motion, the nonmoving party may not

rest upon its pleadings to satisfy its burden.  *Haney v. Preston*, 2010 WL 5392670 at *2 citing

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).  "Rather, the nonmoving party must

'set forth specific facts that would be admissible in evidence in the event of trial from which a

rational trier of fact could find for the nonmovant.'"  *Haney* at *2 citing *Mitchell v. City of

Moore, Okla.,* 218 F.3d 1190, 1197-98 (10th Cir.2000).  The facts "must be identified by

reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."

*Haney* at *2 citing *Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000).

### a.    PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS DOES NOT COMPLY WITH KANSAS DISTRICT LOCAL RULE 56.1 AND SHOULD BE STRICKEN OR DISREGARDED

Local Rule 56.1(b) provides, in pertinent part:

> (1)    A memorandum in opposition to a motion for summary judgment shall begin with a section that contains a concise statement of ***material facts as to which the party contends a genuine issue exists***.  Each fact in dispute shall be numbered by paragraph, ***shall refer with particularity to those portions of the record upon which the opposing party relies***, and if applicable, shall state the number of movant's fact that is disputed. (Emphasis added)

> (2)    If the party opposing summary judgment relies on any facts not contained in movant's memorandum, that party shall set forth each additional fact in a separately numbered paragraph, supported by reference to the record . . ."

(Kansas District Local Rule 56.1(b)(1) and (2). Local Rule 56.1(e) expressly provides that "if the

responding party cannot truthfully admit or deny the factual matter asserted, the response shall

specifically set forth in detail the reasons why.  <u>*All responses shall fairly meet the substance of

the matter asserted*</u>." (Emphasis added)

Contrary to the clear language of Local Rule 56.1(b)(1) above, Plaintiff's Opposition does not begin with or contain a concise statement of material facts as to which she contends a genuine issue exists.  Instead, Plaintiff submits her lengthy responses to Defendant's Uncontroverted Facts (Plaintiff's Response to UPS' Fact Stmt), a substantial number of which do not comply with Federal Rule of Civil Procedure 56(c) or Kansas District Local Rule 56.1(b) and (e).

Like other sections of her Opposition, Plaintiff's Response contains a vast amount of improper argument, conclusory allegations, misstatements and misrepresentations of the record evidence, conjecture and speculation, all of which are intended to distract, mislead and confuse the Court and obscure the fact that Plaintiff has failed to meet her burden of showing that there is genuine dispute as to any material fact.  Plaintiff's conclusory, unsupported denials and unsubstantiated argument regarding irrelevant/immaterial "facts" are not sufficient to defeat Defendant UPS' Summary Judgment Motion.  Rule 56(c), Fed.R.Civ.P.; Local Rule 56.1;

Plaintiff states that the facts set forth in the following paragraphs of UPS' Fact Statement are "undisputed":  2, 3, 6, 8, 27, 28, 32, 33, 46, 54, 55, 61, 63, 100, 103, 106 and 107.

However, in violation of FRCP 56(c)(1)(A) Local Rule 56.1(b) and (e), Plaintiff labels the following paragraphs of UPS' Fact Stmt **"disputed,"** "disputed in part," or "disputed in part and as incomplete" (or similar language to that effect), even though Plaintiff admits in her response to each paragraph that the facts set forth by UPS are not actually disputed:  1, 4-5, 7, 9, 11-12, 15, 17-18, 34, 36-37, 42, 49-50, 53, 58-60, 64-65, 78, 82, 87, 90, 92, 94-96, 98, 101-102, 105.

Similarly, although Plaintiff's responses to the vast majority of UPS' fact statements claim that those facts are "disputed," "disputed in part," or "disputed in part and as incomplete"

(or similar language to that effect), Plaintiff's actual responses to these paragraphs do one or more of the following in contravention of FRCP 56(c)(1) and (4) and Local Rule 56.1(b)**:**

(1) purports to dispute UPS' fact statement in part but sets forth no facts with supporting record citations to controvert that portion of UPS' statement/paragraph (*see, e.g.*, Pl's responses to pars. 13-15, 20-21, 24, 29-31, 41, 44, 47-48, 51-52, 58-59, 64, 67-75, 77, 80-81, 84-85, 88, 93, 97, 99);

(2) either provide no facts to controvert UPS' fact paragraph or admit part of UPS' fact statement and provide no specific facts to controvert the remainder of UPS' fact paragraph (*see, e.g.*, Pl's responses to UPS fact pars. 16-17, 22-23, 25, 51-52, 79;

(3) purports to dispute UPS' fact statement in part but sets forth alleged "facts" with no record citations (*see, e.g.*, Pl's responses to UPS' fact pars. 38-40 ;

(4) purports to dispute UPS' fact statement in part but sets forth "facts" which are clearly contradicted to the competent, admissible record evidence (in some more egregious examples, Plaintiff's "facts" contradict her sworn deposition testimony) **(***see, e.g.*, 10, 17, 21, 24-25, 45, 48, 60, 62, 66, 86**)**; and/or

(5) admit part of UPS' fact statement and recite alleged irrelevant/immaterial "facts" which are completely unrelated to UPS' fact statement (*see, e.g.*, 22, 41, 52, 104).

All of UPS' fact statements should be deemed admitted pursuant to FRCP 56(c) and Local Rule 56.1(b) because Plaintiff has failed to set forth competent, admissible evidence to controvert the specific fact set forth in each paragraph.  *See, e.g., Triple-I Corp. v. Hudson Associates Consulting, Inc.*, 713 F.Supp.2d 1267, 1273 (D.Kan. 2010); *KM Mentor, LLC v. Knowledge Management Professional Soc., Inc.*, 712 F.Supp.2d 1222, 1228 (D.Kan. 2010).

For example, although Plaintiff states that fact par. 83 is "Disputed in part and as incomplete," she set forth no facts or record evidence to dispute this fact statement.  On the contrary, despite purporting to controvert it, Plaintiff admits that she "does not dispute" the information set forth in this paragraph.  Plaintiff's assertions about unrelated matters constitute improper argument and do not fairly meet the substance of UPS' fact statement.  Plaintiff's representation that UPS' fact statement is "directly contradicted by and inconsistent with the record evidence" is not accurate and defies common sense given that Plaintiff admitted this fact paragraph.

Plaintiff's response to par. 83 is one of many clear examples of Plaintiff's failure to comply with Local Rule 56.1 in an effort to distract the Court from the fact that there is no competent, admissible record evidence to dispute UPS' fact statements.

In perhaps some of the most striking examples of Plaintiff's complete disregard for the requirements of Rule 56 and Local Rule 56.1, plaintiff disputes certain fact paragraphs which state that Plaintiff testified to particular information in her deposition.  Although UPS carefully and accurately described plaintiffs' deposition testimony in these paragraphs, plaintiff disingenuously claim that these paragraphs are "controverted" without showing how UPS misstated or mischaracterized Plaintiff's deposition testimony and, instead, arguing that the testimony is irrelevant or raising some completely unrelated claims.  A careful review of plaintiff's deposition transcript shows that plaintiff is disputing matters which she clearly admitted in her deposition.  In response to other UPS fact statements, Plaintiff makes assertions which clearly contradict her sworn deposition testimony.  Plaintiff cannot create a genuine issue of fact sufficient to survive summary judgment by submitting an affidavit or other evidence which contradicts her prior sworn deposition testimony.  *Argo v. Blue Cross and Blue Shield of*

*Kansas, Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006); *Chestand v. Medical Technology and Research Authority*, 216 F.3d 1086 at *6 (10th Cir. 2000).

In other paragraphs, Plaintiff denies that a document such as her 2005 Career Development Planning Guide or other document states the information UPS has set forth in its fact statement without providing any support for her denial. A review of Plaintiff's 2005 CDPG or other document clearly shows that Plaintiff has absolutely no basis for controverting the fact statement.

Plaintiff even goes so far as to set forth certain facts in her Additional Statement of Material Facts and then deny those same facts in response to UPS' paragraphs. In many of Plaintiff's responses to UPS' fact statements, Plaintiff does not address the fact set forth by UPS or only addresses in a cursory manner, and instead discusses completely unrelated (and in most instances irrelevant/immaterial) matters.

Plaintiff's remaining responses to UPS' Fact Statements do not create a disputed issue of material fact because Plaintiff does one or more of the following: (1) misstates the record, (2) relies on improper and/or inadmissible evidence,[1] (3) contains statement and/or relies on evidence which directly contradict Plaintiffs' sworn deposition testimony or that of other witnesses (*see* motions to strike), and/or (4) rely on pure speculation and conjecture which is either contrary to the record or completely unsupported by facts or credible record citations (e.g., Declaration of K. Carpenter). *See, e.g., Triple-I Corp. v. Hudson Associates Consulting, Inc.*, 713 F.Supp.2d 1267, 1275 (D.Kan. 2010); *Pfeifer v. Federal Exp. Corp.*, ---F.Supp.---, 2011 WL 332672 at *2 (D.Kan. 2011); *see also* Exh. AZ, Order granting UPS' summary judgment motion

---

[1]   UPS has filed herewith motions to strike all or a portion of several affidavits/declarations submitted by plaintiffs, including the Declarations of Steve Jones, Doyle Clark, Rodney Fritz, Brian Beauchamp, Harold McLaughlin, the feeder drivers and a general motion to strike several other affidavits.

in *Stephen Jones and Doyle Clark v. United Parcel Service, Inc. et al.*, No. 03-0284-CV-W-GAF

(W.D.Mo. April 7, 2005) at 2 (ECF doc. 506); and Exh. BA, Judge Fenner's Order dated July 19,

2005 in the *Jones/Clark* lawsuit imposing sanctions on plaintiffs' counsel for similar violations

of FRCP 56 and the court's Local Rules in Plaintiffs' Suggestions In Opposition to UPS'

summary judgment motions.  (ECF doc. 534).

Plaintiff cannot defeat UPS' properly supported summary judgment motion by relying on

unsupported speculation and conjecture.  *See Pfeifer v. Federal Exp. Corp.*, ---F.Supp.---, 2011

WL 332672 at *2 (D.Kan. 2011).  ("Conclusory allegations alone cannot defeat a properly

supported motion for summary judgment.  The nonmovant's 'evidence, including testimony,

must be based on more than mere speculation, conjecture, or surmise.'")

**b.     UPS' REPLY TO PLAINTIFF'S RESPONSES TO CERTAIN PARAGRAPHS IN UPS' STATEMENT OF FACTS**

Alternatively, should the Court deny UPS's motion to strike/disregard portions of

Plaintiff's Responses to UPS' Fact Statement, UPS makes the following reply to paragraphs

Plaintiff claims are disputed either in whole or in part:

**Par 1**:  Plaintiff does not appear to seriously dispute this fact which merely sets forth

background information about Plaintiff's early employment at UPS.  Plaintiff admits the first

sentence.  Plaintiff's deposition testimony does not controvert this paragraph, and UPS did not

cite her testimony to support the second sentence (as Plaintiff appears to claim).  Plaintiff's

Employee History Profile (EHP) (Exh. A) lists Plaintiff's original job title "GEN OFFICE

CLERK," and shows that Plaintiff received a "promotion" in 1985 when she changed from part-

time to full-time.  Plaintiff's assertion that her original job title in <u>1984</u> was "customer service

representative" does not controvert this fact statement and is irrelevant to Plaintiff's claims.

**Par. 4:**  Plaintiff admits the substance of this fact statement, i.e., that she became a full-time "dispatch specialist" in a UPS package center in 1999, and sets forth no facts (or record citations) to dispute it.  Despite this admission, Plaintiff argues that the record evidence cited by UPS does not show Plaintiff "applied for and was promoted to that position".  However, Plaintiff testified in her deposition that she was "promoted" to a package dispatch specialist position in 1999 as set forth by UPS in this fact paragraph:

> Q:  " . . . – my question really, . . . , is were you promoted to dispatch specialist at UPS in about June of 1999?
>
> A:  Yes
>
> * * *
>
> Q:  When you were first promoted to specialist, where did you – which department were you in?
>
> A:  I worked in the Kansas City East Center at the James Street building.
>
> Q:  Okay.  So was that with package cars?
>
> A:  Yes, ma'am."

(Exh. BI, Daniels Dep., pp. 20-21)  Contrary to FRCP 56 and Local Rule 56.1, Plaintiff purports to dispute this fact which Plaintiff admitted in her deposition.

**Par. 5:**  Although Plaintiff initially states "Disputed in part and incomplete," she admits that the facts in this paragraph are <u>not actually</u> disputed:  "Plaintiff does not dispute that she moved from the package center to the Feeder Department."  (Pl's Response, p. 9)  Plaintiff admitted the facts set forth in par. 5 in her deposition:

> "Q:  And when you made that move to the feeder department, your job classification was still dispatch specialist and your job group was still specialist, it didn't change, right?
>
> A:  No.
>
> Q:  No, it didn't change or, no –

A:      No, ma'am, it did not change."

(Daniels Dep., p. 22)  Plaintiff's assertion that her deposition testimony is inconsistent with UPS'

fact statement and "shows Plaintiff was moved within the department as a cover dispatch

specialist" mischaracterizes her testimony.  Although Plaintiff testified that, between 1999 and

2009 she was "moved within the Feeder Dept. as a cover dispatch specialist," later in her

deposition, Plaintiff clearly testified that she worked as the <u>night</u> dispatch person when she first

transferred to Feeders in 1999 and was not assigned to work "cover" dispatch until

approximately 2004 or 2005.  (*Id*. at p. 123)  Plaintiff's improper and misleading attempt to

controvert this paragraph clearly violates Local Rule 56.1(b).

**Par. 7:**  Although Plaintiff states that this fact is "Disputed in part and as incomplete,"

she then states she does <u>not</u> dispute the information set forth.  (Pl's Opp., p. 9)  Plaintiff's

assertion that she was "moved within the department as a <u>cover dispatch specialist</u>" does not set

forth any facts to controvert UPS' fact and does not fairly meet the substance of the matter as

required by Local Rule 56.1(e).

**Par. 9:**  As Plaintiff did in response to fact pars. 5 and 7 above, Plaintiff initially states

that this fact is "Disputed in part and incomplete," but then admits that it is <u>not</u> actually disputed:

(Pl's Opp., p. 9)  Plaintiff's argument in the third sentence of her response is improper, irrelevant

and does not fairly meet the substance of UPS' fact statement as required by Local Rule 56.1(e).

Plaintiff's statement that she <u>was</u> promoted in 1999 merely points out that UPS' fact statement

should state that Plaintiff was not promoted "<u>after June 1999</u>" rather than simply stating plaintiff

was not promoted between 1999-2009.  It is undisputed that Plaintiff was promoted in June 1999

and received no promotions after that year.  (Daniels Dep., pp. 20-22)

**Par. 10:**  Although Plaintiff initially states that this fact is "Disputed in part and as

incomplete," Plaintiff admits in her response and her deposition that she was not covered by a

collective bargaining agreement.  (Pl's Opp., p. 9; Daniels Dep., pp. 29, 536)  Plaintiff's current

assertion that she had a "contract that covered her employment" as a dispatch specialist at UPS

directly contradicts her deposition testimony:

> Q:      And as a specialist, did you have any kind of, you know,
>           employment contract that covered specialists?
>
> A:      No.
>
> (Daniels Dep., p. 29)

* * *

> Q:      Okay.  Cause management people don't have a contract,
>           right?
>
> A:      Correct.
>
> (Daniels Dep., p. 46)

* * *

> Q:      Right, You know, sometimes a president or a CEO or other
>           people at companies have a written contract that covers the
>           terms of their employment.  Did you have one as far as you
>           know?
>
> A:      No.
>
> (Daniels Dep., p. 536)

In addition, though Plaintiff later testified that her breach of contract claim is based on UPS'

Code of Business Conduct, she did not testify that she had an "employment" contract at UPS.

Indeed, in the Argument section of her Opposition, Plaintiff asserts that UPS misunderstands her

breach of contract claim because Plaintiff is <u>not</u> claiming she had an employment contract.

The remainder of Plaintiff's response constitutes improper legal argument and contradicts

Plaintiff's sworn deposition testimony.  For example, Plaintiff testified in her deposition that her

breach of contract claim is based on UPS' Code of Business Conduct.  (Daniels Dep., p. 536 and

Exhs. AR and AS)  But in response to this fact statement, Plaintiff asserts that she and UPS

"entered into a written agreement regarding the terms and conditions of her employment" which she claims is the one-page UPS Professional Conduct and Anti-Harassment Policy.  (Pl's Exh. 48)  Plaintiff cites pages 538-539 from her deposition in support of her position, but a careful review of pages 536-40 of the deposition shows that Plaintiff repeatedly referred to UPS' <u>Code of Business Conduct</u> "book" in her answers, not the one-page Code of Professional Conduct.  Plaintiff cannot create a material fact dispute by mischaracterizing her deposition testimony.

**Par. 11:**  Plaintiff initially states that this fact is "disputed in part and as incomplete", then admits that she does "not dispute" the fact set forth by UPS.  Plaintiff's additional speculation and argument are improper, irrelevant/immaterial and do not fairly meet the substance of the matters asserted by UPS in violation of Local Rule 56.1(b) and (e).

**Par. 12:**  Plaintiff sets forth no facts to dispute this paragraph.  Again, Plaintiff first states that this paragraph is "Disputed in part and as incomplete," then admits that she does "not dispute" the facts set forth by UPS.  Plaintiff testified in her deposition that "specialist" is an entry-level management position at UPS (Daniels Dep., p. 24), which is below the level of a full time supervisor.  (*Id*. at 24, 26)  In Plaintiff's EEOC Intake Questionnaire submitted to the EEOC, Plaintiff states that in 2005 and 2006, she submitted letters of intent for promotion to an MIP [supervisor] position[2] which is a job that "has more responsibility . . ." (Pl's Exh. 27, p. 2) further supports UPS' fact statement.

Plaintiff's assertion that she and other specialists were "performed and were responsible for the duties (sic) a full-time supervisor" is not supported by competent, admissible evidence and does not fairly meet the substance of the matter asserted.  Plaintiff admitted in her deposition

---

[2]   It is undisputed that the only letters of intent Plaintiff submitted in 2005/2006 seek promotion to full-time supervisor, which Plaintiff sometimes refers to as "MIP" supervisor.  (*See* Daniels Dep., pp. 218-224 and Exhs. W and Y)

that she does not know all the duties performed by feeder "on road" supervisors (e.g., Wetschensky, Stuke, Sloan) (*see* Daniels Dep., p. 215), nor does she have knowledge of all the duties performed by full-time supervisors Jim Yankovich and Dennis Smith who worked as the twilight dispatchers at James Street.  (*Id*. at 189)  Second, Plaintiff testified that she could not perform the twilight dispatch job, which Mr. Yankovich and Mr. Smith performed.  (Daniels Dep., p. 356; *see also* Dooley Decl., ¶ 52; Yankovich Decl., ¶ 38; Czernicki Decl., ¶ 44; Kirby Decl., ¶ 18)  Unlike Plaintiff, Mr. Smith and Mr. Yankovich performed the twilight dispatcher job between 2004 and 2009 at James Street facility and the in UPS' much larger, more complex Feeder operation at its Lenexa, KS facility.  (Daniels Dep., pp. 636-638; Dooley Decl., ¶ 54; Yankovich Decl., ¶ 38)  Plaintiff relies on the Declaration of Kathleen Carpenter (Pl's Exh. 15) even though Ms. Carpenter did not work in the Feeder Department at James Street (or Lenexa) between 2004 and 2009, was never Plaintiff's supervisor or manager, and was not involved in any decisions concerning Plaintiff's employment.  (Exh. BG, Williams Suppl. Decl., ¶ 52; Exh. BB, Carpenter EHP and Exh. BC, Carpenter GEMS)  Ms. Carpenter's unsubstantiated allegations, speculation and conjecture do not constitute competent, admissible evidence.  *See* Motion to Strike Portions of K. Carpenter Declaration.

**Par. 13:**  Plaintiff has set forth no facts with citations to competent, admissible evidence to dispute this paragraph.  Plaintiff admits UPS' statement concerning the duties/responsibilities of full-time feeder supervisors and managers.  Although Plaintiff purports to controvert the second sentence, she merely argues that she and other specialists performed and were responsible for the "duties a full-time supervisor" without specifying particular duties or responsibilities they allegedly performed or had responsibility for.  Plaintiff has not set forth any facts to demonstrate that she/other specialists "fill[ed] in for [supervisors] or for the feeder manager when he/she

[was] absent or on vacation," the actual fact set forth by UPS.  *See also* UPS' reply concerning par. 12 above.

Plaintiff's conclusory assertions do not constitute competent, admissible evidence and do not fairly meet the substance of UPS' fact statement.  Plaintiff again relies on inadmissible assertions from the Declaration of Kathleen Carpenter.  As set forth above and in UPS' Motion to Strike, Ms. Carpenter did not work in Feeders nor did she work at James Street during most of the relevant period.  Her conclusory, unsupported speculation does not constitute competent, admissible evidence and should be stricken.  *See* Motion to Strike Portions of K. Carpenter Declaration incorporated herein by reference.

**Par. 14:**  As in her response to par. 13 above, Plaintiff admits the duties/responsibilities of full-time Feeder supervisors/managers set forth by UPS but purports to dispute UPS' statement concerning the duties/responsibilities of specialists.  Plaintiff's response does not fairly meet the substance of UPS' fact statement.  Plaintiff has set forth no specific facts (or record citations) showing that specialists have full supervisory authority and can discipline/discharge employees (unlike full-time supervisors and managers).  Plaintiff has also set forth no facts/record citations showing that specialists are held responsible for ensuring and conducting the training, discipline and evaluations of feeder drivers and other groups of employees whom full-time supervisors/managers are responsible for supervising.  On the contrary, the undisputed evidence shows that, unlike full-time supervisors/managers, Plaintiff and other specialists at UPS do not have the authority/direct responsibility to discipline/discharge employees or to train/ perform evaluations of drivers' job performance.  (Dooley Decl., ¶ 6; Liberti Decl., ¶ 6; Williams Decl., ¶ 7; Haynes Dep., p. 155)

**Par. 15:**  Plaintiff first states that this fact paragraph is "Disputed in part and incomplete," then states that the facts set forth are <u>not</u> disputed.  After admitting the facts asserted by UPS, Plaintiff claims that although she testified that full-time supervisors are required to do things like change job functions and duties, travel, relocate and accept lateral transfers, she did not testify that supervisors are "often" required to do them.  Plaintiff's claim that the fact statement is "disputed in part" violates Local Rule 56.1(b).

**Par. 16:**  Plaintiff has not set forth facts supported by competent, admissible evidence to dispute this paragraph.  The only "evidence" Plaintiff cites is the Carpenter Declaration which should be stricken for the reasons set forth in UPS' Motion to Strike Portions of Carpenter Decl. incorporated herein by reference.  UPS' policies state that specialists should properly record their hours worked and receive overtime pay for hours worked in excess of 40 hours per week. (Williams Decl., ¶ 8; Liberti Decl., ¶ 7)

**Par. 17:**  Plaintiff states that this fact statement is "disputed," sets forth no facts to dispute it, and instead, merely points out that her deposition testimony in support of this fact paragraph is located on p. 45 (not p. 46) of her deposition transcript:

> Q:     . . . And specialists at UPS, are they guaranteed that they will only work, you know, a certain shift at UPS and no other?
>
> A:     Within the department that they are attached to, they will only work a specific shift.
>
> Q:     Right, but UPS can change their shift.  You know, say they work during the day.  UPS can change it and say we need you to work during the night, right?
>
> A:     Yes.

(Daniels Dep., p. 45)  Plaintiff's assertion that UPS' fact statement is "disputed" clearly violates Local Rule 56.1(b).

**Par. 18:**  Plaintiff states that this fact statement is "disputed," then admits that she does not dispute the facts set forth by UPS.  Nothing in Plaintiff's response controverts it.  Plaintiff's assertions regarding dispatch specialist "positions" and her argument about whether she was assigned to the "cover dispatch specialist" position do not fairly meet the substance of UPS' fact statement and violate Local Rule 56.1(b) and (e).

**Par. 19:**  Plaintiff set forth no facts or evidence to dispute this fact statement.  Plaintiff's assertion that "at certain and various times there was not a person assigned to work a window (or "shift" or "position") does not fairly meet the substance of UPS' fact stmt.  Plaintiff refers the Court to her deposition testimony about that the James Street Feeder Dept. had one less specialist working in the period right after Nicole Chapell had her automobile accident in October 2007.  (Daniels Dep., pp. 376-77)  None of this testimony Plaintiff cites controverts the fact that there was only one person assigned to work as the dispatcher on a particular shift/window (e.g., day/twilight/night shift or window) in the James Street Feeder Dept.

**Par. 20:**  Plaintiff does not set forth any facts or evidence to dispute this paragraph.  Instead, she admits that, during various periods of time, there was a cover dispatch person who filled in for absences/vacations on the dispatch windows in the Feeder Dept.  The rest of Plaintiff's response does not make sense.  It appears that Plaintiff is merely stating that the cover dispatch person is assigned to work a specific shift on a given day in order to "cover" for the person who is absent or on vacation.  The deposition testimony Plaintiff cites does not controvert this fact statement.

**Par. 21:**  Plaintiff has set forth no facts or competent, admissible evidence to dispute this paragraph.  Plaintiff's assertion that the evidence cited by Defendant does not demonstrate "that alleged" is clearly incorrect.  The declarations cited by UPS set forth the information set forth in

this paragraph.  UPS cited competent, admissible evidence from the declarations of Feeder managers Joe Dooley and Allen Kirby and the Feeder Division managers who made the decisions about which employees to assign to the different dispatch shifts (also known as "windows").  Contrary to Plaintiff's assertions, these declarations do support the fact statement, have foundation and do not call for speculation.  Plaintiff merely argues about whether the night window was "busy."  This does not fairly meet the substance of UPS' fact statement.  Plaintiff's remaining objections to these declarations are completely without merit.

Plaintiff mischaracterizes this fact statement and then goes about trying to dispute it. There is no evidence to dispute the fact that Feeder management assigned (and still does assign) specialists to work the day/night shifts on a regular basis at James Street "because management believes those shifts are not as busy and do not involve as much responsibility/difficulty as the twilight dispatch shift/window."  Plaintiff's assertion near the end of her response that this fact statement is "irrelevant and immaterial" is significant.  If this paragraph were truly irrelevant/ immaterial, Plaintiff cannot avoid summary judgment by disputing it.

The competent, admissible evidence shows that these Feeder managers and Feeder division managers believed that the day and night dispatch windows (shifts) involved less responsibility/difficulty than the twilight dispatch shift.  This explains why the only two people assigned to perform the twilight dispatch as their regular job between 2004 and 2009 were Jim Yankovich and Dennis Smith (both full time supervisors not specialists like Plaintiff).  This is clearly relevant/material to Plaintiff's claim that she was discriminated against with respect to her compensation and "replaced" as the cover dispatch person because of her sex/age.  Plaintiff

was paid less than Mr. Yankovich and Mr. Smith in part[3] because both of them worked the more difficult twilight dispatch window for many years.  (Dooley Decl., ¶ 52; Liberti Decl., ¶ 73)  Plaintiff admitted in her deposition that she never worked as the twilight dispatcher and was not able to perform that job.  (Daniels Dep., pp. 62, 356)

This fact is also relevant to Mr. Dooley and Mr. Christie's decision to assign Jason Isabell to work as the "cover" dispatch person in July 2008.  As set forth in the declarations of Joe Dooley, Ernie Christie and Jason Isabell (and Plaintiff's deposition), unlike Plaintiff, Mr. Isabell already knew how to perform the duties of all three dispatch windows – day, night and twilight.  Accordingly, he could "cover" absences and vacations on all three dispatch windows, including the more complicated/difficult twilight window.  (Dooley Decl., ¶ 37; Christie Decl., ¶ 25; Isabell Decl., ¶ 29)  In fact, he had filled in for Mr. Smith during 2007 when there was no one else to cover the twilight dispatch position.  (Isabell Decl., ¶ 20; Kirby Decl., ¶ 38)

**Par. 22:**  Plaintiff has set forth no facts or competent, admissible evidence to dispute this fact statement.  Plaintiff's assertion that the evidence cited by Defendant does not demonstrate "that alleged" does not make sense.  UPS has submitted Declarations from the Feeder managers Dooley and Kirby and Feeder Division managers Guy Albertson, Jeff Czernicki and Ernie Christie who decided which employees to assign to the Feeder dispatch shifts/windows.  Contrary to Plaintiff's frivolous objections, these declarations support the fact statement, do not "lack foundation" or call for speculation.  Plaintiff's remaining objections to the declarations cited by UPS similarly lack merit.

---

[3]   As Mr. Liberti and Mr. Christie state in their Declarations, Mr. Smith and Mr. Yankovich were paid more than Plaintiff for several reasons, including their work history at UPS, their skills/experience and the fact that they were supervisors.  (Liberti Decl., ¶ 73; Christie Decl., ¶ 37)

Plaintiff mischaracterizes this fact statement and then attempts to dispute it.  There is no record evidence to dispute the fact that Feeder management assigned specialists to the day/night dispatch shifts because they "believe those shifts are not as busy and do not involve as much responsibility/difficulty as the twilight dispatch shift/window."  Plaintiff merely argues about whether she believes the night window was as busy/complicated as the twilight dispatch window.  However, Plaintiff's assertions about her personal views about three dispatch shifts (day/night and twilight) does not fairly meet the substance of UPS' fact statement and is irrelevant.

Plaintiff's assertion that the night dispatch duties were the same as the duties of the twilight window is not accurate and is contradicted by Plaintiff's Statement of Additional Material Facts (AMF) in which Plaintiff states that all three dispatch shifts/windows have different duties/responsibilities.  (*see also* Exhs. I, J)  In Plaintiff's Opposition, she repeatedly claims she was denied the training necessary to enable her to perform the twilight dispatch job.  Plaintiff admitted in her deposition she did not and could not perform the duties of the twilight dispatch window without assistance.  (Daniels Dep., p. 356)

Plaintiff's assertion that this fact statement is "irrelevant and immaterial" similarly does not make sense.  First, if it were truly immaterial, Plaintiff violates Local Rule 56.1(b) by stating that it is a material disputed fact in her Opposition.  Second, it is clearly relevant to Plaintiff's claims.  Feeder managers Dooley and Kirby and division managers Albertson, Christie and Czernicki all stated in their declarations that they believed the day/night dispatch windows involved less responsibility/difficulty than the twilight window.  As they explain, that is why the only two people assigned to work the twilight dispatch job on a regular and continuing basis were Jim Yankovich and Dennis Smith, both of whom were full time supervisors (not specialists like Plaintiff).  This fact is clearly relevant to Plaintiff's claim that she was discriminated against

with respect to her compensation because of her sex/age.  Plaintiff was paid less than Mr. Yankovich and Mr. Smith in part because both of them worked the more difficult twilight dispatch window for many years, both at James Street and Lenexa.  Plaintiff admitted in her deposition that she never worked as the twilight dispatcher.  (Daniels Dep., pp. 62)

This fact is also relevant to the decision by Mr. Dooley and Mr. Christie to have Mr. Isabell perform the "cover" dispatch assignment when he was promoted in July 2008.  As set forth in the declarations of Dooley, Christie and Isabell and Plaintiff's deposition testimony, Mr. Isabell (not Plaintiff) knew how to perform the duties of all three dispatch windows – day, twilight and night, and therefore, could "cover" absences and vacations on all three dispatch windows, including the more complicated/difficult twilight window.  (Dooley Decl., ¶ 37; Christie Decl., ¶ 25; Isabell Decl., ¶ 29)  He had filled in for Mr. Smith during 2007 when there was no one available to cover the twilight dispatch position during his leave of absence.  (Isabell Decl., ¶ 18; Kirby Decl., ¶ 35)

**Par. 23:**  As Plaintiff did in response to paragraphs 21 and 22 above, Plaintiff set forth no facts or competent, admissible evidence to dispute this fact statement the Feeder managers and Feeder division managers' belief that the twilight dispatcher duties are more complicated and require more skill, effort, responsibility and planning, supervision and coordination of customer pickups and other matters than the day and night dispatch assignments.  In violation of Local Rule 56.1(b), Plaintiff cites no evidence at all to support her assertion that this fact statement is "disputed."  Plaintiff's objections to the declarations submitted by UPS are without merit, and Plaintiff did not move to strike any of those declarations.

**Par. 24:**  Plaintiff has set forth no facts or evidence to dispute this paragraph.  As she did in response to pars. 21-23 above, Plaintiff does not submit any competent, admissible evidence

to dispute UPS' statement that Feeder management (*e.g.*, the Feeder managers/division managers who assigned individuals to work the dispatch windows) believed the information set forth or, in this instance, to dispute the fact that since 2004, management has only assigned full time supervisors (Jim Yankovich and Dennis Smith) to work the twilight dispatch position as their regular job assignment.  Plaintiff attempts to mislead the Court by arguing that she and other unidentified "non-supervisors" performed twilight window "duties" (emphasis added).[4]

Although there were days when Plaintiff was the "cover" dispatch person that she reported to work during the twilight shift (because she was not covering absences/vacations on the day or night dispatch shifts or a few other positions, e.g., administrative assistants and part-time yard control/rail yard supervisors), Plaintiff clearly testified in her deposition that she never worked as the twilight dispatcher and alleges in her Complaint and Opposition brief that she did not receive sufficient training to perform that job.

**Par. 25:**  Plaintiff has set forth no facts/evidence to controvert this paragraph which merely states:  "The two full time supervisors who have worked the twilight dispatch window at various times since 2004 are Dennis Smith and Jim Yankovich."  Instead, Plaintiff admits that Mr. Smith and Mr. Yankovich worked the twilight dispatch window "at various times since 2004."  Plaintiff makes the confusing and completely unresponsive assertion that "Plaintiff and other non-supervisory and supervisory employees have also worked on the 'cover' window at various times since 2004."

As set forth in response to par. 24, while Plaintiff was a dispatch specialist in the Feeder Dept., she performed the duties of the night dispatch person during various years and performed

---

[4]   Throughout Plaintiff's Opposition, she makes the misleading assertion that she performed "twilight window duties."  As set forth in UPS' reply concerning this fact par. and several others, Plaintiff testified that she never actually performed the twilight dispatch job nor was she able to do so.

certain "cover" dispatch duties during other periods of time.  As cover dispatch person, Plaintiff covered absences/vacations of the day/night dispatchers and also covered absences/vacations of the part time yard control supervisor (who worked during the hours of the twilight shift), the part time supervisor who handled UPS matters at the rail yard and certain administrative assistants. There were times when Plaintiff was assigned to be the cover person when she was not covering day/night dispatch windows and she would be told to report to work during the twilight dispatch window to assist in whatever way management believed was necessary.  Despite working during that time slot on various occasions between 2004 and 2009, Plaintiff clearly testified that she never covered absences/vacations of the twilight dispatch person or worked as the twilight dispatcher.  (Daniels Dep., p. 62)  On the contrary, Plaintiff testified that she did not receive sufficient training to perform the twilight dispatcher job duties without assistance.  (Daniels Dep., pp. 61-62)

Par. 29:  Plaintiff has set forth no facts or competent, admissible evidence to dispute this paragraph.  Plaintiff admits the facts in paragraphs 27 and 28 about the changes in Feeder management between 2004 and 2009.  Plaintiff's argument that UPS' evidence "does not demonstrate that alleged" does not make sense.  UPS submitted competent, admissible evidence (declarations from the specific Feeder managers/division managers during the relevant period) stating that as Feeder management and UPS' business needs changed, there were changes in Feeder Dept. policies and procedures.  *See* UPS' record citations concerning par. 29.  Again, Plaintiff's objections to these declarations lack merit.  Plaintiff's attempt to controvert this fact statement defies common sense.  Plaintiff's references to the UPS Policy Book similarly do not make sense as Feeder managers and division managers could and did change the

policies/procedures of the Feeder department when necessary.  <mark>(Williams Suppl. Decl., ¶ __;</mark> <mark>Dooley Supp. Decl., ¶ __)</mark>

**Par. 30:**  Although Plaintiff initially states this fact is "disputed in part and as complete," she then admits that the Management Assessment and Promotion Process (MAPP) was "required to be utilized in 2005."  Plaintiff's argument that the MAPP process was not utilized at UPS in 2005 is directly contradicted by the clear record evidence (Liberti Decl., ¶ 30; Liberti Dep., p. 228; Grover Decl., ¶ 2; Daniels Dep., pp. 216-217; Williams Decl., ¶ 32; Exhs. Q, R, S, T; Exhs. W, Y, U and V)  Plaintiff's assertion that the MAPP promotion process was not used "consistently" does not fairly meet the substance of this fact which merely states that UPS began using the MAPP process in 2005.  Contrary to Plaintiff's assertion, UPS did not admit that the MAPP "was not utilized."[5]

**Par. 31:**  Plaintiff admitted in response to UPS' fact statement 30 that the MAPP promotion process was "required" to be utilized at UPS in 2005.  Plaintiff has set forth no facts or evidence to dispute the clear record evidence which shows that the MAPP has several components or that it took some time for UPS to fully implement the MAPP process in the Kansas District.  (*see, e.g.*, Def's Exhs. Q-T; Liberti Decl., ¶ 38; Grover Decl., ¶ 2)  Plaintiff's rambling argument about whether the MAPP was applied or utilized in a consistent manner does not fairly meet the substance of this fact stmt and Plaintiff's assertions regarding the declarations UPS submitted in support of this fact paragraph are completely without merit.  Former Kansas District Human Resources managers Jim Grover and Gary Liberti offer competent, admissible evidence in their declarations to support this fact stmt.

---

[5]   Plaintiff's responses to UPS' Fact pars. 34-42, 44, 45 and 47-53 are irrelevant if the Court finds that Plaintiff's promotion claims are barred by her failure to file a timely charge of discrimination as required by Title VII, the ADEA, the KAAD and the KADEA.

**Par. 34:**  Although Plaintiff initially states that this fact is "Disputed in part and as incomplete," she then admits that she "does not dispute that alleged is set forth in and required by the MAPP."  Like paragraphs 32 and 33 above, par. 34 merely provides an overview of one step or aspect of the general MAPP process set forth in Exhs. Q and T; it does not discuss Plaintiff's applications for promotion or whether there were times when individual management/Human Resources employees failed to follow certain written MAPP procedures.  In response to par. 30 above, Plaintiff acknowledges that UPS began using the MAPP promotion process in 2005.  Plaintiff's assertion that UPS did not comply with/follow the MAPP with employees who applied for promotions as a general matter is not supported by the record evidence.  Contrary to Plaintiff's improper and unresponsive argument, UPS has not made an "express admission" that it did not generally comply with or follow the MAPP process.

**Par. 36:**  Plaintiff has set forth no facts/evidence to dispute this paragraph.  As she did in response to par. 34 above, Plaintiff states that this fact is "disputed in part and as incomplete" but then admits the substance of it.  As in pars. 31-35 above, this paragraph briefly sets forth one aspect or step in the written MAPP procedures.  These steps are set forth in the MAPP Manual and related documents, and the declarations of UPS' Kansas District Human Resources Managers in 2005 and 2006, Mr. Grover and Mr. Liberti.  (Liberti Decl., ¶¶ 30-36; Grover Decl., ¶¶ 2-7; Exh. S, p. 2 and Exh. T, pp. 5, 36, 180)  In response to par. 30 above, Plaintiff admitted the MAPP process was "required to be utilized in 2005".  Plaintiff admits that the information in this fact stmt is set forth in the written MAPP procedures.  Plaintiff's argument that UPS "expressly admitted" that it did not comply with or follow MAPP procedures generally is not supported by the record evidence and does not fairly meet the substance of this fact stmt.

**Par. 37:**  Plaintiff has not set forth any facts/evidence to dispute this fact statement.  Like pars. 32-36 above, it merely describes an aspect of the written MAPP procedures set forth in UPS' Exhibit T and the declarations of Gary Liberti and former Kansas District Employee Relations Manager Brad Williams (Liberti Decl., ¶ 34; Grover Decl., ¶ 5; Williams Decl., ¶ 37; Exh. T, pp. 40, 180)  Plaintiff admits that this requirement is "set forth in and required by the MAPP. "  As set forth above, Plaintiff admitted the MAPP process was "required to be utilized [at UPS] in 2005."  Plaintiff's argument that UPS "expressly admitted" that it did not comply with or follow the MAPP procedures generally is not supported by record evidence and does not fairly meet the substance of this fact paragraph.

After disputing in part then admitting this fact stmt, Plaintiff argues it is irrelevant/ immaterial.  If that were true, any dispute regarding such facts would not preclude summary judgment.  Finally, although Plaintiff objects to UPS' inclusion of a footnote, she has set forth no facts/evidence to dispute the information contained therein.

**Pars. 38, 39 and 40:**  Plaintiff has not set forth any facts/evidence to dispute the facts set forth by UPS.  Like several of UPS' fact pars. above, these fact statements merely describes one aspect or step of the general written MAPP procedures set forth in Exhs. Q-T and the Declarations of Gary Liberti/Jim Grover and former Kansas District Employee Relations Manager Brad Williams (Liberti Decl., ¶ 35-37; Grover Decl., ¶ 6-7; Williams Decl., ¶ 38-40; Exh. Q; Exh. R, p. 1; Exh. S, pp. 2-3; Exh. T, pp. 6, 19)  In response to these pars., Plaintiff admits that the particular steps/aspects/requirements are "set forth in and required by the MAPP."  In response to par. 30 above, Plaintiff admitted the MAPP process was "required to be utilized [at UPS] in 2005."  Plaintiff's argument that UPS "expressly admitted" that it did not comply with or follow MAPP procedures generally with regard to employee applications for

promotions is not supported by record evidence and does not fairly meet the substance of this these fact statements.

After disputing in part then admitting these fact statements, Plaintiff argues they are irrelevant and immaterial.  If that were actually the case, a dispute regarding any of them would not preclude summary judgment, and Plaintiff has failed to comply with Local Rule 56.1(b) by advising the Court that they are disputed material facts.  Finally, though Plaintiff objects to the footnote in UPS' fact stmt 38, she does not set forth any facts/evidence to dispute the information contained therein.

**Par. 41:**  Plaintiff does not seriously dispute and has not set forth any facts/evidence to controvert this statement which merely describes one of the MAPP requirements set forth in Exhibit T and the Declarations of Gary Liberti, Jim Grover and Brad Williams, all former Kansas District Human Resources managers.  (Liberti Decl., ¶46; Williams Decl., ¶ 45; Grover Decl., ¶ 8; Exh. T, pp. 5, 35-37, 180, 182, 184)  Plaintiff admits that this requirement for promotion is "set forth in and required by the MAPP. "  In response to par. 30 above, Plaintiff admitted the MAPP process was "required to be utilized [at UPS] in 2005."  Plaintiff's argument that UPS "expressly admitted" that it did not comply with or follow MAPP procedures generally and her argument about other issues is not supported by the record evidence and, more importantly, does not fairly meet the substance of this fact statement.  Unlike Plaintiff's response, this fact statement does not discuss or set forth any facts concerning Plaintiff's applications for promotion.

After disputing in part then admitting the fact set forth, Plaintiff argues that it is irrelevant/immaterial.  If that were the case, a dispute regarding it would not preclude summary judgment and Plaintiff has failed to comply with Local Rule 56.1(b).

**Par. 42:**  Plaintiff's response to this fact paragraph is a striking example of her failure to comply with FRCP 56 and Local Rule 56.1(b) and (e).  Plaintiff first states that it is "disputed in part and as incomplete" then admits that she "does not dispute what is set forth in and required by the MAPP".  This fact paragraph merely states that "[g]ood interpersonal skills and leadership skills are among the requirements for promotion to full-time supervisor at UPS," as clearly set forth in the MAPP criteria.  (*See* Exhs. F, T)

Plaintiff purports to dispute this fact despite admitting in her deposition that good interpersonal skills were an important factor in getting promoted to a full-time supervisor position.  (Daniels Dep., p. 224)  Plaintiff's improper argument in response to this paragraph contradicts her sworn deposition testimony and other record evidence and defies common sense.  Plaintiff further argues this fact is irrelevant/immaterial.  If that were true, a dispute regarding it would not preclude summary judgment and Plaintiff has failed to comply with Local Rule 56.1(b) by asserting that it is a material disputed fact.

**Par. 44:**  Plaintiff has set forth no facts or competent, admissible evidence to dispute this paragraph.  Plaintiff admits several portions of this fact statement but purports to dispute the portion which states:  "the Human Resources Department has no record of receiving [plaintiff's two promotion assessments in 2005]" and, as a result, Plaintiff was disqualified from the MAPP process.  There is no evidence in the record to show that UPS' Human Resources Dept. has a record of receiving Plaintiff's promotion assessments which her former feeder manager, Mic Haynes, claims to have completed and given to HR.  Although Mr. Haynes testified that he delivered the second assessment form he completed concerning Plaintiff to former Kansas District HR manager Jim Grover, Mr. Grover states in his declaration he has no memory of

receiving it.[6]   (Grover Decl., ¶ 10)  Plaintiff has set forth no facts to show that UPS' Human

Resources' Dept. has a record of receiving Plaintiff's completed MAPP assessment form in

2005.

More importantly, Plaintiff admits she was not given the computerized test or the panel

interview, and has come forward with no facts/evidence to demonstrate that she was not

disqualified from the promotion process.  Instead, Plaintiff makes unfounded objections to the

declarations of Jim Grover and Gary Liberti which clearly set forth competent, admissible

evidence.  Finally, although Plaintiff objects to UPS' footnote, she does not set forth any

facts/evidence to dispute the information contained therein.[7]

**Par. 45:**  Plaintiff's response to this fact statement clearly demonstrates the improper and

non-compliant nature of many of her responses to UPS' fact statements.  Both Plaintiff and

Mr. Haynes testified in their depositions that they prepared Plaintiff's 2005 Career Development

Planning Guide ("CDPG") and that Mr. Haynes put the quoted language set forth in this fact

paragraph in that document.  (Daniels Dep., pp. 296-297; Haynes Dep., pp. 28)  Plaintiff's 2005

CDPG clearly shows that the text quoted in this fact statement.  Rather than simply admitting the

truth of the matter asserted, Plaintiff sets forth nearly an entire page of irrelevant assertions, none

of which addresses the facts set forth by UPS.  For example, Plaintiff claims that she "disputes

that what Defendant cites indicates Plaintiff had any serious issues with coworkers . . .,"

however, UPS merely quoted the text from the CDPG.  Plaintiff's assertions about what she and

Mr. Haynes believed are irrelevant and non-responsive.

---

[6]   Mr. Grover did not know Plaintiff.  (*Id.* at 10)

[7]   The improper/nonsensical nature of Plaintiff's response is further demonstrated by the fact
     that Plaintiff objects to UPS's statement concerning Mr. Haynes' deposition testimony, but
     then admits that Mr. Haynes gave that testimony and provides the page number from the
     deposition transcript.

Half way through her rambling response, Plaintiff admits that the text cited by UPS indicates that Plaintiff's preference at the time of the CDPG in 2005 was not to relocate or travel. Plaintiff asserts that this was merely her preference based on her personal situation and that she would "reconsider this is (sic) her needs changed and if presented with a promotion opportunity." Thus, Plaintiff clearly admits that she did not tell UPS that she was willing to relocate/travel, two requisites for promotion to full time supervisor.

Plaintiff's irrelevant assertions about whether she had problems in her relationships with co-workers is contradicted by her deposition testimony, information in several declarations submitted by UPS (*see, e.g.*, Exh. BE, Declaration of Lora Miller, ¶ 4; Affidavit of Deborah Ammons, ¶ 3; Dooley Decl., ¶ 42; Isabell Decl., ¶ 34; Williams Decl., ¶ 47; Liberti Decl., ¶ 48; Kirby Decl., ¶ 43) Ms. Ammons worked the day dispatch window from 1999 through the time Plaintiff retired in 2009. As she stated in her Affidavit, Ms. Ammons believed Plaintiff often did not treat her well, and did not have a good working relationship with several employees. Plaintiff's attempt to controvert this fact statement clearly violates FRCP 56 and Local Rule 56.1.

**Par. 47:** Plaintiff has set forth no facts/evidence to dispute this paragraph. Instead, Plaintiff argues that Mr. Dooley's statements about whether he filled out Plaintiff's 2006 promotion assessment and why he did not fill it out are unsubstantiated are deficient for a number of reasons, none of which have any merit. Mr. Dooley is clearly competent to testify about these matters and did so in his deposition. (*See* Dooley 2/18/10 Dep., pp. 44-46) Plaintiff's assertions about her performance reviews from earlier years and her claim that her previous manager Mic Haynes thought she should be promoted are irrelevant and do not fairly meet the substance of this fact stmt. Plaintiff's claim that she "disputes that alleged in ¶ 47

because it is inconsistent with and contradicted by the record evidence showing, as Defendant

openly admits in ¶ 47, Mr. Dooley did not fill out the assessment or recommend Plaintiff for

promotion at the relevant time . . .", is incredibly confusing but appears to admit part of this fact

stmt.  Plaintiff has no evidence to controvert Mr. Dooley's testimony and the statements in his

declaration concerning his belief that Plaintiff had difficulty interacting/working well with her

co-workers.  Mr. Dooley's belief is supported by sworn statements of several other UPS

employees who worked directly with Plaintiff, including Deborah Ammons and Lora Miller, and

Human Resources managers Liberti and Williams who were aware of Plaintiff's

conflicts/problems interacting well with her co-workers.  (*See* Declarations and Ammons

Affidavit cited in UPS' reply to fact stmt 46 above; *see also* Daniels Dep., pp. 251-53)

   **Par. 48:**  Plaintiff has set forth no facts/evidence to controvert this fact statement and

demonstrate that Joe Dooley, her manager when she applied for promotion to full-time

supervisor in 2006, believed that Plaintiff was qualified for such a promotion.  In fact, in her

confusing response, Plaintiff admits that Mr. Dooley was her manager at the time she applied for

promotion in 2006 and did not recommend that she be promoted (*see* Pl's Opp., p. 21).  Plaintiff

has no evidence to contradict Mr. Dooley's statements in his Declaration that if he had filled out

Plaintiff's MAPP promotion assessment form in 2006, he would have given her a "1" (the lowest

rating) on the dimensions listed in this fact stmt.  Mr. Dooley stated in his Declaration and

deposition testimony that he believed Plaintiff had difficulty interacting with many of her co-

workers, including other dispatch specialists, supervisors, managers, drivers and mechanics.

(Dooley Decl., ¶¶ 42, 44; Dooley 2/18/10 Dep., p. 187)

   Plaintiff's assertion that she believes she got along well with her coworkers does not

fairly meet the substance of this fact which merely sets forth Mr. Dooley's belief about

Plaintiff's abilities in the areas listed.  Plaintiff's irrelevant assertions that she got along well with coworkers are directly contradicted by statements of numerous coworkers (*see* declarations and D. Ammons Affidavit cited in reply to fact stmt ___ above) and Plaintiff's deposition testimony that she had personality conflicts and other difficulties with co-workers, including but not limited to, dispatch specialists Nicole Chapell and Deborah Ammons.  (Daniels Dep., pp. 251-53)

Plaintiff's assertions about her 2005 manager, Mic Haynes, are irrelevant and non-responsive.  Joe Dooley was Plaintiff's Feeder manager when Plaintiff submitted her letter of interest for promotion in 2006.  (Dooley Decl., ¶¶  1, 42; Exh. O, Haynes EHP; Haynes Dep., pp. 201-202, 244)  Mr. Haynes had no involvement with Plaintiff's 2006 application for promotion/assessment form. (Haynes Dep., pp. 201-202, 243-244)

Plaintiff cannot rely on K. Carpenter's Declaration to controvert this fact statement because, as set forth above and in UPS' Motion to Strike, Ms. Carpenter did not work in the Feeder Dept. at James Street between 2004 and 2009, and has no personal knowledge about Plaintiff's 2006 application for promotion, Plaintiff's daily interaction with co-workers in the Feeder Dept. or Mr. Dooley's assessment of Plaintiff's skills.  (See Carpenter Decl., ¶ 2; Exhs. BB, BC, Carpenter EHP/GEMS; Williams Suppl. Decl., ¶¶ 30, 52)

**Par. 49**:  Although Plaintiff asserts that this paragraph is "disputed in part and incomplete," she admits the fact set forth, *i.e.*, that she did not speak with Mr. Dooley (or anyone else from UPS) about why he did not fill out her promotion assessment form in 2006.  Plaintiff's assertion that she was not obligated to initiate such discussions is irrelevant and does not fairly meet the substance of this fact stmt.  Plaintiff's representation that this fact is disputed in part is improper and fails to comply with FRCP 56 and Local Rule 56.1.

**Par. 50:**  Although Plaintiff asserts that this fact statement is "disputed in part and as incomplete," she then admits it in its entirety.  Plaintiff testified in her deposition that she did not submit a letter of interest or apply for a promotion after 2006.  (Daniels Dep., pp. 270-271)  Plaintiff's response does not address this fact or the fact that, in her Career Development Planning Guide prepared in 2007, Plaintiff clearly indicated she did <u>not</u> want to advance to the next level of management.  (Pl's Exh. 8, p. 3)  Because she cannot dispute this fact, Plaintiff instead offers non-responsive and irrelevant/immaterial argument about whether she should have applied for a promotion after 2006.  Plaintiff's improper response contradicts her deposition testimony and fails to comply with FRCP 56(c)/Local Rule 56.1(b).

**Pars. 51 and 52:**  Plaintiff has set forth no facts or evidence to dispute these fact statements.  The undisputed record evidence shows that there were male employees and employees under age forty who applied for promotion to full time supervisor in Kansas in 2005/2006 who were <u>not</u> promoted, including Jason Isabell (male employee under age 40).  (Exh. G; Williams Decl., ¶ 50, 51; Liberti Decl., ¶ 51, 52; Grover Decl., ¶ 13, 14)

Like Plaintiff, Mr. Isabell did not successfully complete the MAPP process and, therefore, was not eligible for promotion to full-time supervisor in **2006/2007**.  Plaintiff's response does not address this undisputed evidence.  Instead, Plaintiff incorrectly argues that the declarations submitted by UPS are deficient and/or contain inadmissible evidence.  However, former Kansas District HR managers Gary Liberti and Jim Grover and former Kansas Employee Relations Manager Brad Williams are competent to testify regarding the matters in their declarations.  Contrary to Plaintiff's contention, they are not required to submit documentation in support of their testimony.  Nonetheless, UPS submitted documents showing that Mr. Isabell applied for promotion to full-time supervisor in 2006/2007, did not successfully complete the

MAPP process, and was not promoted.  (Exh. G; *see also* Isabell Decl., ¶ 33)  Mr. Isabell is competent to testify that he applied for such a promotion but did not receive it.

Instead of setting forth competent, admissible evidence to dispute these facts statements, Plaintiff submitted unsupported and inadmissible argument, opinion and conjecture which do not fairly meet the substance of UPS' fact stmt.  For example, Plaintiff's argument about whether she "completed" the MAPP process or UPS stopped processing her application when Mr. Dooley did not complete the assessment form/recommend Plaintiff for promotion does not address the matters asserted by UPS.  Plaintiff set forth no facts/record evidence which controvert these fact statements and demonstrate:  (1) that Plaintiff successfully completed the MAPP process, (2) the reason UPS did not continue processing her application or (3) that Mr. Dooley did not fill out Plaintiff's promotion assessment form in 2006 because of her age/sex and/or that UPS failed to promote her due to those factors.

Plaintiff's assertion that the fact that "male employees applied for promotion to full time supervisor in 2005/2006 but were not promoted because they did not successfully complete the MAPP process, including employees whose managers [like Plaintiff's manager] did not complete the employees' written assessments" is "irrelevant and immaterial" defies common sense.  Similarly, Plaintiff's claim near the end of her response to par. 51 that it is "irrelevant and immaterial, with respect to Plaintiff's treatment and claims, that other employees – male or female – may or may not have had their promotion applications processed properly" is clearly erroneous.  This undisputed fact supports UPS' position that Plaintiff's sex played no role in the processing of her promotion application.

Plaintiff's assertion in response to fact stmt 52 that it is "irrelevant and immaterial, with respect to Plaintiff's treatment and claims, that other employees under the age of 40 may or may

not have had their promotion applications processed properly" (Pl's Opp. p. 22), similarly defies logic and undermines Plaintiff's claim that UPS failed to properly process/consider her application for promotion because of her age.

The facts set forth in pars. 51 and 52 are relevant/material because Plaintiff claims that UPS failed to properly process her applications for promotion in 2005/2006 due to her age and gender. These facts and supporting record citations demonstrate that UPS' handling of Plaintiff's applications for promotion was not based on her age/gender because male employees and employees under age forty experienced the same type of treatment as Plaintiff. This information supports UPS' stated reasons for not promoting Plaintiff in 2005/2006.

In any event, given Plaintiff's claim that fact statements 51 and 52 are "irrelevant and immaterial," a dispute as to either one cannot defeat summary judgment, and Plaintiff has failed to comply with FRCP 56 and Local Rule 56.1 by representing that these are material disputed facts.[8]

**Par. 53:**  Plaintiff asserts that this fact statement is "disputed in part and objected to" but then admits the facts set forth. Plaintiff's irrelevant, non-responsive arguments and conjecture do not fairly meet the substance of this fact stmt. In addition, Plaintiff's confusing assertions appear to support UPS' position that Plaintiff cannot show that UPS failed to promote her due to her age/sex. Even at summary judgment, Plaintiff does not identify a single full-time supervisor position which she claims was filled by a male employee or an employee under age forty in either 2005 or 2006. Plaintiff next makes unfounded claims that the declarations submitted by UPS are deficient and lack foundation. As set forth above, UPS' former District Human Resources managers (Jim Grover/Gary Liberti/Brad Williams) are certainly competent to testify

---

[8]  Ironically, because Plaintiff's promotion claims are time-barred, her unsupported arguments are completely irrelevant.

to the information in their declarations.  Plaintiff's assertion that UPS does not specifically state that female employees over age 40 were promoted is confusing, but such information is set forth in the Declarations of Gary Liberti, and Brad Williams.  (Liberti Decl., ¶¶ 52-54; Williams Decl. ¶ 52)   In addition, UPS submitted documentation showing that employees over age 40 and female employees were promoted to full time supervisor positions during 2005 and 2006.[9]

In any event, given Plaintiff's claim that this fact stmt is "irrelevant and immaterial," any purported dispute does not preclude summary judgment and Plaintiff improperly represented that it is a material fact which is disputed in part.

**Par. 58:**  Plaintiff states that this paragraph is "Disputed in part and as incomplete, and Objected to," but admits, as she did in her deposition, that the male individuals listed held full-time supervisor jobs at UPS "at some time during 2006 and 2009."  (*see* Daniels Dep., pp. 636-39)  Plaintiff has not set forth any facts or evidence to dispute that these individuals held that position for several years.  Indeed, the declarations submitted by UPS and the Employee History Profiles (EHPs) of these individuals show that they were held the position of full-time supervisor at UPS for many years and worked in that position both in UPS' James Street Feeder Dept. and in UPS' much larger/more complex Lenexa, KS Feeder Dept. during various years.  (Yankovich Decl., ¶ 38; Dooley Decl., ¶ 52; Liberti Decl., ¶ 73; Exh. AF, p. 1; Exh. AG, p. 1; Exh. AH, p. 1; Exh. AI, p. 1; Exh. AJ, p. 1)

---

[9]   Due to a clerical error, UPS' fact stmt 53 erroneously states that employees over/under age 40 were promoted to full time supervisor "including employees whose managers did not complete written assessments."  The quoted text was inadvertently re-copied from fact stmt 52 and the error was not discovered by defense counsel until they began drafting UPS' reply. None of the declarations cited in support of this fact stmt contain this assertion (Exhs. D, E and P), and there is no record evidence to support it.  Near the end of her response to this par., Plaintiff argues that it is irrelevant/immaterial.  UPS apologizes for this error and has filed simultaneously herewith a motion for leave to correct by interlineation.

Plaintiff has not set forth any facts or evidence to show that she was employed as a full time supervisor at UPS because there is none.  Plaintiff was employed as a dispatch "specialist" (not a supervisor) from 1999 through 2009.  (*See* Exh. A, p. 1 and Daniels Dep., pp. 20-23, 30) In fact, Plaintiff alleges in her Complaint that UPS failed to promote her to full time supervisor.

Instead of fairly meeting the substance of UPS' fact stmt, Plaintiff argues that even though she was not a full-time supervisor, she was "performing and responsible for the duties of a full-time feeder supervisor."  This allegation is not supported by competent, admissible evidence.  Plaintiff admitted in her deposition that she does not have personal knowledge of all duties performed by the male full-time feeder "on road" supervisors listed in this par. (Steve Stuke, Nick Sloan and Wetschensky) or the full-time feeder supervisors listed who worked the more difficult/complicated twilight dispatch window (Jim Yankovich and Dennis Smith).  **(***See* Daniels Dep., pp. 61-62, 67-68, 356)  Plaintiff not only testified that she does not have knowledge of all of the duties performed by Mr. Yankovich/Mr. Smith (who worked the twilight dispatch), but also testified in her deposition that she was not able to perform the twilight dispatch duties without assistance.  (*Id.* at 61-62, 67-68, 356)  Plaintiff was never an "on road" supervisor and did not have the same qualifications/training as those supervisors (Stuke, Wetschensky and Sloan).  (Dooley Decl., ¶¶ 52-53; Yankovich Decl., ¶ 38; *Liberti Decl., ¶¶ 74*)

Plaintiff's objections to the declarations submitted by UPS are without merit.  In addition, Mic Haynes was not Plaintiff's manager and did not supervise Plaintiff after March 2006. (Haynes Dep., p. 52; Exh. O, p. 1)  He did not work at UPS' James Street facility between March 2006 and *late 2007/early 2008*, and retired from UPS in April 2008.  (Exh. O, p. 1; Haynes Dep., pp. 52, 199)  As a result, Mr. Haynes has no personal knowledge about Plaintiff's

job duties/responsibilities (or those of the male employees listed) during most of the relevant time period. [10] (Haynes Dep., pp. 52, 199)

Finally, Plaintiff again relies on inadmissible speculation and conjecture from Kathleen Carpenter. As set forth above and in UPS' Motion to Strike, Ms. Carpenter did not work at the James Street facility or in any Feeder department at UPS between March 2007 and 2009. (Exh. __, Carpenter GEMS, p. 1) Accordingly, she has no personal knowledge regarding the positions held/duties performed by Plaintiff or the James Street full-time Feeder supervisors listed. *See* FRCP 56(c)(4);[11] UPS' Motion to Strike Portions of Carpenter Declaration incorporated herein by reference.

**Par. 59:** Although Plaintiff states that this fact statement is "Disputed in part and as incomplete," Plaintiff admits (as she did in her deposition) that Mr. Wetschensky, Mr. Stuke and Mr. Sloan worked as feeder "on road" supervisors. (*See* Daniels Dep., pp. 215-217; see also Exhs. AG-AI) Plaintiff does not dispute that these supervisors performed the duties listed or were required to have DOT cards and commercial drivers' licenses. Instead, Plaintiff argues that she and other unidentified dispatch specialists "trained, supervised and evaluated drivers," and therefore performed some of the duties performed by full-time on-road supervisors. This assertion is not supported by competent, admissible evidence and is contradicted by the Declarations submitted by UPS which state that Plaintiff did not perform nor was she responsible

---

[10] Mr. Haynes was demoted from manager to supervisor level in 2007 while he was working as a package center manager. When he returned to the James Street Feeder Dept. in late 2007/early 2008, he was an "on road" supervisor who supervised drivers. He had no involvement regarding Plaintiff's employment after March 2006. (*See* Haynes Dep., pp. 52, 192-193, 199)

[11] As FRCP 56(c)(4) clearly states, "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

for training, supervising and evaluating drivers.  (See, e.g., Dooley Decl., ¶ 6; Kirby Decl., ¶ 6; Christie Decl., ¶ 4; Liberti Decl., ¶ 6; Yankovich Decl., ¶ 4)

Moreover, Plaintiff's assertions do not fairly meet the substance of portions of this fact statement, are not supported by competent, admissible evidence and do not comply with Local Rule 56.1.  It is undisputed that Plaintiff did <u>not</u> have a commercial drivers license or a DOT card (Daniels Dep., p. 290) nor was Plaintiff required to have such qualifications for her specialist job.  (Dooley Decl., ¶ 53)  Plaintiff again relies on the Kathleen Carpenter's Declaration.  As set forth in UPS' Motion to Strike Portions of Carpenter Declaration, incorporated herein by reference, Ms. Carpenter does not possess personal knowledge of the matters asserted. Her unsubstantiated speculation and conjecture do not constitute competent, admissible evidence.  *See* Motion to Strike Portions of K. Carpenter Declaration.

**Par. 60:**  Although Plaintiff claims this paragraph is "Disputed in part and as incomplete, and Objected to," she has not set forth facts or record citations to dispute it.  Instead, contrary to FRCP 56(c) and Local Rule 56.1(b), Plaintiff turns around and admits that she does <u>not</u> dispute the facts set forth by UPS.

Rather than addressing the fact set forth by UPS, Plaintiff attempts to confuse and mislead the Court by arguing that she was performing twilight "duties".  Plaintiff's assertion that "[t]he record evidence demonstrates and shows Plaintiff had trained on, performed, and was responsible at various time for twilight dispatch or shift duties . . . " is false and intentionally misstates the record evidence.

Plaintiff's improper and misleading argument that she was "responsible at various times" for "twilight dispatch or shift duties" directly contradicts Plaintiff's deposition testimony and allegations in her Complaint that she was not given sufficient training on the twilight dispatcher

duties, she did not know all the duties/responsibilities of the twilight dispatch and was not able to

perform that job without assistance: [12]

> "Q:     Well, when you first started working as cover dispatcher, which shifts did you cover?
>
> A:      The day window and the night window as needed.   I started training on the Kansas City twilight window. . . .   I was a week into the training and Mic . . . told me that I could not train any longer on that window. . . .  So I never was allowed the opportunity to learn that window."

(Daniels Dep., pp. 61-62)

* * *

> Q:      And you had already been working as a night dispatcher. So when you say . . . you already knew a lot of these different things, 'cause you had been a dispatcher for a –
>
> A:      Right.
>
> Q:      -- few years?
>
> A:      Right.
>
> Q:      . . . . How long did you think you would need training on the twilight dispatch to be able to do that job since you had been a dispatcher for, I guess, four or five years?
>
> A:      . . . . I probably would have needed another solid week, possibly two.

(Daniels Dep., pp. 67-68)

* * *

---

[12]  Plaintiff attempts to mislead the Court by citing to portions of her deposition where she testified that there were days when she had the cover dispatch assignment, but there were no absences/vacations to cover on the day/night dispatch shifts or the other positions she covered such as administrative assistants and the part-time yard control/rail yard positions. On some of those days when she had no absences/vacations to cover, she came to work during the twilight window.  (Daniels Dep., pp. 61-62, 67-68, 356; *see also* Yankovich Decl., ¶ 36).

> Q:      . . . .  In July of 2008, did you think that you were capable
>         of performing the twilight dispatch job at James Street by
>         yourself with no assistance?
>
> A:      No."

(Daniels Dep., p. 356)

* * *

> Q:      . . . . And what training do you think Guy Albertson denied
>         you?  Is it the same training on the twilight dispatch?
>
> A:      Yes, ma'am.

*See also* Compl., ¶ 37

Plaintiff repeatedly testified in her deposition that she was not knowledgeable about various aspects of the twilight dispatch job duties:

> Q:      Are there things about the twilight dispatch that you're not
>         knowledgeable about at James Street?
>
> A:      Well, again, all of the CPU accounts because I never had
>         more than just a brief week of training.
>
> Q:      Are those are customer pickups?
>
> A:      Yes, ma'am.

* * *

> Q:      So was handling these customer pickups a pretty big part of
>         the twilight dispatcher job at James Street?
>
> A:      Yes.

(Daniels Dep., pp. 131-32)

* * *

> Q:      Do you have personal knowledge about all of the job
>         duties, you know, all the trailers, all the volume, all the
>         reports on the twilight dispatch window at James Street
>         between 2007 and 2009?
>
> A:      I couldn't possibly have all the knowledge.

(Daniels Dep., p. 168)

* * *

Q:     Do you know all the – the duties and tasks that the twilight
        dispatcher would do during his shift?

A:     I couldn't possibly know all that he is required to do.

* * *

Q:     . . . . Well, is there anything else that you're aware of that
        the twilight dispatcher would do during his shift?

A:     I just said I didn't – I couldn't speak to that, no.

(Daniels Dep., p. 189)

Q:     . . . . I mean, between, say, 2006 and 2009, do you know of
        any other forms that the twilight dispatcher would use?

[objection]

Q:     Other than what you already said?

[objection]

A:     But it is speculation.  I wasn't there.

Q:     Well, then you need to say you don't know if I –

A:     I don't know.

(Daniels Dep., pp. 193-94)

* * *

Q:     Now, on the twilight dispatch, what reports did the twilight
        dispatcher have to fill out on a daily basis?

[objection]

A:     I, again, would have to speculate and you've asked me not
        to do that –

Q:     Right.

A:     -- so I am not aware of what forms, if any, the twilight
        supervisor was responsible for.

Q:      And you said forms, and I don't know if you're using that
        the same.  Do you mean reports?  'Cause I asked about
        reports.  Do you know of any reports that the twilight
        dispatcher had to fill out and submit?

A:      No.

(Daniels Dep., pp. 198-99)(Emphasis added)

Despite her present assertions to the contrary, Plaintiff also repeatedly testified in her

deposition that she was never able to perform the twilight dispatch duties on her own (Daniels

Dep., pp. 62, 130-31, 168, 189, 198-99, 356), and never performed the twilight dispatch job

either as her regular job assignment or when she worked as the "cover" dispatch person in the

James Street Feeder Dept.

Q:      My question, though, was, while you were cover
        dispatcher, did you ever actually cover the twilight dispatch
        in terms of doing that job yourself?

A:      No, ma'am.

(Daniels Dep., pp. 62)

* * *

Q:      When you said you were cover dispatcher at James Street,
        that you did not actually cover the twilight dispatch
        window, who covered it while you were the cover
        dispatcher if the twilight person was not there?

A:      Well, as I stated, I started a week's training on that . . . "

Q:      Right, but my question –

A:      So it would –

Q:      was who actually was covering it while you were cover –
        while you were working as a cover dispatcher?

A:      I believe Nick Sloan was in our department at that time and
        I believe he covered that window.

(Daniels Dep., pp. 80-81)

* * *

> Q:      . . . . Who else would cover the twilight if that dispatcher was not there while you were assigned as a cover dispatcher?
>
> A:      I think Joe Dooley.  I – I know Joe Dooley covered it a couple of times.
>
> Q:      Anybody else?
>
> A:      Anyone else that would have covered that position at that –
>
> Q:      Right, while you were a cover dispatcher.
>
> A:      Not that I recall.

(Daniels Dep., pp. 81-82)

As set forth above, on pp. 67-68 of Plaintiff's deposition, she admitted she was not able to perform the twilight dispatch job.  Plaintiff's response to UPS' fact stmt 86 below also directly contradicts her claim in this response that she performed the twilight dispatch duties.

Plaintiff's effort to mislead and confuse the Court with respect to these issues is further demonstrated by the fact Plaintiff's EEOC Charges and Questionnaire specifically allege that Plaintiff did <u>not</u> receive sufficient training on the twilight dispatcher duties and Plaintiff was never allowed to cover the twilight dispatch job.  (Exh. AV, pp. 2-3; Pltf. Exh. 27)  Plaintiff cannot avoid summary judgment by making unsubstantiated assertions which directly contradict her Complaint, deposition testimony and other competent, admissible evidence in the record.

Plaintiff's response also violates Local Rule 56.1(e) because it does not fairly meet the substance of the matters asserted.  (*See also*, Exhs. AZ, AZ-1, *Jones/Clark* Order, and *Howard v. Columbia Public School Dist., et al.,* 363, F.3d 797 (8th Cir. 2004).  Finally, Plaintiff's objections to the declarations submitted by UPS are without merit.

**Par. 62:**  Plaintiff has set forth no facts or evidence to dispute this paragraph.  For the reasons set forth in its reply to par. 60 above, Plaintiff's response is improper and does not controvert the facts set forth by UPS.  Instead, as Plaintiff did in response to par. 60, Plaintiff directly contradicts her statement in her deposition, Complaint, EEOC Charges and EEOC Questionnaire that she did not receive the training necessary to do the twilight dispatcher job, and never performed that job either as her regular assignment or when she was the cover dispatch person.  *See* record citations in support of para. 62 in UPS' Fact Stmt and UPS' reply concerning para. 60 above.  Plaintiff's response to UPS' fact stmt 86 below also directly contradicts her claim in this response that she performed the twilight dispatch duties.

**Par. 63:**  Plaintiff's response to this paragraph is particularly confounding and improper because Plaintiff contradicts herself within the response by first arguing that she "performed, and was responsible at various times for twilight dispatch . . .  duties" while at the same time asserting that she was not able to perform the twilight dispatch job because she was denied the necessary training:  "Plaintiff was capable of performing the duties of the twilight window on her own if provided with proper training . . .which she was denied."  (Pl's Opp. at 25)  This admission that she could not perform the twilight dispatch job on her own contradicts Plaintiff's response to UPS' fact par. 60 above and the third sentence of her response to this fact stmt.  Plaintiff's unsubstantiated assertions regarding Jason Isabell are irrelevant and do not fairly meet the substance of this fact paragraph.  For all of these reasons, Plaintiff's response does not comply with FRCP 56 or Local Rule 56.1.  (Fed.R.Civ.P. 56(c); Local Rule 56.1(b); Exhs. AZ, AZ-1)

**Par. 64:**  Although Plaintiff claims this fact statement is "Disputed in part and as incomplete," Plaintiff set forth no facts or evidence to dispute it.  Plaintiff admits (consistent

with her deposition testimony) that she worked as the cover dispatch person in 2005.  (Daniels Dep., p. 22)  Plaintiff's claim that she was not "assigned" to work in that capacity and, instead, was offered, accepted and held that position is merely a semantics argument, not a genuine issue of disputed fact.  Plaintiff's assertion that she held the "cover position" for five years does not fairly meet the substance of this fact stmt.  As set forth in UPS' reply to pars. 60 and 62 above, Plaintiff's assertion that she covered the "twilight windows or shifts" is false and contradicts her sworn deposition testimony and other record evidence as well as Plaintiff's allegations in her Complaint and EEOC Charges that she was denied the training necessary for her to cover or perform the twilight dispatch duties.  (See response to par. 60 above and record citations therein; Daniels Dep., pp. 61-62; Compl., ¶ 37; *see also* Exh. AV, pp. 2-3; Pl's Exh. 27, p. 3)

After Plaintiff's confusing assertion that she was not "assigned" to work as the cover dispatch person, Plaintiff admits that when she went from working the night dispatch to working the cover dispatch assignment in 2004/2005, it merely (1) involved a change in her "work schedule/shift," and (2) did <u>not</u> change her job classification/grade or compensation.

**Par. 65:**  Plaintiff admits that she held the cover dispatch assignment.  She admitted in her deposition that, in that assignment, she covered absences/vacations of the day/night dispatchers.  (Daniels Dep., pp. 22, 61; *see also* Dooley Decl., ¶ 31 n.1)  However, as she did in response to pars. 60 and 62 above, Plaintiff attempts to mislead the Court and mischaracterizes the record evidence about whether she performed the twilight dispatcher job or covered absences/vacations on that shift.  As demonstrated in response to par. 60 above, Plaintiff admitted in her deposition that she never performed the twilight dispatcher job or covered absences/vacations of the twilight dispatcher.  (*See* citations to plaintiff's set forth in reply to

pars. 60 and 62 above)  Also, as set forth above, Plaintiff claims in this lawsuit that she was not allowed to cover/perform/learn the twilight dispatch job.

Despite Plaintiff's repeated admission that she never performed the twilight dispatch job either as her regular job or while she had the cover dispatch assignment, Plaintiff attempts to confuse and mislead the Court by claiming that she performed "twilight duties" in her cover position.  As Plaintiff states in her response to this fact stmt, she sometimes performed twilight yard control duties if she covered absences/vacations of Jason Isabell (while he was the yard control person) or if she was told to come to work during the twilight shift because she was not covering absences/vacations on the day/night dispatch shifts or other clerical or entry-level management positions such as administrative assistants or part-time rail yard person.  (Dooley Supp. Decl., ¶ 18)  Accordingly, although Plaintiff was physically present at James Street during the twilight dispatch shift on such occasions, she never covered or performed the twilight dispatch job.  (Dooley Supp. Decl., ¶ 21; Kirby Decl., ¶ 26)  *See* also UPS' record cites in its original Fact Stmt and its reply to pars. 60 and 65)  As set forth above, Plaintiff cannot avoid summary judgment by contradicting her deposition testimony and allegations in her Complaint.

**Par. 66:**  Although Plaintiff first represents that this fact statement is "Disputed in part and as incomplete, and Objected to", Plaintiff then admits that former Feeder Division Manager Guy Albertson decided that absences/vacations of the twilight dispatcher (full-time supervisors Jim Yankovich and Dennis Smith, alternately) could only be covered by a full-time supervisor. (Daniels Dep., pp. 61-62, 80, 84-85, 210)  Plaintiff admitted in her deposition that Mr. Albertson made this decision and that her one week of training on the twilight dispatch job duties occurred in 2004 or 2005.  (*See* Daniels Dep., pp. 61-62)

Plaintiff's assertion that, when Mr. Albertson made this decision, all of the full-time supervisors were male is irrelevant and does not fairly meet the substance of this fact stmt. There is absolutely no evidence that Mr. Albertson made this decision based on Plaintiff's gender.  In fact, the undisputed record evidence demonstrates that Mr. Albertson made this decision because he wanted to avoid serious service failures to customers, not based on the gender of any employee.  (Albertson Decl., ¶ 18)

The full-time feeder supervisors at James Street in 2004/2005 -- Steve Stuke (1993) and Nick Sloan (2000) -- had been promoted to full time supervisor several years earlier.  (*See* Exh. AH, p. 1; Exh. AI, p. 1)  There is absolutely no evidence concerning the identities/gender of the qualified applicants/candidates at the time Mr. Stuke and Mr. Sloan were promoted to full-time supervisor positions.  Plaintiff's claim that par. 66 is "an express admission by Defendant it would only allow males to perform this work or cover the twilight window" makes no sense and does not fairly meet the substance of par. 66.

Similarly, Plaintiff's assertion that the record evidence shows Plaintiff had trained on, performed and was responsible at various times for twilight dispatch or shift duties at the James Street facility does not relate to fact statement 66.  As set forth above, this intentionally confusing and misleading statement contradicts Plaintiff's deposition testimony and other record evidence as well as Plaintiff's Complaint.  (*See* citations to par. 66 in UPS' Fact Stmt and record citations set forth by UPS in its reply to pars. 60, 62 and 65 above)  This assertion is also directly contradicted by Plaintiff's response to UPS' fact stmt 86.

**Par. 67:**  Plaintiff has set forth no facts or competent, admissible evidence to dispute this fact statement.  Plaintiff admits that Mr. Albertson made the decision.  Plaintiff's claim that Mr. Albertson's Declaration is deficient and consists of "unsubstantiated allegations" is without

merit and defies logic.  Plaintiff has not (and cannot) set forth any competent, admissible evidence to dispute Mr. Albertson's explanation in his declaration about why he made the decision in 2004 or 2005 to allow only a full-time supervisor to cover absences/vacations of the twilight dispatcher.  As with Plaintiff's response to par. 66, her assertion that she "trained on, performed, and was responsible at various times for twilight dispatch or shift duties" is contrary to the record evidence, including Plaintiff's deposition testimony and her Complaint, and does not fairly meet the substance of this fact statement.  *See* UPS' reply to pars. 60, 62 and 65 above and record citations therein.  For all of these reasons, Plaintiff's response does not comply with FRCP 56(c) or Local Rule 56.1(b) and (e).

**Par. 68:**  Plaintiff has set forth no facts or competent, admissible evidence to dispute this fact statement.  The undisputed record evidence shows that Plaintiff worked the night dispatch hours/window before Natalie McGaugh transferred to the Feeder Dept. and began working the night dispatch hours when Ms. McGaugh was discharged in 2006.  (*See* UPS' record citations in support of fact par. 68)  Plaintiff's assertions about whether she was the "cover" person at the time she began working the night shift following Ms. McGaugh's termination do not fairly meet the substance of this fact statement or controvert it.

**Par. 69:**  Plaintiff has set forth no facts/competent admissible evidence to dispute this fact statement.  It is undisputed that Plaintiff began working the night dispatch hours/shift when Natalie McGaugh was discharged in 2006.  (*See* Plaintiff's response to UPS' fact stmt 68)

**Par. 70:**  Plaintiff has not set forth any facts/competent, admissible evidence to dispute this fact statement.  Plaintiff admits that when Nicole Chapell transferred to the Feeder Dept. and began working the night dispatch shift in late 2006 or early 2007, Plaintiff went back to working the cover dispatch assignment.  However, Plaintiff did not cover absences/vacations on the

twilight dispatch job during this or any other period that she worked the cover dispatch assignment.  (*See* UPS' reply to fact stmts 60, 62, 65 and 66 above and record citations therein)

**Par. 71:**  Plaintiff has set forth no facts to dispute this paragraph.  Plaintiff's testified in her deposition that when Nicole Chapell was injured in a car accident in October 2007, Plaintiff starting working the night dispatch hours/shift again.  (*See* UPS' record citations for this fact stmt)  Plaintiff's assertion that she was only working the night shift hours to "cover" for Ms. Chapell does not fairly meet the substance of this fact statement or controvert this fact stmt.

**Par. 72:**  Although Plaintiff states that this paragraph is "Disputed in part and as incomplete," Plaintiff has set forth no facts to dispute it.  On the contrary, Plaintiff testified in her deposition that Ms. Chapell never returned to work after her car accident, and Plaintiff worked the night dispatch shift from October 2007 until she retired in August 2009.  (*See* UPS' record citations in support of this fact stmt)  Plaintiff's assertion that she merely "covered" the night dispatch window until July 2008 and then Plaintiff was assigned to the night window does not controvert this fact stmt nor does it fairly meet the substance of the matter asserted.

Regardless of how Plaintiff characterizes her dispatch assignment ("cover" versus "night"), it is undisputed that Plaintiff worked the night dispatch schedule/hours from October 2007 (when Ms. Chapell was injured) until Plaintiff retired in August 2009.  Plaintiff's normal work hours (Approximately Sun. 5:30 p.m.–Mon. 2:45 a.m. and Mon-Thurs 10:00 p.m. - 6:00 a.m.) did not change during that period).  (Exh. AO)

**Par. 73:**  Plaintiff claims this fact statement is "Disputed in part and as incomplete," but she has set forth no facts or competent, admissible evidence to dispute that she was working the night dispatch shift hours in late 2007/early 2008.  Plaintiff admits (as she testified in her deposition) that the James Street Feeder Dept. was "short-handed" during late 2007/early 2008.

It is undisputed that there was one less dispatch specialist working while Ms. Chapell was on leave of absence, that full time feeder supervisors had to cover absences/vacations on the dispatch windows, and that this situation made it more difficult for the feeder manager to run the James Street Feeder Department.  Plaintiff's assertion that she was acting as the cover dispatcher is irrelevant and does not controvert or fairly meet the substance of this fact stmt.

**Par. 74:**  Although Plaintiff claims this fact statement is "Disputed in part and as incomplete," Plaintiff has set forth no facts or evidence to dispute it.  Plaintiff admits that Jason Isabell covered the twilight dispatch duties while the twilight dispatcher Dennis Smith was on leave of absence in 2007 because management had no one else who could do it.  Plaintiff's assertion that Mr. Isabell received training and supervision during this time is not supported by competent, admissible record evidence and does not fairly meet the substance of this paragraph. During that time period (mid 2007), Plaintiff covered vacations/absences on the day/night dispatch windows, the part-time yard control and rail yard positions, and administrative assistants.  (*see* Daniels Dep., p. 413; Dooley Decl., ¶ 40; Kirby Decl., ¶ 26)  Though she occasionally reported to work during the twilight shift when she was not covering an absence/vacation, Plaintiff admitted in her deposition that (1) she did not work with Mr. Isabell on a regular basis during the period he covered the twilight dispatch in 2007 when Mr. Smith was on leave, and (2) she does not have personal knowledge of all the duties Mr. Isabell performed and the exact nature/frequency of the assistance/supervision she claims he received. (*See* Daniels Dep., pp. 95-99; *see also* Dooley Suppl. Decl., ¶ 22)

Moreover, as Mr. Isabell and Feeder management state in their declarations, Mr. Isabell already knew how to perform the twilight dispatch job duties when he covered that shift in 2007 when Mr. Smith was on leave because Mr. Isabell had worked closely with the twilight

dispatcher for several years in the course of performing his yard control job, and he had taken the initiative to learn the dispatcher job duties without any formal training (*see* record citations in support of par. 75 of UPS' Fact Stmt)  (Dooley 2/18/10 Depo., pp. 176-77)

Plaintiff's claim that this fact stmt is inconsistent with UPS' assertion that back in 2004/2005, Feeder Division Manager Guy Albertson had decided that only a full-time supervisor could cover absences/vacations on the twilight dispatch window/shift is irrelevant, not supported by the record evidence and does not meet the substance of the matter asserted.  As Plaintiff admits in response to fact par. 76, Mr. Albertson was <u>not</u> the Feeder Division Manager in 2007 when Mr. Isabell covered the twilight dispatch during Mr. Smith's leave of absence.  At that time, Jeff Czernicki was the Feeder Division Manager and Allen Kirby was the James Street Feeder Manager.[13]

As Mr. Czernicki and other members of Feeder management state in their declarations, UPS' policies/procedures changed over time and Mr. Czernicki/Mr. Kirby believed they did not have anyone who could cover Mr. Smith's twilight dispatch job during his leave of absence. (Czernicki Decl., ¶ 27; Kirby Decl., ¶ 35; Isabell Decl., ¶ 22)  Plaintiff has not set forth any facts supported by competent, admissible evidence to show that these new managers (Czernicki and Kirby) did not believe the matters set forth in this paragraph.  Plaintiff's argument about whether her job assignment was labeled "cover" or "night" dispatch when Ms. Chapell off work due to the car accident and Plaintiff worked the night dispatch hours is irrelevant, does not controvert this fact statement and does not fairly meet the substance of it.

**Par. 75:**  Plaintiff has set forth no facts or competent, admissible evidence to dispute this fact statement.  Plaintiff admits in her response (and testified in her deposition) that Jason Isabell

---

[13]   Neither of them was in Feeder management in 2004/2005 when Mr. Albertson made that decision.

worked as the <u>yard control</u> supervisor on the twilight shift from 2003 through 2007 before he covered the twilight dispatch duties during Mr. Smith's leave of absence.  Plaintiff also admits, as she did in her deposition, that as yard control person, Mr. Isabell worked closely with the twilight dispatchers (Mr. Yankovich and Mr. Smith).  Plaintiff sets no facts to dispute that Mr. Isabell's statements in his declaration (and the other declarations cited by UPS) that, while working closely in the dispatch office with the twilight dispatchers for several years, Mr. Isabell took the initiative (unlike Plaintiff) to assist those dispatchers and learn to perform the twilight dispatch duties.  Plaintiff's assertion that Mr. Isabell received training, close supervision and assistance is not supported by competent, admissible evidence (*see, e.g.*, UPS' reply to Par. 74 above concerning Plaintiff's lack of personal knowledge about Mr. Isabell's activities during the twilight dispatch window during as she was not there on a regular basis).  Moreover, it is contradicted by competent, admissible evidence in the declarations submitted by UPS and the deposition testimony of Plaintiff and Joe Dooley.  (*See* Daniels Dep., pp. 100, 102-03, 157-158 and UPS' other record citations in support of this fact stmt)

Plaintiff's assertion that she performed various "twilight duties" including covering Mr. Isabell's yard control duties (during twilight shift) while he was absent/on vacation does not controvert this fact paragraph.  Similarly, Plaintiff's assertions about whether she received the same training, supervision and assistance as Mr. Isabell are not supported by competent, admissible evidence.  (*See* Daniels Dep., pp. 100, 102-03, 157-58)  Moreover, Plaintiff's improper argument about those matters and whether she was working as a cover dispatcher at various times are non- responsive and do not fairly meet the substance of this paragraph.  Finally, Plaintiff does not dispute the information set forth in footnote 10.

**Par. 77:**  Plaintiff has not set forth competent, admissible evidence to dispute this paragraph.  As set forth in paragraph 75 above and as demonstrated by Plaintiff's deposition testimony when read in context, Plaintiff's conclusory allegation that Mr. Isabell received "formal" and extensive training regarding the twilight dispatch duties is not supported by competent, admissible evidence.  (Daniels Dep., pp. 100, 102-03, 157-58) Plaintiff has not set forth specific facts based on personal knowledge to controvert the statements by Mr. Isabell, Mr. Yankovich, Mr. Kirby and Mr. Dooley that Mr. Isabell learned the twilight dispatch job duties by working closely with the twilight dispatcher in the course of performing his own yard control job (during the twilight shift) and assisting/observing the twilight dispatchers.  (*See* UPS' record citations in support of fact par. 77)  Plaintiff has little personal knowledge regarding the specific training/assistance Mr. Isabell allegedly received concerning the twilight dispatch duties. (Daniels Dep., p. 160)

In fact, Plaintiff testified that Mr. Isabell worked closely with and assisted the twilight dispatchers in the course of performing his yard control job.  (Daniels Dep., pp. 100, 102-03, 158)  While Mr. Isabell took the initiative to learn the twilight dispatch duties while performing his yard control job duties (between 2003 and 2006), Plaintiff was working the night or the cover dispatch assignment (mainly during the day/night dispatch shifts) in which she did not perform or cover the twilight dispatch duties.  (Dooley Decl., ¶ 23-31; Isabell Decl., ¶ 17, 19-20; Dooley Suppl. Decl., ¶ 19-20)  Plaintiff's unsupported speculation and conjecture do not constitute competent, admissible evidence.

**Par. 78:**  Plaintiff improperly claims that this fact paragraph is "Disputed in part and as incomplete," then states that she does <u>not</u> dispute it.  Plaintiff testified in her deposition that she did not complain about this situation.  (Daniels Dep., p. 494)  Plaintiff then goes on to argue that

this fact statement is "irrelevant and immaterial."  If that were true, a dispute concerning this fact would not preclude summary judgment and Plaintiff has not complied with Local Rule 56.1(b) because it is not a material fact.

However, if Plaintiff believed that she was being treated unfairly/discriminated against as she now claims, she could have made a complaint to management/Human Resources.  It is undisputed that she complained to Human Resources in 2006 when Mr. Dooley left a note at her house because he needed her to work and could not reach her by telephone.  (Daniels Dep., pp. 267-69)  Between 2005 and 2007, Plaintiff complained to District Human Resources Manager Gary Liberti about Natalie McGaugh and Nicole Chapell allegedly engaging in improper behavior.  (Liberti Decl., ¶ 48)

**Par. 79:**  Although Plaintiff claims that this fact paragraph is "Disputed," she has set forth no facts supported by competent, admissible evidence to controvert it.  Instead, Plaintiff makes a conclusory statement about what she believes the record evidence shows concerning whether she was the cover dispatch person when Joe Dooley returned to the James Street Feeder manager job in March 2008.  Plaintiff does not set forth any evidence to show that she was not working the night dispatch hours at that time or that Mr. Dooley did not believe the night window was her assigned shift.  Plaintiff refers the Court to an Aug. 2006 email and a Dec. 2007 email string between Plaintiff and Allen Kirby, both of which are irrelevant to show what Mr. Dooley believed Plaintiff's assigned shift was in March 2008.  In addition, Mr. Kirby's Dec. 29, 2007 email to Plaintiff (Pl's Exh. 25), refers to Plaintiff as the "night dispatcher" in response to her request for comp/discretionary days off (which supports UPS' fact stmt).

**Par. 80:**  As with par. 79, Plaintiff has not set forth any facts or evidence to dispute this paragraph.  Although Plaintiff claims that it is "Disputed in part and because incomplete,"

Plaintiff admits that while Ms. Chapell was on leave between March and July 2008, Mr. Dooley had to use full time supervisors to cover absences/vacations on all three dispatch windows/shifts. Plaintiff unsubstantiated assertions about what Mr. Dooley believed are not sufficient to properly controvert this paragraph.  Similarly, Mr. Dooley's deposition testimony and the Aug. 2006 email which Plaintiff references do not specifically controvert the facts set forth by UPS.

**Par. 81:**  Plaintiff has set forth no facts to dispute this paragraph, and instead, argues that the declarations submitted by UPS do not support it.  Plaintiff's conclusory, unsubstantiated assertions are contradicted by the statements in those declarations.  Former District Human Resources Manager Gary Liberti and Feeder Division Manager Ernie Christie are competent to testify concerning this fact statement.  In addition, Plaintiff has set forth nothing to controvert Exh. AX, p. 1.  Following Ms. Chapell's car accident occurred in October 2007, she was off work for several months.  (Exh. AX, p. 1)  However, UPS did not become aware until mid 2008 that that Ms. Chapell would not be returning to work due to the her injuries/medical condition. (*See* UPS' record citations in support of this fact stmt)

**Par. 82:**  After stating that it is "Disputed in part and incomplete," Plaintiff admits this fact statement in its entirety.  Plaintiff then sets forth conclusory, unsupported arguments which do not controvert this fact stmt, are irrelevant and do not fairly meet the substance of the matter asserted.

Plaintiff's assertion that Gary Liberti and Jamie Diaz were responsible for making the decision to promote Jason Isabell to dispatch specialist is not supported by competent, admissible evidence and contradicts the clear record evidence.  Though Mr. Liberti and former James Street Hub Manager Jamie Diaz encouraged Cindy Holt to interview for the feeder dispatch specialist position Mr. Isabell was promoted to in July 2008 (a transfer for Ms. Holt who was already a

"specialist" in a package center), there is no evidence that they had any involvement in the decision to promote Mr. Isabell that position. [14]

**Par. 83:**  Although Plaintiff claims that fact par. 83 is "Disputed in part and as incomplete," Plaintiff admits that she does not dispute the facts set forth.  Plaintiff's assertions about whether she was the "night dispatcher" constitute improper argument, do not controvert this fact stmt and do not relate to the matters asserted.  Plaintiff's claim that "that alleged by Defendant is "directly contradicted by and inconsistent with the record evidence" is incorrect, violates Local Rule 56.1 and ironic given that Plaintiff admits she does not dispute the information set forth in this fact statement.  Plaintiff's response to par. 83 merely argues about irrelevant/non-responsive matters.

**Par. 84:**  Although Plaintiff states that fact paragraph 84 is "Disputed in part and as incomplete," she has set forth no facts/evidence to dispute it.  Plaintiff admits that when Mr. Isabell was promoted to dispatch specialist in July 2008, he was assigned to work as the cover dispatcher.  Plaintiff has not (because she cannot) set forth any facts to controvert the remainder of par. 84 which states:  "[Mr. Isabell] was assigned to work as the cover dispatcher because he already knew how to cover the twilight dispatch shift and Mr. Dooley and Mr. Christie believed he was able to cover all dispatch windows."  Plaintiff's allegation that she was more qualified than Mr. Isabell to perform the "cover" dispatch assignment is irrelevant, non-responsive, and contradicted by the competent, admissible evidence, including Plaintiff's deposition testimony.  As set forth in response to paragraphs 60, 62, 65, 74 and 75 above,

---

[14]   Mr. Liberti and Mr. Diaz encouraged Ms. Holt to interview for this position in the Feeders Dept. because they knew UPS was trying to eliminate specialist positions in the package centers and her position might be eliminated.  (Liberti Decl., ¶ 21)  However, neither Mr. Liberti nor Mr. Diaz participated in the decision to promote Mr. Isabell.  (*See* Liberti Decl., ¶ 22; Christie Decl., ¶ 23).

Plaintiff testified in her deposition that:  (1) Mr. Isabell knew how to perform the more difficult/complicated twilight dispatch job duties; (2) Mr. Isabell covered the twilight dispatch for an extended period of time in 2007 when Mr. Smith was on leave; (3) Plaintiff was not able to perform the twilight dispatch job by herself in July 2008; and (4) Plaintiff had never performed the twilight dispatch job or covered absences of that dispatcher.  (Daniels Dep., p. 356)  Nor can Plaintiff controvert the statements in Mr. Dooley and Mr. Christie's declarations that they did not believe Plaintiff was able to cover the twilight dispatch job if that person was not at work.  (Dooley Decl., ¶ 38; Christie Decl., ¶ 26)

        As UPS stated in its reply to pars. 60, 62 and 65 above, Plaintiff's assertion in response to summary judgment that "she knew how to and had covered all the windows," directly contradicts her deposition testimony, Complaint, EEOC charges and interrogatory answers (see UPS' citations to the record evidence set forth therein).  Plaintiff has not (because she cannot) set forth any facts/evidence to dispute Mr. Dooley and Mr. Christie's statements in their declarations that they believed Mr. Isabell was able to cover all three dispatch windows when they promoted him in July 2008.  The competent, admissible evidence supports this fact par. regarding their beliefs about Mr. Isabell and their decision to assign him to work the cover dispatch in July 2008.

        Plaintiff's assertion that her former manager Mic Haynes believed Plaintiff was "best qualified to hold the cover position" is irrelevant, does not controvert this fact stmt nor does it fairly meet the substance of this par.  Mr. Haynes left the James Street Feeder manager job in March 2006.  He did not supervise Plaintiff or Mr. Isabell after that time and retired from UPS in February, 2008, approximately four months <u>before</u> Mr. Isabell was promoted/assigned to work the cover dispatch duties.  (Haynes Dep., pp. 170, 200-01)  Plaintiff's response to par. 84 is a striking example of Plaintiff's failure to comply with Local Rule 56.1(b) by representing that a

fact is "disputed" when it is not and there is no competent, admissible record evidence to dispute the matter set forth.

**Par. 85:**  In a similar manner to her response to par. 84, Plaintiff states that this fact statement is "Disputed and objected to," but sets forth no facts (let alone facts supported by competent, admissible evidence) to dispute it.  However, unlike par. 84, Plaintiff does not come forward and admit the fact statement, despite the fact that she cannot truthfully controvert it. This fact par. states:  "Mr. Dooley and Mr. Christie believed that it made better business sense to keep plaintiff on the night dispatch because she knew that window and they did not believe she was capable of covering absences and vacations on the twilight dispatch window."

Plaintiff's assertion that she was more qualified to perform the cover dispatch assignment or that she had allegedly performed that assignment for five years, is irrelevant, non-responsive, not supported by competent, admissible evidence and is contradicted by the record evidence, including Plaintiff's deposition testimony.  As set forth in response to pars. 60, 62, 65, 74 and 75 above, Plaintiff testified in her deposition that:  (1) Mr. Isabell knew how to perform the more difficult/complicated twilight dispatch job duties; (2) Mr. Isabell covered the twilight dispatch when Mr. Smith was on leave; (3) Plaintiff was not able to perform the twilight dispatch job by herself in July 2008; and (4) Plaintiff never performed the twilight dispatch job or covered vacations/absences of that dispatcher.  (S*ee also* Daniels Dep., p. 356)  Nor can Plaintiff controvert the statements in Mr. Dooley and Mr. Christie's Declarations that they did not believe Plaintiff was able to cover absences/vacations of the twilight dispatch person.  (Dooley Decl., ¶ 38; Christie Decl., ¶ 85)

As set forth in its reply to pars. 60, 62 and 65 above, Plaintiff's misrepresentation that "she knew how to and had covered all the windows," is directly contradicted by Plaintiff's

deposition testimony and other record evidence as well as allegations in Plaintiff's Complaint and EEOC charges.  Plaintiff does not (because she cannot) set forth any facts/evidence to dispute that Mr. Dooley and Mr. Christie believed Mr. Isabell was able to cover all three dispatch windows.  The record evidence directly supports UPS' assertion regarding their beliefs about Mr. Isabell's ability to cover all three dispatch windows and their reason for decided to have him work the "cover" dispatch assignment.  Plaintiff's unfounded objections to Mr. Dooley/ Mr. Christie's Declarations are completely without merit.

Moreover, Plaintiff's assertion that former manager Mic Haynes believed Plaintiff was "best qualified to hold the cover position" is irrelevant, non-responsive and does not fairly meet the substance of this fact statement.  Mr. Haynes left the James Street Feeder manager job in March 2006.  He did not supervise Plaintiff/Mr. Isabell after that time and retired from UPS in April, 2008, three months before Mr. Isabell was promoted and assigned to work at the cover dispatch person.  (*See* record citations in UPS' reply to par. 84 above.)  Like Plaintiff's response to par. 84, her response to par. 85 is a striking example of Plaintiff's failure to comply with Local Rule 56.1.  Plaintiff merely argues about irrelevant matters and alleges "facts" which are not supported by competent, admissible evidence.

**Par. 86:**  Plaintiff purports to dispute this fact statement which accurately summarizes Plaintiff's sworn deposition testimony.   Plaintiff clearly testified that, despite receiving training on the twilight window, she could not perform the twilight dispatch duties without assistance in July 2008:

> "Q:    Well, when you first started working as cover dispatcher,
>          which shifts did you cover?
>
>                                        * * *
>
> A:     The day window and the night window as needed.  I started
>          training on the Kansas City twilight window. . . .  I was a

> week into the training and Mic . . . told me that I could not
> train any longer on that window. . . .  So I never was
> allowed the opportunity to learn that window."

(Daniels Dep., pp. 61-62)

* * *

Q:      And you had already been working as a night dispatcher.
        So when you say . . . you already knew a lot of these
        different things, 'cause you had been a dispatcher for a –

A:      Right.

Q:      -- few years?

A:      Right.

Q:      . . . . How long did you think you would need training on
        the twilight dispatch to be able to do that job since you had
        been a dispatcher for, I guess, four or five years?

A:      . . . . I probably would have needed another solid week,
        possibly two.

(Daniels Dep., pp. 66-67)

* * *

Q:      . . . .  In July of 2008, did you think that you were capable
        of performing the twilight dispatch job at James Street by
        yourself with no assistance?

A:      No."

(Daniels Dep., p. 356)

Plaintiff's assertion that "that alleged by Defendant is contradicted by and inconsistent

with the record evidence" is false.  After representing that the facts in this par. are controverted,

Plaintiff admits that, despite receiving training on the twilight window, she could not perform all

of the twilight dispatch duties on her own and needed additional training in order to do so.  In

this bizarre response, Plaintiff references her own deposition testimony and confirms the fact set

forth by UPS.

As set forth in reply to pars. 60, 62 and 65 above, Plaintiff's assertion that she was performing "some twilight duties" is intentionally vague and misleading. As her deposition testimony and the declarations show, Plaintiff never performed or "covered the twilight dispatch job. (*See* UPS' reply to pars. 60, 62 and 65 above and record citations therein)

Plaintiff's claim in this response that, despite receiving training on the twilight dispatch, she was not able to perform all of the "twilight duties" on her own, directly contradicts Plaintiff's representation that this paragraph is disputed. It also contradicts Plaintiff's misleading assertions in response to pars. 60, 62, and 65 above that she performed the twilight dispatcher job. Plaintiff's admissions in this response, clearly demonstrate that Plaintiff has failed to comply with FRCP 56 and Local Rule 56.1 in this response to UPS' fact par. and many others. Finally, Plaintiff's speculation and conjecture about Mr. Isabell's alleged training is irrelevant, contradicted by the competent, admissible record evidence and does not fairly meet the substance of this fact stmt.

**Par. 87:** Again, although Plaintiff asserts that this fact statement is "Disputed in part and as incomplete," Plaintiff admits the facts set forth by UPS (which are supported by competent, admissible evidence). Moreover, Plaintiff's assertions about that Mr. Isabell did not do "this all on his own . . ." are contradicted by the competent, admissible record evidence, are non-responsive and fail to fairly meet the substance of this fact stmt. Plaintiff worked the night dispatch hours both before and after Mr. Isabell was promoted and assigned to work as the cover person in July 2008. (Daniels Dep., 344-45, 374-75) Accordingly, Plaintiff does not have personal knowledge about whether Mr. Isabell received "back-up, support or reinforcement from supervisors" when he covered absences/vacations on the dispatch windows after he was

promoted in July 2008.  Plaintiff's unsubstantiated speculation and conjecture do not properly controvert this fact stmt under FRCP 56(c) or Local Rule 56.1(b).

**Par. 88:**  Although Plaintiff asserts that this fact statement is "Disputed in part and as incomplete," Plaintiff has set forth no facts/evidence to show that she ever told Mr. Dooley or Mr. Christie that she was able to cover absences/vacations on the twilight dispatch window or that she wanted to cover them.

Because Plaintiff has no facts/evidence to controvert this paragraph, Plaintiff instead sets forth non-responsive argument and allegations which are:  (1) in some instances, contradicted by Plaintiff deposition testimony; (2) contradicted by the competent, admissible record evidence; (3) not supported by any citations to the record or competent, admissible evidence; or (4) completely irrelevant/immaterial.  For example, as set forth in UPS' reply to pars. 60, 62 and 65 above, Plaintiff attempts to confuse/mislead the Court by arguing that she performed various or some "twilight duties."

Indeed, as set forth in UPS' reply to pars. 60, 62, 65 and others, Plaintiff's deposition, and Plaintiff's response to par. 86, Plaintiff was not able to perform the duties of the twilight dispatch position on her own and, therefore, did not "cover" absences/vacations of the twilight dispatcher.  The fact that Plaintiff sometimes came in during the twilight shift while she was the "cover" person but did not work as the twilight dispatch person or that she sometimes covered the job duties of the yard control supervisor (Mr. Isabell's job before July 2008), does not mean that she performed or covered the twilight dispatcher's job.

Plaintiff's assertion that she repeatedly told management that she wanted to remain in the "cover" position (in which she did <u>not</u> cover absences/vacations of the twilight dispatchers) is non-responsive and does not controvert this fact stmt.  Similarly, Plaintiff's allegation that she

held the cover position for five years (without covering the absences/vacations on the twilight dispatch window) does not fairly meet the substance of this fact stmt and is irrelevant.  Finally, Plaintiff's assertion that "management was fully aware that she wanted to cover the twilight shift" is contradicted by the record evidence.  In fact, Plaintiff's feeder managers between March 2006 and August 2009 (Mr. Dooley and Mr. Kirby), as well as her feeder division managers during that period, Mr. Czernicki and Mr. Christie, all state in their declarations that plaintiff never told them that she was able and willing to cover the twilight dispatch job.  (see, e.g., Dooley Decl., ¶ 39; Christie Decl., ¶ 26; Czernicki Decl., ¶¶ 31-33)

Par. 89:  Plaintiff admits that her job classification (dispatch specialist) and pay did not change when Jason Isabell was promoted to a dispatch specialist position (same level as Plaintiff) and began working the cover dispatch assignment.  Plaintiff does not address the fact that her job grade did not change.  Although Plaintiff claims that her work hours/schedule changed in July 2008, the undisputed record evidence, including Plaintiff's deposition testimony, clearly show that Plaintiff worked the night dispatch shift/hours from October 2007 (when Ms. Chapell had the car accident) until August 2009 (when Plaintiff retired).  (Daniels Dep., pp. 22-23, 29, 374-75; see also Dooley Decl., ¶ 28)

As set forth in UPS' reply to pars. 60, 62, 65 and others, Plaintiff admitted in her deposition that even when she had the "cover" dispatch assignment before July 2008, she never covered absences/vacations of the twilight dispatcher.  (*See* record citations therein)  Whereas the undisputed evidence shows that as the cover dispatch person after July 2008, Mr. Isabell covered absences/vacations on all three of the dispatch shifts at James Street.  (Dooley Decl., ¶ 37; Christie Decl., ¶ 25)

**Par. 90:**  Plaintiff's assertion that this paragraph is "Disputed in part and as incomplete" is improper and violates Local Rule 56.1 because Plaintiff actually admits the truth of this fact statement.  Plaintiff testified in her deposition that she met with Gary Liberti on July 31, 2008 and complained about Mr. Isabell working the cover dispatch assignment.  (Daniels Dep., pp. 357, 442; *see also* Liberti Decl., ¶ 25)

Plaintiff's assertion that UPS has not listed all of the other topics Plaintiff claims she and Mr. Liberti discussed during the July 31, 2008 meeting does not controvert this fact stmt.  While UPS denies that several of the issues listed in Plaintiff's response were actually discussed during the July 31, 2008 meeting, Plaintiff's allegations regarding those other topics do not fairly meet the substance of this fact stmt and are non-responsive, irrelevant and immaterial.

UPS assumes for purposes of this summary judgment motion only that, during the July 31, 2008 meeting, Plaintiff told Mr. Liberti that she thought Mr. Isabell had been given the "cover" dispatch assignment due to his age/sex.  As a result, Plaintiff's assertion that she allegedly complained about age/sex discrimination during that meeting does not create a genuine issue of material fact.  It is undisputed that Plaintiff never complained about age/sex discrimination at UPS prior to July 31, 2008.

**Par. 92:**  Plaintiff has set forth no facts to dispute this paragraph and does not seriously dispute it.  In Plaintiff's response she admits (as she did in her deposition) that she did not contact Mr. Liberti to complain about Mr. Isabell being placed in the "cover" dispatch assignment until after Mr. Isabell was promoted and began working as the cover person in July 2008.  (Daniels Dep., p. 357; *see also* Liberti Decl., ¶ 25)  Plaintiff does not controvert this fact stmt.  Instead, Plaintiff admits UPS' assertion that she told Mr. Liberti in the meeting that she believed that one reason Mr. Isabell was given the cover dispatch assignment was Plaintiff's

complaint to Human Resources in 2006 about Mr. Dooley leaving a note at her house because he needed her to work and could not contact her. For the reasons set forth in UPS' reply to par. 91, Plaintiff's allegation in this response that she complained to Mr. Liberti during the July 2008 meeting that she believed Mr. Isabell's cover dispatch assignment was due to his age/sex discrimination are irrelevant, non-responsive and do not fairly meet the substance of this fact stmt.

**Par. 93:** Plaintiff has set forth no facts/evidence to dispute this fact paragraph. On the contrary, Plaintiff admits that Mr. Liberti told Plaintiff that he would look into the concern(s) she raised during their July 31, 2008 meeting. Plaintiff sets forth no facts or competent, admissible evidence to show that Mr. Liberti did <u>not</u> speak with Mr. Dooley and Mr. Christie about their decision to have Mr. Isabell work the cover dispatch assignment when he was promoted in July 2008. Plaintiff appears to argue about whether Mr. Liberti actually "met with Mr. Liberti (sic) or Mr. Christie" but provides no record citations to support her claim. Even if she had, UPS' fact par. states that Mr. Liberti spoke with them, not that he "met" with them. In any event, Plaintiff's argument is irrelevant; non-responsive; not supported by competent, admissible evidence; and does not fairly meet the substance of this fact stmt.[15]

**Par. 94:** Plaintiff admits that she met with Gary Liberti and Brad Williams on February 26, 2009, but appears to dispute UPS' statement that the purpose of the meeting was to follow up on Plaintiff's concerns. Although, Plaintiff's response is difficult to comprehend, near the end Plaintiff specifically states that her "concerns" include "that she complained of to (sic) Mr. Liberti in July of 2008." In Plaintiff's response to UPS' fact par. 90, Plaintiff specifically

---

[15] Plaintiff's assertion that Mr. Dooley was not told by Mr. Liberti about the issues raised and complaint made by Plaintiff in July of 2008 is confusing. Mr. Dooley testified that he was told that Plaintiff complained about Mr. Isabell being assigned to work cover dispatch following his promotion in July 2008. (Dooley Decl., ¶ 47)

states that when she met with Mr. Liberti in July 2008, she complained about being replaced in the cover assignment by Mr. Isabell due to her sex/age. In Plaintiff's deposition, she testified that during the February 2009 meeting, Mr. Liberti discussed the discrimination allegations set forth in her EEOC charge/questionnaire. (Daniels Dep., pp. 431-436) Accordingly, Plaintiff appears to admit that, during the Feb. 2009 meeting with Mr. Liberti and Mr. Williams, they did discuss her alleged concern about age/sex discrimination.

Plaintiff's assertion that Mr. Liberti and Mr. Williams met with her in February 2009 to "falsely accuse her of improperly recording her time," is not supported by competent, admissible evidence from Mr. Liberti and Mr. Williams about the reasons they believed they were meeting with Plaintiff. Plaintiff's unsubstantiated conjecture about Mr. Liberti/Mr. Williams' beliefs regarding the reasons for their meeting with Plaintiff in Feb. 2009 do not controvert this fact statement or create a genuine issue of fact.[16]

**Par. 95:** Although Plaintiff purports to controvert this paragraph, Plaintiff admitted this fact statement in her deposition:

> "Q:     Did Gary ever tell you that he had talked to Joe Dooley
>          about the issues raised in the July '08 meeting?
>
> A:      Yes.

---

[16]  UPS denies that Mr. Liberti or Mr. Williams "falsely accused Plaintiff of improperly recording her time." (See Liberti Decl., ¶ 60; Williams Decl., ¶ 56) As Plaintiff testified in her deposition, during the February 2009 meeting, Mr. Liberti reminded Plaintiff about the need to accurately record her start/finish work times in the PTRS time recording system. (Daniels Dep., pp. 392-93, 433-35, 499-501; Liberti Decl., ¶ 57; Williams Decl., ¶ 53) Mr. Liberti spoke with Plaintiff about recording her time worked accurately because he believed that she failed to do so on at least one instance in January 2009 when he saw her leaving work before the scheduled finish of her shift, and a review of Plaintiff's time records during the January/February 2009 period and the video surveillance tapes at the James Street facility indicated that Plaintiff had failed to accurately record her start/finish work times on several occasions. Several of Plaintiff's time records also revealed that she was not taking/recording a meal/break each day as required. (Liberti Decl., ¶¶ 57-58; Williams Decl., ¶¶ 53-54; Exh. AO)

> Q:      Okay.  And when was that?
>
> A:      In February.
>
> Q:      Of '09?
>
> A:      Yes, ma'am."

(Daniels Dep. p. 478)  Plaintiff's response does not comply with FRCP 56 or Local Rule 56.1.

Par. 96:  Although Plaintiff purports to dispute this paragraph, Plaintiff testified in her deposition as follows:

> "Q:     . . . . Did they tell you – did Mr. Liberti say in that meeting you need to record your start and finish times correctly in PTRS?
>
> A:      I believe he did.
>
> Q:      Do you remember anything else in that conversation about, you know, how you were recording your time in PTRS?
>
> A:      No.
>
> * * *
>
> Q:      In the meeting in February 2009 with Gary Liberti and Brad Williams, do you remember anybody, . . ., saying anything else about issues relating to how you're recording your time in PTRS, . . . ?
>
> A:      I remember the conversation going something like Gary telling me I needed to document my start work, my finish work, and my meals and my breaks.  He alluded to some discrepancies . . . .
>
> * * *
>
> Q:      what did he say about discrepancies in your time records?
>
> A:      That I wasn't documenting it correctly –
>
> Q:      Did he –
>
> A:      -- in terms of meals and breaks.

> Q:    Did he say anything about whether or not you were
>       recording your start and finish times correctly?  Or did he
>       ask any questions or make any comments?
>
> A:    I don't recall.
>
> Q:    You don't remember if he did?
>
> A:    I don't remember if he did.

(Daniels Dep., pp. 393-95)

Plaintiff's assertion that Mr. Liberti "falsely" accused her of recording her work time

incorrectly is not supported by the record evidence.  First, Plaintiff testified that she does not

remember much of what Mr. Liberti said about recording her time in the PTRS system.  (Daniels

Dep., pp. 393-95, 432)  Plaintiff did not testify that Mr. Liberti accused her of falsifying her time

records.  (*See id.* at 392-95, 433-34)

Even if Mr. Liberti had accused Plaintiff of recording her time improperly (which Mr.

Liberti denies), Def's Exh. AO shows that there were discrepancies between the Plaintiff's

start/finish work times she entered into the PTRS time-recording system and the actual time she

arrived/left work on various dates as documented by UPS' security cameras.

**Par. 97:**  Plaintiff does not set forth any facts or evidence to dispute this paragraph.

Plaintiff's non-responsive argument in this response is irrelevant, not supported by competent,

admissible evidence, and does not fairly meet the substance of this fact stmt.

**Par. 98:**  Although Plaintiff purports to dispute this fact statement "in part", she admits

the facts set forth in their entirety.  Plaintiff does not (because she cannot) set forth any facts or

evidence to dispute this paragraph or the record evidence which UPS has cited.

**Par. 99:**  Although Plaintiff purports to dispute this paragraph, Plaintiff sets forth no facts

to show that any of her managers "refused to meet with her or speak to her or provide her with

information necessary to do her job."  Plaintiff has no competent, admissible evidence to dispute

that Mr. Dooley met with her in February 2009 to discuss her concerns.  Rather, the competent,

admissible evidence shows that Mr. Dooley believed the purpose of their Feb. 2009 meeting was

to discuss any concerns Plaintiff had.  (Dooley Decl., ¶ 55)

Par. 101:  Although Plaintiff claims that this paragraph is "Disputed in part and as

incomplete," Plaintiff admits the facts set forth.  Plaintiff then sets forth nearly a page of

improper argument and unfounded allegations which are irrelevant/immaterial and not supported

by competent/admissible evidence.  Plaintiff's conclusory, unsubstantiated assertions about UPS'

Code of Business Conduct and other documents which are not even mentioned in UPS' fact par.

are non-responsive and do not fairly meet the substance of or controvert this fact stmt.

Par. 102:  Although Plaintiff claims that par. 102 is "Disputed in part and as incomplete

and Objected to," Plaintiff admits this fact statement in its entirety.  After admitting that both

editions of the Code of Business Conduct produced by Plaintiff in this lawsuit contain the

language described by UPS, Plaintiff sets forth a paragraph of argument which contains no

facts/record citations to controvert this fact stmt.  Plaintiff's conclusory, unsubstantiated

allegations are irrelevant, non-responsive and do not meet the substance of this fact stmt.

Par. 104:  Although Plaintiff claims this fact par. is "Disputed in part and as incomplete,"

she admits the facts set forth by UPS.  Plaintiff then argues that the information is "irrelevant and

immaterial."  If that were true, any dispute regarding it would not defeat summary judgment.

Moreover, Plaintiff's assertions that UPS and its employees are required to comply with

the reporting/non-retaliation provisions of UPS' Code of Business Conduct and UPS'

Professional Conduct/Anti-Harassment policy, supports UPS' position that the Code does not

create a contract.  Rather, it merely documents the obligations of UPS and its employees to

comply with equal employment opportunity laws.  Plaintiff's arguments concerning these issues are irrelevant, non-responsive and do not fairly meet the substance of this fact stmt.

**Par. 105:**  Plaintiff's claims that this fact stmt is "Disputed in part," then admits the fact set forth in its entirety.  Plaintiff admits (as she did in her deposition) that she never told anyone in UPS management/Human Resources that she thought UPS' Code of Business Conduct was a contract:

> "Q:    Did you ever tell anybody in management or HR at UPS that you thought the Code of Business Conduct was a contract?
>
> A:     No.
>
> Q:     Did anybody in management or HR at UPS tell you that they thought the Code of Business Conduct was a contract?
>
> [objection]
>
> A:     No."

(Daniels Dep., p. 542)  Plaintiff's response clearly contradicts her sworn deposition testimony and violates FRCP 56 and Local Rule 56.1.

Plaintiff claims that this fact stmt is "irrelevant and immaterial" and sets forth a series of allegations about non-responsive matters.  Given Plaintiff's assertion that this fact par. is irrelevant/immaterial, any alleged dispute about it would not defeat summary judgment.

Plaintiff has not set forth any facts to show that UPS management/Human Resources ever told Plaintiff that the Code constituted a contract.  Plaintiff's unsupported allegations about the purported legal effect of these documents does not fairly meet the substance of this fact stmt or controvert it.

**B.      DEFENDANT'S RESPONSE TO PLAINTIFF'S ADDITIONAL STATEMENT OF MATERIAL FACTS**

Plaintiff sets forth a lengthy, repetitive Statement of Additional Material Facts ("AMF")[17], which does not comply with Federal Rule of Civil Procedure 56(c) and Kansas District Local Rule 56.1(b) and (d) for many of the same reasons as Plaintiff's responses to UPS' Fact Statement.  As Plaintiff did in her Response to UPS' Fact Statement, Plaintiff's AMF sets forth a long list of confusing and misleading purported "facts" which are largely duplicative of her responses to UPS' Fact Statement and contain a vast amount of unsupported and improper argument, opinion and conjecture.  Moreover, many of Plaintiff's purported facts are, for the most part, not actually disputed and/or are irrelevant/immaterial to Plaintiff's claims (either in whole or in part).  Plaintiff combines undisputed and/or irrelevant/immaterial facts in many of her "fact" paragraphs with unsupported allegations, conjecture, innuendo and argument.

Plaintiff's AMF, like her responses to UPS' Fact Statement is simply another attempt to persuade the Court that, due to the sheer volume of purported facts, there must be a disputed issue of material fact somewhere.  However, a careful review of Plaintiff's alleged facts and the competent, admissible evidence demonstrates that is simply not the case.

Kansas District Local Rule 56.1(b) which provides in pertinent part:

> If the party opposing summary judgment relies on any facts not contained in the movant's memorandum that party shall set forth each additional fact in a separately numbered paragraph, supported by references to the record, in the manner required by subsection (a) above.

Local Rule 56.1(d) requires that:

> All facts on which a motion or opposition is based shall be presented by affidavit

---

[17]     Most of Plaintiff's fact paragraphs do not set forth "additional" facts.  Instead, they largely repeat the facts Plaintiff set forth in her responses to UPS' Fact Statement. As a result, UPS addressed a significant number of Plaintiff's "additional facts" in its reply to Plaintiff's responses to UPS' Fact Statement.

> . . . and/or relevant portions of pleadings, depositions, answer to interrogatories and responses to requests for admissions.  <u>Affidavits or declarations shall be made on personal knowledge and by a person competent to testify to the facts stated which shall be admissible in evidence.</u>

Rules 56.1(b) and (d), Local Court Rules for the District of Kansas.

As set forth in UPS' responses to Plaintiff's fact paragraphs below (and its reply to Plaintiff's responses to many of UPS' fact statements), the vast majority of Plaintiff's alleged facts are improper and do not comply with Rule 56, Fed.R.Civ.P. and Local Rule 56.1 (in whole or in part) because they combine an undisputed or immaterial fact with an alleged fact that is actually a factual or legal assertion that does one or more of the following:  (1) is not supported by competent, admissible evidence either in whole or in part (e.g., 1, 5-6, 10-12, 14-15, 30-31, 34, 36, 68, 70, 72, 77, 80-81, 83, 86, 106-108); (2) is contrary to the competent, admissible record evidence (e.g., 3, 6, 11, 13-16, 24-25, 29-32, 34-36, 42-43, 48, 56, 59, 62, 64, 66, 69, 76, 78, 85, 96, 104-105, 107); (3) is contradicted by Plaintiff's sworn deposition testimony (e.g. pars. 1, 27, 32, 44, 52); (4) is not actually disputed by UPS (e.g. pars., 2, 4, 7-9, 17-23, 26, 33, 45, 50-51, 53-54, 57-60, 65, 67, 73-75, 84, 87-90, 95); and/or (5) is irrelevant/immaterial to Plaintiff's claims (e.g. pars., 1-10, 12-13, 16-17, 19-22, 26, 28, 37, 41, 43, 53-54, 57-64, 66-70, 72, 75-76, 78-85, 96-97, 99-103, 105, 106).  In a few instances, Plaintiff actually contradicts her own fact statement either in her response to a paragraph in UPS' Fact Statement or in another fact paragraph of Plaintiff's own AMF.

In order to avoid summary judgment, Plaintiff must set forth specific facts supported by competent, admissible evidence showing that a genuine issue of material fact exists with respect to her claims.  See Rule 56(c), Fed.R.Civ.P.  However as demonstrated below (and in UPS' reply to Plaintiff's responses to UPS' Fact Statement, Plaintiff has failed to satisfy this requirement.  Plaintiff's unsupported allegations, speculation, opinions, conjecture and argument and failure to

set forth specific facts supported by competent, admissible evidence (as required by FRCP 56 and Local Rule 56.1) make it difficult for the Court to determine which facts, if any, Plaintiff actually claims are disputed.

Plaintiff's AMF contravenes the language and purpose of FRCP 56 and Local Rule 56.1 which are designed to enable a court to efficiently evaluate a party's claims in light of the admissible record evidence.  This is clearly part of Plaintiff's effort to convince the Court that it is simply too difficult and time-consuming to analyze Plaintiff's claims in light of the relevant, admissible evidence.  However, Plaintiff cannot defeat UPS' properly supported summary judgment motion by overwhelming and misleading the Court with unsupported, inadmissible and irrelevant matters.  The Court is not required to sift through Plaintiff's misleading factual allegations and scour the record in search of a genuine issue of material fact which is actually supported by competent, admissible evidence.  *KM Mentor, LLC v. Knowledge Management Professional Society, Inc.*, 712 F.Supp 2d 1222, 1230 (D.Kan.2010)

Accordingly, UPS requests that the non-compliant portions of Plaintiff's AMF be stricken, or in the alternative, disregarded by the Court in ruling on Defendant's Motion.  In the event the Court does not strike/disregard those portions of Plaintiff's AMF which faile to comply with FRCP 56 and/or Local Rule 56.1(b), UPS submits the following response to each paragraph of Plaintiff's AMF:

Par. 1:  Plaintiff worked in the UPS Kansas City, Kansas ("James Street") Feeder Department since 1999 and held the position of cover dispatcher from 2004 through July of

2008.  Pl Ex. 1, Daniels Dep., at 22, 59-60; Pl. Ex. 23, Def. Answer, ¶ 23; Pl. Ex. 21, Def. Supp.

Ans. & Obj. to Pltf. 1ˢᵗ Req. Adm., No. 1.[18]

Disputed in part, misleading, contradicted by Plaintiff's deposition testimony and other

admissible record evidence, not supported by certain record evidence cited by Plaintiff, and

immaterial/irrelevant.  As Plaintiff's deposition testimony and her Employee History Profile

show, it is undisputed that Plaintiff's job title/classification between 1999 and 2009 was

"dispatch specialist."  (Daniels Dep., p. 22; Exh. A)  UPS does not have an actual position or job

title of "cover dispatcher."  (Williams Decl., ¶ 11)  Plaintiff's deposition testimony also shows

that she did not work the "cover" dispatch assignment during the entire period 2004-2008.  (See

Daniels Dep., pp. 75-76, 343; see also Dooley Decl., ¶¶ 26-28; Kirby Decl., ¶¶ 30-32; Pl's

Ex. 23, ¶ 23; Pl's Ex. 21, No. 1)  Moreover, Plaintiff testified that she alternated between the

night and cover dispatch assignments between 2004 and July 2008.  (see Daniels Dep., pp. 75-

76, 343)

More importantly, Plaintiff's assertion that she held the "cover" dispatch position is

misleading and irrelevant/immaterial because Plaintiff admitted in her deposition that she

worked the night dispatch schedule/hours both before and after Jason Isabell was promoted to

dispatch specialist in July 2008 and assigned to work the cover dispatch.  (See Daniels Dep.,

pp. 75-76, 343-345, UPS also incorporates by reference its record citations in pars. 68-69, 71 of

its Fact Stmt)  Thus, Plaintiff's work hours did not change in July 2008.  (See Daniels Dep.,

p. 345; Dooley Decl., ¶ 40)

---

[18]     For ease of reference, UPS sets forth Plaintiff's fact paragraph and UPS' response.  UPS considered this with respect to its reply to Plaintiff's responses to UPS' Fact Statement but doing so would added over 60 pages to the length of UPS' reply brief.

Plaintiff's allegation that she held the cover dispatch assignment from 2004 through 2008 is also irrelevant/immaterial because Plaintiff testified that as cover dispatch person, she never covered absences/vacations on the busier, more difficult twilight dispatch shift, unlike Mr. Isabell.  (Daniels Dep., pp. 62, 80-81, 210; see UPS' record citations in SOF 64-65, 70, 87 and record citations therein)[19]  Furthermore, Plaintiff admitted in her deposition she was not able to perform the twilight dispatch duties without assistance in July 2008 when Mr. Isabell was given the "cover" dispatch assignment and covered all three dispatch windows.  (Daniels Dep., p. 356; see SOF 87 and records citations therein)  As a result, Plaintiff's allegation that she was the "cover" dispatcher from 2004-2008 is irrelevant/immaterial.

Par. 2:  Plaintiff's former Feeder manager, Mic Haynes, felt Plaintiff should have been promoted to a supervisor or MIP.  Pl. Ex. 14, Haynes Dep., at 93, 98, 136-37.

Undisputed, but irrelevant/immaterial.  Mr. Haynes' personal belief about whether Plaintiff should be promoted to a full-time supervisor position is irrelevant/immaterial for several reasons.  Plaintiff only submitted letters of interest for promotion to full-time supervisor in 2005 and 2006.  Although Mr. Haynes was Plaintiff's manager in 2005 and testified that he filled out a promotion assessment form for Plaintiff that year, he stated in Plaintiff's 2005 Career Development Planning Guide (CDPG) that he believed Plaintiff would be ready for promotion in 3-5 years:

> Regina has expressed that she would like to consider advancing to the next level of management.  Based upon the date that Regina determines then the proper steps will be completed at that time to coach and counsel as well as prepare her for that in 3 to 5  years.  I reviewed with Regina that advancing to the next level will be dependent upon her willingness to relocate and travel.

---

[19]     "SOF" refers to UPS' Statement of Uncontroverted Facts in its original Memorandum and the record citations contained therein.

(Pl's Ex. 7, p. 6)(emphasis added)  On p. 3 of Plaintiff's 2005 CDPG, Plaintiff indicated that she was not interested in "advance[ing] to the next level of management," and was not willing to relocate, travel, change job functions or accept a lateral transfer (Pl's Ex. 7, p. 3), all of which are requirements for promotion to full time supervisor at UPS.  (Liberti Decl., ¶ 46; Liberti Dep., pp. 50, 57-58; Williams Decl., ¶ 45; Daniels Dep., pp. 296-297)

In Plaintiff's 2005 CDPG, Mr. Haynes stated he believed Plaintiff would be ready for promotion to the next management level in 3-5 years (not in 2005 or 2006).  (Pl's Ex. 7, p. 6)  In that same document, Plaintiff checked "no" in response to the questions about her willingness to travel and relocate, both of which are requirements for promotion to full-time supervisor. (Pl's Ex. 7, p. 3)  Mr. Haynes testified that he was not involved in the decision-making process as to who was selected for promotion for full-time supervisor in 2005, and does not know who made the decisions or the reasons for those decisions.  (Haynes Dep., pp. 98-99, 247-249)  There were no full-time supervisor positions open/filled in the James Street Feeder Dept. in 2005 or 2006.  (Exh. BG, Supplemental Declaration of Brad Williams, ¶ 23)

Mr. Haynes was not Plaintiff's manager when she submitted her letter of intent for promotion in 2006 and had no involvement with her application for promotion or any decisions regarding full-time supervisor promotions in 2006.  (Haynes Dep., pp. 243-244, 246-247; see also Daniels Dep., p. 31)  There were no full-time supervisor positions open/filled in the James Street Feeder Dept. in 2006 or 2007.  (Id. at ¶ 24)  In any event, Plaintiff's promotion claims are barred because she did not file a timely charge of discrimination regarding such claims.  See also Reply to Pl's Resp. to UPS Fact par. 41 above.

Par. 3:  Although Plaintiff twice properly submitted applications and materials for promotion to a full-time supervisor position in 2005 and 2006, Defendant did not process

Plaintiff's applications and did not meet or follow-up with her; Defendant never told Plaintiff the status of her promotion applications.  Pl. Ex. 1, Daniels Dep., at 225-28, 245-46; Pl. Ex. 2, Daniels Notes (July 31, 2008); Pl. Ex. 37, Liberti Dep., at 209-10.

Disputed in part, contrary to the record evidence in part, misleading, misstates the record evidence and irrelevant/immaterial because Plaintiff knew she had not been promoted in 2005 or 2006.

When UPS' Human Resources Dept. received Plaintiff's letter of intent in 2005, Kansas District Human Resources Manager Jim Grover sent Plaintiff a letter of acknowledgement (Ex. U), and Human Resources sent Plaintiff's promotion packet/blank assessment form to Plaintiff's manager Mic Haynes to complete.  (Haynes Dep., p. 238)  Although Mr. Haynes testified in his deposition that he completed Plaintiff's MAPP assessment form and returned it to Human Resources, they have no record of receiving it.  As a result, the Human Resources employee who processed MAPP paperwork, did not schedule Plaintiff for the computer test or continue to process her application for promotion.  (See SOF 44 and record citations therein; Liberti Decl., ¶ 36; Grover Decl., ¶ 6, Williams Decl., ¶ 39)

When Plaintiff submitted her letter of intent for promotion to full-time supervisor in 2006, the new District Human Resources Manager, Gary Liberti, sent Plaintiff an acknowledgment letter (Ex. V), and the Human Resources Dept. sent Plaintiff's manager, Joe Dooley, the MAPP packet and an assessment form to complete. (SOF 46 and record citations therein)  Mr. Dooley transferred to the James Street Feeder manager position in 2006, but he had worked in that department with Plaintiff in prior years while he was a feeder supervisor.  As a result of his previous interaction with Plaintiff, his observations, Plaintiff 's complaints to him and other management/Human Resources employees about her conflicts with co-workers

(especially Natalie McGaugh and Nicole Chapell) and other employees, Mr. Dooley did not believe Ms. Daniels possessed good interpersonal/communication skills which are necessary to be a full time supervisor and effectively interact with, supervise and train a group of employees. (Dooley Decl., ¶ 42-43; Ex. BH ,J. Dooley Suppl. Decl., ¶ 35)

While it is true that UPS did not expressly notify Plaintiff that she had not been promoted in 2005 or 2006, Plaintiff clearly knew that she had not been promoted in 2005 or 2006, and testified that she had the same job classification ("Dispatch specialist") from 2004 through 2009. (see Daniels Dep., pp. 22-23, 223; Ex. A)  In January 2007, the Kansas District HR Manager sent all employees, including Plaintiff, the annual MAPP form letter, reminding employees that they had to submit a new letter of intent each year if they wanted to apply for a promotion.  (Daniels Dep., p. 223; Williams Suppl. Decl., ¶ 25-26)  Plaintiff testified that, shortly after Allen Kirby became her manager in March 2007, he asked Plaintiff whether the packet in the manager's office was a current or earlier application for promotion, and Plaintiff told him that she was no longer interested in promotion.  (Daniels Dep., pp. 272-73)

The undisputed evidence shows that UPS began processing Plaintiff's promotion applications in 2005 or 2006.  There is no evidence UPS did not continue to process Plaintiff's applications due to her age/gender.  On the contrary, the undisputed evidence shows that Mr. Dooley never completed a promotion assessment for any employee who applied for a full-time supervisor position, including Jason Isabell who was under age forty (Dooley Dep., pp. 171-172; Dooley Decl., ¶ 45), and there were other managers/supervisors in the Kansas District who did not fill out MAPP promotion assessments for male/female employees and employees under/over age 40 who applied for promotion in 2005/2006.  (Grover Decl., ¶¶ 11, 13; Liberti Decl., ¶ 39)

In any event, this fact statement is irrelevant/immaterial because Plaintiff's promotion claims are barred due to her failure to file a timely charge of discrimination regarding such claims.

Par. 4:  Plaintiff's former manager, Mr. Haynes, stated he twice submitted Plaintiff's promotional paperwork to Human Resources, including hand delivering such to former Kansas District Human Resources Manager Jim Grover.  Pl. Ex. 14, Haynes Dep., at 43-44, 99.

Undisputed, but misleading and irrelevant/immaterial.  Mr. Haynes' testified that he completed Plaintiff's promotion assessment form twice in 2005.  However, it is undisputed that Mr. Haynes wrote in Plaintiff's 2005 Career Development Planning Guide (CDPG) that he believed Plaintiff would be ready for promotion in 3-5 years (not during 2005 when he filled out the CDPG)  (see Pl's Ex. 7, p. 6)  In that same CDPG, Mr. Haynes noted that he reviewed with Plaintiff that advancing to full-time supervisor would be dependent upon her willingness to relocate and travel (Id.)  Plaintiff indicated in that same 2005 CDPG that she was not willing to travel or relocate, both of which are requirements for promotion to full-time supervisor at UPS. (Id.; Daniels Dep., p. 298; Haynes Dep., pp. 247-248; Williams Decl., ¶¶ 43, 45)

Mr. Haynes testified that the second time he filled out Plaintiff's promotion assessment form in 2005, he gave it to Kansas District HR Manager Jim Grover.  Mr. Grover did not personally process MAPP assessment forms (Grover Decl., ¶ 10) nor did he know Plaintiff.  (Id. at ¶ 10)  There is absolutely no evidence that Mr. Grover instructed anyone to stop processing Plaintiff's application for any reason, let alone her age/gender.

Mr. Haynes' deposition testimony is irrelevant because he left the James Street Feeder manager job at the time Plaintiff submitted her letter of intent/interest for promotion in 2006 and

had no involvement with that application for promotion.  (Haynes Dep., pp. 246-247; see also

Dooley Decl., ¶ 19)

Mr. Haynes testified that he did not make decisions about which employees to promote to

full time supervisor in 2005 nor does he know who made the decisions or the reasons for those

decisions regarding such promotions.  (Haynes Dep., pp. 98-99, 247-249)  Mr. Haynes also

testified that he has no personal knowledge about why plaintiff was not promoted/other

employees were promoted to those positions.  (Id. at 98-99, 303-304, 170)  There were no full

time supervisor positions open/filled in the James Street Feeder Dept. in 2005 or 2006.

(Williams Suppl. Decl., ¶ 24)  See also Reply to Pl's Resp. to UPS Fact par. 45 above.

Par. 5:  UPS claims it has no record of, did not receive, or lost Plaintiff's promotional

paperwork.  Id., at 43-44, 99.

Disputed in part, contrary to the record evidence in part, not supported by competent,

admissible evidence in part, and misleading.  The fact statement is extremely misleading.  As set

forth above, Plaintiff submitted letters of intent for promotion to full-time supervisor in 2005 and

2006.  (Exs. W and Y)  Both years, UPS' HR Dept. sent Plaintiff a letter of acknowledgment.

(Exs. U and V)  UPS does not claim that it "has no record of" Plaintiff's "promotional

paperwork."  Rather, the record evidence shows that UPS' HR Dept. has no record of Plaintiff's

manager Mic Haynes completing/returning Plaintiff's promotion assessment in 2005. (SOF 44

and record citations therein)  As a result, Human Resources did not give Plaintiff the computer

test or continue to process her application for promotion. (SOF 44 and record citations therein)

Plaintiff relies entirely on the deposition testimony of former Feeder manager Mic Haynes in

support of her misleading fact statement.  Although he testified that he completed Plaintiff's

assessment in 2005 and gave it to HR, he testified that he has no knowledge about what

happened to it after that time.  (Haynes Dep., pp. 99, 241, 245-246)  He also testified that he had

no evidence or knowledge that she was not promoted because of her sex or age. (Id. at 93-94)

Plaintiff never asked anyone in management or Human Resources about the status/results of her

applications for promotion in 2005/2006, including Mr. Haynes who allegedly filled out a

promotion packet for Plaintiff twice in 2005.  (See Daniels Dep., pp. 224-225)

There is no evidence that UPS did not continue to process Plaintiff's application for

promotion to full time supervisor in 2005 (or 2006) due to her age/sex.  Plaintiff admitted she has

no evidence that she was not promoted due to her age/sex nor does she have knowledge about

any employees who received such promotions.  (Daniels Dep., pp. 346-347, 349)  On the

contrary, the competent, admissible evidence also shows that UPS promoted female employees

and employees over age forty to full time supervisor positions in 2005 and 2006.  (Grover Decl.,

¶ 15; Liberti Decl., ¶ 53; Williams Decl., ¶ 52)  In addition, there were male employees and

employees under age 40 who were not promoted to full time supervisor in 2005/2006 because

their manager/supervisor did not fill out/return their promotion assessment forms.  (Grover Decl.,

¶ __; Liberti Decl., ¶ __; Williams Decl., ¶ __ )

In any event, as set forth above and in UPS' Argument section below, Plaintiff's

promotion claims are barred because she failed to file a timely charge of discrimination

regarding such claims.  See also Reply to Pl's Resp. to UPS Fact pars. 44 and 45 above and

record citations therein.

Par. 6:  UPS management utilizes a subjective process – "People's Meetings" – to

endorse and "blackball" employees for consideration for and promotion to supervisory and

managerial positions and training opportunities.  Pl. Ex. 14, Haynes Dep., at 17-23.

Disputed, misleading, contrary to the record evidence and not supported by competent, admissible evidence.  There is absolutely no competent, admissible evidence to support this misleading and irrelevant allegation.  Plaintiff relies exclusively on the unfounded speculation of Mic Haynes, a former Feeder manager.  Mr. Haynes never worked in Human Resources and testified that he never attended a single People's Meeting. (Haynes Dep., pp. 9-14, 17-18, 116; Williams Supp. Decl., ¶ __)  His deposition testimony is not based on personal knowledge about what occurred in the People's meetings (Id. at 17-23, 116), and is clearly inadmissible. Mr. Haynes admitted he has no knowledge of anyone discussing Plaintiff at a People's meeting (nor did he ever attend a "People's meeting") and he was not involved in decisions regarding promotion of employees to full-time supervisor. (Id. at 118-19, 248-249)

In addition, UPS began implementing the MAPP promotion process which includes a computerized test administered by UPS Human Resources Dept.  (Liberti Decl., ¶¶ 30, 35) Thus, decisions regarding promotion of employees to management positions in 2005/2006 were not based solely on a "subjective process."  Mr. Haynes' purported testimony regarding any discussions of "employee training" at People's meetings is similarly not based on personal knowledge and is inadmissible and irrelevant. (Haynes Dep., pp. 17-18)  Finally, Plaintiff's promotion claims are barred by her failure to file a timely charge of discrimination.  See also Reply to Pl's Resp. to UPS Fact par. 48 above.

Par. 7:  There are no full-time female supervisors or managers in the James Street Feeder Department.  Pl. Ex. 14, Haynes Dep., at 294-96; Pl. Ex. 38, Dooley Dep., at 40-41; Pl. Ex. 22, Def. Supp. Ans. & Obj. to Pltf. 2nd Req. Adm., No. 1: Pl. Ex. 17, FT Sup. & Spec., James Street.

Undisputed, but misleading and irrelevant/immaterial.  This fact statement is confusing as to time frame.  Although it appears to be in the present tense, it cites deposition testimony of Mic

Haynes who retired in February 2008 and Ex. 17 which is a list of full-time supervisors/ specialists at the James Street facility as of July 1, 2008.  There was one feeder manager, Joe Dooley, and three full-time feeder supervisors -- Jim Yankovich, Scott Wetschensky and Steve Stuke -- at James Street in July 2008.  (Dooley Supp. Decl., ¶ 32)  None of these individuals were promoted to their full-time supervisor positions in 2005 or 2006 when Plaintiff applied for such a promotion.  (See Exhs. AF-AH)  Plaintiff has submitted no evidence to show that any of the managers/supervisors listed were promoted as a result of age or sex discrimination.  There is no evidence in the record showing such individuals were employed at the time they were promoted to supervisor/manager, who made the decisions to promote them, the reasons for those decisions, the sex/age of any other qualified candidates/applicants, etc.  There were no full time feeder supervisor jobs that were open/filled at James Street between January 2005 and December 2007.  (Dooley Supp. Decl., ¶ 31)

Par. 8:  As of July 1, 2008, there were 51 (fifty-one) full-time supervisors and specialists at the James Street facility and only 13 (seven) of these were female.  Pl. Ex. 16, Def. Supp. Ans. & Obj. to Pltf. 3rd Interrog., No. 1; Pl. Ex. 17, FT Sup. & Spec., James Street.

Undisputed, but irrelevant and immaterial.  These raw statistics are irrelevant and do not constitute evidence of sex discrimination or sex-based animus regarding Plaintiff's application for promotion.  See Turner v. Public Service Co. of Colorado, 563 F.3d 1136, 1146 (10th Cir. 2006)

Plaintiff has not submitted any information/documentation showing that any of the male supervisors at James Street as of July 1, 2008 were promoted due to their gender.  Specifically, Plaintiff has set forth no evidence regarding the circumstances of the male employees' promotions, including but not limited to:  (1) when the male supervisors were promoted; (2) who

made the decisions to promote them (3) their relevant work experience/qualifications; (4) their location, facility and department either immediately before or after they were promoted; or (5) the gender of the employees who applied for and were qualified for such positions.  This fact statement which simply lists raw statistics regarding the total numbers of male and female employees who held full-time supervisor and specialist jobs at James Street combined as of a particular date is not evidence that UPS made any decisions concerning Plaintiff

Par. 9:  As of July 1, 2008, out of 40 (forty) supervisors at the James Street facility, only 7 (seven) were female.  Pl. Ex. 16, Def. Supp. Ans. & Obj. to Pltf. 3rd Interrog., No. 1; Pl. Ex. 17, FT Sup. & Spec., James Street.

Undisputed, but irrelevant and immaterial.  For the reasons set forth in UPS' response to Fact par. 8 above, this fact statement is neither disputed nor material.  These raw statistics are irrelevant and do not constitute evidence of sex discrimination.  Plaintiff has not submitted any information/documentation showing that any of these male supervisors at James Street in 2008 were promoted as a result of sex discrimination.  This fact statement which merely lists raw statistics regarding the number of male/female employees who held full- time supervisor jobs in all departments at James Street as of a particular date does not constitute competent, admissible evidence that UPS made any decisions concerning Plaintiff's employment due to her gender.

Specifically, Plaintiff has set forth no evidence regarding the circumstances of their promotions, including but not limited to:  (1) when the male supervisors were promoted; (2) who made the decisions to promote them (3) their relevant work experience/qualifications; (4) their location, facility and department either immediately before or after they were promoted; or (5) the gender of the employees who applied for and were qualified for such positions.  In

addition, as set forth below, Plaintiff's promotion claims are barred and she has failed to allege

and cannot prove that her job was somehow improperly classified or that it was due to age/sex.

Par. 10:  There have historically been a far greater number of men than women in

supervisory and managerial positions at the UPS James Street and Lenexa, Kansas facilities.  Pl.

Ex. 15, Carpenter Declar., at ¶ 11; Pl. Ex. 14, Haynes Dep., at 294-96

Disputed, but not supported by competent, admissible evidence, misleading and

irrelevant/immaterial.  For the reasons set forth in UPS' responses to Pl's Fact pars. 8 and 9

above, this allegation is irrelevant/immaterial.  However, unlike pars. 8 and 9, this statement is

also objectionable because it contains no time frame.  It is merely a broad, conclusory

unsubstantiated allegation concerning all "supervisory and managerial" positions and all

departments at UPS' James Street and Lenexa facilities combined.

Plaintiff relies solely on the unsupported allegations of Kathleen Carpenter and Mic

Haynes, neither of whom:  (1) worked in Human Resources at UPS, (2) were responsible for

managing or supervising the James Street or the Lenexa facility, or (3) had jobs in which they

were responsible for gathering/maintaining/reviewing information or documentation showing the

actual number of male/female employees who held such positions or applied for them.

Mic Haynes worked as a package, Hub (inside package handling employees) or feeder supervisor

during most of his employment at UPS.  (See Ex. O)  He was not promoted to a "manager"

position where he was responsible for a department such as the James Street Feeder Dept. until

2004.  He was demoted to "supervisor" in 2007 due to integrity/performance issues, and did not

manage any department at UPS between January 2007 and his retirement in Feb. 2008. (Ex. O)

Ms. Carpenter worked as a "specialist" in package delivery centers at UPS' Lenexa and

James Street facilities since 2003, other than a short period of time in 2007 when she worked as a

"specialist" in Industrial Engineering.  (Williams Suppl. Decl., ¶ 29 and Exhs. 1 and 2 attached thereto)  She never worked in Human Resources or held a position above the entry-level management position of specialist, in which she did not supervise a group of employees or a department.  (Williams Suppl. Decl., ¶¶  29, 31)  As a result of the positions they held, Ms. Carpenter and Mr. Haynes did not make decisions concerning the promotion of employees to "supervisor"/"managerial" positions nor were they responsible for maintaining/reviewing or analyzing information concerning the gender of supervisory/managerial employees at James Street or Lenexa.  (Williams Suppl. Decl., ¶ 34)

Contrary to FRCP 56(c)(4) and Local Rule 56.1, Ms. Carpenter's Declaration is not based on personal knowledge, does not set out specific facts supporting this inadmissible allegation, or show that she is competent to testify on the matters stated.  Indeed, Ms. Carpenter sets forth <u>no</u> facts at all to support this assertion.  Plaintiff's conclusory, unsubstantiated allegation is clearly inadmissible and irrelevant/immaterial.  See Motion to Strike Portions of Carpenter Declaration.

Par. 11:  UPS has a practice of discriminating against women in the manner in which it classifies their jobs, shifts, duties, and assignments and, also, impeding or denying promotion and training opportunities.  Pl. Ex. 15, Carpenter Declar., ¶¶ 7-11, 13.

Disputed, not supported by competent, admissible evidence, contradicted by the record evidence, and misleading.  Plaintiff relies solely on Kathleen Carpenter's conclusory, inadmissible allegation to support this alleged fact statement.  Contrary to FRCP 56(c)(4) and Local Rule 56.1, Ms. Carpenter's Declaration is not based on personal knowledge, does not set out specific facts supporting this assertion which would be admissible at trial, or show that she is competent to testify on the matters stated.  Indeed, Ms. Carpenter sets forth <u>no</u> facts in her Declaration to support this broad, conclusory allegation.

Ms. Carpenter worked as a "specialist" in package centers in Lenexa and James Street since 2003, other than a short period of time in 2007 when she worked as a "specialist" in Industrial Engineering.  (Exhs. BB, BC)  As a package specialist between 2003 and 2009, Ms. Carpenter's job duties primarily involved clerical, administrative and dispatch type duties for package car (brown delivery truck drivers) in a specific center, e.g., Lenexa West center. (Williams Supp. Decl., ¶ 31)  Package center specialist is an entry-level management job at UPS, below the level of full-time supervisor and manager.  In that position, Ms. Carpenter was <u>not</u> involved in decisions regarding any of the matters listed for any management employees, including specialists (like Plaintiff), supervisors or managers.  (Id. at ¶ 32)  She never worked in Human Resources and was not responsible for managing/supervising any department and, therefore, lacks personal knowledge to support her allegation. (Id. at ¶ 29)

Moreover, in her Declaration, Ms. Carpenter does not set forth any specific facts or documentation to support her conclusory allegation that UPS discriminates against female employees based on their gender with respect its decisions concerning job classification, shifts, duties, assignments, promotions and training opportunities.  See Motion to Strike Carpenter Decl.

Par. 12:  UPS has submitted information to the EEOC which does not accurately reflect the managerial status of UPS James Street employees, including designating specialists, the position Plaintiff held, as managerial.  Pl. Ex. 16, Def. Supp. Ans. & Obj. to Pltf. 3rd Interrog., No. 3; Pl. Ex. 19, EEO-1 Rep.: Officials & Mgrs; Pl. Ex. 20, EEO-1 Rep.

Disputed, but irrelevant/immaterial and not supported by competent, admissible evidence. It is not clear what Plaintiff means in this paragraph, but the evidence cited does not support her allegation that UPS allegedly submitted inaccurate information to the EEOC.

Par. 13:  UPS does not post or make known to its employees specific full-time supervisory positions which are open and UPS is looking to fill or promote into.  Pl. Ex. 15, Carpenter Declar., at ¶ 9; Pl. Ex. 37, Liberti Dep., at 187.

Disputed in part, partially misstates the record evidence, misleading, and irrelevant/immaterial.  Although UPS does not formally "post" full-time supervisor job openings, former Human Resources Manager Gary Liberti testified that employees are advised of such openings in their career planning discussions.  (Liberti Dep., p. 187)  Formal career planning discussions are normally conducted with management employees (including specialists) twice a year.  (Williams Suppl. Decl., ¶ 36)  Managers also have informal discussions with their employees regarding such positions when they learn there is or will be an opening.  (Id.)

This paragraph is also misleading and partially contradicts the record evidence because UPS employees do not submit applications for promotion at the time a management position becomes vacant.  Instead, UPS' Human Resources group implemented the MAPP promotion process in 2005 which it uses to identify qualified candidates for promotion to management positions such as full-time supervisor.  (Grover Decl., ¶ 2-3; Liberti Decl., ¶ 30); Exhs. Q-T; Williams Suppl. Decl., ¶ 38)

Under MAPP, employees must submit a letter of interest each year they want to be considered for promotion to a management position and set forth the type of management-level position they seek, e.g., full-time supervisor, etc.  (Grover Decl., ¶ 3; Liberti Decl., ¶ 31; Exh. Q)  Every January from 2005 to 2010, the District HR manager sent all Kansas employees a form letter advising them that they needed to submit a letter of intent if they wanted to apply for promotion to a management-level position (e.g., full-time supervisor) that year.  (Grover Decl., ¶ 3; Liberti Decl., ¶ 31; see, e.g., Ex. V)

When an opening occurs in a position such as full-time Feeder supervisor, the Feeder division manager and James Street Feeder manager select individuals from the pool of qualified applicants to interview for that opening.  (Liberti Decl., ¶¶ 36-37; Williams Decl., ¶¶ 39-40)  Thus, employees are advised of anticipated job opening by their managers in formal and informal meetings, and employees are advised in writing about how to apply for such positions.

Plaintiff relies on a conclusory, unsupported assertion in Kathleen Carpenter's Declaration.  As set forth above and in UPS' Motion Strike, Ms. Carpenter did not work in Human Resources, has no personal knowledge regarding Plaintiff's applications for promotion, and has set forth no factual information/documentation to support her assertion as to employees generally at UPS.  (see Williams Suppl. Decl., ¶ 29, 52)  See Motion to Strike Carpenter Decl.

Par. 14:  UPS management, including Gary Liberti, aggressively try and force women over the age of 40 to retire.  Pl. Ex. 15, Carpenter Declar., at ¶¶ 2-4.

Disputed, not supported by competent, admissible evidence, and contrary to the record evidence.  This fact statement like many others, does not comply with FRCP 56 or Local Rule 56.1 because Plaintiff has cited no competent, admissible record evidence to support it.  Instead, Plaintiff relies on Kathleen Carpenter's allegations concerning her specific situation at UPS and her conclusory, inadmissible allegation about UPS generally.  As set forth above and in UPS' Motion Strike, Ms. Carpenter was not Plaintiff's manager or supervisor, did not work in the Feeder Dept., or Human Resources, and has no personal knowledge regarding Plaintiff's situation.  Ms. Carpenter set forth no facts to support her broad allegation concerning "women over the age of 40" and does not identify any member of management who allegedly engaged in such conduct toward her other than Gary Liberti.  Ms. Carpenter's unsupported opinion/speculation is irrelevant and inadmissible.  See Motion to Strike Carpenter Decl.

Moreover, Ms. Carptenter's conclusory allegation is contradicted by the fact that UPS has promoted numerous female and male employees over age forty to full-time specialist, supervisor and manager positions since 2005.  (Williams Decl., ¶ 52; Liberti Decl., ¶ 53; Williams Suppl. Decl., ¶ 37)  In fact, Plaintiff was <u>over</u> age forty when she was promoted to her management position (specialist).  (See Daniels Dep., pp. 6-7, 20)  Plaintiff's manager in 2006, 2008-2009, Joe Dooley, was promoted to "manager" when he was over age forty.  (Dooley Suppl. Decl., ¶ 2)

Moreover, at the time Plaintiff retired, all but one of the remaining six management employees in the James Street Feeder Dept. were over age 40 and four of those individuals were over age 50, including female employee Debbie Ammons.  (Dooley Suppl. Decl., ¶ 48)  There is absolutely no evidence that anyone ever tried to force Plaintiff to retire.  On the contrary, Plaintiff testified in her deposition that she voluntarily retired from UPS in 2009.  (Daniels Dep., p. 17)

Par. 15:  In 2009, UPS was trying replace older full time employees with younger part time employees.  Id., at 2-3.

Disputed, not supported by competent, admissible evidence, inadmissible speculation and contrary to the record evidence.  Plaintiff once again sets forth a conclusory allegation with no specific facts or admissible evidence to support it.  Instead, Plaintiff relies solely on a unsupported assertion in Kathleen Carpenter's Declaration.  As set forth above and in UPS' Motion Strike, Ms. Carpenter set forth no facts in her Declaration to support broad allegation or that she had personal knowledge about how other employees were treated by UPS.  See also UPS' response to par. 14 above and Motion to Strike Carpenter Declaration.

In addition, Ms. Carpenter's allegation is contradicted by the fact that UPS promoted numerous female and male employees over age forty to full-time supervisor positions since

2005.  (Williams Decl., ¶ 52; Liberti Decl., ¶ 53)  Plaintiff was over age forty when she was first promoted to management at UPS in 1999.  (See Daniels Dep., pp. 6-7, 20)  Plaintiff's manager Joe Dooley, was not promoted to "manager" at UPS until he was over age forty.   Moreover, at the time Plaintiff retired, all but one of the remaining six management employees in the James Street Feeder Dept. were over age 40 and four of those individuals were over age 50, including female employee Debbie Ammons.  Plaintiff voluntarily retired from UPS in 2009.  (Daniels Dep., p. 17)

Par. 16:  Defendant, through corporate deposition testimony, has openly admitted that, although required to be followed, UPS managers in the Kansas District did not comply with UPS promotion policies and procedures (the Management Assessment and Promotion Process or "MAPP") and promotion applications and materials were not processed properly.  Pl. Ex. 34, Corp. Dep. (Liberti), at 10, 14, 15-17, 287-90, 293, 295.

Disputed in part, misstates the record evidence, contradicted in part by the record evidence, misleading and irrelevant/immaterial.  As the deposition testimony of Gary Liberti and the Declarations of Mr. Liberti, Jim Grover, and Brad Williams and the MAPP policies and procedures state, UPS began implementing the MAPP process in 2005.  (See SOF 30 and record citations therein)  As they have stated, it took some time for the Kansas District Human Resources Department to fully implement the MAPP procedures.  (See SOF 31 and record citations therein)  Also not surprisingly, during 2005 and 2006, there were times when individual managers/ supervisors erroneously failed to perform various tasks set forth in the written MAPP policies and procedures.  (See SOF 51-53 and record citations therein; Williams Suppl. Decl., ¶ 39)

However, Plaintiff's assertion is irrelevant/immaterial because Plaintiff's promotion claims are barred by her failure to file a timely charge of discrimination with the EEOC/KHRC. It is also irrelevant/immaterial because it is undisputed that there were instances when management/Human Resources erroneously failed to perform a MAPP task or step when processing promotion applications of male employees and employees under age forty.  (Grover Decl., ¶ 11; Liberti Decl., ¶ 39; Williams Decl., ¶ 51)  There is no evidence that these errors occurred only with respect to female employees or employees over age forty.  The undisputed evidence also shows that there were instances when Human Resources was unable to locate the promotion assessment forms of male employees and employees under age forty.  (*See Id.*)

It is undisputed that Plaintiff's manager in 2006, Mr. Dooley, did not fill out a promotion assessment form for any employee who sought promotion to full time supervisor.  (Dooley Decl., ¶ 45)  In any event, Plaintiff's promotion claims are barred by her failure to file a timely charge of discrimination.

Par. 17:  Although Defendant has submitted lengthy declaration testimony from former Kansas District Human Resources Manager Gary Liberti regarding the MAPP, its application, and UPS promotion practices, Mr. Liberti stated in his deposition in this case he does not know what "MAPP" stands for.  Def. Ex. E, ¶¶ 38-42; Pl. Ex. 37, Liberti Dep., at 35-36, 41-42.

Undisputed, but partially misstates the record, misleading and irrelevant/immaterial. Mr. Liberti was asked in his deposition exactly what the "MAPP "acronym stands for and answered "I can't remember without looking at it."  Plaintiff's counsel asked the question without showing Mr. Liberti the MAPP manual or any other MAPP document identifying the exact terminology.  This fact statement is completely irrelevant/immaterial.  As Mr. Liberti's Declaration and deposition state, he was the KS District Human Resources Manager from early

2006 through mid 2010 and was clearly competent to testify regarding the substance of the MAPP process based on personal knowledge.

Par. 18:  Defendant's MAPP Procedure and Reference Manual states it is to be used to "ensure the accurate, detailed, and timely completion of corresponding documents for the process" and "[a]s an Equal Opportunity Employer, UPS has an ethical and legal obligation to ensure that our people practices are fair, consistent, and appropriate."  Pl. Ex. 41, MAPP Proced. & Ref. Man., at 1, 9.

Undisputed.

Par. 19:  Defendant's MAPP or promotion policies and procedures state and require that, whether or not the applicant moves past the initial stages of that process, the applicant's manager is to meet with the employee or applicant and give the applicant feedback and let them know whether they are qualified or have been selected to proceed with the process.  Id., at 3, 4, 5; Pl. Ex. 2, Daniels Notes (July 31, 2008), at PLT 320-22; Pl. Ex. 37, Liberti Dep., at 227-28; Pl. Ex. 42, MAPP Guide, at 2; Pl. Ex. 34, Corp. Dep. (Liberti), at 10, 14, 15-17.

Undisputed, but irrelevant/immaterial.  Plaintiff does not claim that her Feeder manager in 2005, Mic Haynes, treated her unfairly or discriminated against her.  On the contrary, Plaintiff testified that they had a positive work relationship.  (Daniels Dep., pp. 77-78)  While it is undisputed that Mr. Haynes did not follow up with Plaintiff about her application for promotion in 2005 after she submitted her letter of intent and he allegedly completed her promotion assessment, Plaintiff does not allege that Mr. Haynes discriminated against her in any way (see (Daniels Dep., pp. 226-28); Pl's Answer to Interrogs. 4-5, 10), and Mr. Haynes testified he did not discriminate against Plaintiff.  (Haynes Dep., p. 169)

This fact statement is also irrelevant/immaterial because it is undisputed that UPS was in the process of implementing the MAPP procedures in 2005 and 2006 (see Grover Decl., ¶ 2; Liberti Decl., ¶ 30), and that there were instances when individual managers/supervisors erroneously failed to follow up on particular MAPP tasks/steps.  (Grover Decl., ¶ 11; Liberti Decl., ¶ 39)  Similarly, it is undisputed that some of these instances involved male employees and employees under age forty.  (Grover Decl., ¶ 11; Liberti Decl., ¶ 39; Williams Decl., ¶ 51)  It is also undisputed that UPS promoted female employees and employees over age forty to management positions in both years.  (See, e.g., Liberti Decl., ¶ 53-54; Williams Decl., ¶ 52)  This fact is irrelevant/immaterial.

Par. 20:  The letters which were sent to Plaintiff from the UPS Kansas District Human Resources Managers in 2005 and 2006, acknowledging and in response to her letters of intent for promotion to a full time MIP supervisor position in the Kansas District, state, "Your written expression of interest is the first step of the promotion process.  The next step will be a series of assessments.  Your supervisor or manager will contact you with further details."  Pl. Ex. 9, Daniels Letter (Aug. 9, 2005); Pl. Ex. 10, Grover Letter (Aug. 19, 2005); Pl. Ex. 11, Daniels Letter (March 2, 2006); Pl. Ex. 12, Liberti Letter (March 17, 2006).

Undisputed.  This fact statement is also irrelevant/immaterial because it is undisputed that UPS was in the process of implementing the MAPP procedures in Kansas during 2005 and 2006 (see Grover Decl., ¶2; Liberti Decl., ¶ 30), and that there were instances in those years when individual managers/supervisors erroneously failed to follow up on particular MAPP procedures/steps.  (Grover Decl., ¶ 11; Liberti Decl., ¶ 39)  Similarly, it is undisputed that some of these instances involved promotion applications from male employees and employees under age forty.  (Grover Decl., ¶ 11; Liberti Decl., ¶ 39; Williams Decl., ¶ 51)  It is also undisputed

that UPS promoted female employees and employees over age forty to management positions in both years.  (See, e.g., Liberti Decl., ¶ 53-54; Williams Decl., ¶ 52)  In any event, as set forth in UPS' Argument below, Plaintiff's promotion claims are barred.

Par. 21:  The UPS Policy Book states that, "As individuals, we do not have the authority to change or disregard any of our company's policies.  We are expected to follow existing policies, even if not always in complete agreement with them.  Our managers and supervisors set the example for carrying out our policies.  They, therefore, are expected to lead the way for other UPS people – by word and action – in living up to our policies." Pl. Ex. 32, UPS Policy Book, at 9.

Undisputed, and irrelevant/immaterial.  This fact statement is also irrelevant/immaterial because it is undisputed that UPS was in the process of implementing the MAPP procedures in Kansas during 2005 and 2006 (see Grover Decl., ¶ 2; Liberti Decl., ¶ 30), and that there were instances in those years when individual managers/supervisors erroneously failed to follow particular MAPP procedures/steps.  (Grover Decl., ¶ 11; Liberti Decl., ¶ 39)  Similarly, it is undisputed that some of these instances involved the promotion applications of male employees and employees under age forty.  (See UPS' response to Pl's fact par. 20 and record citations therein)  It is also undisputed that UPS promoted female employees and employees over age forty to management positions in both years.  (See, e.g., Liberti Decl., ¶ 53-54; Williams Decl., ¶ 52)

Par. 22:  Defendant never met or followed-up with Plaintiff to discuss her promotion applications in 2005 and 2006.  Pl. Ex. 1, Daniels Dep., at 225-229; Pl. Ex. 2, Daniels Notes (July 31, 2008), PLT 320-22.

Undisputed, but misleading and irrelevant/immaterial.  This fact statement is irrelevant/immaterial because it is undisputed that UPS was in the process of implementing the MAPP procedures in Kansas during 2005 and 2006 (see Grover Decl., ¶ 2; Liberti Decl., ¶ 30), and there were instances in those years when individual managers/supervisors erroneously failed to follow-up on certain tasks/aspects of the MAPP process such as talking with the employees after he/she submitted his/her letter of interest.  (See UPS' response to Pl's fact pars. 19-21 above and record citations therein)  It is also undisputed that some of these instances involved promotion applications of male employees and employees under age forty, and that UPS promoted female employees and employees over age forty to management positions in both years.  (See UPS' responses to Pl's fact pars. 19-21 above and record citations therein.)

It is undisputed that UPS sent all employees a form letter each year reminding them that to submit a new letter of intent each year, if they wanted to apply for promotion that year.  (Exs. U, V; Daniels Dep., pp. 223-224)  Plaintiff submitted a letter of interest for promotion to full time supervisor in March, 2006 (Ex. Y), and knew that she had not been promoted to such a position in 2005.  (See UPS' response to Pl's fact par. 3 above and record citations therein.)

In addition, Plaintiff testified that shortly after Allen Kirby became her manager in March 2007, he asked Plaintiff about her 2006 promotion paperwork which Plaintiff alleges Mr. Kirby found in the Feeder manager's office.  (Daniels Dep., pp. 272-273)  Plaintiff allegedly told Mr. Kirby that she was no longer interested in a promotion.  (Id. at 273; Kirby Decl., ¶ 42) Plaintiff clearly knew that she had not been promoted to full-time supervisor in 2005/2006. Despite that knowledge, Plaintiff did not speak with Mic Haynes, Joe Dooley or Human Resources between 2005 and July  2008 to inquire about her applications for promotion.  (see Daniels Dep., pp. 226-28)

Par. 23:  UPS has admitted it promoted employees to full-time supervisor positions in the

Kansas District in 2005 and 2006 and there were applicants being interviewed and considered for

promotion to full-time supervisory positions in the Kansas District during that period – the same

time Plaintiff had submitted her promotion application materials.  Def. ¶ 53; Pl. Ex. 21, Def. 2nd

Sup. Ans. & Obj. to Pltf. 1st Req. Adm., No. 32; Pl. Ex. 16, Def. Supp. Ans. & Obj. to Pltf. 3rd

Interrog., No. 2; Pl. Ex. 18, Female Employees Interviewed.

Undisputed, and the record evidence shows that UPS promoted female/male employees

and employees over/under age forty to full-time supervisor positions in 2005 and 2006.  (Liberti

Decl., ¶¶ 53-54; Williams Decl., ¶ 52)

Par. 24:  After UPS failed or refused to follow-up or meet with her regarding her

promotion applications and learning, in 2007, that her promotion packet and assessment that had

been sent to Joe Dooley had not been completed, Plaintiff believed it was a futile gesture to

apply for or submit any further materials for promotion.  Pl. Ex. 1, Daniels Dep., at 240, 245-46,

249, 270-71, 329.

Disputed in part, contradicted in part by the record evidence, and UPS objects to the

extent Plaintiff's assertion constitutes a legal argument/conclusion rather than a fact statement.

This paragraph contains allegations of fact and Plaintiff's alleged legal conclusion that:  "it was a

'futile gesture' to apply for or submit any further materials for promotion".  To the extent

Plaintiff is attempting to assert the "futile gesture" exception to the requirement that an employee

must apply for a promotion in order to state a claim, Plaintiff has failed to set forth specific facts

necessary to establish that that exception is applicable and her assertion constitutes legal

argument, not a fact statement.  As set forth in UPS' Argument section, in order to establish a

prima facie claim of age/sex discrimination in promotion under federal/state statutes, plaintiff

must show that she applied for an was qualified for the promotion she sought.  The "futile gesture" exception applies only when the employee can establish that the employer has "a consistently enforced discriminatory policy.  Leung v. LabOne, Inc., 1996 WL 743830 at *4 (D. Kan. Dec. 23, 1996).  Plaintiff has not set forth such evidence.

Moreover, Plaintiff's alleged belief that it would have been futile to apply for promotion in 2007 is not supported by any record evidence.  Plaintiff had a new manager in 2007, Allen Kirby, and a different division manager, Jeff Czernicki.  (Williams Supp. Decl., ¶ 42)  Neither of them had any involvement with Plaintiff's 2005/2006 applications for promotion and there is no evidence that they made any decisions regarding Plaintiff's employment due to her age/sex or made any comments regarding Plaintiff's age/sex.  (See Williams Supp. Decl., ¶ __)  In fact, Plaintiff testified that she told Mr. Kirby that she was not interested in applying for promotion in 2007.  (Daniels Dep., pp. 272-73)

There is no evidence regarding the qualifications of Plaintiff/other employees for promotion to full-time supervisor in 2007 or the full time supervisor positions that were open/filled that year in the Kansas District.  There were no open feeder dispatch specialists positions at James Street in 2007.  (Williams Supp. Decl., ¶ __)  In addition, there is no record evidence concerning the sex/age of employees who were promoted to full-time supervisor positions in the Kansas District in 2007.  Accordingly, Plaintiff's assertion that she believed it would have been "futile" to apply is pure speculation and irrelevant/immaterial.

Par. 25:  Plaintiff's Career Development Planning Guide materials from 2004 and 2005 do not state she had interpersonal skill problems which disqualified her for consideration for promotion to a supervisory position.  Pl. Ex. 6, Car. Dev. Guide (2004); Pl. Ex. 7, Car. Dev. Guide (2005).

Disputed in part, contradicted in part by the record evidence and misleading.  Plaintiff's 2004 Career Development Planning Guide was completed by Plaintiff and her then manager Greg Mispagel.  Mr. Mispagel did not work in the James Street Feeder Dept. in 2005/2006 when Plaintiff applied for promotion to full-time supervisor.  (Haynes Dep., pp. 115, 168-169, 244)

On p. 6 of Plaintiff's 2005 CDPG, titled "Individual Development Plan," Plaintiff's manager at the time, Mic Haynes, wrote under the section titled "Coaching and Training": "COACH AND COUNCIL (SIC) REGINA TOWARDS DEVELOPMENT FOR FULL TIME MIP."  (Pl's Ex. 7, p. 6)  Under "Other Development Actions", Mr. Haynes wrote:  "BUILD A BETTER TEAM RELATIONSHIP WITH THOSE YOU FOLOW AND THOSE THAT FOLLOW YOU . . . . LEARN HOW TO HAVE A WIN-WIN SITUATION.  YOU WILL NOT BE ABLE TO CONTINUE DAY TO DAY WITHOUT GETTING ISSUES RESOLVED."  (Id.)

Plaintiff admitted in her deposition that she and dispatch specialists Debbie Ammons and Nicole Chapell had conflicts and difficulty working with each other. (Daniels Dep., pp. 252-254, 263-266; see also Ammons Decl., ¶ 3)  Plaintiff testified that Ms. Chapell complained that Plaintiff yelled at her and Plaintiff claimed Ms. Chapell was rude and cursed at her.  (Daniels Dep., pp. 252-254)  It is undisputed that Kansas District HR Manager Liberti had to get involved to try to resolve the conflicts between Plaintiff and Ms. Chapell.  (Id.; Liberti Decl., ¶ 48)  In addition, 2005 Feeder manager Mic Haynes testified about arguments/conflicts between Plaintiff and Ms. Ammons and Ms. Chapell. (Haynes Dep., pp. 161, 210-211)  The overwhelming record evidence, including declarations from the following employees who worked with Plaintiff, clearly shows that Plaintiff had conflicts with numerous employees and was perceived by Feeder managers Dooley/Kirby and HR manager Liberti (and others) as an employee who did not communicate/interact well with her co-workers. (Ex. BF, D. Ammons Aff., ¶ 3; Ex. BE, L.

Miller Decl., ¶ 4; Isabell Decl., ¶ 34; Dooley Decl., ¶ 42; Dooley Dep., pp. 84-87; Kirby Decl.,

¶ 43; Liberti Decl., ¶ 48; see also Haynes Dep., pp. 160-61)

Par. 26:  Former Feeder Manager Mic Haynes testified he did not remember Plaintiff

indicating that she refused to consider being transferred or move and she had merely indicated

her preference at a particular time because of personal reasons.  Pl. Ex. 14, Haynes Dep. , at 36,

254-57.

Undisputed, but misleading and irrelevant/immaterial.  Plaintiff testified that she entered

the responses on page 3 of her 2005 Career Development Planning Guide (Pl's Ex. 7) and

marked "no" in response to the following:

        A.      Advance to the next level of management

        B.      Relocate

        C.      Travel

        D.      Change Job Functions

        E.      Accept a Lateral Transfer

(Daniels Dep., p. 285; Pl's Ex. 7)  Plaintiff also admitted in her deposition that she knew that

these were requirements for promotion to full time supervisor.  (Daniels Dep., pp. 291-292, 296-

297; see also Liberti Decl., ¶7)

Mr. Haynes later testimony in his deposition that he did not remember Plaintiff making

these statements is irrelevant given Plaintiff's testimony that she wrote the information on the

form.  In addition, Plaintiff testified she was not willing to travel or relocate for work in 2005

(Daniels Dep., p. 298), and Mr. Haynes testified that he wrote under "Career Goals (3-5 years)"

in Plaintiff's 2005 CDPG:

        Regina has expressed that she would like to consider advancing to the next level
      of management.  Based upon the date that Regina determines then the proper steps will

be completed at that time to coach and counsel as well as prepare her for that in 3 to 5 years.  I reviewed with Regina that advancing to the next level will be dependent upon her willingness to relocate and travel.

(Pl's Ex. 7, p. 6; Haynes Dep., pp. 37-38)

Par. 27:  Plaintiff was not aware that if she indicated a preference not to travel or relocate at a particular time that it could forever affect her chances of promotion or that it made her any less qualified to be considered for the next level of management; in any event, as she was not allowed to go through the promotion process, that was not discussed with her in connection with her applications.  Pl. Ex. 1, Daniels Dep., at 285-87.

Disputed and contrary to Plaintiff's deposition testimony that Mr. Haynes told her that these were requirement for promotion.  (Daniels Dep., pp. 291-292, 296)

Par. 28:  The MAPP candidate Scoring Sheet to be completed by management is based on entirely subjective criteria.  Pl. Ex. 43, MAPP Scoring Sheet.

Disputed in part, but irrelevant/immaterial.  The MAPP scoring form Plaintiff submitted was not completed.  However, there is a section labeled "In-Box" where Human Resources would write the applicant's scores on computerized test which contains some objective components (e.g., math, problem solving and decision making, organizational skills) if the individual progressed to that step in the process.  (See Exhs. Q, T)  Plaintiff did not take the computer test or have a panel interview in 2005 or 2006 for the reasons set forth in UPS' reply to Pl's responses to UPS fact pars. 44, 48.  In any event, Plaintiff's promotion claims are barred by her failure to file a timely charge of discrimination.

Par. 29:  Plaintiff routinely performed and was responsible for supervisory duties.  Pl. Ex. 1, Daniels Dep., at 25, 38, 39, 5 3-55, 111, 171-82, 221-22, 453-54; Daniels Notes (July 31, 2008).

Disputed, contradicted by the record evidence (including the deposition testimony of Joe Dooley and Gary Liberti and certain deposition testimony from Plaintiff.  (See Dooley Decl., ¶ 6; Liberti Decl., ¶ 6)  As set forth in their declarations, Plaintiff did not have supervisory authority to hire, fire or discipline employees and did not have responsibility for ensuring their training, evaluations or discipline were performed.  (Dooley Decl., ¶ 6; Liberti Decl., ¶ 6; Williams Decl., ¶ 7)  Unlike full time supervisors, Plaintiff did not fill in for absences/vacations of full time supervisors or the Feeder manager.  (Dooley Decl., ¶ 23)  More importantly, Plaintiff testified she never performed the twilight dispatch job, which full time supervisors Jim Yankovich and Dennis Smith.  (See UPS' reply to Pl's response to SOF 59 and 63 and record citations therein).  Nor was Plaintiff ever a feeder on road supervisor responsible for training, evaluating and disciplining drivers.  (See Exh. A; Dooley Decl., ¶ 53)  In addition, Plaintiff stated in her EEOC Intake Questionnaire that in 2005/2006, she applied for promotion to full-time ("MIP") supervisor positions which had more responsibility than her specialist position.  (Pl's Exh. 27, p. 2)

Par. 30:  There are other women at UPS, like Plaintiff, who perform supervisory duties and have supervisory responsibilities – yet, whose positions are classified as non-supervisory.  Pl. Ex. 15, Carpenter Declar., ¶¶ 7-11.

Disputed in part, not supported by competent, admissible evidence, misleading, inadmissible speculation and contrary to the record evidence.  Plaintiff once again sets forth a conclusory allegation with no specific facts or admissible evidence to support it.  Instead, Plaintiff relies solely on a conclusory, unsupported assertion in Kathleen Carpenter's Declaration.  As set forth above and in UPS' Motion Strike, Ms. Carpenter was not a manager or supervisor, did not work in Human Resources, was not Plaintiff's manager or supervisor, did not

work in the Feeder Dept., and had no involvement in employment decisions concerning management employees, including specialists like Plaintiff.  (William Suppl. Decl. ¶¶ 30-32) Other than Ms. Carpenter's allegations about her own particular job duties, her Declaration contains no facts to support this fact paragraph or show that she has personal knowledge about the jobs of "other women at UPS."  There is also no factual information about the "other women"/"jobs" she references.  See Motion to Strike Carpenter Decl.

In addition, Ms. Carpenter's allegation is contradicted by the record evidence showing that Plaintiff's job duties as a dispatch specialist did not include supervisory duties such as hiring/firing or disciplining employees. (Williams Decl., ¶ 7; Liberti Decl., ¶ 6; Dooley Decl., ¶ 6)  UPS incorporates herein its response to Pl's fact par. 29 above.

Par. 31:  UPS has a practice of classifying and compensating female employees who are performing and responsible for supervisory duties as non-supervisory.  Id.

Disputed in part, not supported by competent, admissible evidence, misleading, inadmissible speculation and contrary to the record evidence.  Plaintiff once again sets forth a conclusory allegation with no specific facts or admissible evidence to support it.  Instead, Plaintiff relies solely on a conclusory, unsupported assertion in Kathleen Carpenter's Declaration.  As set forth above and in UPS' Motion Strike, Ms. Carpenter was not a manager or supervisor, did not work in Human Resources, was not Plaintiff's manager or supervisor, did not work in the Feeder Dept., and had no involvement in employment decisions concerning management employees, including specialists like Plaintiff.  (William Suppl. Decl. ¶¶ 30-32) Other than Ms. Carpenter's allegations about her own job duties, her Declaration contains no facts to support this paragraph or show that she has personal knowledge about the jobs of "other

women at UPS."  There is also no factual information about the "other women"/"jobs" she

references.  See Motion to Strike Carpenter Decl.

Moreover, Plaintiff has set forth no facts with supporting citations showing when, how

and why the "specialist" position was created or by whom or that it was created in a

discriminatory manner.  Finally, Ms. Carpenter's allegation is directly contradicted by the

undisputed evidence that Jason Isabell and Marco Zarate, male employees under age forty, had

the same job classification as Plaintiff – dispatch specialist -- and performed the same duties as

Plaintiff when they worked the night dispatch shift between 2008 and 2010.  (Isabell Decl., ¶ 36;

Ex. AM)  Moreover, Mr. Isabell has had that job classification since July 2008, even though he

(unlike Plaintiff) had the skills, knowledge and ability to perform the more difficult/complicated

twilight dispatch job and covered that position when the twilight dispatch person was absent/on

vacation.  (Ex. AM Isabell EHP; Isabell Decl., ¶¶ 10, 29, 31; Daniels Dep., pp. 62, 76-77, 80-81,

210, 343-345)

Par. 32:  Plaintiff's former manager, Mic Haynes, stated that Plaintiff performed the

duties of and had the responsibilities of a full-time supervisor.  Pl. Ex. 14, Haynes Dep., at 157-

58.

Disputed in part, misleading, contradicted by the clear record evidence including certain

deposition testimony from plaintiff and irrelevant/immaterial  Mr. Haynes was not Plaintiff's

manager after March 2006 and had no personal knowledge of her duties/responsibilities after that

time.  More importantly, Plaintiff did not have the supervisory authority to hire, fire or discipline

employees.  UPS incorporates SOF 14 and the record citations contained therein.  As a specialist,

Plaintiff was not held responsible for ensuring the training, evaluation and discipline of drivers

and other employees.  (See id.)  Moreover, Plaintiff testified that she never performed the

twilight dispatcher duties and was not able to do so by herself.  (UPS incorporates herein by reference its reply to Pl's response to UPS' fact stmt 60)  Plaintiff also stated in her EEOC Intake Questionnaire that <u>the full-time ("MIP") supervisor job she applied for in 2005 and 2006 had more responsibility than her specialist job</u>.  (Exh. 27, p. 2)

Plaintiff cannot create a genuine issue of fact in opposition to summary judgment by contradicting her sworn deposition testimony.

Par. 33:  Plaintiff was paid less than supervisory employees, and she was not eligible for and did not receive other economic benefits made available to supervisory employees, including UPS stock through the Management Incentive Program ("MIP").  Pl. Ex. 23, Def. Answer, ¶ 39; Pl. Ex. 38, Dooley Dep., at 63-65; Pl. Ex. 27, Intake Quest.

Undisputed that Plaintiff was paid less than male and female full-time supervisory employees and was not eligible for the MIP stock incentive program provided to individuals who held full-time supervisor jobs.  As set forth in UPS' response to Pl's fact par. 12 and Plaintiff's deposition testimony and EEOC In-take Questionnaire, Plaintiff did not have the duties and responsibilities of a full-time supervisor.

Par. 34:  UPS classified Plaintiff's OMS or dispatch specialist job or position, as well as other females' OMS dispatch specialist jobs or positions, in a manner which did not reflect her actual job duties and resulted in Plaintiff performing the same duties as a supervisor, but being paid less than supervisors, as well as being denied other economic benefits, such as UPS stock, supervisors receive.  Pl. Ex. 1, Daniels Dep., at 453-54; Pl. Ex. 15, Carpenter Declar., ¶¶ 7, 8, 10, 11, 13.

Disputed, not supported by competent, admissible evidence in part, misleading, inadmissible speculation, and contrary to the record evidence.  Plaintiff once again sets forth a

conclusory allegation with no specific facts or admissible evidence to support it.  Plaintiff again relies on the conclusory, unsupported assertion in Kathleen Carpenter's Declaration.  As set forth above and in UPS' Motion Strike, Ms. Carpenter was not a manager or supervisor, did not work in Human Resources, was not Plaintiff's manager or supervisor, did not work in the Feeder Dept., and had no involvement in employment decisions concerning management employees, including specialists like Plaintiff.  Ms. Carpenter's Declaration contains no facts to support this broad allegation and show that she has personal knowledge about the jobs of "other women at UPS."  She does not even identify the "other women"/"jobs" she references.  See Motion to Strike Carpenter Decl.  There is absolutely no factual information in the record about when/how/why the specialist position in the James Street Feeder Dept. was created or by whom or that it was created in a discriminatory manner.  UPS incorporates herein by reference its responses to Plaintiff's fact pars. 29 and 32 above and the record citations therein.

Plaintiff's assertion in this paragraph is directly contradicted by the undisputed evidence that male employees Jason Isabell and Marco Zarate had the same job classification as Plaintiff – dispatch specialist -- and performed the same duties as Plaintiff when they worked the night dispatch shift between 2008 and 2010.  (Isabell Decl., ¶¶ 10, 29; Ex. AM)  In addition, Mr. Isabell had that job classification since July 2008, even though he (unlike Plaintiff) had the skills, knowledge and ability to perform the more difficult/complicated twilight dispatch job and covered that position when the twilight dispatch person was absent/on vacation.  (Ex. AM; Isabell Decl., ¶¶ 10, 29, 31; Daniels Dep., pp. 62, 76-77, 80-81, 210, 343-345)

Par. 35:  The UPS Salary Administration Guidelines are premised on an employee's job or position being accurately classified and not being classified in a discriminatory fashion.  Def. Ex. AA; Def. Ex. BB; Def. Ex. CC.

Undisputed, but not supported in part by the record evidence.  There is no record evidence to support Plaintiff's assertion that "The UPS Salary Administration Guidelines are premised on an employee's job . . . .not being classified in a discriminatory fashion."  Plaintiff merely cites the Salary Admin. Guidelines.  This fact paragraph is also irrelevant/immaterial because Plaintiff has not properly asserted a claim that her job was incorrectly classified due to her age/sex and has set forth no record evidence to support such a claim.  See also response to Pl's Fact par. 31 above.

Par. 36:  UPS management, including Gary Liberti, has repeatedly been made aware that OMS or specialist employees are performing supervisory duties and it refuses to address this issue.  Pl. Ex. 15, Carpenter Declar., at ¶¶ 8, 10.

Disputed in part, not supported by competent, admissible evidence, misleading, inadmissible speculation and irrelevant/immaterial.  Plaintiff once again sets forth a conclusory allegation with no specific facts or admissible evidence to support it.  She does not identify any member of UPS management other than Mr. Liberti.  She does not identify any time frame and the phrase "it refuses to address the issue" does is difficult to understand.

Plaintiff again relies on the unsupported assertion in Kathleen Carpenter's Declaration.  As set forth above and in UPS' Motion Strike, Ms. Carpenter was not a manager or supervisor, did not work in Human Resources, was not Plaintiff's manager or supervisor, did not work in the Feeder Dept., and had no involvement in employment decisions concerning management employees, including specialists like Plaintiff.  Other than Ms. Carpenter's allegations about her own particular job duties, her Declaration contains no facts to support this fact paragraph or show that she has personal knowledge about the jobs of "other women at UPS."  There is also no factual information about the "other women"/"jobs" she references.  See Motion to Strike

Carpenter Decl.  Plaintiff has set forth no record evidence about when, why or how the specialist position was created or by whom or that it was created in a discriminatory manner.

Plaintiff's assertion in this paragraph is directly contradicted by the undisputed evidence that male employees Jason Isabell and Marco Zarate had the same job classification as Plaintiff – dispatch specialist -- and performed the same duties as Plaintiff when they worked the night dispatch shift between 2008 and 2010.  In addition, Mr. Isabell had that job classification since July 2008, even though he (unlike Plaintiff) had the skills, knowledge and ability to perform the more difficult/complicated twilight dispatch job and covered that position when the twilight dispatch person was absent/on vacation.  Finally, there is no evidence that As a result, this fact statement is irrelevant and not based on competent, admissible evidence.

Par. 37:  In July of 2008, Gary Liberti, former Kansas Human Resources District manager, asked Plaintiff why, given the duties and responsibilities she had and was performing, she or her position was not classified as MIP or supervisory. Pl. Ex. 1, Daniels Dep., at 453-54; Pl. Ex. 2 , Daniels Notes (July 31, 2008), at PLT 324-25; Pl. Ex. 29, EEOC Cg. (April 2009), at PLT 105.

Undisputed in part and irrelevant/immaterial.  Mr. Liberti does not remember asking Plaintiff about this and his notes of their July 31, 2008 meeting do not contain a reference to this topic.  (Liberti Dep., p. 258; Ex. AN)  However, this fact paragraph is irrelevant/immaterial and misleading because Plaintiff has not properly asserted a legal claim in her Complaint that her feeder dispatch specialist job was incorrectly classified due to her age/sex and there is no record evidence to support such a claim. (See Complaint, Count I,II, IV)

Similarly, there is absolutely no evidence that Plaintiff's feeder dispatch specialist job was improperly "classified" or that it was not classified as a full-time supervisor job due to

Plaintiff's sex/age.  The dispatch specialist job in the James Street Feeder Dept. existed before Plaintiff transferred to that Department in 1999.  (See Daniels Dep., pp. 52-53)  It has been held by male employees Jason Isabell and Marco Zarate who performed the same duties as Plaintiff performed while she worked the night dispatch hours between October 2007 and August 2009, except that Mr. Isabell also performed the more difficult twilight dispatch duties while he was working the cover dispatch assignment from July 2008 until August 2009 when Plaintiff retired.  (Isabell Decl., ¶ 29; Williams Decl., ¶ 29; Liberti Decl., ¶ 24)  After Plaintiff retired, Mr. Isabell worked the night dispatch window just as Plaintiff had done.  (Isabell Decl., ¶ 36; Dooley Decl., ¶ 56)  See also response to Pl's Fact par. 31 above.

Par. 38:  Although it has been proposed that UPS consider making the night dispatch and cover dispatch positions supervisory or MIP, management has chosen not to do so because of cost or economic reasons. Pl. Ex. 5, Daniels Notes (July 14, 2009); Pl. Ex. 38, Dooley Dep., at 75-76.

Disputed in part and misstates Joe Dooley's deposition testimony.  Plaintiff has completely mischaracterized Mr. Dooley's testimony.  At pp. 75-76 of his deposition, Mr. Dooley was asked if he had ever talked to Gary Liberti about making the night dispatch an "MIP" position and he said he does not recall them ever discussing that.  (Dooley Dep., p. 75)  Then Mr. Dooley was asked:

"Q:     Was there ever any discussion with Mr. Liberti or anyone about creating another MIP position in feeders?"

A:      I had spoken to Ernie Christie about – when we lost Natalie, who was one of the three dispatch specialists, if, if there was an opportunity to have another MIP.  I was wanting to

get the MIP vacation coverage position is what I wanted, 'cause of the flexibility I would then have."

(Dooley Dep., ,p. 75)

Contrary to Plaintiff's misleading fact par., Mr. Dooley never testified that  he or any feeder manager or division manager ever "proposed that UPS consider making the night dispatch dispatch position supervisory or MIP or that management has chosen not to do so for any reason. Mr. Dooley testified at pp. 75-76 that he spoke with his boss Ernie Christie about possibly making a <u>new</u> cover dispatch position that would be a full time MIP supervisor and cover all the dispatch windows (unlike Plaintiff who did not cover absences/vacations on the twilight dispatch window).  Mr. Dooley testified that Mr. Christie said that due to the cost cutting at UPS, the changes of getting a full time MIP supervisor to work as the cover dispatch person for all three shifts was slim.  See UPS' response to par. 37 above and record citations therein.

Par. 39:  Plaintiff held the position of and worked as cover dispatcher for almost five years, from 2004 until July of 2008. Pl. Ex. 1, Daniels Dep., at 22, 59-60.

Disputed in part, misleading, contrary to the record evidence, misleading and immaterial/irrelevant.  Given that this fact statement repeats a portion of Pl's fact par. 1 above, UPS incorporates herein its response to par. 1 as if set forth fully herein.  As Plaintiff testified in her deposition and as Plaintiff's Employee History Profile (Def's Ex. A) shows, Plaintiff held the job title/classification "dispatch specialist" at UPS during the entire period 1999-2009.  (Daniels Dep., p. 22)  Plaintiff's deposition testimony shows that she alternated between the night and cover dispatch assignments/hours between 2004 and 2008, but never worked the twilight dispatch window/shift.  (See citations in UPS' response to Pl's fact par. 1 above.)

Plaintiff's assertion that she held the "cover" dispatch position is misleading and immaterial because it is undisputed that Plaintiff's work hours did not change when Mr. Isabell starting working the "cover" dispatch assignment in July 2008.  Plaintiff admitted in her deposition that she worked the night dispatch hours before and after Jason Isabell was promoted to dispatch specialist and assigned to work the cover dispatch in July 2008.  Feeder manager Joe Dooley and Feeder Division manager Ernie Christie did not believe Plaintiff was working the cover dispatch person in early to mid 2008.  (Dooley Decl., ¶¶ 36, 38;  Dooley Dep., pp. 32-33, 193; Christie Decl., ¶ 21)

It is also misleading/immaterial because Plaintiff testified that when she worked as the "cover" dispatch person, she never covered absences/vacations on the more difficult twilight dispatch shift. (Daniels Dep., pp. 62, 80-82)  Plaintiff admitted that, when Jason Isabell was assigned to work cover dispatch in July 2008, he covered all three dispatch shifts/windows including the twilight dispatch.  Plaintiff also admitted in her deposition she was not able to perform the twilight dispatch duties without assistance in July 2008 when Mr. Isabell was given the "cover" dispatch assignment. (Daniels Dep., p. 356)  Accordingly, Plaintiff's allegation that she was the "cover" dispatcher from 2004-2008 is irrelevant/immaterial.

Par. 40:  In July of 2008, Plaintiff was stripped of, or removed from, the cover dispatch position she held and replaced by a younger, less experienced male. Pl. Ex. 1, Daniels Dep., at 442-43, 447-48.

Disputed, contrary to the record evidence, misleading and conclusory argument.  Plaintiff testified in her deposition and her EHP shows that Plaintiff held the job title/classification "dispatch specialist" throughout the period 1999-2009.  (Daniels Dep., p. 22; Ex. A)  Plaintiff's testimony shows that she alternated between the night and cover dispatch assignments/hours

between 2004 and 2008, but never worked the twilight dispatch window/shift.  (See UPS'
responses to Pl's fact pars. 1 and 39 and record citations therein set forth above.)

Plaintiff's assertion that she was removed from the cover dispatch job when Jason Isabell
was promoted in July 2008 is misleading and immaterial because it is undisputed that Plaintiff's
work hours did not change when Mr. Isabell was promoted and started working the cover
dispatch assignment in July 2008.  (See Daniels Dep., pp. 75-76, 343; SOF 68-69, 71 and record
citations therein; Dooley Decl., ¶ 40)  Plaintiff worked the night dispatch hours both before and
after Mr. Isabell was promoted to dispatch specialist and assigned to work cover dispatch in
July 2008.  (Id.)

Plaintiff's assertion that she had the "cover dispatch position" is misleading and
immaterial for several reasons.  First, Plaintiff testified that, unlike Mr. Isabell, when she worked
as the cover dispatch person, she <u>never</u> covered absences/vacations on the busier, more difficult
twilight shift.  (Daniels Dep., pp. 62, 80-82)  When Jason Isabell was assigned to work cover
dispatch in July 2008, he covered all three dispatch shifts/windows including the busier, more
difficult twilight dispatch.  (Daniels Dep., p. 356; Isabell Decl., ¶¶ 10, 29)  Plaintiff admitted in
her deposition she was not able to perform the twilight dispatch duties without assistance in
July 2008 when Mr. Isabell was given the "cover" dispatch assignment.  (Daniels Dep., p. 356)
Accordingly, Plaintiff's allegation that Mr. Isabell took the "cover dispatch position" she had
been performing is contrary to the record evidence and is misleading.

Par. 41:  Plaintiff, as the cover dispatcher, was covering for the night dispatch window at
the time she was removed from the cover position; she was not the full-time night dispatcher at
that time. Pl. Ex. 1, Daniels Dep., at 442-43, 447-48; Pl. Ex. 25, Email (Dec. 29, 2007).

Disputed, contrary to the record evidence, misleading but immaterial.  Feeder manager Joe Dooley and Feeder Division manager Ernie Christie did not believe Plaintiff was working the cover dispatch person in early to mid 2008.

In any event, as set forth in response to fact pars. __ above, Plaintiff's assertion that she was the "cover" dispatch person until July 2008 when Mr. Isabell was promoted and assigned to work cover dispatch is misleading and immaterial to Plaintiff's claims.  Plaintiff testified in her deposition and her EHP shows that Plaintiff held the job title/classification "dispatch specialist" throughout the period 1999-2009.  (Daniels Dep., p. 22; Ex. A)  Plaintiff's testimony shows that she alternated between the night and cover dispatch assignments/hours between 2004 and 2008, but never worked the twilight dispatch window/shift.  (See UPS' responses to Pl's fact pars. 1 and 39 and record citations therein set forth above.)  As set forth in response to Pl's fact referenced above, Feeder manager Dooley and Division Manager Christie did <u>not</u> believe Plaintiff was working as the cover dispatch person in 2008.  Rather, they believed Plaintiff was working the night dispatch at that time.  (Dooley Decl., ¶¶ 36, 38;  Dooley Dep., pp. 32-33, 193;  Christie Decl., ¶ 21)  As a result, they did not "remove" plaintiff from that position and replace her with Mr. Isabell when he was promoted in July 2008.  (Dooley Decl., ¶¶ 35, 40;  Dooley Dep., pp. 32-33, 36-37, 193; Christie Decl., ¶ 26)

Plaintiff's assertion that she had the "cover dispatch position" is misleading and immaterial for several reasons.  First, Plaintiff testified that, unlike Mr. Isabell, when she worked as the cover dispatch person, she <u>never</u> covered absences/vacations on the busier, more difficult twilight shift.  (Daniels Dep., pp. 62, 80-82)  When Jason Isabell was assigned to work cover dispatch in July 2008, he covered all three dispatch shifts/windows including the busier, more difficult twilight dispatch.  (Isabell Decl., ¶¶ 9, 29)  Plaintiff admitted in her deposition she was

not able to perform the twilight dispatch duties without assistance in July 2008 when Mr. Isabell was given the "cover" dispatch assignment.  (Daniels Dep., p. 356)  Accordingly, Plaintiff's allegation that Mr. Isabell took the "cover dispatch position" she had been performing is contrary to the record evidence and is misleading.

Second, it is undisputed that Plaintiff's work hours did not change when Jason Isabell starting working the cover dispatch assignment in July 2008.  (See Daniels Dep., pp. 344-345; Dooley Decl., ¶¶ 38, 40)  Plaintiff worked the night dispatch hours both before and after Mr. Isabell was promoted and assigned to work cover dispatch in July 2008.  (Daniels Dep., pp. 344-345; Dooley Decl., ¶¶ 38, 40)

Par. 42:  UPS gave Plaintiff no advance notice she was going to be removed from the cover position she held or that it was interviewing for that position; UPS removed her from the cover position and placed Jason Isabell in that position while Plaintiff was on vacation. Pl. Ex. 1, Daniels Dep., at 442-43; Pl. Ex. 2, Notes (July 31, 2008), at PLT 322-24; Pl. Ex. 27, Intake Quest.

Disputed in part, misleading, contrary to the record evidence and immaterial.  As set forth in response to Pl's fact pars. 40 and 41 above, management believed that Plaintiff was working as the night dispatch person in mid 2008, and therefore, did not make a decision to "remove" plaintiff from that position when Mr. Isabell was promoted in July 2008.  (Dooley Decl., ¶¶ 36, 38; Christie Decl., ¶ 26; Dooley Dep., pp. ¶ 32-33, 36-37, 193)

This fact assertion is immaterial because, even assuming arguendo that Plaintiff had been "removed" from the cover dispatch assignment (as she claims), UPS was not required to give her "advance notice."

Par. 43:  Joe Dooley interviewed one female, as instructed by management, who had no interest at all in the cover position, felt she was being forced to interview so UPS could "cover their butts," and was told by Mr. Dooley he already had someone else in mind for the position. Pl. Ex. 1, Daniels Dep., at 662-63; Pl. Ex. 2, Daniels Notes (July 31, 2008), at PLT 323-24.

Disputed in part, misleading, contrary to the record evidence in part, based on inadmissible hearsay and immaterial/irrelevant.  Gary Liberti recommended that package center specialist Cindy Holt be interviewed for the open Feeder dispatch specialist position in July 2008 (the position Mr. Isabell ultimately received) because the Kansas District was attempting to reduce the number of package center specialists and was considering eliminating Ms. Holt's job. (Liberti Decl., ¶ 21)

Plaintiff's assertions that Ms. Holt "felt she was being forced to interview so UPS could 'cover their butts,'" and that Ms. Holt "was told by Mr. Dooley he already had someone else in mind for the position," are based solely on Plaintiff's hearsay testimony and notes about what Cindy Holt allegedly told Plaintiff.  See Fed.R.Evid. 801.

Like most of Plaintiff's alleged facts, this fact paragraph is misleading, not supported by competent, admissible evidence and irrelevant.

Par. 44:  Although Defendant claims Plaintiff was removed from and not allowed to remain in the cover position because she lacked twilight window experience, Plaintiff did have twilight window experience; yet, UPS did not allow her to complete her twilight window training. Pl. Ex. 1, Daniels Dep., at 60-62, 90-92, 111-12.

Disputed in part, but mischaracterizes UPS' position, misleading and confusing, and contradicts Plaintiff's sworn deposition testimony and other record evidence.

UPS has not asserted and does not "claim[] Plaintiff was removed from" or "not allowed to remain in the cover position" in 2008.  On the contrary, as set forth above, Feeder manager Joe Dooley and Feeder Division Manager Ernie Christie believe Plaintiff was working as the night dispatch person in mid 2008, not cover dispatch.  Instead, the record evidence shows that Mr. Dooley and Mr. Christie had one open dispatch specialist position in mid 2008, and decided to promote Jason Isabell to that position.  The undisputed record evidence also shows that they assigned Mr. Isabell to work as the cover dispatch person at that time because he was able to cover absences/vacations on all three dispatch shifts, including the twilight dispatch window.

Plaintiff once again attempts to mislead the Court by asserting that "Plaintiff <u>did</u> have twilight window experience . . ." (emphasis added)  As discussed in UPS' reply to Pl's response to UPS' facts, Plaintiff's present assertion in response to summary judgment that she "did have twilight window experience" is misleading and contradicts Plaintiff's deposition testimony that she was not able to perform the twilight dispatch job, and never performed or covered the twilight dispatch shift.

Plaintiff's assertion in this fact par. that, "despite her alleged twilight window experience, UPS did not allow her to complete her twilight window training," is misleading, confusing and contrary to Plaintiff's deposition testimony.  Plaintiff testified in her deposition that UPS gave her one week of twilight dispatch training rather than the two weeks she believes were necessary for Plaintiff to learn to perform the twilight dispatch job by herself).  (Daniels Dep., pp. 61-62, 602, 721)

Plaintiff testified that, after she received the one week of training, Mr. Haynes told her that her training would not continue because former Feeder Division Manager Guy Albertson had decided that only a full-time supervisor could work or "cover" the twilight dispatch window.

(Daniels Dep., pp. 61-62)  It is undisputed that Mr. Albertson made this decision in that general period of time in order to avoid serious service failure on the more difficult, complicated twilight dispatch window.  (Albertson Decl., ¶ 18)  As set forth in Mr. Albertson's declaration, around this same time, the Feeder Dept. had "missed" a trailer of packages which resulted in UPS' failure to deliver hundreds of packages to customers on time.  (Id. at ¶ 17)  There is absolutely no evidence that his decision was due to the age/gender of Plaintiff or any other employee.

Par. 45:  After UPS started training on the twilight window, UPS put in place a rule or requirement that only supervisory or MIP employees would be allowed to work on or cover the twilight window. Pl. Ex. 14, Haynes Dep., at 137; Pl. Ex. 1, Daniels Dep., at 61-62.

Undisputed, but confusing and misleading.  Plaintiff makes the vague assertion that "After UPS started training . . . , UPS put in place a rule . . . that only supervisory . . . employees would be allowed to work on or cover the twilight window."  As set forth in response to par. 44 above, Plaintiff testified that shortly after Mic Haynes told Plaintiff that she would be working as the cover dispatch person in 2004 or 2005, she was given one week of training on the twilight dispatch window.  (Daniels Dep., pp. 61-62)  Plaintiff testified that, after she received the one week of training, Mr. Haynes told her that her training would not continue because Division Manager Guy Albertson had decided that only a full-time supervisor could work or "cover" the twilight dispatch window.  (Id.)  It is undisputed that Mr. Albertson made this decision to try to reduce the risk of serious service failures on the more difficult, complicated twilight dispatch window.  (Albertson Decl., ¶ 18)  There is absolutely no evidence that Plaintiff's age/sex played any part in his decision.

Par. 46:  Although Defendant had a rule that only a full-time supervisor could work on or cover the twilight window, Jason Isabell, who was not a full-time supervisor, was allowed to and did work on and cover the twilight window. Pl. Ex. 14, Haynes Dep., at 137-141; Def. ¶ 74.

Disputed in part, confusing, misleading, and misstates the record evidence.  UPS admits that in 2007, the new James Street Feeder manager Allen Kirby and the new Division Manager, Jeff Czernicki, used Jason Isabell to cover the twilight dispatch for a couple of months while the twilight dispatch person, Dennis Smith, was on a leave of absence.    This occurred at least two years after Mr. Albertson made the decision that he wanted a full time supervisor to work/cover the twilight dispatch window.  Mr. Albertson was not the Division Manager in 2007, and Mic Haynes was not the James Street Feeder Manager.  (See Albertson Decl., ¶ 12)

Mr. Isabell worked as the part-time Feeder yard control supervisor at James Street from 2003 through 2008.  Plaintiff admitted in her deposition that in his position as yard control supervisor, Mr. Isabell worked closely with the twilight dispatch person (Jim Yankovich or Dennis Smith) in the course of performing his own job duties and learned to perform the twilight dispatch duties.  (Daniels Dep., pp. 91, 102-103, 157-160)  As Mr. Isabell and Mr. Yankovich stated in their declaration, Mr. Isabell took the initiative to learn the twilight dispatch job duties by assisting the dispatcher and asking questions.  (Isabell Decl., ¶ 19; Yankovich Decl., ¶ 28)  Plaintiff did not take advantage of the same opportunity even though there were occasions while she was the cover person when she was instructed to come to work and assist during the twilight dispatch shift because there were no absences/vacations to cover that day/week.  (See Yankovich Decl., ¶ 36)

It is undisputed that, unlike Mr. Isabell, Plaintiff was not able to perform/cover the twilight dispatch window.

Par. 47:  The twilight window experience and qualifications UPS claimed it wanted for the cover position and which it alleges Plaintiff lacked and prevented her from remaining in or being considered for the cover position were only afforded or made available to employees in positions held only by males. Id.; Pl. Ex. 14, Haynes Dep., at 137-141; Pl. Ex. 1, Daniels Dep., at 61-62.

Disputed, contrary to the record evidence, and misleading.  As set forth in response to par. 1 of Pl's AMF, Plaintiff's position at UPS from 1999-2009 was "dispatch specialist." Plaintiff was never demoted or transferred from that position/job classification.  (UPS incorporates by reference its record citations set forth in response to par. 1 of Pl's AMF)  As the undisputed evidence also shows, Mr. Isabell did not receive any formal training on the twilight dispatch duties.  Instead, he took the initiative to learn those duties because he worked closely with the twilight dispatchers in the course of performing his duties as the yard control person. He worked during the twilight shift and sat next to the twilight dispatch person.  Mr. Isabell learned those duties primarily by assisting/observing the twilight dispatchers while performing his own job.  There is no evidence that Plaintiff ever asked to be moved to the yard control job which Mr. Isabell held.

In addition, there were days while Plaintiff was the cover dispatch person when she came to work during the twilight dispatch because there were no absences/vacations for her to cover. She could have taken advantage of those opportunities and learned the twilight dispatch duties, but she chose not to do so.  She never told managers Joe Dooley or Allen Kirby that she wanted to learn the twilight dispatch job.

Par. 48:  Plaintiff was not provided with cover dispatch training that was given to the younger, male that replaced Plaintiff in the cover position. Id. at 61-62, 158-59.

Disputed in part, confusing, misleading, contrary to the competent, admissible record evidence.

It is undisputed that Jason Isabell worked as the part-time Feeder yard control supervisor at James Street from 2003 through 2008.  It is also undisputed that in his yard control job, Mr. Isabell worked closely with the twilight <u>dispatch</u> person (either Jim Yankovich or Dennis Smith) in the course of performing his job duties and, as a result of assisting/observing them, learned to perform the twilight dispatch duties.  (Daniels Dep., pp. 157-160; Isabell Decl., ¶ 19; Yankovich Decl., ¶ 28)  Plaintiff's deposition testimony to the contrary is not based on personal knowledge and does not constitute competent, admissible evidence.

Plaintiff claims she was the cover dispatch person between 2004 and July 2008.  (Pl's Fact par. 1)  Plaintiff testified that as the cover dispatch person, she covered absences on the day/night dispatch window and also covered absences/vacations of administrative assistants, the part time rail yard clerk and the part time yard control supervisor.  (Daniels Dep., pp. 61-62, 90-94)  While Plaintiff claims Mr. Isabell received formal training on the twilight dispatch, a careful review of her deposition testimony shows that Plaintiff normally did not work during the twilight dispatch window and does not have knowledge of specific training which Mr. Isabell supposedly received on the twilight dispatch duties other than working closely with the twilight dispatch person in order to perform his own yard control supervisor job during the twilight window.  (see Daniels Dep., pp. 102-103, 157-160; Isabell Decl., ¶ 19-20; Yankovich Decl., ¶ 28-29)

Although Plaintiff occasionally reported to work <u>during</u> the twilight hours when she was the cover dispatch person and she had no absences/vacations to cover, Plaintiff did not take advantage of the same opportunity to assist the twilight dispatcher, ask questions and learn the

twilight dispatch job duties, as Mr. Isabell had done.  (See Yankovich Decl., ¶ 28; Dooley Decl., ¶ 31; Isabell Decl., ¶ 19.

Par. 49:  Plaintiff's former manager, Mic Haynes, testified under oath that he believed Plaintiff should have been placed in the cover dispatcher position and she was the individual best qualified to hold the cover position. Pl. Ex. 14, Haynes Dep., at 136-37.

Disputed in part, but irrelevant/immaterial, confusing and misleading.  Mr. Haynes' opinion about who should have been given the cover dispatch assignment in July 2008 is completely irrelevant and not based on personal knowledge.  Mr. Haynes retired in February 2008 and left the James Street Feeder manager job in March 2006.  (Ex. O EHP; Haynes Dep., pp. 135-136, 170, 200-01)  Mr. Haynes testified he had no personal knowledge or involvement in Mr. Isabell's 2008 promotion or the decision to put him in the cover dispatch assignment. (Haynes Dep., pp. 135-136, 170)

Par. 50:  The day, night, and twilight dispatch positions or windows in the Feeder Department have very different duties and responsibilities and the hours are much different. Pl. Ex. 30, JBAs.

Undisputed.

Par. 51:  Joe Dooley stated in his deposition that the different feeder dispatch specialist positions have different duties and the duties change.  Pl. Ex. 38, Dooley Dep., at 25, 28.

Undisputed, but confusing/misleading.  Mr. Dooley testified that there are three dispatch windows.  On the deposition pages referenced, Plaintiff's counsel questioned Mr. Dooley about the job breakdown analyses (JBAs) for the dispatch windows at James Street.  Mr. Dooley testified that as UPS' business changes over time, UPS adds or deletes information in the JBAs. (Dooley Dep., p. 25)

Par. 52:  Plaintiff had experience performing the duties of, and working in, all the different dispatcher positions (windows or shifts) in the feeder department – day, night, twilight, and cover. Pl. Ex. 1, Daniels Dep., at 25, 38, 39, 53-55, 111, 171-82, 221-22, 453-54; Pl. Ex. 14, Haynes Dep., at 61-62.

Disputed, misleading, contrary to the record evidence including Plaintiff's deposition testimony and Plaintiff's claims/allegations in her Complaint.  This fact statement is also contradicted by Plaintiff's statements in the Pretrial Order that she did not receive sufficient training to perform the twilight dispatch job duties.

Plaintiff's present assertion in response to summary judgment that she "had experience performing the duties of, and working in, all the different dispatcher positions (windows or shifts) in the feeder department – day, night, twilight" directly contradicts the undisputed record evidence and Plaintiff's allegations in her Complaint that she was not given sufficient training on the twilight dispatch window/shift (the job performed by Jim Yankovich and Dennis Smith alternatively between 2004 and 2009) and therefore, never learned to perform that particular job:

> "Q:      Well, when you first started working as cover dispatcher, which shifts did you cover?
>
> A:      The day window and the night window as needed.  I started training on the Kansas City twilight window . . . I was a week into the training and Mic . . . told me that I could not train any longer on that window. . . .  So I never was allowed the opportunity to learn that window."
>
> (Daniels Dep., pp. 61-62)

* * *

> Q:      And you had already been working as a night dispatcher. So when you say . . . you already knew a lot of these different things, 'cause you had been a dispatcher for a –
>
> A:      Right.

Q:      -- few years?

A:      Right.

Q:      . . . . How long did you think you would need <u>training on the twilight dispatch to be able to do that job</u> since you had been a dispatcher for, I guess, four or five years?

A:      . . . . I probably would have needed another solid week, possibly two.

(Daniels Dep., pp. 67-68)

* * *

Q:      . . . .  In July of 2008, did you think that you were capable of performing the twilight dispatch job at James Street by yourself with no assistance?

A:      <u>No</u>."

(Daniels Dep., p. 356)

* * *

Q:      . . . . <u>And what training do you think Guy Albertson denied you?  Is it the same training on the twilight dispatch?</u>

A:      <u>Yes, ma'am.</u>

(Daniels Dep., p. 442)

(Daniels Dep., pp. 61-62, 67-68, 422-423; see also Compl., ¶ 37, Plaintiff's

Answers to Interrogs. 5, 10)  Plaintiff also repeatedly testified that she was not

knowledgeable about various aspects of the twilight <u>dispatch</u> duties:

"Q:      Are there things about the twilight dispatch that you're not knowledgeable about at James Street?

A:      Well, again, all of the CPU accounts because I never had more than just a brief week of training.

Q:      Are those customer pickups?

A:      Yes, ma'am.

* * *

Q:      So was handling these customer pickups a pretty big part of the twilight dispatcher job at James Street?"

A:      Yes."

(Daniels Dep., pp. 131-32)

* * *

Q:      Do you have personal knowledge about all of the job duties, you know, all the trailers, all the volume, all the reports on the twilight dispatch window at James Street between 2007 and 2009?

A:      I couldn't possibly have all the knowledge."

(Daniels Dep., p. 168)(Emphasis added)

* * *

**Q:      Do you know all the – the duties and tasks that the twilight dispatcher would do during his shift?**

**A:      I couldn't possibly know all that he is required to do.**

* * *

Q:      . . . . Well, is there anything else that you're aware of that the twilight dispatcher would do during his shift?

A:      I just said I didn't – I couldn't speak to that, no."

(Daniels Dep., p. 189) (Emphasis added)

Q:      . . . . I mean, between, say, 2006 and 2009, do you know of any other forms that the twilight dispatcher would use?

[objection]

Q:      Other than what you already said?

[objection]

A:      But it is speculation.  I wasn't there.

Q:      Well, then you need to say you don't know if I –

A:      I don't know."

(Daniels Dep., pp. 193-94) (Emphasis added)

* * *

Q:      Now, on the twilight dispatch, what reports did the twilight dispatcher have to fill out on a daily basis?

[objection]

A:      I, again, would have to speculate and you've asked me not to do that –

Q:      Right.

A:      -- so I am not aware of what forms, if any, the twilight supervisor was responsible for.

Q:      And you said form, and I don't know if you're using that the same.  Do you mean reports?  'Cause I asked about reports.  Do you know of any reports that the twilight dispatcher had to fill out and submit?

A:      No."

(Daniels Dep., pp. 198-99)(Emphasis added)  Plaintiff cannot create a genuine issue of fact and thereby avoid summary judgment by making factual assertions that directly contradict her sworn deposition testimony.

Par. 53:  Plaintiff had repeatedly told Mr. Dooley and other managers she wanted to come off the night dispatch window and that she did not want to regularly cover or work nights, Sunday and holiday nights, in particular. Pl. Ex. 38, Dooley Dep., at 41-42; Pl. Ex. 37, Liberti Dep., at 181-83; Pl. Ex. 8, Car. Dev. Guide (2007), at PLT 202; Pl. Ex. 27, Intake Question., at 3.

Undisputed, but irrelevant and confusing.  Plaintiff does not indicate the time period she is referring to in this fact paragraph.  Moreover, this fact paragraph and much of the record evidence Plaintiff relies on demonstrate that Plaintiff worked the night dispatch hours/shift

between 2007 and 2009 when she retired from UPS.  As a result, they clearly undermine Plaintiff's claim that her job changed in July 2008.

Par. 54:  Plaintiff's 2008 time sheets, which were approved by Mr. Dooley, show Plaintiff was covering the night window. Pl. Ex. 13, PTRS Times Sheets; Pl. Ex. 38, Dooley Dep., at 130-31.

Undisputed, but misleading and irrelevant/immaterial.  UPS admits that Plaintiff's PTRS time sheets from October 2007 through August 2009 (and later) show that Plaintiff generally worked the night dispatch shift/hours.  UPS also admits that Plaintiff erroneously indicated in the notes section of her time records that she was "covering for Nicole" in 2008 and early 2009, even though Nicole Chapell was terminated by UPS in December 2008.  The undisputed record evidence shows that Mr. Dooley and his direct supervisor Ernie Christie did not believe they had a "cover" dispatch person in 2008 before Mr. Isabell was promoted and assigned to work as the cover person.  (Dooley Decl., ¶ 34; Christie Decl., ¶ 22)

Par. 55:  Mr. Dooley, Mr. Liberti, and other managers knew Plaintiff was performing the duties and held the position of cover dispatcher. Pl. Ex. 38, Dooley Dep., at 32, 35; Pl. Ex. 37, Liberti Dep., at 179-83; Pl. Ex. 24, Email (Aug. 3, 2006).

Disputed in part, but irrelevant/immaterial.  Plaintiff does not identify what time period she is referring to in this fact statement.  It is undisputed that Plaintiff worked as the cover dispatch person from 2004 or 2005 until late 2007.  However, the undisputed evidence shows that in March 2008 when Mr. Dooley returned to the James Street Feeder Manager job, Plaintiff was working the night dispatch hours.  They only had two dispatch specialists working because Nicole Chapell had never returned to work after her car accident.  It is also undisputed that Plaintiff's work hours/schedule did not change between October 2007 and August 2009.

Moreover, it is undisputed that when Plaintiff was the cover dispatch person, she never covered absences/vacations of the twilight dispatcher.

Par. 56:  On January 13, 2009, utilizing UPS email, James Street Feeder Supervisor Scott Wetschensky sent to another other male Feeder Supervisor, Jim Yankovich, and other male employees, including the individual who had replaced Plaintiff in the cover position, Jason Isabell, a four page sexually discriminatory email which was disparaging of and ridiculed women, including stating that women need to keep their problems and concerns to themselves. *This email was entitled: "THE MAN RULES" - in bold face, upper case letter on the front page. Pl. Ex., 26, Email (Jan. 13, 2009).*

Disputed in part, contrary to the record evidence in part, misleading, irrelevant/ immaterial and contains improper legal conclusion/argument.  The fact supervisor Scott Wetschensky sent this email is not material or disputed.  The email is clearly irrelevant/immaterial because Mr. Wetschensky:  (1) has been a feeder "on road" supervisor since  2007 (Ex. AG), (2) was never Plaintiff's supervisor or  manager; and (3)  had no involvement in decisions concerning Plaintiff's employment/compensation.

Mr. Wetschensky's email was not sent to Plaintiff and does not mention, concern or relate to Plaintiff or any decisions concerning her employment/compensation.[20] (See Pl's Ex. 26).  Instead, it is a silly, non-work related attempt at humor , not a statement regarding Mr. Wetschensky's or any other individual's beliefs about Plaintiff or female employees generally. The three recipients of this email -- Mr. Isabell, Mr. Nord and Mr. Yankovich -- were never Plaintiff's supervisors/managers and had no involvement in decisions concerning her employment, and only Mr. Yankovich held a higher-level position than Plaintiff.  (See Dooley

---

[20]      It is unclear how Plaintiff obtained a copy of this email.

Decl., ¶ 18; Yankovich Decl., ¶¶ 1, 3, 6; Isabell Decl., ¶ 13)  This completely irrelevant email from Mr. Wetschensky does not constitute evidence of sex discrimination or demonstrate sexual animus with respect to any decisions concerning Plaintiff.  See, e.g., Sykes v. Napolitano, 710 F.Supp.2d 133, 147-48 (D.D.C. 2010) (email containing "racially derogatory joke" forwarded by supervisor who was not involved in reassignment decision failed to create inference of race discrimination or demonstrate racial animus).  Paragraph 56 of Pl's AMF, like many others, does not comply with FRCP 56 or Local Rule 56.1 and provides a good example of Plaintiff's attempt to avoid summary judgment by submitting irrelevant/immaterial opinions and conjecture in the guise of facts.

Par. 57:  When asked about this email by Plaintiff's counsel during a deposition in this case, Gary Liberti and Joe Dooley claimed not to have been previously aware of its existence. Pl. Ex. 37, Liberti Dep., at 103; Pl. Ex. 38, Dooley Dep., at 114.

Undisputed, but irrelevant/immaterial, particularly given that the email is not addressed to Mr. Dooley.  Plaintiff's assertion in this fact paragraph underscores the irrelevant nature of this email.  See UPS' response to par. 56 of Plaintiff's AMF above.

Par. 58:  When UPS Feeder Manager Joe Dooley was asked if and how this email was responded to after learning of it, Mr. Dooley said the employees who sent this email, who report to him, were told only that this was an improper use of UPS email for personal or non-work-related purposes; no disciplinary action was taken with the employees who sent this email. Pl. Ex. 38, Dooley Dep., at 115-120.

Undisputed, but irrelevant/immaterial.  Plaintiff was not a recipient of this email and it is unclear how Plaintiff obtained a copy.  However, the undisputed evidence shows that Plaintiff never complained or brought this email to the attention of management/Human Resources

despite the fact that she was still employed at UPS as of the date set forth in the email.  UPS incorporates herein by reference its responses to pars. 56 and 57 of Plaintiff's AMF above.

Par. 59:  Although this type of email and conduct is addressed within and prohibited by the UPS Professional Conduct and Anti-Harassment Policy, which Mr. Dooley agreed in writing to comply with, when Mr. Dooley was asked in his deposition if he believed that email was sexually discriminatory, he said he did not know. Id. at 120-122; Pl. Ex. 50.

Undisputed, but misleading, misstates the record evidence and irrelevant/immaterial.  For the reasons set forth above in response to pars. 56 and 57 of Plaintiff's AMF, Mr. Wetschensky's email is completely irrelevant and immaterial.  Mr. Dooley testified that he was not aware of the email before he attended Gary Liberti's deposition in this lawsuit in Feb. 2010.  (Dooley Dep., pp. 114-116)  When questioned about the email at his own deposition on Feb. 18, 2010, Mr. Dooley testified that he believed the email was inappropriate for the workplace and that he had counseled Mr. Wetschensky about sending such emails after Mr. Dooley learned about it the day before his deposition.  (Id. at 118)  Mr. Dooley testified "I don't know" in response to a question from Plaintiff's counsel about whether "that email being sent via the UPS E-mail system . . . is contrary to UPS' policy regarding sexual discrimination."  The question was confusing and lacked foundation, but the email clearly does not constitute sex discrimination.

Par. 60:  Gary Liberti, former Kansas District Human Resources Manager, gave corporate deposition testimony stating that, although he was sure it has occurred, he could not recall any situations where UPS had found a violation of the UPS Code of Business Conduct non-retaliation provisions. Pl. Ex. 37, Liberti Dep., at 262.

Undisputed, but irrelevant/immaterial, not supported by the deposition testimony cited, and lacks context/foundation.

Par. 61:  On July 31, 2008, Plaintiff met with Gary Liberti and specifically made a complaint of sex and age discrimination and retaliation. Pl. Ex. 1, Daniels Dep., at 425, 427, 429, 451-52; Pl. Ex. 2, Notes (July 31, 2008); Pl. Ex. 27, Intake Quest.; Pl. Ex. 28, EEOC Cg. (Nov. 2008); Pl. Ex. 29, EEOC Cg. (April 2009).

Disputed in part, but misleading and irrelevant/immaterial.  For purposes of this Motion only, UPS does not dispute Plaintiff's assertion that she complained of age/sex discrimination in her meeting with Gary Liberti in July 2008.

Plaintiff's vague, misleading claim that she complained of "retaliation" in that meeting, but does not indicate the nature of her alleged retaliation complaint that day.[21]  It is undisputed that Plaintiff met with Mr. Liberti that day to express her dissatisfaction with the fact that Mr. Isabell had been working the Feeder cover dispatch assignment since early July 2008,  (Liberti Decl., ¶ 79-80; Pl's Ex. 27, p. 3)  UPS denies that Plaintiff complained about retaliation in that meeting.  (Liberti Decl., ¶ 79)  Plaintiff stated in her Aug. 2008 EEOC In-take Questionnaire that she complained to Mr. Liberti in the July 2008 meeting that Mr. Isabell had been given the cover dispatch assignment in retaliation for Plaintiff's complaint about Mr. Dooley to HR in 2006 when he left a note at her house because he needed her to work not in retaliation for complaining about alleged age/sex discrimination:

> On July 31, 2008, I met with Gary Liberti . . . to voice my concerns regarding . . . my cover job being given away for no known reason or explanation[22] by Joe

---

[21]     Notably, in the EEOC in-take Questionnaire Plaintiff completed in Aug. 2008, she does not state that she complained to Mr. Liberti or made any reference in their July 2008 meeting about age/sex discrimination.  (Pl.'s Ex. 27, p. 3)

[22]     Interestingly, Plaintiff contradicts herself in her EEOC Questionnaire (as she did in her Complaint/deposition) by first stating that she told Mr. Liberti that Mr. Dooley gave her no explanation or reason for assigning Mr. Isabell to the cover position and then stating in the next paragraph that "The only reason Joe Dooley gave me was that Jason Isabell knew the MIP dispatch window."  (Ex. 27, p. 3)

Dooley and that I felt this was not only discrimination but retaliation on Joe Dooley's part for reporting him to HR in 2006.

(Pl's Ex. 27, pp. 2-3)

In Plaintiff's deposition, she testified that the first time she complained to anyone in UPS management/Human Resources about age or sex discrimination was during her meeting with Mr. Liberti in July 2008.  (Daniels Dep., pp. 425, 438)  Moreover, Plaintiff repeatedly stated in her deposition, interrogatory answers and Complaint that the alleged retaliation about which she is complaining in this lawsuit occurred after her alleged meeting with Mr. Liberti in July 2008 meeting.  (Daniels Dep., pp. 425, 438)

Par. 62:  Plaintiff told Mr. Liberti the basis of her complaint, stating she believed she had been improperly removed from her cover position and replaced by a younger, less qualified male and she had been denied training provided to the individual who replaced her. She also asked Mr. Liberti to confirm the promotion process and procedures; she then told him she felt her promotion applications had not been processed properly and that no one from management had ever met or followed-up with her. She told Mr. Liberti she felt that, because of this, she was being discriminated against because of her age and sex and, also, in retaliation for an earlier complaint she had made about Mr. Dooley coming to her home. Pl. Ex. 1, Daniels Dep., at 446-60; Pl. Ex. 2, Daniels Notes (July 31, 2008).

Disputed in part, contrary to certain record evidence, misleading and confusing, but irrelevant/immaterial.  Despite the length of this fact par., Plaintiff has not set forth any disputed issues of material fact.  UPS admits for purposes of this Motion only that Plaintiff complained about age/sex discrimination during her July 31, 2008 meeting with Gary Liberti.  While UPS denies that Plaintiff discussed all the issues listed in this fact par. during that meeting, Plaintiff's assertion that she complained about all of these alleged instances of age/sex discrimination are

irrelevant/immaterial given that UPS is not disputing (for purposes of this Motion) that Plaintiff complained of sex/age discrimination during the meeting.

Plaintiff's admission here that she told Mr. Liberti that she believed the conduct she allegedly complained about was due to her age/sex and her complaint in 2006 about Mr. Dooley coming to her home shows that she did not complain that she had been retaliated against for engaging in any conduct protected by Title VII, the ADEA, the KAAD or the KADEA (i.e. retaliation for complaining about age/sex discrimination).  It is undisputed that Plaintiff never complained of age/sex discrimination to anyone in management/HR before July 31, 2008 when she met with Mr. Liberti.  (Compl., ¶ 29)

Par. 63:  At that meeting, on July 31, 2008, Plaintiff was told for the first time, by Mr. Liberti, that promotion applications and materials are not always processed properly or timely returned to human resources by managers and, also, an applicant's manager is required to follow-up and meet with the applicant to inform them of the status of their application - regardless of whether or not the applicant is being further considered for promotion. Pl. Ex. 1, Daniels Dep., at 446-60; Pl. Ex. 2, Daniels Notes (July 31, 2008).

Disputed, contradicted in part by the record evidence, but irrelevant/immaterial and misleading.  Although Mr. Liberti testified that he did not make these statements to Plaintiff during the July 2008 meeting, Plaintiff's allegations are irrelevant/immaterial to her claims. Plaintiff's promotion claims are barred by her failure to file a timely charge of discrimination.

Plaintiff's assertion that this was the first time that she was told the alleged information about processing promotion applications and the manager follow-up described in the MAPP documents, does not excuse Plaintiff from the requirement in Title VII, the ADEA, the KAAD and the KADEA that she file a timely charge of discrimination regarding a promotion decision.

Though Plaintiff attempts to imply that she did not know until 2008 that she was not promoted to full time supervisor in 2005/2006, Plaintiff clearly knew before 2008 that she had not been promoted.

Plaintiff submitted a letter of intent for promotion to full-time supervisor in March 2006 (Ex. Y), thus she clearly knew she had not been promoted before that time.  With respect to her 2006 application for promotion, Plaintiff testified that in 2007, she and her new Feeder manager Allen Kirby discussed the fact that Mr. Dooley had not filled out her promotion assessment form/packet in 2006.  (Daniels Dep., pp. 265-266)  Plaintiff also stated she told Kirby that she was not interested in applying for promotion.  Plaintiff also claims in opposition to summary judgment that she did not submit an application for promotion in 2007 because she knew it would be a "futile gesture" due to the alleged sex/age discrimination.  Thus, Plaintiff cannot show that she was not aware of the alleged discriminatory denial of promotion before her meeting with Mr. Liberti in July 2008.

Par. 64:  Although Mr. Liberti expressly told Plaintiff he would look into her concerns and he would follow-up with her, neither Mr. Liberti nor anyone from UPS ever got back to Plaintiff regarding her concerns or complaint. Pl. Ex. 1, Daniels Dep., at 431-32, 467-68, 482-83, 501-02; Pl. Ex. 2, Notes, at PLT 325; Pl. Ex. 27, Intake Quest.; Pl. Ex. 29, EEOC Cg. (April 2009).

Disputed in part, contrary to the record evidence and misleading but irrelevant/immaterial.  Mr. Liberti looked into the concern he believed Plaintiff raised in their July 2008 meeting, and attempted to speak with Plaintiff about her concern a few months later. (Liberti Decl., ¶¶  25, 27)  In addition, Mr. Liberti or Brad Williams (former Employee Relations Manager) had asked Mr. Dooley to speak with Plaintiff about her concern regarding Mr. Isabell's

being assigned to the cover dispatch.  Nonetheless, as with most of Plaintiff's allegedly disputed material facts, this fact paragraph is irrelevant/immaterial.  Even if management/Human Resources had not followed up with Plaintiff about her complaint to Mr. Liberti, it would not constitute a violation of any law or regulation.

Par. 65:  Plaintiff then filed an intake questionnaire with the EEOC in August of 2008, followed with a charge of discrimination on November 21, 2008. Pl. Ex. 27, Intake Quest.; Pl. Ex. 28, EEOC Charge (Nov. 2008).

Undisputed.

Par. 66:  After filing her charge of discrimination with the EEOC in November of 2008, and making her internal complaint of age and sex discrimination and retaliation in July of 2008, Plaintiff was told by her manager, Joe Dooley, on February 18, 2009, that she was being investigated by UPS security for not recording her time properly. Pl. Ex. 1, Daniels Dep., at 516-19; Pl. Ex. 53, Dooley Notes (Feb. 18, 2009); Pl. Ex. 3, Daniels Notes (Feb. 18, 2009).

Disputed in part, misleading, contrary to the record evidence in part and irrelevant/immaterial.

It is undisputed that until he met with Plaintiff on February 18, 2009, Mr. Dooley did not know that Plaintiff had allegedly complained to Gary Liberti in July 2008 about age/sex discrimination or retaliation.  It is also undisputed that Mr. Dooley did not know until the Feb. 18, 2009 meeting about the exact nature of Plaintiff's EEOC charge.  (Dooley Dep., p. 52; Dooley Supp. Decl., ¶ 42)  The fact that Plaintiff complained to Mr. Liberti in July 2008 and filed an EEOC Charge in November 2008 is similarly irrelevant/immaterial because it is undisputed that the UPS' Security Dept. reviewed the PTRS time records of Plaintiff and a few other employees at that time who had not complained about alleged discrimination/retaliation or

filed EEOC charges.[23]  (Liberti Decl., ¶ 61; Williams Decl., ¶ 57)  In addition, the undisputed

evidence shows that this review of Plaintiff's time records was due to the fact that when Mr.

Liberti went to try to talk to Plaintiff at the James Street facility one morning in January 2009,

she was leaving before the end of her scheduled shift.  (Liberti Decl., ¶ 57; Williams Decl., ¶ 53)

> Par. 67:  Mr. Dooley also told Plaintiff he had heard she filed a charge of discrimination
> with the EEOC. Id.; Pl. Ex. 53, Dooley Notes (Feb. 18, 2009).

Undisputed, but misleading and irrelevant/immaterial.  UPS incorporates its response to

par. 66 of Pl's AMF and the record citations therein.

Par. 68:  After Plaintiff filed her charge of discrimination with the EEOC in November of 2008,

Plaintiff was falsely accused of improper time recordation, including recording times for periods

she allegedly had not worked (i.e., falsifying her start and stop times), in a meeting in February

of 2009 with UPS Kansas District Human Resources Manager Gary Liberti and UPS Employee

Relations Manager Brad Williams. Pl. Ex. 1, Daniels Dep., at 392-94; Pl. Ex. 3, Daniels Notes

(Feb. 18, 2009); Pl. Ex. 29, EEOC Charge (April 2009).

Disputed in part, misleading, unsupported by the record evidence in part, and

irrelevant/immaterial.   As set forth in those responses/replies, the undisputed record evidence

shows that Plaintiff was not "accused" of improper time recording in February 2009.

As the undisputed record evidence also shows that Gary Liberti and Brad Williams had a

reasonable basis for believing that Plaintiff had not been recording her start/finish work times

and her meals/breaks accurately on various occasions.  Mr. Liberti went to try to speak with

Plaintiff one morning and saw her leaving before the scheduled end of her shift.  (Liberti Decl.,

---

[23]   Moreover, it is undisputed that UPS' Security Dept. had reviewed the time records of
many employees whom management/Human Resources had reason to believe had not properly
recorded their start, finish, meal or break times correctly.  (Liberti Decl., ¶ 48; Williams Decl.,
¶¶ 54-55)

¶ 57)  The results of UPS' review of several of Plaintiff's PTRS time cards and UPS'
surveillance tapes at James Street led UPS to believe that Plaintiff failed to accurately record her
start/finish work times accurately on several dates in 2009.  (Williams Decl., ¶ 54; Liberti Decl.,
¶¶ 57-58; Exh. AO)  As Plaintiff's deposition testimony indicates, Gary Liberti merely spoke to
Plaintiff in the February 2009 meeting about the need to properly record her time in the PTRS
system.

Par. 69:  Plaintiff specifically mentioned and complained about the conduct of both Mr. Liberti
and Mr. Dooley in the intake questionnaire which Plaintiff submitted to the EEOC in connection
with her charge of discrimination filed in November of 2008; both Mr. Liberti and Mr. Dooley
saw and reviewed the intake questionnaire. Pl. Ex. 27, Intake Quest.; Pl. Ex. 1, Daniels Dep., at
498-99; Pl. Ex. 3, Daniels Notes (Feb. 18, 2009).

    Disputed in part, contrary to the record evidence in part but irrelevant/immaterial.
Plaintiff's EEOC Intake Questionnaire does not mention former KS Employee Relations
Manager Brad Williams.

Par. 70:  Mr. Liberti was aware of Plaintiff's EEOC charge prior to meeting with Plaintiff in
February of 2009 and accusing her of improperly recording her time. Pl. Ex. 1, Daniels Dep., at
436, 498-99; Pl. Ex. 21, Def. 2nd Supp. Ans. & Obj. to Pltf. First Req. for Adm., No. 29.

    Disputed in part, unsupported by the record evidence in part and misleading, but
irrelevant and immaterial.   The record evidence does not support Plaintiff's claim that Mr.
Liberti "accused" her of improperly recording her time.  Moreover, the undisputed record
evidence shows that UPS has a reasonable basis to believe that Plaintiff had not recorded her
start/finish work times accurately in the PTRS system on various occasions.  (Liberti Decl., ¶ 58;
Williams Decl., ¶ 54; Exh. AO)  Moreover, there is no competent, admissible evidence that Mr.

Liberti advised Plaintiff to record her time properly in PTRS due to her EEOC Charge.  Mr.

Liberti, Mr. Williams and other members of UPS management/Human Resources had previously

advised employees who had not filed an EEOC charge or complained about discrimination to

properly record their start/finish work times and meals/breaks in the PTRS time recording

system.  (Liberti Decl., ¶¶  59, 61; Williams Decl., ¶ 55; Dooley Decl., ¶ 48; Kirby Decl., ¶ 46)

Further, Plaintiff testified in her deposition and has stated in her Response to UPS'

Summary Judgment Motion that there were many times when she did not take her meal/break

period as instructed and as required by UPS' policies.

Par. 71:  Mr. Liberti was slapping Plaintiff's intake questionnaire in his hand during the

February 2009 meeting and angrily asked Plaintiff, "Well, do you want me to get the EEOC

down here?" Pl. Ex. 1, Daniels Dep., at 500-01.

Undisputed for purposes of UPS' summary judgment motion only.

Par. 72:  Prior to Plaintiff's meetings with Joe Dooley and, then, Gary Liberti and Brad Williams,

in February of 2009, Plaintiff had never had a formal meeting with UPS management wherein

she was told she was not recording her time properly and accused of falsifying her start and stop

times. Pl. Ex. 1, Daniels Dep., at 397-98, 516-19; Pl. Ex. 37, Liberti Dep., at 210-11.

Disputed in part, not supported by the record evidence in part, misleading and

irrelevant/immaterial.  The record evidence shows that Plaintiff was not accused of falsifying her

start and stop work times.  Rather, Mr. Liberti spoke with Plaintiff about the need to properly

record her time in the PTRS system. Mr. Williams, Mr. Dooley, Mr. Kirby and other members of

management/HR had done with many other employees in the past.  (Liberti Decl., ¶ 59; Williams

Decl., ¶ 55)  It is undisputed that management/HR managers, including but not limited to Mr.

Liberti, Mr. Williams, Mr. Dooley and Allen Kirby, had spoken with hundred of UPS

employees, including Plaintiff, before February 2009 about the need to properly record their time in PTRS. (Liberti Decl., ¶ 59; Williams Decl., ¶ 55; Dooley Decl., ¶ 48; Kirby Decl., ¶ 46)

UPS' Human Resources Dept. was not aware before the review of Plaintiff's time cards in late January/early February 2009 that Plaintiff was incorrectly recording her start/finish work times incorrectly in the PTRS until late January/early February 2009. (Williams Suppl. Decl., ¶ 47) Thus, Plaintiff's claim that she had never had a "formal" meeting or discussion with management about these issues is irrelevant/immaterial.

Par. 73: UPS tells its employees using the PTRS or personal time recording system it would be an integrity issue not to record their times correctly. Pl. Ex. 44, PTRS Memo (PLT 556).

Undisputed, but misstates the record evidence. The UPS memo Plaintiff cites re "Review of PTRS Procedure" discusses the need for employees who record their time in PTRS to take/record a meal/break. The memo states: "It would be an integrity issue to record a meal or break that was not actually taken." (Pl's Exh. 44) UPS was trying to ensure that employees were being given proper breaks/meal time.

Par. 74: During Plaintiff's meeting with Gary Liberti in July of 2008, Mr. Liberti stated he was going to visit with Joe Dooley regarding Plaintiff's complaint. Pl. Ex. 1, Daniels Dep., at 431-32; Pl. Ex. 1, Notes (July 31, 2008), at PLT 325; Pl. Ex. 27, Intake Quest.; Pl. Ex. 29, EEOC Cg. (April 2009).

Undisputed, but misleading and misstates the record evidence. Plaintiff testified that Mr. Liberti stated he would look into her concern raised in the July 31, 2008 meeting. (Daniels Dep., p. 431-32)

Par. 75:  Mr. Liberti told Plaintiff he met with Mr. Dooley regarding the meeting he had with Plaintiff in July of 2008 and that Mr. Dooley was to follow-up with Plaintiff. Pl. Ex. 1, Daniels Dep., at 478, 501-02.

Undisputed, but misleading and irrelevant/immaterial.

Par. 76:  Mr. Dooley, by contrast, claims he was unaware Plaintiff had met with Gary Liberti in July of 2008. Pl. Ex. 1, Daniels Dep., at 477-78; Pl. Ex. 3, Daniels Notes (Feb. 18, 2009).

Disputed in part, misleading, contrary to the record evidence in part and irrelevant/immaterial.  Mr. Dooley testified that he was aware that Plaintiff had met with Mr. Liberti in July 2008 to express her dissatisfaction about Mr. Isabell being assigned the cover dispatch.  Contrary to Plaintiff's assertion, Mr. Dooley did not state that he was unaware that Plaintiff had expressed a concern to Mr. Liberti regarding Mr. Isabell's cover dispatch assignment.  (See Dooley Decl., ¶ 47)  Mr. Dooley's testimony that Brad Williams rather than Mr. Liberti contacted him to look into Plaintiff's concern is irrelevant.  Mr. Williams reported to Mr. Liberti, the District HR Manager.

If Plaintiff were correct and Mr. Dooley was unaware of Plaintiff's meeting with Mr. Liberti in 2008, it would negate Plaintiff's claim in par. 77 below that Mr. Dooley began retaliating against her between September and November 2008 because it is undisputed that Mr. Dooley did not learn of Plaintiff's EEOC Questionnaire until Plaintiff showed it to him in their February 18, 2009 meeting and Plaintiff did not file her first EEOC charge until November 21, 2008.  (Dooley Dep., pp. 486-87; Pl's Exh. 28)

Par. 77:  Plaintiff received a decrease in calls and emails from Mr. Dooley after making her internal complaint and filing her charge of discrimination. Pl. Ex. 1, Daniels Dep., at 474, 486-87.

Disputed in part, not supported by competent, admissible facts and evidence.  Mr. Dooley denies that he decreased his business communications with Plaintiff at any time in 2008 or 2009 (Dooley Decl., ¶ 55), and Plaintiff asserts in fact par. 76 above that Mr. Dooley told her that he was not aware she had complained to Gary Liberti in July 2008.  In addition, Plaintiff testified in her deposition that she does not know the number of emails/voicemails she received from Mr. Dooley per day before/after the alleged decrease began or exactly when this alleged decrease in communications started.  Plaintiff also testified that she cannot identify any specific information concerning her job duties which Mr. Dooley allegedly failed to provide her or any communications he sent other employees but did not provide to Plaintiff.

It is undisputed that Mr. Dooley met with Plaintiff in February 2009 to address any concerns she might have (Dooley Decl., ¶ 55), and Plaintiff performed her assigned job duties well during 2009.  Even if Plaintiff could show that this alleged decrease in communications from Mr. Dooley occurred, there is no evidence that it was due to any complaint or concern Plaintiff raised or Plaintiff's EEOC Charge which Mr. Dooley did not know about until February 2009.

Par. 78:  These decreased communications interfered with Plaintiff performing and prevented her from carrying out her job duties in the most effective manner possible. Id.

Disputed, contrary to the record evidence and irrelevant/immaterial.  UPS incorporates herein by reference its response to par. 78 above and the record citations contained therein.

Par. 79:  Plaintiff was forced to work through her lunch and breaks during the time she worked at UPS. Pl. Ex. 1, Daniels Dep., at 433-34; Pl. Ex. 47, Emails (June 2009) .

Disputed, but misleading and irrelevant/immaterial.  Despite receiving Exh. 44, UPS' Code of Business Conduct and various documents concerning UPS' Compliance program/hotline

(Daniels Dep., pp. 553, 557-58, 559, 562; Pl's Exh. 44; Exhs. AR, AS and Exh. AT), and despite filing an unrelated complaint with the UPS Ethics/concern line in 2009, Plaintiff never filed such a complaint with UPS Corporate or Human Resources regarding this alleged violation of UPS' written policy regarding breaks/meals.

Par. 80:  UPS has a practice of forcing employees to work through their breaks and not being allowed to take their lunch, but, instructing employees to record their time as if they are taking breaks and lunch. Id.; Pl. Ex. 15, Carpenter Declar., at ¶¶ 5, 6; Pl. Ex. 4, Daniels Notes (June 29, 2009).

Disputed, not supported by competent, admissible evidence and irrelevant/immaterial. UPS incorporates by reference its response to par. 79 of Plaintiff's AMF and the record citations therein.  As set forth repeatedly above, Kathleen Carpenter's Declaration contains inadmissible conjecture and speculation.  Ms. Carpenter's Declaration contains no facts to support this broad, conclusory assertion that UPS had such a "practice" or to demonstrate that she had personal knowledge about information given to UPS employees generally.  See Motion to Strike Carpenter Decl.

As Plaintiff sets forth in par. 73 of her AMF, Plaintiff and other employees at UPS were instructed to properly record their "times" in the PTRS system on a number of different occasions.  (see Liberti Decl., ¶ 59; Kirby Decl., ¶ 46; Dooley Decl., ¶ 48; Pl's Exh. 44)  As set forth in par. 73 of Pl's AMF and Pl's Exh. 44, UPS tells its employees to properly record their start/finish work times and meal/break times correctly in the PTRS system.  In any event, this assertion is irrelevant/immaterial to Plaintiff's claims.  See also Plaintiff's fact statements 81 and 82 which show that Plaintiff was told to properly record her meals/breaks and start/finish work times on many occasions.

Par. 81:  Plaintiff received inconsistent instructions from UPS regarding the recording of her

time worked; UPS management has stated that, even if break or lunch is not taken, time should

be recorded to show a break and lunch were taken. Pl. Ex. 46, Email (April 1, 2009); Pl. Ex. 47,

Emails (June 2009); Pl. Ex. 15, Carpenter Declr., at ¶¶ 5, 6.

Disputed in part, not supported by competent, admissible evidence and

irrelevant/immaterial.  UPS incorporates by reference its response to pars. 79 and 80 of Pl's

AMF and the record citations therein.  As set forth repeatedly above, Kathleen Carpenter's

Declaration contains inadmissible conjecture and speculation.  Ms. Carpenter's Declaration

contains no facts to support this conclusory assertion or show that she had personal knowledge

regarding any instructions given to Plaintiff.  See Motion to Strike Carpenter Decl.  There is

clear record evidence showing that Plaintiff was instructed by Mr. Liberti and Mr. Dooley to

take/record her meals and breaks, particularly after she advised Mr. Liberti that she was confused

about the issue in 2009.  See also UPS' response to par. 80 of Pl's AMF above and record

citations therein.

As Plaintiff sets forth in par. 73 above, Plaintiff and other employees at UPS were

instructed to properly record their "time[]" in the PTRS time recording system.  (see also Liberti

Decl., ¶ 59; Kirby Decl., ¶ 46; Dooley Decl., ¶ 48; Pl's Exh. 44; As set forth in par. 73 of Pl's

AMF and Pl's Exh. 44, UPS tells its employees to properly record their start/finish work times

and meal/break times correctly in the PTRS system.  In any event, this assertion is

irrelevant/immaterial to Plaintiff's claims.

Par. 82:  Plaintiff was also told by management there should be very few days she would not to

be able to take her break or meal and, yet, also, she was told she should always take and record

her break and lunch and there is no reason not to take break or lunch. Pl. Ex. 46, Email (April 1,

2009); Pl. Ex. 47, Emails (June 2009).

Undisputed, but confusing, misleading and irrelevant/immaterial.  UPS incorporates by

reference its responses to pars. 80 and 81 of Pl's AMF and the record citations contained therein.

Par. 83:  UPS does not provide proper coverage for employees in order to allow them to take

their breaks and lunch. Pl. Ex. 1, Daniels Dep., at 433-34; Pl. Ex. 15, Carpenter Declar., at ¶¶ 5,

6.

Disputed in part, not supported by competent, admissible evidence and completely

irrelevant/immaterial.  UPS incorporates by reference its response to pars. 79-82 of Pl's AMF

and the record citations therein.  As set forth repeatedly above, Kathleen Carpenter's Declaration

contains inadmissible conjecture and speculation.  Ms. Carpenter's Declaration contains no facts

to support this conclusory assertion or show that she had personal knowledge to support this fact

paragraph.  See Motion to Strike Carpenter Decl.  There is clear record evidence showing that

Plaintiff was instructed by Mr. Liberti and Mr. Dooley to take/record her meals and breaks after

she advised Mr. Liberti that she was confused about the matter in 2009.  (Exh. 62 Daniels email

to GL and his resp re taking/recording meals/breaks in 09; Liberti Decl., ¶ 62; Dooley Decl.,

¶ 48)

As Plaintiff indicates in par. 73 above and Pl's Exh. 44 and various other record evidence

shows, Plaintiff and other employees at UPS were instructed to properly take and record their

meals/breaks.  (Liberti Decl., ¶ 59; Kirby Decl., ¶ 46; Dooley Decl., ¶ 48; Pl's Exh. 44; Pl's Exh.

36, see also Rymer Dep., pp. 22-23)  In any event, this assertion is irrelevant/immaterial.

Par. 84:  UPS has stated in memoranda and corporate deposition testimony that its concern

regarding employees recording their breaks and lunches is based on its fear of liability for failing

to compensate its employees for the actual time they have worked. Pl. Ex. 44, PTRS Memo. (PLT 556); Pl. Ex. 36, Corp. Dep. (Rymer), at 20-30.

Undisputed, but misleading and irrelevant/immaterial.  Neither Plaintiff's Exh. 36 nor Russ Rymer's deposition testimony state that UPS' concern regarding whether employees properly record their breaks/meals is based solely or primarily on "its fear of liability."  (See Pl. Ex. 44; Pl. Ex. 36, Rymer Dep., pp. 20-30)

Par. 85:  After being falsely accused of improper time card recordation, experiencing a decrease in business communications from her manager, and, still, never having received any follow-up from Mr. Liberti regarding her complaint in July of 2008 or the status of any investigation, Plaintiff filed another charge of discrimination with the EEOC on April 3, 2009. Pl. Ex. 29, Charge (April, 2009).

Disputed in part, contrary to the record evidence in part, misleading and irrelevant/immaterial.  UPS admits that Plaintiff filed her second EEOC charge on April 3, 2009. The remaining factual allegations which Plaintiff purports to include in this paragraph were previously included in various pars. of Pl's AMF above.  Accordingly, UPS will not address them again, and instead, incorporates by reference herein its responses to those fact paragraphs including all record citations.

Par. 86:  UPS has stated that Gary Liberti has been trained by UPS to recognize employee complaints of age and sex discrimination and retaliation; the UPS Guidelines for Investigation of Workplace Issues expressly address the type of discrimination and retaliation complaint made by Plaintiff and recognize it as such. Pl. Ex. 21, Def. 2nd Supp. Ans. & Obj. to Pltf. First Req. for Adm., No. 11; Pl. Ex. 33, Guide. Invest. Work. Issues, at 3, 10.

Disputed in part, not supported by competent, admissible evidence in part, vague

misleading, confusing and contains improper legal conclusion/argument.  UPS admits that Mr.

Liberti received training regarding employee complaints of age/sex discrimination and unlawful

retaliation.  UPS also admits that its Guidelines for Investigation of Workplace Issues discuss

various matters relating to employee complaints of discrimination/retaliation.  (See Pl's Exh. 33)

This fact par. is irrelevant/immaterial because, as set forth in response to par 71 and other

pars. of Pl's AMF, UPS assumes for purposes of its Summary Judgment Motion only that

Plaintiff complained of age/sex discrimination during her July 2008 meeting with Mr. Liberti.[24]

It is unclear what the second half of this fact paragraph means.  However, the record evidence

does not demonstrate, as Plaintiff's appears to claim, that UPS' "Guidelines for Investigation of

Workplace Issues" (general guidelines concerning investigation of employee complaints)

"expressly address[es] the type of discrimination and retaliation complaint made by Plaintiff" or"

recognize[s] it as such"as Plaintiff claims.  UPS denies that Plaintiff complained about retaliation

during the July 2008 meeting.  Even assuming arguendo that she did, Plaintiff testified and stated

in her EEOC Questionnaire that she told Mr. Liberti that Jason Isabell was given the cover

dispatch assignment in early July 2008 because she reported Mr. Dooley to HR in 2006 because

he left a note on her door.  (Pl's Exh. 27; Daniels Dep., pp. 268-69)    Plaintiff's fact par. also

appears to contain improper legal argument/ conclusion which is not supported by the record

evidence.

Par. 87:  Mr. Liberti - a former UPS Kansas District Human Resources Manager - has testified

that when Plaintiff met with him on July 31, 2008 she did not make a report or complaint of

---

[24]      Mr. Liberti denies Plaintiff made any such complaint.  (Liberti Decl., ¶ 79)

discrimination. Pl. Ex. 21, Def. 2nd Supp. Ans. & Obj. to Pltf. First Req. for Adm., No. 12; Pl.

Ex. 37, Liberti Dep., at 208, 211-12.

       Undisputed.

Par. 88:  Mr. Liberti told Plaintiff he was involved with the selection of the employees to

interview for Plaintiff's cover position. Pl. Ex. 2, Notes (July 31, 2008), at PLT 323; Pl. Ex. 37,

Liberti Dep., at 241-43.

       Undisputed, but misstates the record evidence.  The documents cited by Plaintiff merely

state that Mr. Liberti told Plaintiff that he may have been involved in the decision to allow Cindy

Holt to interview for the dispatch specialist position that Mr. Isabell got.  Not only is this fact

paragraph irrelevant, Mr. Liberti's suggestion that Joe Dooley and Ernie Christie allow Cindy

Holt to interview for the Feeder dispatch specialist position (because the District was eliminating

package center specialist jobs at that time) does not support Plaintiff's age/sex discrimination

claims because Ms. Holt is female and was over age fifty in 2008.  (Liberti Decl., ¶ 21)

Par. 89:  UPS presented Plaintiff with a document, which Plaintiff signed and returned to UPS,

entitled Professional Conduct and Anti-Harassment Policy, and which prohibits harassment by

UPS and its employees, as set forth therein, and states harassment on the basis of age or sex is a

form of unlawful discrimination. Pl. Ex. 48, Daniels Agreement.

       Undisputed.  The Professional Conduct and Anti-Harassment Policy merely sets forth

UPS' policy that UPS and its employees must comply with laws which prohibit unlawful

discrimination and retaliation.  UPS has employees sign a copy of this document to show they

reviewed it.  (Dooley Supp. Decl., ¶ 24)

Par. 90:  This signed, written document states that an employee who feels they have been subjected to "objectionable conduct" must report it immediately and any employee making any such report will not be adversely affected or retaliated against for any such report. Id.

Undisputed, but misstates the language set forth in Plaintiff's Exh. 48.  UPS incorporate herein its response to Pl's fact par. 89 and the record citations therein.

Par. 91:  This signed, document or agreement also states that, "[i]in response to any such reports, UPS will conduct a prompt and through (sic) investigation." Id.

Undisputed that UPS' Professional Conduct and Anti-Harassment Policy states the following:  "In response to any such reports, UPS will conduct a prompt and thorough investigation."  (Pl's Exh. 48)  However, this document merely sets forth UPS' Professional Conduct and Anti-Harassment Policy which covers all employees.  This Policy states that all UPS employees must comply with laws that prohibit unlawful discrimination, harassment and/or retaliation.  There is absolutely no evidence that it is a bargained-for or negotiated "contract" or "agreement," as Plaintiff implies.  Plaintiff's assertion that the Policy is an "agreement" is not supported by any competent, admissible evidence and constitutes an improper legal conclusion.  UPS has employees sign the policy to indicate that they have reviewed it.  (Dooley Suppl. Decl., ¶ 24)

Par. 92:  This agreement has no disclaimer language stating it is not a contract. Id.

Undisputed that, unlike the UPS Code of Business Conduct (Exhs. AR and AS), UPS' Professional Conduct and Anti-Harassment Policy (Pl's Exh. 48) does not contain language expressly stating that it is not a contract.  (Pl's Exh. 48)  However, this document merely sets forth UPS' Professional Conduct and Anti-Harassment Policy which covers all employees.  This

Policy merely states that all UPS employees must comply with equal employment opportunity laws that prohibit unlawful discrimination, harassment and/or retaliation.  There is absolutely no evidence that it is a bargained-for or legally-binding "contract," as Plaintiff claims.  To the contrary, Plaintiff's assertion that the Policy is an "agreement" is not supported by any competent, admissible evidence and constitutes an improper legal conclusion.

Par. 93:  Gary Liberti and Joe Dooley have also entered into the same signed, written agreement with UPS. Pl. Ex. 49, Liberti Agreement; Pl. Ex. 50, Dooley Agreement.

Undisputed that Gary Liberti and Joe Dooley reviewed/signed a copy of UPS' Professional Conduct and Anti-Harassment Policy.  However, this document merely sets forth UPS' Professional Conduct and Anti-Harassment Policy which covers all employees.  This Policy merely states that UPS and its employees must comply with laws that prohibit unlawful discrimination, harassment and/or retaliation.  There is absolutely no evidence that it is a bargained-for or negotiated "contract" or "agreement," as Plaintiff claims.  Plaintiff's assertion that the Policy is an "agreement" is contrary to the record evidence (see Williams Suppl. Decl., ¶¶ 7-9; Dooley Suppl. Decl., ¶¶ 24-27), and constitutes an improper legal conclusion.

Par. 94:  Mr. Liberti and Mr. Dooley have also entered into signed, written agreements with UPS, entitled "Professional Conduct" and which contain language from the UPS Code of Business Conduct and UPS Policy Book, prohibiting discrimination and harassment; these agreements have no disclaimer language stating they are not contracts. Pl. Ex. 51, Liberti Prof. Cond. Agreement; Pl. Ex. 52, Dooley Prof. Cond. Agreement.

Undisputed that, unlike the UPS Code of Business Conduct (Exhs. AR and AS), UPS' Professional Conduct and Anti-Harassment Policy (Pl's Exh. 48) does not contain language expressly stating that it is not a contract.  (Pl's Exh. 48)  These documents merely set forth UPS'

Professional Conduct and Anti-Harassment Policy which covers all employees.  This UPS Policy merely states that all employees must comply with equal employment opportunity laws that prohibit unlawful discrimination, harassment and/or retaliation.  There is absolutely no evidence that they "entered into signed, written agreements with UPS," or that the Code of Professional Conduct/Anti-Harassment Policy constitutes a bargained-for or legally-binding "contract" or "agreement."  Plaintiff's assertion is directly contrary to the record evidence that Mr. Liberti and Mr. Dooley did <u>not</u> consider the Policy to be a contract or agreement (Dooley Suppl. Decl., ¶¶ 25-27), and constitutes an improper legal conclusion.

Par. 95:  All employees of UPS are required to comply with the UPS Code of Business Conduct (the "Code") reporting and non-retaliation obligations and provide signed acknowledgment that they will comply with the non-retaliation provisions of the Code. Pl. Ex. 37, Liberti Dep., at 145; Pl. Ex. 34, Corp. Dep. (Liberti), at 262-63.

Undisputed, but misleading and irrelevant/immaterial.  The Code of Business Conduct requires employees to follow the laws that prohibit unlawful discrimination/retaliation.  The fact that employees sign an acknowledge form stating that they have reviewed the Code and will comply with UPS' policies is irrelevant/immaterial.

Par. 96:  Plaintiff believed that the Code, including its promises and representations regarding discrimination and retaliation, formed a contract between her and UPS. Pl. Ex. 1, Daniels Dep., at 536-44, 574-76.

Disputed, contrary to the record evidence in part, irrelevant/immaterial and asserts a local conclusion.  There is absolutely no evidence that UPS considered the Code of Business Conduct to be a contract with Plaintiff.  As set forth in par. 95 above, all employees are required to

comply with the Code of Business Conduct which contains an express disclaimer stating that it

does not constitute a contract.  (See Exh. AR; Exh. AS; Liberti Decl., ¶ 64; Williams Decl., ¶ 61)

Plaintiff testified that she reviewed the entire Code of Business Conduct when she received it

from UPS.

Par. 97:  Plaintiff relied on Defendant's representations and promises in the Code, particularly,

the reporting and non-retaliation requirements and obligations, in making her internal report or

complaint of discrimination and retaliation to Gary Liberti in July 2008. Id. at 536-44, 574-76.

Undisputed that Plaintiff testified as set forth in this fact paragraph, however, Plaintiff's

testimony is irrelevant/immaterial given the express disclaimer in UPS' Code of Business which

states that UPS does not intend the Code to be a contract/agreement.  All UPS employees,

including Plaintiff, are required by UPS' Code of Business Conduct and UPS' Professional

Conduct/Anti-Harassment Policy to report conduct which they believe (in good faith) violates

UPS' policies and/or federal/state statutes prohibiting unlawful discrimination/retaliation.  UPS

is required to follow such laws, including the anti-retaliation provisions of such federal/state and

local statutes.  As part of its compliance efforts, UPS' Code of Business Conduct and Code of

Professional Conduct require all employees to report suspected unlawful

discrimination/harassment.

Plaintiff's assertion that she would not have reported unlawful sex/age discrimination and

retaliation to Mr. Liberti in July 2008 but for UPS' policies prohibit unlawful

discrimination/retaliation is not supported by the record evidence and defies logic.  Those

policies merely explain that UPS and its employees must comply with laws prohibiting

discrimination/retaliation.  UPS could not make a binding promise with Plaintiff to do anything

other than follow the law.

Par. 98:  UPS states and represents in its Policy Book and Investigation Guidelines that: UPS will give each employee complaint prompt, sincere attention; UPS will keep the employee informed about the status of the complaint; UPS takes such situations very seriously, and requires that they be vigorously and thoroughly investigated; and, retaliation, retribution, or harassment against any employee who in good faith asks any question or raises any concern regarding the company's compliance responsibilities is prohibited, and is grounds for discipline, which may include dismissal. Pl. Ex. 32, Policy Book, at 20; Pl. Ex. 33, Invest. Guidelines, at 1, 21.

Undisputed, however, this fact paragraph contains so many alleged facts that it is difficult to respond to.  UPS objects to the extent Plaintiff has mischaracterized the contents of the Policy Book or the Guidelines for Investigation of Workplace Issues in Pl's Exhs. 32 and 33.

Par. 99:  Defendant has provided lengthy declarations with its motion from two UPS managers who were deposed in this case, individually and as corporate deponents, and for whom UPS submitted lengthy, substantive errata changes, including changing and adding testimony. Def. Ex. C (Dooley Declar.); Def. Ex. E (Liberti Declar.); Pl. Ex. 34, Corp. Dep., (Liberti), at 1-2, 259-61; Pl. Ex. 35, Corp. Dep. (Dooley), at 1-2; Pl. Ex. 37, Liberti Dep., at 1-2; Pl. Ex. 38, Dooley Dep., at 1-2; Pl. Ex. 39, Liberti Errata; Pl. Ex. 40, Dooley Errata.

Disputed in part, but irrelevant/immaterial, misleading and improper.  This paragraph does not contain any specific facts related to Plaintiff's claims.  Instead, it contains improper argument concerning the declarations/errata sheets submitted by Joe Dooley and Gary Liberti. As a result, it clearly does not comply with FRCP 56 or Local Rule 56.1 and should be stricken.

Par. 100:  UPS Feeder Manager Joe Dooley submitted an errata sheet for his individual deposition in this case which included over 64 changes, at least 56 of which are or appear to be

substantive, including changing and adding to his testimony, and during which deposition he was questioned by UPS counsel. Pl. Ex. 40, Dooley Errata.

Disputed in part, but irrelevant/immaterial, misleading and improper.  This paragraph does not contain any specific facts which relate to Plaintiff's claims.  Instead, it contains improper argument concerning the errata sheet submitted by Joe Dooley.  As a result, it clearly does not comply with FRCP 56 or Local Rule 56.1 and should be stricken.

Par. 101:  Former Kansas District Human Resources Manager Gary Liberti submitted an errata sheet for his individual deposition in this case which included over 78 changes, at least 72 of which are or appear to be substantive, including changing and adding to his testimony, and during which deposition he was questioned by UPS counsel. Pl. Ex. 39, Liberti Errata.

Disputed in part, but irrelevant/immaterial, misleading and improper.  This paragraph does not contain any specific facts related to Plaintiff's claims.  Instead, it contains improper argument concerning the errata sheet submitted by Gary Liberti.  As a result, it clearly does not comply with FRCP 56 or Local Rule 56.1 and should be stricken.

Par. 102:  As a result, in addition to their errata changes, these managers have given three different sets of allegedly sworn testimony or statements in this case regarding the same issues and subject matters and topics. Def. Ex. C (Dooley Declar.); Def. Ex. E (Liberti Declar.); Pl. Ex. 34, Corp. Dep., (Liberti), at 1-2; Pl. Ex. 35, Corp. Dep. (Dooley), at 1-2; Pl. Ex. 37, Liberti Dep., at 1-2; Pl. Ex. 38, Dooley Dep., at 1-2; Pl. Ex. 39, Liberti Errata; Pl. Ex. 40, Dooley Errata.

Disputed, but irrelevant/immaterial, misleading and improper.  This paragraph does not contain any specific facts related to Plaintiff's claims.  Instead, it contains improper argument

concerning the errata sheets submitted by certain witnesses.  As a result, it clearly does not comply with FRCP 56 or Local Rule 56.1 and should be stricken.

Par. 103:  While employed by UPS, former Kansas District Human Resources Manager Jim Grover, along with UPS, was found guilty in a case tried before a judge in New York Federal District Court, Northern District, and affirmed by the Second Circuit Court of Appeals, of violating the ADA and New York Human Rights law; yet, Mr. Grover is still employed with UPS and has submitted a declaration in this case trying to justify the conduct of UPS. Picinich v. United Parcel Service, 583 F.Supp.2d 336 (N.D.N.Y. 2008) (aff'd, 318 Fed.Appx. 34 (2d Cir. 2009)); Picinich v. United Parcel Service, No. 5:01-CV-1868, 2005 WL 3542571 (N.D.N.Y. Dec. 23, 2005) (aff'd in part, vacated in part, 236 Fed.Appx. 663 (2d Cir. 2007); Picinich v. United Parcel Service, 321 F.Supp.2d 485 (N.D.N.Y. 2004); Pl. Ex. 21, Def. 2nd Supp. Ans. & Obj. to Pltf. First Req. for Adm., No. 26.

Disputed in part, but largely irrelevant/immaterial, misleading and improper.  This paragraph does not contain any facts which have any bearing on this lawsuit.  Instead, it contains improper argument, speculation and legal conclusions concerning a lawsuit filed against UPS in New York approximately ten years ago.  It clearly does not comply with FRCP 56 or Local Rule 56.1 and should be stricken.  Moreover, there is absolutely no evidence that Mr. Grover was "found guilty" in any legal proceeding.

Par. 104:  The UPS Code of Business Conduct and signed, written agreements which UPS management enters into state the Company will not tolerate discrimination, and that anyone found to have engaged in discriminatory conduct will be disciplined, including dismissal. Pl. Ex. 31, UPS Code of Bus. Conduct, at Stmt. of Policy, ii, 8; Pl. Ex. 49, Liberti Agreement; Pl. Ex.

50, Dooley Agreement; Pl. Ex. 51, Liberti Prof. Cond. Agreement; Pl. Ex. 52, Dooley Prof.

Cond. Agreement.

Disputed in part, misleading, contrary to the record evidence in part, improper legal

conclusion/argument.  As set forth in its responses to pars. 89-96 of Plaintiff's AMF, all UPS

employees are covered by the Code of Business Conduct which contains an express disclaimer

stating that it is not a contract/agreement.  It is unclear what "signed, written agreements"

Plaintiff is referring to, however, as set forth above, there is absolutely no evidence that UPS'

Professional Conduct and Anti-Harassment Policy (which states that it applies to all employees)

is a contract or "agreement."  Instead, both documents are statements by UPS that the Company

and its employees must comply with laws prohibiting discrimination/retaliation.

Par. 105:  Prior to failing to process Plaintiff's promotion applications and stripping or removing

her from her cover position, Plaintiff complained to UPS about an incident where Joe Dooley

went to Plaintiff's home and posted a note her door to try and force her to cover for another

employee; Mr. Dooley was reprimanded and counseled by UPS for this. Pl. Ex. 1, Daniels Dep.,

at 458-463; Pl. Ex. 38, Dooley Dep., at 52-57.

Disputed in part, contrary to the record evidence in part, misleading, argumentative and

irrelevant/immaterial.  The record evidence does not support Plaintiff's suggestion that UPS

intentionally "fail[ed] to process" Plaintiff's promotion applications or that UPS "stripp[ed] or

remove[ed] [Plaintiff] from her cover position.  UPS incorporates herein by reference its

responses to those fact paragraphs of Pl's AMF and the record citations therein.  Plaintiff's

assertion that Mr. Dooley was reprimanded in 2006 for leaving a note on her door when he

needed her to work and could not contact her by telephone does not support Plaintiff's claims in

this lawsuit.  On the contrary, Plaintiff's assertion that Mr. Dooley was upset or retaliated against

her for reporting him to HR in 2006 seriously undermines her claim that Mr. Dooley took any action toward Plaintiff based on her age/sex or unlawful retaliation for allegedly complaining about age/sex discrimination.  (See Pl's Exh. 27, pp. 2-3)

Par. 106:  Former UPS James Street Division Manager, Jaime Diaz, has a practice of discriminatory and abusive conduct towards women and retaliation towards employees reporting or complaining of improper conduct and unlawful treatment by UPS and its management. Pl. Ex. 55, Bleisch Dep., at 35-36, 40-47, 103-06; Pl. Ex. 54, Samborski Dep., at 12-17; 226-232.

Disputed, but not supported by competent, admissible evidence and completely irrelevant/immaterial.  Jamie Diaz was a Hub Manager at the James Street facility from at least 2008 to early 2010.  Mr. Diaz was not Plaintiff's manager or supervisor nor did he work in Human Resources.  Mr. Diaz was not involved in any decisions concerning Plaintiff's employment or compensation.  (Id.)  There is absolutely no evidence that Mr. Diaz had any involvement in any of the alleged decisions/actions which are the subject of Plaintiff's claims in this lawsuit.

Moreover, the two individuals whose deposition testimony Plaintiff cites to support these broad, conclusory allegations, Catherine Bleish and Mark Samborski, did not work in the Feeder Dept. at James Street between 1999 and 2009   Plaintiff has not set forth any facts showing that they have personal knowledge concerning the matters alleged and they have not set forth specific facts supporting their broad conjecture and conclusory allegations.  This fact paragraph does not comply with FRCP 56 or Rule 56.1 and should be stricken.  See UPS' Motion to Strike Samborski deposition testimony filed herewith.

Par. 107:  Both Gary Liberti and Jaime Diaz took part in removing Plaintiff from the cover position she had held for 5 years and replacing her with a younger, less experienced, male

employee, Jason Isabell. Pl. Ex. 1, Daniels Dep., at 657-58, 662-63; Pl. Ex. 1, Daniels Notes

(July 31, 2008), at PLT 322-23.

Disputed, not supported by competent admissible evidence, contrary to the record

evidence and improper.  UPS did not "remove[e] Plaintiff from the cover position she had held

for 5 years" or "replace her with a younger, less experienced, male employee . . . "  UPS

incorporates herein by reference its responses to pars. __ of Pl's AMF and the record citations

contained therein.

In any event, there is absolutely no evidence that Gary Liberti or Jamie Diaz made the

decision to promote Jason Isabell to the Feeder dispatch specialist position in 2008 or assign him

to work as the cover dispatch person.  Instead, the undisputed record evidence demonstrates that

Joe Dooley and Ernie Christie made those decisions.  (Dooley Decl., ¶ 35; Christie Decl., ¶ 23;

Liberti Decl., ¶ 22)  Mr. Diaz was a Hub manager who had no involvement in Feeder personnel

matters.   Plaintiff's record citations do not demonstrate that Mr. Liberti made either of those

decisions.

Par. 108:  UPS engages in a practice of sex and age discrimination and retaliation, which is

carried out at the UPS James Street and Lenexa facilities and within the James Street Feeder

Department. Pl. Ex. 15, Carpenter Declar., ¶¶ 2, 3, 4, 7, 8, 9, 11, 12, 13; Pl. Ex. 53, Sifuentes

Dep., at 76-77, 137-39, 286-87; Pl. Ex. 54, Samborski Dep., at 12-17; 226-232; Pl. Ex. 55,

Bleisch Dep., at 35-36, 40-47, 103-06.

Disputed, not supported by competent, admissible evidence, contrary to the evidence, and

contains improper legal conclusion.  Plaintiff has set forth no factual information to support this

conclusory allegation.  There is no admissible evidence of age or sex discrimination in the record

and certainly no evidence of a "practice" of sex/age discrimination or retaliation at UPS' James

Street or Lenexa facility, as Plaintiff alleges in this "fact" statement.  Instead of setting for facts supported by citations to the record, Plaintiff relies on inadmissible speculation and conjecture. Plaintiff again relies on inadmissible conclusions and opinions from Kathleen Carpenter's Declaration and the depositions of retired feeder driver William Sifuentes, package car driver Mark Samborski, and former safety supervisor Catherine Bleish who left UPS in 2007.

None of these individuals have personal knowledge of any decisions concerning Plaintiff's employment nor do they provide any competent, admissible evidence of age/sex discrimination.  William Sifuentes is the only one of the four who even worked in the James Street Feeder Department.  However, Mr. Sifuentes is a retired feeder driver who never worked in management/Human Resources.  He testified in his deposition that he has no personal knowledge and was not involved in any decisions concerning Plaintiff's employment, including but not limited to, decisions regarding Plaintiff's promotions, compensation, and job duties/shift/assignments.  He testified at length that he believes he was treated unfairly due to his race (Hispanic) by being assigned older, rough riding tractors beginning back in the early 1990s.

Although Mr. Sifuentes testified that managers and supervisors were asking him about his retirement plans in the year or two before he retired, there were legitimate reasons for doing so.  Mr. Sifuentes and other drivers often discuss retirement plans.  Feeder management asked him about his retirement plans to enable UPS to be able to plan/run its business without interruption.  Management asked him about his retirement plans a few times in 2009 and 2010 because in late 2008, Mr. Sifuentes told UPS that he was retiring in early 2009.  After management posted his bid job and another driver bid that job (and other drivers then bid based on seniority into each opening caused by these changes), Mr. Sifuentes advised UPS that he had changed his mind and was not retiring.

Mark Samborski has worked as a package car (brown delivery truck) driver and similarly testified in his deposition that he has no knowledge concerning Plaintiff's employment.  The fact that Mr. Sifuentes and Mr. Samborski claim they were treated unfairly contradicts (rather than supports) Plaintiff sex discrimination claim.  Mr. Samborski testified that he believed he was treated unfairly by his managers because he reported work-related injuries on several occasions and due to his religious beliefs.

None of these individuals set forth specific facts showing a "practice" of age/sex discrimination or retaliation for complaining of age/sex discrimination or any specific factual information concerning Plaintiff's employment at UPS.  See UPS' Motions to Strike Carpenter Decl. and Motions to Strike deposition testimony of Mark Samborski and Williams Sifuentes.,

## III.    ARGUMENT

It is by now well-established that summary judgment is not a "disfavored procedural shortcut," but an important procedure "designed to secure the just, speedy and inexpensive determination of every action."  *Haney v. Preston*, 2010 WL 5392670, *2 (D. Kan. Dec. 22, 2010) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)). "While the party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact, the moving party need not negate the nonmovant's claim, but need only point out to the district court that there is an absence of evidence to support the nonmoving party's case."  *Universal Money Centers, Inc. v. American Tel. & Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994) (internal quotations and citations omitted).

Once the movant has met this burden, the nonmovant cannot avoid summary judgment simply by showing "the mere existence of *some* alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986), or "some metaphysical doubt as to the material facts."  *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986).  Nor can a plaintiff defeat a properly supported motion for summary judgment by

repeating conclusory opinions, resting on speculation, or asserting allegations unsupported by

fact. *See, e.g., Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242 (10th Cir. 2000); *Conaway v.

Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

Rather, to preclude the entry of summary judgment, the nonmovant must show the

existence of disputes over material facts that might affect the outcome of the suit under the

governing law.  *Anderson,* 477 U.S. at 250 (1986).  She must "set forth specific facts that would

be admissible in evidence in the event of trial from which a rational trier of fact could find for

the nonmovant.'"  *Haney*, 2010 WL 5392670 at 2 (quoting *Mitchell v. City of Moore, Okla.*, 218

F.3d 1190, 1197-98 (10th Cir 2000).  To accomplish this, the facts "must be identified by

reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."

*Adams,* 233 F.3d at 1246.

Plaintiff's Response falls far short of meeting the standards required by Rule 56 and

governing law to withstand UPS' Motion for Summary Judgment.  Despite her dramatic and

repeated references to the existence of "abundant," "overwhelming," and "quite stunning"

evidence sufficient to defeat summary judgment, Plaintiff's rhetoric is not backed by an actual

showing of any such competent evidence.  Moreover, contrary to plaintiff's repeated

mischaracterizations of the law addressing pretext, in order to avoid summary judgment, plaintiff

bears the heavy burden of proffering a "quantum of evidence" that establishes that an employer

acted in bad faith *to cover up a discriminatory purpose*, that is, that the employer's conduct was

a pretext *for discrimination*, that is, that "discrimination was a determinative factor in the

employer's actions – simply disbelieving the employer is insufficient."  *Piercy v. Maketa et al.*,

480 F.3d 1192, 1200-1201 (10th Cir. 2007).  Despite the voluminous nature of her Response,

Plaintiff has not been able to establish that a genuine issue of material fact exists as to any of her claims. Accordingly, UPS is entitled to summary judgment in its favor as a matter of law.

A.    PLAINTIFF'S FAILURE TO PROMOTE AND DENIAL OF TRAINING CLAIMS ARE TIME-BARRED

Plaintiff's claims include allegations of three separate and discrete employment actions that she alleges were discriminatory.  She alleges (1) that she applied for and was denied promotion to a  full-time supervisor position in 2005 and in 2006 because of her sex and age (ECF Doc. 84, Pretrial Order, p. 6; ECF Doc. 1, Count II), (2) that she was denied training for the twilight dispatch shift on one (and no other) occasion in approximately 2004 or 2005 because of her sex and age (*see* Memorandum, p. 34, footnote 15), and (3) that she was  reassigned from the cover dispatch shift to the night shift in July 2008 because of her sex and age (ECF Doc. 84, pp. 4-5), in violation of Title VII, the KAAD, the ADEA, and the KADEA.

(1)    Plaintiff failed to timely exhaust her age and sex discrimination claims.

For any of these claims to be properly before the Court in this lawsuit, plaintiff had to administratively exhaust each claim by filing a timely charge of discrimination, that is, within 300 days (for her Title VII and ADEA claims), and within six months (for her  KAAD and KADEA claims) after each of these allegedly discriminatory actions occurred.  42 U.S.C. §2000e-5(e)(1); *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002); *Bolden v. PRC Inc.*, 43 F.3d 545, 552 (10th Cir. 1994); K.S.A. 44-1005(i); *Wallace v. Beech Aircraft Corporation*, 87 F.Supp.2d 1138, 1145 (D. Kan. 2000)  It is undisputed that plaintiff did not file a Charge of Discrimination until November 21, 2008.  (SOF 107)   Because plaintiff failed to file a timely charge with respect to either her promotion or her training claims, those claims are time-barred as a matter of law.

In a transparent effort to avoid being time-barred, plaintiff now argues that her promotion and denial of training claims did not accrue when these allegedly discriminatory actions occurred, but instead accrued years later in July 2008, when plaintiff alleges she was reassigned from the cover dispatch shift (the only one of these unrelated discrete actions to have been timely asserted), and when, on a separate date in July 2008 she allegedly discussed her 2005/2006 denial of promotion claims with Gary Liberti (District HR Manager). (Response, pp. 71, 73)

Plaintiff's arguments are, however, contrary to established law, including cases cited by plaintiff, one of which is a decision by this Court: *Almond et al. v. United School District # 501*, --- F.Supp.2d ---, 2010 WL 4384206 (D. Kan. Oct. 28, 2010). Each discrete act of allegedly discriminatory or retaliatory treatment "constitutes its own 'unlawful employment practice' for which administrative remedies must be exhausted." *Martinez v. Potter,* 347 F.3d 1208, 1210 (10th Cir. 2003). Such "discrete acts" include a denial of promotion, a transfer, or a denial of training, and accrue at the time they occur, and may not be asserted under a continuing violations theory. See, e.g., *Almond et al.*, 2010 WL 4384206 at 5 (quoting *Martinez*, 347 F.3d at 1210-11(quoting *Morgan*, 536 U.S. at 114). Discrete claims that are not timely exhausted are no longer viable. *Id.*; (See also *Proctor v. UPS*, 502 F.3d 1200, 1206 (10th Cir. 2007) (a cause of action accrues when the employee receives notice of the adverse employment action). Because plaintiff's promotion and training claims were not timely exhausted, they are no longer actionable claims.

Plaintiff also argues that summary judgment is inappropriate because there is a disputed issue of fact as to when she first allegedly learned "why" she was supposedly not promoted (Response, p. 71). That argument is, however, irrelevant and immaterial to when her cause of action accrued. "'[N]otice or knowledge of discriminatory motivation is not a prerequisite for a

cause of action to accrue ... [o]n the contrary, it is knowledge of the adverse employment decision itself that triggers the running of the statute of limitations'" *Almond et al.*, 2010 WL 4384206 at *8 (quoting *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1187 (10th Cir. 2003)). Plaintiff's claims accrued when she learned that she was not promoted, not years later when she alleges she discussed the decision with Mr. Liberti, and the same is true of her belated claim that there was one instance in 2004 or 2005 when she did not receive training.  Accordingly, this attempt to avoid the time-bar is also without merit.

> (2)     Plaintiff's claims are not revived by the Lilly Ledbetter Fair Pay Act.

Plaintiff also argues that her promotion and training claims are revived by the Lilly Ledbetter Fair Pay Act of 2009 ("FPA"). (Response, pp. 67-70)  This argument is completely unavailing.

This Court has explicitly held, in agreement with a number of other courts that have addressed the issue, that a failure to promote claim and other claims of discrete acts of  alleged discrimination are not covered by the FPA.  Acts fall within the FPA only if they involve claims of discrimination in compensation.  Easily identifiable discrete acts and decisions that may *impact* pay, like denial of a promotion, are not "compensation decisions," do not fall within the FPA, and therefore are not "revived" by that FPA as plaintiff argues.  *See Almond et al.*, 2010 WL 4384206 at 11 and fn 84 and cases cited therein.

In contrast with discrete acts of discrimination that may *impact* pay, the FPA was enacted "to capture the wide gamut of *compensation practices*, from single, discrete decisions *about pay* to arrangements, schemes, systems, or other practices *related to pay.*" *Almond et al.*, 2010 WL 4384206 at 9 (quoting H.R. Rep. No. 110-237 at 5(emphasis added).  The legislative history of the FPA shows that the rationale for drawing a distinction between discrete acts of alleged

discrimination (even if they impact pay) and claims of "discrimination in compensation," has to

do with the secrecy that often surrounds compensation decisions, which can make such decisions

not immediately apparent:

> [w]hile workers know immediately when they are fired, refused employment or
> denied a promotion or transfer, the secrecy and confidentiality associated with
> employees' salaries make pay discrimination difficult to detect.

*Id.* (quoting H.R. Rep. No. 110-237, at 6).

In contrast, with the discrete decisions regarding promotion and training at issue here,

there was no secrecy:  plaintiff was aware that she did not receive certain promotion(s) and she

was aware of the instance when she did not receive training at the time these actions occurred.

Accordingly, plaintiff's claims that she was denied promotion and training, even if they could or

may have had an impact on pay, are discrete acts and not compensation decisions under the FPA.

*See Almond et al.*, 2010 WL 4384206 at 9-10; *Proctor,* 502 F.3d at 1206.  Accordingly, UPS is

entitled to summary judgment on plaintiff's claims regarding denial of promotion and denial of

training, discrete acts as to which she failed to exhaust her administrative remedies, and which

are therefore time-barred as a matter of law.

### B.    PLAINTIFF'S PROMOTION CLAIMS FAIL AS A MATTER OF LAW

For the reasons set forth above, plaintiff's promotion claims are time-barred as a matter

of law, and UPS  is accordingly entitled to summary judgment as to these claims on that  ground

alone.  But even  assuming *arguendo* her promotion claims were not barred, UPS would still be

entitled to summary judgment because plaintiff has not and cannot  establish elements of those

claims.

### 1.    Plaintiff's 2005 Promotion Claim Fails as a Matter of Law

Plaintiff cannot establish a prima facie case of sex or age discrimination with respect to

her application for promotion in 2005, because she has not and cannot establish that she was

qualified for the promotion she sought, or establish an inference of discrimination, both of which are essential elements of her claim.  (*See* Memorandum, pp. 23-28)

It is undisputed that, following her application for promotion to full-time supervisor in 2005, plaintiff did not proceed through the formal promotion process, because UPS did not have a record of receiving an assessment from plaintiff's then manager, Mic Haynes, a necessary step in the promotion process.[25] (SOF[26] 44 )  Plaintiff argues at length that she was qualified for promotion because she was a long-term satisfactory employee.  However, whether plaintiff performed satisfactorily in the position she was then occupying  does not establish, as she must, that she was qualified for promotion to the higher level position she was seeking.  *See, e.g., Amro v. The Boeing Co*., 232 F.3d 790, 796 (10th Cir. 2000) (in order to establish a prima-facie case in a denial of promotion claim, the plaintiff must establish she was qualified for a promotion); *Hernandez v. McDonald's Corp.*, 975 F.Supp. 1418, 1424 (D. Kan. 1997).

Moreover, in order to be eligible for promotion to full-time supervisor, the employee must be willing to travel, relocate, accept a lateral transfer, or change job functions, as UPS management-level employees are routinely transferred from department to department and facility to facility within the particular UPS district.  (SOF 41)  It is undisputed that plaintiff was unwilling to travel, relocate, accept a lateral transfer, or change job functions, , and so indicated in writing.  (Daniels Dep. p. 298, ECF Doc. 100-7)  Accordingly, even if plaintiff's application had proceeded through the formal promotion  process in 2005, she would have been disqualified

---

[25] Plaintiff argues that Mic Haynes testified  that he submitted the completed assessment packets. It is, however,  undisputed --  and plaintiff proffers no evidence indicating otherwise --  that UPS has no  record of receiving a completed packet assessment.  (SOF 44)

[26] In citing to its Statement of Facts ("SOF") within the Argument section herein, UPS also refers this Court to its Reply to Plaintiff's Response to its Statement of Facts.

from consideration for promotion because of her unwillingness to travel and relocate – a threshold requirement  for promotion to the position of full-time supervisor.[27]  (SOF 41)

In addition, plaintiff has not and cannot establish that any circumstances existed giving rise to an inference of discrimination. Plaintiff  has presented no evidence beyond speculation and conclusory allegations that her sex or age played any part with respect  her failure to receive a promotion in 2005.

Moreover, UPS articulated a legitimate non-discriminatory reason for not promoting plaintiff in 2005, i.e., because her application did not go through the  complete  process as a result of UPS having no record of receiving a completed assessment packet from her manager, a prerequisite for moving her application forward for consideration at the next step on the process.

In a effort to suggest that an inference of discrimination can be drawn in the circumstances and also to suggest that UPS' articulated reason was pretextual, plaintiff  argues that: (1) UPS did not follow its policies and procedures in processing plaintiff's 2005 application for promotion by losing her packet; (2) UPS did not post open positions; (3) UPS used people's meetings to blackball employees from promotion and training; (4) Mic Haynes believed that plaintiff should have been promoted; and  (5) the number of women in management positions at UPS is less than the number of men.  (Response, pp. 65-66, 78- 79)  None of these assertions creates a material fact issue as to whether plaintiff has met her burden of establishing the element of reasonable inference of discrimination and/or pretext.

---

[27] Plaintiff also argues that she was qualified for a full-time supervisor position because, as a cover dispatcher, she at times performed the duties of the twilight dispatch shift, performed by a full-time supervisor.  Contrary to plaintiff's present allegations and as discussed in detail below, plaintiff testified in her deposition that she never covered the twilight dispatch shift and that she could not perform the duties of that position on her own. (SOF 65, 70, 86)

The fact that UPS has no record of receiving the assessment packet from plaintiff's

manager, whether through inadvertent administrative error or mistake, without evidence of

discriminatory motivation, is not evidence of pretext.[28]  *See Berry v. T-Mobile USA*, 490 F.3d

1211, 1222 (10th Cir. 2007) (explaining that a clerical error or a mistake is not evidence of

pretext);  *See also Leigh v. Bureau of State Lottery*, 1989 WL 62509 *4-6 (6th Cir. 1989 ) (no

pretext where hiring of unqualified white applicant was the result of an administrative error

where no evidence that it was motivated by racial animus); *See also McCoy v. Maytag Corp.*,

495 F.3d 515, 523 (7th Cir. 2007) (explaining that pretext "means more than a mistake on the

part of the employer; pretext means a lie, specifically a phony reason for some action");  *See also*

*Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1310 (7th Cir. 1997)  ("The fact that the

employer was mistaken or based its decision on bad policy, or even just plain stupidity, goes

nowhere as evidence that the proffered explanation is pretextual.")  Accordingly, the fact that

plaintiff's application was not taken through the promotion process in 2005 (regardless of

whether it was because Haynes did not return the completed assessment to Human Resources or

because Human Resources misplaced the assessment) is not evidence of pretext.  Nor does it

raise a reasonable inference of discrimination, given that the record shows that, in  2005, there

were male employees and employees under 40 years of age whose managers did not fill out and

return their promotion assessments and/or for whom Human Resources has no record of

receiving a promotion assessment.  (Liberti Decl., ¶¶ 39, 51-52; Grover Decl., ¶¶ 11, 13-14; SOF

---

[28] Contrary to plaintiff's representations to this Court that failure to follow policies and
procedures defeats summary judgment, the case law cited by plaintiff holds only that
"*disturbing* procedural irregularities," such as fabrication of evidence, and "falsifying or
manipulating [of relevant] criteria ...," *may* be evidence of pretext.  Mere administrative error
or oversight, as is present is this case, is not a "disturbing procedural irregularities" sufficient
to raise an inference of discrimination or pretext.  (*See* Response, p. 79 *citing Plotke v. White*,
405 F.3d 1092, 1104 (10th Cir. 2005)

51-53)  Like plaintiff, the applications of those employees were not moved forward for further consideration under the promotion process that year.  (*Id.*)

Similarly, plaintiff's contention that Mic Haynes believed that plaintiff "should be promoted," are irrelevant to plaintiff's 2005 promotion claim and do not raise an inference of discrimination or establish pretext.  If Haynes did submit the packet as he states, plaintiff did not proceed through the process as a result of error or oversight by the Human Resources department, not discriminatory animus. Moreover, Haynes' personal belief is not based on knowledge of the assessments and qualifications of the other candidates for the promotion in question.[29]

Plaintiff's conclusory claim that UPS supposedly "blackballs" employees is based on self-serving allegations and is without any support in the record. Conclusory allegations, speculation, conjecture and suspicion, are insufficient to defeat summary judgment.  *Haney*, 2010 WL 5392670 at 2; *Conaway,* 853 F.2d at, 794.  Such unsupported allegations clearly do not raise a reasonable inference of discrimination or establish that UPS' reason for not promoting plaintiff was pretextual.

Moreover, whether UPS posts open positions or does not have a practice of posting them is irrelevant and immaterial.  UPS requires that employees interested in promotion submit a letter of interest each year, which plaintiff was aware of.  Plaintiff was also aware that if she wanted to be considered for promotion the following calendar year, she had to renew her letter of interest. (Ex. U, V; Daniels Dep. p. 246)  Moreover, the number of women in comparison to the number of men in any particular position also does not, standing alone, raise an inference of

---

[29] Further, as Haynes himself testified once the manager completes the assessment, the manager has no further involvement in the decision as to whether an individual will be placed in the qualified applicants pool.

discrimination or pretext with respect to plaintiff's claims against UPS.  *See, e.g., Turner v. Public Service Co. of Colorado*, 563 F.3d 1136, 1146-1147 (10th Cir. 2009) (without evidence regarding the number of men v. women applicants, interviewees, and the like, evidence of a number of men v. women [one woman out of 115 positions]  in the workplace is "nearly meaningless," and provides no information regarding whether the plaintiff was not selected for promotion because of sex);  *Pope v. Quivira Council*, 2009 WL 347434, *2 (10th Cir. Feb. 12, 2009) (evidence that plaintiff was the only African-American employed by the employer is not probative of race discrimination, where no evidence is presented concerning number of qualified African-Americans who have applied for employment).

Plaintiff admitted in her deposition that she does not know who made the promotion decisions in 2005 and that she has no evidence that any of the decision makers made comments or engaged in any conduct evidencing sex or age-based animus, or that they even knew plaintiff. (Daniels Dep., pp. 250, 346-48, 401)  In addition, in 2005, there were male employees and employees under 40 years of age for who Human Resources has no record of receiving a promotion assessment on who did not complete the process as a result.  (Liberti Decl., ¶¶ 39, 51-52; Grover Decl., ¶¶ 11, 13-14; SOF 51-53)  Like plaintiff, those employees were disqualified from the promotion process that year.  (*Id*.) In addition, there were female employees and employees over age 40 promoted to full-time supervisor positions in 2005.  (SOF 53)

In short, plaintiff's unsupported assertions, speculation and conclusory allegations are unavailing to raise an inference of discrimination or pretext with respect to her 2005 application for promotion.  As a result, UPS is entitled to summary not only on the ground that  plaintiff's claim is  time-barred, but because she has failed to establish elements essential to her claim that the denial of her application for promotion  in 2005 was discriminatory.

(1)     Plaintiff's 2006 Promotion Claim Fails as a Matter of Law

As discussed in detail above, plaintiff's 2006 promotion claim is time-barred as a matter

of law.[30]  But as with her 2005 promotion claim, even if it were not time-barred –which, as

demonstrated above, it is -- UPS would still be entitled to summary judgment with respect to her

2006 promotion claim.

As with plaintiff's 2005 promotion claim, plaintiff cannot establish essential elements of

her discrimination claim with respect to her applications for promotion in 2006 because she has

not and cannot show that she was qualified for the position or that the evidence gives rise to a

reasonable inference of discrimination.[31]  Plaintiff was not promoted in 2006 because she did not

proceed through the promotion process as a result of her then manager, Joe Dooley, not

completing a promotion assessment packet for plaintiff because he did not believe that she was

qualified for promotion to a full-time supervisor position.  (*See* Memorandum, pp. 31-34)  As set

out in detail in UPS' Memorandum, Dooley did not believe that plaintiff was qualified for the

promotion because of plaintiff's ongoing conflicts with other employees under his supervision.

(*See* Memorandum, pp. 31-33)  Although plaintiff now claims a factual dispute exists regarding

--------

[30] Plaintiff also summarily argues that she did not apply for promotion after 2006 because to do
so would have been futile.  A plaintiff who has failed to apply for a position may establish a
prima facie case of discrimination by demonstrating that "[s]he would have applied but for
accurate knowledge of an employer's discrimination and that [s]he would have been
discriminatorily rejected had she actually applied." *Bennett v. Quark, Inc*., 258 F.3d 1220,
1228 (10th Cir.2001) (internal citations omitted) *overruled on other grounds by Boyer v.
Cordant Technologies, Inc*., 316 F.3d 1137, 1140 (10th Cir.2003).  The futile gesture
exception requires a showing of a pervasive, consistent, and continuing pattern or practice of
discrimination in order to justify excusing the plaintiff from the requirement of applying for
the position.  Application must be "a vain and useless act."  *Id.*  Choosing not to apply on the
basis of no reason other than not being promoted the two prior times applied, is simply not
what is intended by and does not meet the futile doctrine standard. *Id.*  Plaintiff herself
testified that before she even knew anything about why she was not promoted in 2005 and
2006, she decided not to apply again.  (Daniels Dep. pp. 245-246).

[31] Contrary to plaintiff's allegations in her Response, UPS is not claiming that a denial of
promotion is not an adverse employment action.  (*See* Response, p. 78-79)

her relationships with her coworkers, it is undisputed -- and plaintiff so testified -- that she had

ongoing conflicts with various other employees, including all of the other OMS dispatchers.

(SOF 42, 47-48; Daniels Dep. pp. 251-255, 263-265)  Moreover, she has no evidence that

Dooley's reason for not believing she was qualified is pretextual.  *Timmermeyer v. Wichita Eagle

and Beacon Pub. Co*., 90 F.Supp.2d 120, 1207 (D. Kan. 2000) (plaintiff's subjective opinions

concerning her own qualifications does not demonstrate a dispute of fact about the genuineness

of the employer's belief).

Plaintiff also argues that use of subjective criteria in assessing performance is *per se*

evidence of discrimination. That argument is contrary to the case law she herself cites.   Courts

have merely noted that use of subjective criteria *may provide opportunities* for discrimination.

(*See* Response, p. 79, citing *Burrus v. United Tele. Co. of Kan*., 683 F.2d 339, 342 (10th Cir.

1982) (actually affirming finding that plaintiff did not get along well with other employees to be

a legitimate business reason with no evidence of pretext).  Moreover, contrary to plaintiff's

claims, it is well-established that courts do not sit as "super-personnel departments free to

second-guess the business judgment of an employer," but only to determine if they were

motivated by discriminatory animus.[32]

There is no evidence that Mr. Dooley's proffered reason for not completing the

assessment was pretextual, no evidence calling into doubt his belief that plaintiff's interpersonal

skills did not qualify her for a management position, and no evidence indicating or creating a

reasonable inference that the reason Mr. Dooley did not complete plaintiff's written assessment

---

[32] *See also Power v. Koss Construction Company*, 499 F.Supp.2d 1194, 1204 (D. Kan. 2007)
("[a]s the Tenth Circuit has explained, "[t]he reason for this rule is plain: our role is to
prevent intentional discriminatory hiring practices, not to act as a 'super personnel
department,' second guessing employers' honestly held (even if erroneous) business
judgments")

because of her age/sex or that his proffered reason is pretextual.  (SOF 47-48; Dooley Decl.

¶¶ 45, 51).  See *Piercy*, 480 F.3d at 1200 ("a challenge of pretext requires a court to look at the

facts as they appear to the person making the decision at issue, not the aggrieved employee; the

relevant inquiry is not whether their proffered reasons were wise, fair or correct, but rather

whether they believed those reasons to be true and 'acted in good faith upon those beliefs.'")[33]

(internal citations omitted)   Mr. Dooley has not completed a promotion assessment for any

employee seeking promotion to full-time supervisor at UPS.  (Dooley Decl., ¶ 45)  The only

evidence plaintiff proffers as allegedly evidencing age/sex animus on the part of Mr. Dooley is

that Mr. Dooley allegedly asked plaintiff what her plans were with respect to retirement.[34]

(Response, p. 77)  However, any such inquiry is not evidence of age animus- "a company has a

legitimate interest in learning its employees' plans for the future, and it would be absurd to deter

such inquiries by treating them as evidence of unlawful conduct."  *Colosi v. Electri-Flex Co.*,

965 F.2d 500, 502 (7th Cir. 1992); *See also Ziegler v. Beverly Enters. – Minn., Inc.*, 133 F.3d

671, 676 n. 3 (8th Cir. 1998) (holding an employer's questions about an employee's age and

retirement plans insufficient to demonstrate age discrimination): and *Woythal v. Tex-Tenn Corp.*,

112 F.3d 243, 247 (6th Cir. 1997)(same).

---

[33] Given that the relevant inquiry is whether Mr. Dooley acted in good faith in believing plaintiff did not get along well with others, conclusory claims, unsupported by the record, concerning other manager's opinions of plaintiff's job performance are irrelevant as to Mr. Dooley's good faith belief.  *Id.*; *See also Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1175-1176 (10th Cir. 2006) (finding different treatment by different supervisors is not evidence of pretext: any difference may be the result of different supervisor's reactions)

[34] As addressed in detail in Section C below, plaintiff relies largely on a chain email titled "The Man Rules" which can best be described as a light-hearted way of poking fun of the differences between the sexes, and barely rises to the level of a stray-remark by a non-decision maker and has no probative value.  (*See* Section below).  Further, there is simply no evidence that Mr. Dooley or any relevant decision-maker sent, received or was even aware of this email or endorsed it, nor is there evidence that the email was at any time directed to or received by plaintiff.  (ECF Doc. 100-26)

Accordingly, UPS is also entitled to summary judgment on plaintiff's 2006 promotion claim because even if it were not time-barred, she has not and cannot proffer any evidence that creates a reasonable inference of discrimination or demonstrates Mr. Dooley's stated  reason for not recommending plaintiff for promotion was a pretext for discrimination.

**C.      PLAINTIFF'S DENIAL OF TRAINING CLAIM FAILS AS A MATTER OF LAW**

As demonstrated in Section II A. above, plaintiff's denial of training claim is time-barred, because she did not file a charge of discrimination until almost four years after she claims she was denied training.  But even assuming *arguendo* that plaintiff's claim was not time-barred, UPS would still be entitled to summary judgment because plaintiff cannot establish that she suffered an actionable adverse action, and she has not and cannot proffer any evidence that raises a reasonable inference of discrimination or pretext.  (*See* Memorandum, pp.  34-38)

Not everything that makes an employee unhappy is an "adverse employment action."  To constitute an adverse action, the employer's conduct must be "materially adverse" to the employee's job status.  *See, e.g., Wells v. Colo. Dept. of Transportation* ,  325 F.3d 12005, 1213 (10th Cir. 2003)  Only acts that constitute "a significant change in employment status, such as hiring, firing, failure to promote, reassignments with significantly different responsibilities, or a decision causing a significant change in benefits" constitute an adverse action for purposes of a sex or age discrimination claim. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761(1998);  *See also Bush v. Mukasey, 2008 WL 3833815 as 2(D.Utah Aug. 13, 2008);  Pope v. Quivira Council*, 2007 WL 4561143 at *1, 4 (D. Kan. Dec. 20, 2007).  Not receiving one week of additional training on the twilight dispatch window had no effect on plaintiff's position as dispatch specialist, her compensation or benefits at UPS.  (SOF 8-9, 17)

Plaintiff argues that denying her additional training on the twilight dispatch window was an adverse action because as a result of not receiving that training in 2004, plaintiff's shift was changed in 2008. Plaintiff's attenuated argument is without merit.  As explained in greater detail in Section D below, even assuming *arguendo,* that the 2008 change in shift was the result of the alleged denial of training four years earlier, plaintiff has not and cannot show that the change in shift constituted a reassignment with significantly different job responsibilities or a change in benefits, and thus it did not constitute an adverse action for purposes of a discrimination claim. *See, e.g., Sims v. The Boeing Company*, 2000 WL 633228 at *1 (10th Cir. May 17, 2000) (unpublished opinion) (affirming district court's finding that a change in shift was not an adverse action); *Flores v. City and County of Denver*, 2002 WL 188956 at *1, 2 (10th Cir. Feb. 7, 2002) (lateral transfer to a different position not an adverse action because not accompanied by change in pay or benefits); *Vann v. Southwestern Bell Telephone Co.*, 2006 WL 1166120 at *5-6 (10th Cir. May 3, 2006) (involuntary lateral transfer back to the employee's previous position at a different location in a different state was not an adverse action); *See also Lebow v. Meredith Corporation*, 484 F.Supp.2d 1202 (D. Kan. 2007) (change from directing a Monday-Friday morning newscast to a Wednesday-Saturday and weekend evening newscasts (less significant newscasts) did not constitute an adverse action because the plaintiff's job responsibilities remained essentially the same); (*See also* Memorandum, pp.  36-37, 42-43)

Moreover, Guy Albertson, the Division Manager, was the manager who made the decision in 2004-05 that only full-time supervisors should perform the twilight dispatch function, so there was no need for plaintiff as a dispatch specialist to receive such training. There is no evidence (and plaintiff has proffered none) that Albertson's decision was motivated by plaintiff's

age or sex, rather than by legitimate, nondiscriminatory business considerations.[35]  (*See* Memorandum, pp.  37-38)

Nor has plaintiff offered any evidence beyond her assumptions and conclusory allegations that Albertson's reasoning and decision in this regard was a pretext for alleged discrimination.  Instead, it is telling that, in the absence of any probative or relevant evidence of discrimination, plaintiff relies for this claim and other claims on a chain email circulated among some employees in January 2009 (that was not circulated to  plaintiff, Albertson, Joe Dooley or any other employees plaintiff alleges discriminated against her) titled "The Man Rules."  (See ECF Doc 100-26)  This flimsy and attenuated effort to suggest that an email sent in 2009, obviously intended to be humorous, is evidence establishing that business decisions made in 2004 and 2008 were based on sexual animus borders on the ludicrous.  Moreover, such allegedly "discriminatory" communications among random management employees having no connection to the decisions at issue, the decision-makers involved, plaintiff or plaintiff's employment, are no more than stray remarks having no probative value as to whether Mr. Albertson's decision was motivated by plaintiff's age or sex.  *Vasilescu v. Black & Veatch Pritchard, Inc*., 155 F.Supp.2d 1285, 1292-3 (D. Kan. 2001) (age based comments by non-decision makers are immaterial and not evidence of age-based animus; "[i]solated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions"); *See also Kirkpatrick v. Phizer, Inc.*, 391 Fed.Appx. 712, 2010 WL 3199802 *6 (10th Cir. 2010), *Wagoner v. Pfizer, Inc.* 391 Fed.Appx. 701, 2010 WL 3199778  *6 (10th Cir. 2010); (*See* Memorandum, p.  37-39).

---

[35]  Plaintiff has also failed to show any causal connection between the decision made by Albertson in 2004 regarding additional training, and the decision made by entirely different managers (Joe Dooley and Ernie Christie) in 2008 about which dispatchers should work which shift.

Plaintiff's arguments are, in short, again based on speculation, assumptions and conclusory allegations wholly insufficient to establish elements essential to her training claim. Accordingly, even if plaintiff's denial of training claim was not time-barred, UPS would still be entitled to summary judgment in its favor on this claim as a matter of law.

### C.   PLAINTIFF'S SHIFT CHANGE CLAIM FAILS AS A MATTER OF LAW

Plaintiff alleges that in July 2008, she was discriminated against because of her sex and age in violation of Title VII, KAAD, the ADEA, and KADEA when UPS allegedly reassigned plaintiff from cover dispatcher to the night dispatch window and assigned a younger, male employee, Jason Isabell to work as the cover dispatch person.  (ECF Doc. 84, Pretrial Order, pp. 4-5)  Plaintiff has once again failed to establish elements essential to her claims.

It is undisputed that as of July 2008, plaintiff, a dispatch specialist with UPS, worked the night dispatch shift, a shift on which plaintiff had, in fact, worked  the majority of the time since being promoted to the dispatch specialist position in 1999 at the age of 48.  (SOF 2, 4, 61, 64-65, 68-69; *See* Memorandum, pp. 39-40)  It is also undisputed that the only change with respect to plaintiff's job duties in the position of dispatch specialist with UPS at any time was a change in shift from consistently working the night dispatch shift, to rotating from shift to shift while working as a cover dispatcher, covering absences on the night, twilight,[36] and day shifts.  (SOF 61, 63-65, 68-72, 89)

To begin with, plaintiff has failed to establish that she incurred any adverse employment action.  As a matter of law, a change in shift assignment where, as here, there was no change in

---

[36] Contrary to plaintiff's allegations in her Response, and as explained in detail below, it is undisputed, and plaintiff clearly acknowledged in her deposition testimony, *that she at no time performed the duties of the twilight dispatch shift,* but merely reported to work during that shift when the full-time supervisor covering dispatch was on vacation. On those instances, UPS had another full-time supervisor actually performing the twilight dispatch duties.  (SOF 64-65, 70)

pay or benefits or job title and no "significantly different responsibilities" is not sufficient to constitute an adverse employment action.  *See, e.g., Burlington Indus.* 524 U.S. at 761: and *Wells v. Colo. Dept. of Transportation,* 325 F.3d at 1213 (the employer's conduct must be "materially adverse" to the employee's job status).

Plaintiff's attempt to suggest otherwise by offering conclusory and unsupported allusions to the alleged "detrimental and adverse" affect of this change are insufficient to render the decision "adverse" within the meaning of the law.  The alleged change in shift plaintiff says occurred in 2008 was, in the circumstances, simply not an adverse action for the purpose of a discrimination claim under Title VII, KAAD, the ADEA, and KADEA.  She has failed to establish this essential element of her claim.

Moreover, plaintiff has not and cannot show that the decision to assign Mr. Isabell to work the cover dispatch position instead of plaintiff was made for discriminatory reasons.  The shift assignment decision was made by Feeder Manager Joe Dooley and Kansas Feeder Division Manager Ernie Christie.  (*See* Memorandum, pp. 40-41)  When Mr. Isabell was promoted from part-time supervisor to dispatch specialist (the same level position held by plaintiff), Mr. Dooley determined that plaintiff should continue to work the night dispatch shift she was already working, given she had the most experience on that shift, and given that she had never actually performed the twilight dispatch duties necessary to actually cover the more demanding and complicated duties of the twilight dispatch shift.  In  contrast, Mr. Isabell knew how to perform those duties on his own.  (SOF 75; *See also* Memorandum, pp. 44-45)  Mr. Dooley had no involvement in Mr. Albertson's prior decision not to allow dispatch specialists (as opposed to full-time supervisors) to work the twilight shift, and he had no involvement in Mr. Isabell learning the twilight dispatch shift duties. There is absolutely no evidence that Mr. Dooley's

decision to assign Mr. Isabell to the twilight shift, while plaintiff remained the night shift dispatcher, was motivated by plaintiff's sex or age.  There is also no evidence that Mr. Dooley's shift assignment decision was a pretext for discrimination, rather than a good faith business decision, given that Mr. Isabell knew how to perform the twilight shift duties on his own, whereas plaintiff testified that she had at no time performed those duties and could not perform them on her own in July 2008.  *See Piercy*, 480 F.3d at 1200. (a challenge of pretext requires a court to look at the facts as they appear to the person making the decision at issue, not the aggrieved employee; the relevant inquiry is not whether their proffered reasons were wise, fair or correct, but rather whether they believed those reasons to be true and "acted in good faith upon those beliefs.")[37] (internal citations omitted)

In an attempt to suggest discriminatory animus, plaintiff relies on the same unavailing arguments that (1) Mr. Dooley asked her about her retirement plans, and (2) on the "The Man Rules" chain email circulated in January 2009 by several UPS employees not including Mr. Dooley or any other decision-maker involved in any of the decisions pertaining to plaintiff's employment at any time.

First, as set forth above, an inquiry regarding an employee's retirement plans, in order to project company staffing needs, as in the present case, is not evidence of age animus.  (*See* Section II.B.2 above, and cases cited therein) Second, the "Man Rules" email circulated among several UPS employees in 2009 – a group that did not include Mr. Dooley or any other relevant decision maker – in no way creates a reasonable inference that Mr. Dooley's 2008 assignment

---

[37] Given that the relevant inquiry is whether Mr. Dooley acted in good faith in believing plaintiff did not get along well with others, conclusory claims, unsupported by the record, concerning other manager's opinions of plaintiff's job performance are irrelevant as to Mr. Dooley's good faith belief. *Id.*; *See also Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1176 (10th Cir. 2006) (finding different treatment by different supervisors is not evidence of pretext: any difference may be the result of different supervisor's reactions)

decision was tainted by discriminatory animus.  Simply disbelieving the employer's explanation is insufficient: a plaintiff must proffer probative evidence that "discrimination was a determinative factor in the employer's actions. *Piercy v. Maketa et al.*, 480 F.3d 1192, 1200-1201 (10th Cir. 2007).  Plaintiff has failed to make any such showing with respect to her shift change claim.

Because plaintiff has failed to establish elements essential to her claim of discrimination in the change of shift/removal from cover dispatch decision, UPS is entitled to summary judgment as a matter of law.

**D.    PLAINTIFF FAILED TO PLEAD AND CANNOT NOW ASSERT A CLAIM OF UNEQUAL PAY UNDER ANY LAW BUT THE EQUAL PAY ACT**

Plaintiff alleges that, in the position of dispatch specialist/OMS dispatcher, a position she held from 1999 to 2009, she performed the same duties as the full-time supervisor employees who worked the twilight dispatch window, but was denied equal pay under the Equal Pay Act. (ECF Doc. 1, p. 13; *See also* ECF Doc. 84, Pretrial Order, p. 6)

The conclusory assertions plaintiff now offers regarding  compensation, job classification and discriminatory salary discussions are apparently references to plaintiff's allegation that she supposedly performed the same duties as full-time supervisors who worked the twilight shift but did not receive the same pay.[38]  .It should be noted that plaintiff did not plead a claim of unequal pay(i.e. a Fair Pay Act claim) under Title VII, the KAAD, the ADEA,

_____

[38] Plaintiff expressly  refers to her claim that she performed supervisory duties but did not receive supervisory pay in discussing her "classification" claim.  (*See* Response, p. 78; *See also* ECF Doc. 84, Pretrial Order, p. 6) Plaintiff clearly pleads she performed supervisory duties but was denied supervisory pay in her Equal Pay Act count, but proffers no such allegations in Counts I and II. It should be noted, however, that plaintiff did not plead a claim of unequal pay under Title VII, the KAAD, the ADEA, or the KADEA. She pled  only a claim of unequal pay on the basis of sex under the Equal Pay Act.  (See ECF Doc. 1, Complaint, Counts I, II, & IV)

or the KADEA. She pled only a claim of unequal pay on the basis of sex under the Equal Pay Act.  (See ECF Doc. 1, Complaint, Counts I, II, & IV)

But even assuming for purposes of this motion that plaintiff's Title VII/FPA claim is properly before the Court,  it is arguably time-barred.   P The claim plaintiff now presents as a claim of alleged wage discrimination under Title VII/FPA is based on the same allegations as in plaintiff's Equal Pay Act claim, i.e.,  that she supposedly performed the same duties as full-time supervisors but was denied equal pay.  (ECF Doc. 84, p. 16)  Plaintiff did not file a charge of discrimination until November 2008- almost a decade after she first began working as an OMS dispatcher in 1999, and at least 3-4 years after being aware that full-time supervisors (a higher level position, with higher pay) were the only ones assigned to work the twilight dispatch shift. This is not a situation where an employee is unaware of what other employees in the same position doing the same level duties were being paid, but of being aware for years that full-time supervisors who were at a higher pay grade were, according  to her, performing functions she alleges she also performed,as a cover dispatcher,while being paid less as a result of being in a lower-level position.  (*See* Section A. above; *See also* Memorandum, starting p. 67) Therefore, her claim should not be considered as preserved or revived by the FPA.

 Quite apart from the evidence – including her own testimony – that she never in fact actually performed the twilight shift dispatcher duties while working as cover dispatcher (See Section A, above), she was long aware of the pay disparity she now complains of, yet did not timely assert it in her charge.

### E.    PLAINTIFF CANNOT ESTABLISH AN EQUAL PAY ACT CLAIM

Plaintiff alleges that her dispatch specialist job required equal skill, effort and responsibility and was performed under similar working conditions as the twilight dispatch job

performed by male feeder full-time supervisors, but she was denied equal pay in violation of the Equal Pay Act (EPA)  (*See* Compl., Count IV; ECF Doc. 84; Daniels Dep., pp. 633-35)

Plaintiff bears a heavy burden in attempting to establish a claim under the Equal Pay Act. To  establish a *prima facie* case, plaintiff must establish that she performed substantially all of the duties of a higher-paid male coworker, and not simply that a higher-paid coworker performed some of the same job duties as plaintiff.  *Lewis v. D.R. Horton*, 2010 WL 1063887 at *4 (10th Cir. March 24, 2010).  Courts have made it clear that the definition of "equal work" under the EPA is narrowly construed – failure to furnish equal pay for "comparable work" or "like jobs" is not actionable.  *Id*.

It is undisputed that plaintiff at no point in time performed the duties of the twilight dispatch job.  Although plaintiff has now proffered conclusory allegations that she in fact performed those duties, her deposition testimony is clear that she never performed the duties of the twilight dispatch job.  It is also undisputed that by contrast to the day and night dispatch, the twilight dispatch shift is far busier and more difficult because the Hub package sort operates during the twilight shift and there is a substantially larger volume of inbound/outbound trailers and customer pickups during that shift.  (SOF 21-23)

Plaintiff admits that she does not know all of the duties of the twilight dispatch window nor does she know all the responsibilities of feeder supervisors.  (Daniels Dep., pp. 125, 130-31, 137, 168, 187-89, 192-94, 196, 215, 311-13, 316-18)  It is also undisputed that full-time supervisors and managers, unlike specialists, supervise feeder drivers and various other employees, including specialists, and are held responsible for ensuring training, evaluation, discipline, and other matters concerning those employees.  (SOF 13-34; Dooley Decl., ¶¶ 6-7; Liberti Decl., ¶¶ 6-8; Yankovich Decl., ¶¶ 4, 6)  Unlike full-time supervisors and managers,

specialists do not have full supervisory authority, cannot discipline/discharge employees and are not held responsible for ensuring training, discipline and performance evaluations of drivers and various other employees.  (*Id*.)  Third, unlike specialists, full-time supervisors are often required to change job functions, duties, responsibilities and departments, travel, relocate and accept lateral transfers and often work more than 40 hours per week but do not receive overtime pay.  (SOF 15-16; Dooley Decl., ¶ 6; Liberti Decl., ¶ 7)  Fourth, unlike specialists, supervisors fill in for each other and for the feeder manager when he/she is absent or on vacation.  (SOF 13)

Accordingly, plaintiff cannot meet the heavy burden of demonstrating that she performed equal work under the same working conditions as full-time supervisors who worked the twilight shift.  *See Myers v. LeFlore County Board of Comm's.*, 1998 WL 43170, *5 (10th 1998) (finding that plaintiff could not establish a *prima facie* case under the EPA where plaintiff claimed she performed the same work as equipment operators where she "did not undertake these activities with the same frequency, skill, effort or responsibility as possessed by seasoned equipment operators.")  As a result, plaintiff fails to establish a *prima facie* case under the Equal Pay Act.

But even assuming, arguendo, that  plaintiff could establish a *prima facie* case, UPS can demonstrate that the wage differences between plaintiff and these full-time supervisors were based on several factors other than sex.  First, the full-time supervisors' salaries were higher because they held a higher level position and UPS uses different salary ranges/grades for dispatch specialists and supervisors.  (SOF 54; Liberti Decl., ¶¶ 70-75; Christie Decl., ¶ 34)  *See Varley v. Superior Chevrolet*, 1997 WL 161942 *12 (D. Kan. March 21, 1997) (granting summary judgment for the employer where higher salaries of the two male employees were justified by former salaries, experience levels, market value of their services, and recognized management potential)  Second, the salaries of plaintiff and these supervisors depended in part

upon their work histories/experience and salaries in their previous positions at UPS. (SOF 55; Liberti Decl., ¶¶ 70-71; Grover Decl., ¶¶ 19-20; Christie Decl., ¶ 35); *Id.*; *See Angove v. Williams-Sonoma, Inc.*, 2003 WL 21529409 *7 (10th Cir. Jul. 8, 2003) (finding that an employee's prior experience is a factor "other than sex")  Unlike plaintiff, all of these individuals had been full-time supervisors for several years and had worked as feeder supervisors in UPS' much larger/more complex Lenexa, Kansas Feeder operation.  Plaintiff worked as a dispatch specialist and prior to that as a clerk/customer service representative; she never worked as a full-time supervisor and never worked at the Lenexa facility.  (SOF 1, 7)

For example, Jim Yankovich had been a full-time supervisor since 1987 (including a period as an on-road supervisor), worked as the twilight dispatcher for several years, and had worked as a feeder supervisor in the larger/more complex Lenexa Feeder operation.  (SOF 58-60; Exh. AF, p. 2; Yankovich Decl., ¶¶ 10-11, 38-39)  Because Mr. Yankovich occupied a higher level position for many years, worked the more difficult twilight dispatch shift for several years and had more extensive feeder experience/skills and a different work/salary history at UPS, his salary was higher than plaintiff's salary.  (*Id.*; Liberti Decl., ¶¶ 70-75; Williams Decl., ¶¶ 67-70; Christie Decl., ¶¶  34-39; SOF 11-16, 21-24, 58-60)

The other four male supervisors also had different employment/salary histories, skills, duties, jobs and work experience at UPS than plaintiff and had worked as full-time supervisors, particularly in the larger, more complex Lenexa Feeder operation where plaintiff never worked. (*Id.*; SOF 25, 58-60)  Accordingly, UPS can establish that the differences in salary between plaintiff and these male full-time supervisors were based on factors other than sex.  *See Varley*, 1997 WL 161942 at *12; *Angove*, 2003 WL 21529409 at *7.

### F.      PLAINTIFF CANNOT ESTABLISH A RETALIATION CLAIM

Plaintiff's claim of retaliation is based on her allegation that she complained of discrimination to Gary Liberti, a former district Human Resources manager for UPS, in July 2008, and that she filed charges of discrimination in November 2008 and April 2009.  It is undisputed that the only conduct plaintiff alleges that she suffered as a result of her complaints to Liberti is (1) an alleged brief decrease in communications from her manager, Joe Dooley, in the fall of 2008; and (2) being accused of improperly recording her time in February 2009.  (*See* Memorandum, p. 46; *See* Response, pp. 85)

As explained in detail in UPS' Memorandum, plaintiff fails to establish a prima facie case of retaliation because she has not and cannot show that she suffered an adverse employment action as a result of allegedly complaining to Liberti about discrimination.[39]  The standard for establishing the "adverse action" element of a retaliation claim is an objective standard and requires a plaintiff to "show that a reasonable employee would have found the challenged action materially adverse."  *Burlington Northern & Santa Fe Railroad Co. v. White,* 548 U.S. 53, 68 (2006)("We speak of *material* adversity because we believe it is important to separate significant from trivial harms"….the standard for judging harm must be objective.)

The conduct on which plaintiff relies simply does not rise to the level of materially adverse harm under this objective standard .  (*See* Memorandum, pp. 46-47, 49-50)   An alleged brief decrease in communications with a manager (which-- even assuming that it occurred -- plaintiff admits had no impact on her job performance does not constitute materially adverse action within the meaning of the law.  Similarly, an employer  discussing with an employee her

---

[39] Liberti does not deny that plaintiff came to him with various complaints, as plaintiff suggests in her Response.  Rather he has made it clear that he did not recall or understand that she was connecting or attributing the various issues about which she was complaining to her age and sex.  But even assuming for purposes of this summary judgment motion only that she did engage in protected conduct, she still did not suffer any adverse action as a result.

obligation to maintain accurate timekeeping records and legitimate concerns about her time records – in connection with which no adverse consequences or discipline occurred – also does not constitute a materially adverse action causing significant harm.

Plaintiff also alleges that an inference of discrimination or pretext can be drawn from the fact that UPS supposedly failed to investigate her July 2008 complaint.  (*See* Response, p. 89)   The record shows, however, that Gary Liberti did, in fact, investigate plaintiff's complaint although he did not believe or understand it to be a discrimination complaint.[40] Plaintiff's insistence that he did not conduct an investigation is based not on any probative evidence, but on assumptions and unsupported conclusions, which are wholly insufficient to create an inference of discrimination or to demonstrate pretext.

In an attempt to bolster her retaliation argument, plaintiff offers her own exaggerated account of the nature of the meeting at which her time-keeping practices were discussed, followed by a litany of allegations about supposedly improper wage and hour practices at UPS, without any reference whatsoever to any supporting (let alone probative) evidence. These bare, unsupported contentions, even assuming for purposes of this motion only that they were even true, still do not establish that she was subjected to any materially adverse employment action because of her complaint to Mr. Liberti.  Plaintiff has not and cannot establish this essential element of her retaliation claim.

---

[40] It is telling that plaintiff also argues that, even if plaintiff  did not mention age or sex discrimination, her complaints had "all the hallmarks" of age and sex discrimination, and therefore Liberti's assertion that he did not believe she was alleging discrimination could reasonably be viewed as "suspicious." Plaintiff does not say what these "hallmarks" are or provide any probative evidence of what she actually said that would make any such inference as obvious as plaintiff now suggests.  Once again, her argument is based not on probative evidence supported by the record, but on assumptions, presumptions and conclusory allegations.

Plaintiff focuses instead on the "causal connection" element of her retaliation claim, arguing that the proximity in time between when she filed a charge of discrimination in November 2008 and when the concerns about her time-keeping were addressed with her in February 2009 and the "manner" in which she alleges she was reminded to record her time properly, was sufficient causal connection to establish evidence of circumstances that justify an inference of retaliatory motive.  (Response at 87)  Even if plaintiff had or could establish that she was subjected to a materially adverse action – which she has not – she ignores the fact that the timing of the meeting about her time records occurred when it was discovered that plaintiff was one of the employees discovered not to be properly recording their time.  Other than assumption, presumption and conclusory allegations, plaintiff offers not evidence establishing that the meeting was causally connected to filing her charge several months earlier rather than to the time recording issue, the discovery of which was much more proximate in time.

Because plaintiff has failed to establish elements essential to her retaliation claim, UPS is entitled to summary judgment on this claim.

### G.    PLAINTIFF'S CONTRACT/PROMISSORY ESTOPPEL CLAIM FAILS

As explained at length in UPS' Memorandum, Kansas courts have repeatedly held that plaintiff cannot assert a common law cause of action when federal law provides an adequate remedy.  That is nevertheless  exactly what plaintiff attempts to do here: assert her retaliation claim for which a cause of action exists under both state and federal law (Title VII, the KAAD, the ADEA, and the KADEA) as a separately actionable breach of contract/promissory estoppel claim.  (*See* Memorandum pp. 61- 62)  In her Response, plaintiff cites no binding authority holding otherwise.  (*See* Response, pp. 94-98)  As such, plaintiff's breach of contract/promissory estoppel claim fail(s).

But even assuming *arguendo* that plaintiff could maintain a breach of contract/promissory estoppel claim, UPS would still be entitled to summary judgment.  The entirety of plaintiff's contract/promissory estoppel claim rests on plaintiff's receipt of the Code of Business Conduct ("Code"), and a now newly-minted argument concerning UPS' "Professional Conduct and Anti-Harassment Policy" (Harassment Policy)  (Response, pp. 95-96)

It is undisputed that plaintiff does not allege that any UPS employee made any representations concerning the Code or the Harassment Policy, or that plaintiff  ever even discussed the Code or the Anti-Harassment policy with any UPS employee.  Her claim is based entirely on the language of Code and the Anti-Harassment Policy the latter of which plaintiff did not even mention in the pre-trial order.  (See ECF Doc. 84, p. 5) The documents speak for themselves as to what they state and contrary to plaintiff's repeated unsupported representations, there is no genuine issue of disputed fact in that regard.

Kansas law is clear that "[t]he existence of an implied contract depends on the intent of the parties, divined from the totality of the circumstances:"

> A mutual intent to form a contract is necessary to show that an implied-in-fact contract exists. A unilateral expectation on the part of the employee does not create an implied-in-fact contract for continued employment. A reasonable person must be able to find from all relevant circumstances of the plaintiff's employment that there was an intent on both sides to be bound.
> *Doud v. Countrywide* 1997 WL 292127 *11 (D. Kan. May 5, 1997); (*See also*

Memorandum, pp. 63-64)

No reasonable person could find that either the Code or the Anti-Harassment Policy constitute intent on the part of UPS to enter into a contract with plaintiff: "[t]here is no 'meeting' [of the minds] created by unilateral expectations of an employee – [b]argaining is an essential prerequisite." *Id.*   Moreover, Kansas law is clear that an employment manual does not by itself provide sufficient evidence of an intent to form a contract; additional evidence is needed.  *Id.*;

*citing Farthing v. City of Shawnee, Kan.*, 39 F.3d 1131, 1138-39 (10th Cir.1994), *Conaway v.*

*Smith*, 853 F.2d 789, 794 (10th Cir.1988) (under Kansas law, unilateral expression in a personnel

manual is not bargained for and so cannot alone be the basis for an implied employment

contract).  Plaintiff has not and cannot proffer any evidence to show that there was mutual

intention to form a contract with regard to these provisions.  Accordingly, plaintiff's contract

claim fails as a matter of law.[41]  *Id.*

As further evidence defeating any claim of a contract between plaintiff and UPS, UPS'

Code expressly states that it is not a contract for employment.[42]  (SOF 101; *See* Memorandum, p.

64)  The existence of the disclaimer is the nail in the coffin of plaintiff's already failed contract

claim.  *Doud*, 1997 WL 292127 at *12 (granting summary judgment finding that the existence of

disclaimer in the employee handbook unequivocally denies any intent to form a contractual

relationship); *See also Warren v. City of Junction City, Kansas*, 176 F.Supp.2d 1118, 1128 (D.

Kan. 2001) (finding that a disclaimer in the employee manual of the existence of a contract was

dispositive of the question of whether the manual establishes any sort of intent to enter into an

implied contract); *see also Kastner.*, 2d 909, 919 (Kan. App. 1995) (finding that disclaimer

"makes it clear that [defendant] did not intend to form a contract with [plaintiff]"); *Plummer v.*

---

[41] Given no evidence of intent on the part of UPS to convert statements of policy into contractual obligations, the lack of disclaimer language in the Harassment Policy does not somehow convert a policy statement into a contract.

[42] The case law cited by plaintiff concerning disclaimers is inapposite and distinguishable from the present case, given that plaintiff has no evidence contradicting the disclaimer and expressing an intent to contract on the part of UPS.  (*See* Response, p. 95 *citing, in part*, *Abbott v. BNSF Railway Co.*, 383 Fed. Appx. 703,  2010 WL 2428658  (10th Cir. 2010) *Abbott* merely holds that disclaimers are not *always* dispositive, that is they are not dispositive "*if there is evidence of contrary intent.*" Id. at *6.   No such evidence exists here, let alone the type of evidence required to survive  summary judgment.  *See Id.* at *8-9. (finding no implied contract where disclaimer and dismissing cases cited by plaintiff [the very cases cited by plaintiff in the present case] as completely distinguishable explaining plaintiff "relied on broad statements from cases that, on examination, include significant facts that make those cases distinguishable from his")

*Humana of Kansas, Inc.*, 715 F.Supp. 302, 303-304 (D. Kan. 1988) (granting summary judgment for employer on breach of contract claim where disclaimer and no evidence of contravening intent by the employer)  In addition, as explained in detail in UPS' Memorandum, plaintiff cannot establish any of the elements of contract.  (*See* Memorandum, pp. 63-65)  Plaintiff's attempt to fashion a contract claim out of a statement of policy simply finds no support in the law, nor is it the type of claim recognized under Kansas law.  Accordingly, plaintiff's contract claim is barred and its existence finds no support in the law.

Plaintiff's alternative claim of promissory estoppel claim similarly fails.  (See Memorandum, pp. 61-62, 65-67)  Plaintiff fails to cite any case law binding upon this Court demonstrating even the existence of such a claim in the employment context.  Accordingly, UPS is entitled to summary judgment with respect to plaintiff's contract/promissory estoppel claim.

## IV.    CONCLUSION

For the reasons set forth above, UPS respectfully requests that the Court grant summary judgment in its favor as to all of plaintiff Regina Daniels' claims and dismiss this lawsuit with prejudice.

ARMSTRONG TEASDALE LLP

BY:  _/s/ Jennifer L. Arendes_
      Jennifer L. Arendes, #77944
      Narcisa P. Symank, #78179
      ARMSTRONG TEASDALE LLP
      7700 Forsyth Blvd., Suite 1800
      St. Louis, Missouri 63105
      314.621.5070
      314.621.5065 (facsimile)
      jarendes@armstrongteasdale.com
      nsymank@armstrongteasdale.com

      and

      Laurence R. Tucker, #70074
      2345 Grand Boulevard, Suite 2000
      Kansas City, Missouri 64108-2617
      816.221.3420
      816.221.0786 (facsimile)
      lrtucker@armstrongteasdale.com

      ATTORNEYS FOR DEFENDANT
      UNITED PARCEL SERVICE, INC.

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 24, 2011 the foregoing was filed electronically

under seal with the Clerk of the Court by operation of the Court's electronic filing system:

Fredrick D. Deay, II
Law Offices of Fredrick D. Deay, II
7575 W. 106th Street, No. 14
Overland Park, Kansas 66212

Dennis E. Egan
Popham Law Firm
712 Broadway, Suite 100
Kansas City, Missouri 64105

*Attorneys for Plaintiff*

/s/ Jennifer L. Arendes