**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| REGINA DANIELS, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| | ) |
| vs. | )  Case No. 09-2304-JAR |
| | ) |
| UNITED PARCEL SERVICE, INC., | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

**MEMORANDUM AND ORDER**

Plaintiff filed this action alleging claims of discrimination and retaliation on the basis of sex and age under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act ("ADEA"), the Kansas Act Against Discrimination ("KAAD"), and the Kansas Age Discrimination in Employment Act ("KADEA"). Plaintiff also alleges a violation of the Equal Pay Act and common law claims for breach of contract, or in the alternative, promissory estoppel, under Kansas law. This matter is before the Court on defendant United Parcel Service, Inc.'s ("UPS") Motion for Summary Judgment (Doc. 90). The Court also considers UPS' motions to strike the following evidence submitted by plaintiff in response to summary judgment: the deposition testimony of Mark Samborski (Doc. 112), the deposition testimony of William J. Sifuentes (Doc. 113), the declaration of Kathleen Carpenter (Doc. 123) and the deposition testimony of Catherine Bleish (Doc. 124). The motions are fully briefed and the Court is prepared to rule. As described more fully below, defendant's motion for summary judgment is granted. Defendant's motions to strike are granted in part and denied in part.

# I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[1] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[3] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4] An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6] In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

---

[1]Fed. R. Civ. P. 56(a).

[2]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[6]*Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[11]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[12]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[13]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[14]  When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[15]

---

[8]*Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[9]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[10]*Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197-98 (10th Cir.2000) (quoting *Adler,* 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[11]*Adams*, 233 F.3d at 1246.

[12]Fed. R. Civ. P. 56(c)(4).

[13]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[14]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[15]*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[16]  The Court takes this opportunity to comment that this general rule does not appear to hold much weight in this case.  Despite estimating that trial would take five to seven days, the briefing in this case ballooned in size as it progressed, culminating in over 200 pages for the reply memorandum and related motions to strike.  Most of the voluminous briefing involves the lengthy responses to factual statements presented by the parties.  Defendant presented 107 statements of fact; plaintiff presented 108.  While the factual statements themselves are generally reasonable in number and length, the statements in opposition by both parties are not.  Upon review, the Court finds that both parties are guilty of using the "point-counterpoint" method to argue their cases, rather than to concisely discuss and directly controvert the record evidence.[17]  The statements made in opposition to statements of fact are unwieldy, argumentative, and often not relevant.  And a fair amount of the additional facts presented by plaintiff overlap with the factual averments presented by defendant—at times, they appear to differ in semantics alone.

To be sure, presenting this volume of lengthy, immaterial, repetitive, argumentative and duplicative facts for the Court to unravel does not allow for a "speedy and inexpensive" determination of this action.  To the contrary, it creates a laborious task for the Court that is anything but speedy and surely is not inexpensive for the parties.  Nonetheless, the Court has endeavored to sort through the parties' unnecessarily difficult presentation of the facts and disregards those statements that either do not comport with the record evidence, are

---

[16]*Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[17]Of course, the Court's local rule only imposes a page limit for the argument section of the brief.  While both parties requested and were granted leave to file their briefs in excess of these page limits, the Court was not forewarned that the factual matter in those briefs would be so unwieldy.

argumentative, are immaterial, or that require the Court to weigh evidence and make credibility

determinations.

## II.     Motions to Strike and Evidentiary Objections

### A.     *Separately-filed Motions to Strike*

Defendant moves to strike four exhibits attached to plaintiff's response, which all entail

testimony by other UPS employees that they have suffered or witnessed discriminatory treatment

by UPS.  The amendments to Fed. R. Civ. P. 56(c), effective December 1, 2010, provide the

appropriate summary judgment procedures for setting forth the parties' factual positions.  This

includes the provision that "a party may object that material cited to support or dispute a fact

cannot be presented in a form that would be admissible in evidence."[18]  The advisory committee

notes on this amendment explain:

> The objection functions much as an objection at trial, adjusted for
> the pretrial setting.  The burden is on the proponent to show that
> the material is admissible as presented or to explain the admissible
> form that is anticipated.  There is no need to make a separate
> motion to strike.  If the case goes to trial, failure to challenge
> admissibility at the summary-judgment state does not forfeit the
> right to challenge admissibility at trial.[19]

Yet, defendant filed four separate motions to strike along with its reply memorandum, resulting

in over 100 pages of additional briefing on the admissibility of these four exhibits.[20]  The Court

---

[18]Fed. R. Civ. P. 56(c)(2).  Defendant's motion for summary judgment was filed on December 1, 2010.  The motions to strike were filed on March 24 and March 28, 2011.  They are subject to the amended version of Rule 56 which became effective December 1, 2010.

[19]Fed. R. Civ. P. 56 advisory committee's note.

[20]Defendant apparently believed its extra pages of briefing on the motions to strike was necessary in addition to its 193-page reply memorandum, most of which is consumed by disputing factual material presented in plaintiff's response.  And surely, some of this volume could have been eliminated by simply refraining from unnecessarily cutting and pasting each of plaintiff's additional statements of fact into the reply.  In that reply, defendant also suggests that plaintiff's evidentiary objections should not be considered in the absence of a separate motion to strike.  For the reasons set forth above, this position is inaccurate.  Evidentiary objections should be made

takes this opportunity to stress that such expansive briefing is unnecessary—the motions to strike are duplicative of each other and duplicative of the arguments made in the reply itself—and overly argumentative.  It suffices that the party objecting to summary judgment material simply state the objection with a brief description (akin to a speaking objection) and a citation to the Federal Rule or case upon which the objection is based, in response to the factual averment itself.  The response to such an objection should be equally brief.  Nonetheless, the Court proceeds to briefly discuss defendant's motions to strike before determining the uncontroverted facts in this matter.[21]

First, defendant argues that the objected-to material does not support the facts to which they are offered to support.  To the extent this is true, the Court reminds defendant that in order for a fact to be deemed controverted, the Court must first find that there is evidence in the record that supports the party's response that a fact asserted is controverted.  Likewise, it would be contrary to this Court's obligation in deciding summary judgment to simply accept a party's assertion that a fact is uncontroverted without verifying that the evidence supports that fact.  The Court need not strike evidence on this basis, it simply declines to accept the parties' characterization of a fact if the evidence does not support the factual averment.  The Court agrees, for example, that the statement of fact that "UPS engages in a pattern of discriminatory treatment" is not an appropriate factual averment given the cited-to evidence.  Instead, those statements by other UPS employees only go to establish their own treatment.  The fact that other UPS employees may have suffered discriminatory treatment may support an <u>argument</u> that UPS

_____

in response to a statement of fact without separately moving to strike.

[21]Notwithstanding the fact that the Court finds separately-filed motions to strike unnecessary and duplicative, it declines to find that they were untimely filed.

has such a pattern of behavior, but it does not establish this as a statement of fact.  Such an argument should be made in the argument section of the brief.

Defendant further argues that certain portions of these employees' statements should be stricken for lack of personal knowledge, or because they are based on conclusory statements and conjecture.  Fed. R. Civ. P. 56(c)(4) requires that affidavits be made on personal knowledge and "set out facts that would be admissible in evidence . . . ."  Fed. R. Evid. 602 requires that a testifying witness "ha[ve] personal knowledge of the matter" testified to.[22]  "Under the personal knowledge standard, an affidavit is inadmissible if 'the witness could not have actually perceived or observed that which he testifies to.'"[23]  Statements of "mere belief in an affidavit must be disregarded."[24]

The evidence at issue on this point involves other UPS employees' treatment.  Defendant argues that none of the statements by other employees about UPS' alleged practice of discrimination are based on personal knowledge of UPS' treatment of plaintiff.  While defendant is correct that these statements are not based on personal knowledge of plaintiff's treatment, that is not what they are offered to establish.  In general, "the testimony of other employees about their treatment by the defendant is relevant to the issue of the employer's discriminatory intent."[25]  These employees have personal knowledge about their own treatment and testimony about their own treatment is admissible.  The extent to which this evidence establishes any of plaintiff's claims goes to the weight and not the admissibility of that evidence. The Court will

---

[22]Fed. R. Evid. 602.

[23]*Argo v. Blue Cross Blue Shield*, 452 F.3d 1193, 1200 (10th Cir. 2006).

[24]*Id.* (quoting *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)).

[25]*Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1314–15 (10th Cir. 2006) (quotation omitted).

only consider, for purposes of determining the uncontroverted evidence, those statements that the declarant could have perceived or observed, and will construe the evidence in the light most favorable to plaintiff as the non-moving party.

Finally, defendant argues that Carpenter's declaration should be stricken because it includes conclusory allegations, speculation and conjecture. Conclusory allegations without specific supporting facts do not have probative value.[26] Also, at the summary judgment stage, "statements of mere belief" in an affidavit must be disregarded.[27] As with defendant's personal knowledge objection, Carpenter's testimony about UPS' treatment of her is admissible. Her declaration establishes that she has personal knowledge of her own experience at UPS. Yet, the declaration also includes statements about policies and practices beyond her own treatment. Carpenter repeatedly opines about UPS' treatment toward "employees" or "female employees" without providing any supporting facts as to which other employees were discriminated against, or what facts she bases these conclusory statements upon. The Court agrees that these statements are inadmissible, both because Carpenter lacks personal knowledge and because these statements are merely statements of her belief. The Court finds that Carpenter's statements of her own experiences and observations are admissible, but her statements about UPS' treatment toward other unnamed employees are not.

**B.    *Evidentiary and Procedural Objections to Statements of Fact***

Plaintiff asserts a number of objections to defendant's statements of fact, such as "self-serving," "biased," or "unsubstantiated," without providing a basis for such objections. As described above, the Court considers declarations that are based on personal knowledge and does

---

[26]*Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1143 (10th Cir. 2005).

[27]*Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006).

not weigh the credibility of witnesses at this time, rendering moot plaintiff's objections based on bias and self-serving or conclusory. To the extent plaintiff argues that certain declarations are unsubstantiated, the Court overrules the objections. At the summary judgment stage, the Court may consider any affidavit or declaration that is made on personal knowledge so long as the declarant is competent to testify on the matters asserted.[28] An affidavit or declaration "substantiates" a statement of fact in the same way that plaintiff purports to support certain facts based on the statements in her own deposition. The fact that evidence is favorable to defendant does render it inadmissible as biased or self-serving. Plaintiff does not come forward with any argument as to why these declarations should be discounted under the "sham affidavit" rule, and the Court finds no other basis for this objection in the record.

Defendant requests in the reply memorandum that the Court strike plaintiff's statements of additional fact that do not comply with this district's Rule 56.1, because they overwhelm and mislead the Court with "unsupported, inadmissible, and irrelevant matters." Again, the Court disregards any facts that are not properly supported. However, defendant makes it difficult for the Court to admonish any alleged attempt by plaintiff to "overwhelm" the Court in the face of defendant's own unnecessarily extensive and repetitive reply brief and motions to strike.[29]

Defendant argues that the Court should deem admitted all of its statements of uncontroverted fact because plaintiff failed to comply with Fed. R. Civ. P. 56(c) by not citing to the record with particularity in disputing those facts. Many of plaintiff's attempts to controvert defendant's statement of facts baldly assert that the fact is undisputed, yet "contradicted" by the

---

[28]Fed. R. Civ. P. 56(c)(4).

[29]Defendant's responses in the reply to plaintiff's statements of additional fact are anything but concise and replete with argument.

record cited in support.  In fact, many of these objections are simply statements of additional fact that do not dispute the statement of fact, but instead add to it.   The Court will accept as uncontroverted any facts set forth by defendant that are not directly controverted by the record evidence referenced by plaintiff.  The Court agrees with defendant that plaintiff often failed to properly adhere to the method of controverting facts set forth in D. Kan. Rule 56.1, which requires "a concise statement of material facts as to which the party contends a genuine issue exists.  Each fact in dispute must be numbered by paragraph, refer with particularity to those portions of the record upon which the opposing party relies."  The local rule also states that "[a]ll responses must fairly meet the substance of the matter asserted."[30]  To the extent plaintiff purports to controvert a fact without record support, it will not be deemed controverted.

At the same time, the Court is cognizant that part of its task in deciding summary judgment is to determine the uncontroverted facts viewed in the light most favorable to plaintiff. To the extent that plaintiff controverts defendant's recitation of facts as incomplete, or on the basis of semantics, it is often in furtherance of this principle: explaining that a fact, while generally uncontroverted, should be stated differently so as to be read in the light most favorable to plaintiff.  The Court of course applies this principle in determining the material uncontroverted facts in this manner, but urges both parties to more efficiently present their factual statements in the future by meaningfully attempting to mete out the material uncontroverted facts, as fairly supported by the record evidence, without resort to legal argument.

### III.   Uncontroverted Facts

---

[30]D. Kan. R. 56.1(e).

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to plaintiff. Plaintiff Regina Daniels was born in 1952 and is female. She was hired by UPS as a part-time customer service representative in 1984 and became a full-time customer service representative the following year. Plaintiff has always worked at UPS' Kansas City, Kansas ("James Street") facility.

In 1999, plaintiff applied for and became a full-time dispatch specialist in the package center. "Dispatch Specialist" is classified by UPS as an entry level management position. Specialists are classified below full time supervisors. In October 1999, plaintiff laterally transferred to a dispatch specialist position in the "feeder" department. Feeder drivers at UPS drive tractor trailer trucks with packages between UPS facilities. As a feeder dispatch specialist, plaintiff worked dispatching tractor trailer drivers with their loads, among other tasks. Plaintiff worked as a dispatch specialist in the feeder department until she retired in 2009; her job classification did not change from 1999 until she retired in 2009. Plaintiff was not promoted, demoted, disciplined or discharged by UPS between 1999 and 2009.

Dispatch specialists do not have formal supervisory authority, cannot discipline or discharge employees, and are not held responsible for ensuring training, discipline and evaluations of drivers and various other employees. Full time supervisors and specialists at UPS are sometimes required to change job functions and their hours and assignments change from time to time. Supervisors sometimes change duties, responsibilities and departments, travel, relocate and accept lateral transfers. Full time supervisors and managers in the feeders department supervise the feeder drivers and various other employees and are held responsible for training, discipline, evaluations and other matters. Supervisors also fill in for each other and for the manager during absences and vacations. Plaintiff and one other dispatcher, Kathleen

Carpenter, did perform supervisory duties such as giving drivers instructions and orders, being left alone in the office without a supervisor, delivering packages in their own cars, and supervising administrative assistants.

There are no full-time female supervisors or managers in the James Street feeder department. As of July 1, 2008, thirteen out of fifty-one full-time supervisors and specialists at the James Street facility were female. Seven out of forty full-time supervisors were female.

There are three feeder dispatch windows or shifts at the James Street facility: day (approximately 6 a.m.-2 p.m.), twilight (approximately 2 p.m.-l0 p.m.) and night (Sunday 6 p.m.-2 a.m. and Tuesday through Thursday l0 p.m.-6 a.m.). These windows have very different duties and responsibilities and the hours are much different. Each dispatch window at James Street is supposed to have one person assigned to work as the dispatcher on that shift and each window has different assigned duties. At certain times, James Street has also had an employee assigned to work as a cover dispatcher in the feeder department. This employee fills in for absences and vacations on the dispatch widows. Feeder management considers the twilight dispatch shift at James Street to be busier and more difficult than the day and night dispatch windows because, among other things, the Hub Sort operates during the twilight shift and there is a larger volume of inbound and outbound feeder trailers and customer pickups during that shift.[31]

As a dispatch specialist, plaintiff reported to the James Street feeder manager. The James Street feeder manager has changed several times since 2005. Mic Haynes was the James Street

---

[31]Plaintiff's objections to the declarations of UPS feeder management are overruled and denied. Facts that merely describe the views of feeder management are properly supported by those individuals' declarations. Those individuals' declarations are based on personal knowledge and are not speculative. Moreover, these facts are certainly material to defendant's stated nondiscriminatory reason for the alleged adverse employment actions in this case and whether those reasons were a pretext for discrimination.

feeder manager in 2004-2005.  Joe Dooley held the position from March 2006 through March 2007.  Allen Kirby held the position from March 2007 through March 2008.  Joe Dooley has held the position since March 2008.  The feeder manager reports to the Kansas Feeder Division Manger, who was Guy Albertson from 2004 or 2005 until June 2006; Jeff Czernicki from June 2006 to October 2007, and Ernie Christie since October 2007.

Plaintiff worked the night dispatch window from October 1999 through approximately 2004.  In approximately 2005, plaintiff was offered and accepted the cover dispatch specialist assignment.  Her job classification and grade did not change, but she now filled in for absences and vacations on the other dispatch windows, not just the night window, and covered the part-time supervisor at the railyard.  However, plaintiff did not cover the twilight window.  She performed some of the twilight duties from time to time, but never covered absences or vacations on the twilight window without supervision.  At some point, plaintiff expressed to Kansas District Human Resources Manager Gary Liberti her preference for working as a cover dispatcher, instead of night dispatcher.  In 2008, plaintiff expressed her preference to not work on holidays to her then-supervisor, Kirby.[32]

In 2004 or 2005, plaintiff received one week of training on the twilight dispatch window from Jim Yankovich, the twilight dispatcher.  After plaintiff began this training, feeder division manager Albertson decided that the twilight dispatch window could only be covered by a full-time supervisor when the regular supervisor who worked that shift was absent or on vacation.  Albertson made this decision because he believed that it would reduce the risk of serious service failures during what he believed was the busier and more complex twilight window.  Therefore,

---

[32]Plaintiff also cited to an excerpt from Dooley's deposition transcript for the proposition that she told Dooley that she would prefer not to work on weekends and holidays; however, the page numbers cited were not attached to Doc. 100, Ex. 38.

UPS did not allow plaintiff to continue training on the twilight window. Plaintiff testified that, despite receiving training on the twilight window, she could not perform all of the twilight dispatch duties without assistance or without further training.

In 2006, plaintiff began covering the night dispatch window again after the regular night dispatcher was discharged until late 2006 or early 2007. Beginning in October 2007 until July 2008, plaintiff again covered the night window. Dooley did not believe when he became the James Street feeder manager in March 2008 that there was an assigned cover dispatcher even though plaintiff's time sheets reflected that she was covering the night window during this period. He believed that plaintiff was the night dispatcher and that he had a designated day dispatcher and twilight dispatcher. Dooley testified he would assign full-time supervisors to cover absences and vacations on the dispatch windows.

On July 9, 2008, Dooley and Christie promoted Jason Isabell from yard control supervisor to dispatch specialist.[33] Isabell became the cover dispatch specialist and covered all three windows, including the twilight window. Dooley and Christie believed Isabell could cover all three dispatch windows, including the twilight window. Isabell's promotion occurred while plaintiff was on vacation.

UPS does not post full-time supervisory job positions that are open that UPS is looking to fill or promote into. Instead, these are made known to employees through "career discussions" and word of mouth. In 2005, UPS began using the Management Assessment and Promotion Process ("MAPP") to fill open management positions. Under the MAPP process, employees are

---

[33]Plaintiff testified that UPS had interviewed one female for the open dispatch specialist position, Cindy Holt, who currently worked in the package center. Plaintiff's testimony about what Holt told her happened at the interview and what Dooley said to Holt is hearsay; the Court sustains defendant's hearsay objection. In fact, Dooley's statements are double-hearsay. Because they are inadmissible, the Court will not consider them.

required to submit a letter of interest to Human Resources each year in order to apply for a promotion. In 2005 and 2006, plaintiff submitted letters of interest to Human Resources, seeking promotion to a full time supervisor position. Plaintiff received letters back from the Human Resources Manager, explaining that he had received plaintiff's letter of interest, that the next step in the process would be a series of assessments, and that her supervisor or manager would contact her with further details. UPS has no record of receiving Haynes' promotion assessment for plaintiff in 2005 and Dooley did not fill out a promotion assessment for plaintiff in 2006. Plaintiff did not receive any follow-up from management or Human Resources about the status of her promotion applications in 2005 and 2006.

The letters sent to plaintiff in response to her letters of interest also state: "As a reminder, letters from candidates interested in a management position expire annually on December 31. To maintain eligibility, you must submit a new letter each year."[34] If an employee submits a letter of interest for promotion but does not successfully complete the MAPP process and receive a promotion that year, she must submit a new letter of interest the following year and complete the MAPP process to be eligible for promotion. In 2007, plaintiff's then-supervisor Kirby approached plaintiff with an envelope that was addressed to Dooley that enclosed the next step of assessments from the previous year promotion process. Plaintiff explained to Kirby that this was an old packet of application materials and that she would not be submitting a letter of interest or applying for a promotion at the end of 2006, as she believed it would be futile in light of not receiving a promotion in 2005 and 2006.

On July 31, 2008, plaintiff met with Liberti. Plaintiff had asked to meet with Liberti to

---

[34]Doc. 100, Ex. 10;

express her concerns about being removed from the cover dispatch position, without warning, while she was on vacation, while Isabell was promoted to a full time dispatch specialist position and the cover dispatch assignment. Plaintiff believed she should have been allowed to continue as a cover dispatch specialist and Isabell should have been assigned the night dispatch window shift.

Plaintiff further asked Liberti for clarification about the promotion process and whether the managers were obligated to follow up with an employee who had submitted a letter of interest in the MAPP. Plaintiff complained about not being allowed to complete training on the twilight window. She further stated that she felt that Dooley's removal of her from the cover position was in retaliation for a complaint she made in 2006 to Human Resources about an incident where Dooley came to her home to ask her to work an extra shift. During this July 31, 2008 meeting, Liberti asked plaintiff a series of questions about her job responsibilities. After plaintiff answered his questions, he asked her, "Well, why isn't your job classified as an MIP position?" Plaintiff responded, "I don't know, Gary, you tell me." Then, Liberti told plaintiff that he would meet with Dooley and Christie and then follow up with her. Plaintiff filled out an intake questionnaire with the EEOC in August 2008. No one followed up with plaintiff about her July 31, 2008 meeting.

Plaintiff filed her first EEOC/KHRC charge against UPS on November 21, 2008. After plaintiff's EEOC charge was filed, she noticed a significant decrease in business communication from Dooley. However, she does not recall any of her managers ever refusing to speak with her or meet with her when she asked to speak or meet with them. Plaintiff admits that this decrease in communication had no effect on her job performance.

Plaintiff met with Dooley on February 18, 2009. Dooley told plaintiff that he had heard

that she filed an EEOC complaint and they discussed plaintiff's EEOC questionnaire, which she provided to Dooley at the meeting. Dooley asked plaintiff questions about the allegations she made in that questionnaire. Dooley then spoke to plaintiff about the need to properly record her time.

Later in February 2009, Liberti and Brad Williams met with plaintiff. At this meeting, Liberti told plaintiff either that he told Dooley to follow up with her about Isabell's cover dispatch promotion, or that he had spoken with Dooley about the subject. Liberti told plaintiff that he understood she had concerns and plaintiff provided him with a copy of her EEOC questionnaire. Liberti read over the questionnaire and was slapping the document in his hand during the meeting. At one point, Liberti asked "Do you want me to get the EEOC down here?" Liberti also talked to plaintiff during this meeting about how she needed to document her start and finish times, as well as her meals and breaks, because there had been some discrepancies. In the month before this meeting, UPS audited the time records of plaintiff and other employees who UPS suspected were not accurately reporting their start and finish times, and discovered some discrepancies between the start and finish times that were recorded, and the information on surveillance cameras. According to plaintiff, she was often forced to work without taking a break or lunch, so this would effect the time of day she left.

Plaintiff filed a second EEOC/KHRC charge in April 2009.

UPS has salary administration guidelines which set forth detailed procedures for determining starting pay and raises for full time specialists and supervisors. There are different salary grades and ranges for supervisors and specialists; the guidelines are premised upon an employees' job classification. Plaintiff's salary as a dispatch specialist depended in part on her pay rate in her previous job at UPS. Plaintiff received a yearly salary increase every year

between 2006 and 2009.  As a dispatch specialist, plaintiff's raise each year was determined by the feeder division manager based on the salary administration guidelines.  Plaintiff was paid less than supervisory employees, and she was not eligible for and did not receive stock through the Management Incentive Program ("MIP").

Jim Yankovich, Scott Wetschensky, Steve Stuke, Nick Sloan and Dennis Smith were full time feeder supervisors at UPS between 2006 and 2009 and had higher salaries between 2006 and 2009 than plaintiff.  These individuals had all been full-time supervisors for several years and had worked as feeder supervisors in the larger feeder operation at UPS' Lenexa, Kansas facility.  Wetschensky, Stuke, and Sloan worked as feeder on-road supervisors between 2006 and 2009.  On-road supervisors train, supervise and evaluate drivers. They perform safety and training rides with drivers and attend driver training school. They are required to have DOT cards and commercial drivers' licences.  Specialists do not have these duties or requirements.[35] Yankovich and Smith worked as dispatchers on the twilight shift at James Street for several years and had been dispatchers in the Lenexa Feeder Department, which was a larger and more complex feeder department than James Street.

UPS provides a copy of its Code of Business Conduct ("Code") to all employees.  UPS employees receive the Code after they are hired.  Plaintiff reviewed the entire Code when she received it from UPS.  UPS policies require employees to report known or suspected illegal or unethical conduct, including discrimination.  Plaintiff produced two different versions of the Code which she received from UPS, a 2002 edition and a 2004 edition.  Both versions contain a similar disclaimer that the Code is not a contract.  The 2004 Code provides, for example:

---

[35]Plaintiff's objection to this fact is overruled and denied.  William's and Dooley's declarations on this point are neither subjective nor speculative.  They simply recite the work histories for these individuals.

> The Code is not an express or implied contract of employment and does not create any contractual rights of any kind between UPS and its employees. In addition, all employees should understand that the Code does not modify their employment relationship, whether at will or governed by contract. This Code is intended to clarify each employee's existing obligation for proper conduct. UPS reserves the right to amend, alter, or terminate the Code or the policies at any time for any reason. The most recent version of this manual may be found on the Corporate Compliance Web site and on www.ups.com.[36]

Plaintiff never told anyone in management or Human Resources that she thought the Code was a contract and no one in management believed that it was a contract.

The Code also contains a Statement of Policy, which provides that each employee has the responsibility to report to the company violations of the law or UPS' business standards:

> each employee's responsibility to report to the company any situation where our standards or the laws are being violated. Any employee disclosing, in good faith, violations or suspected violations of legal requirements or UPS business standards will not be subjected to retaliation or retribution. Likewise, failure to comply with the provisions of the [Code] will not be tolerated.[37]

Plaintiff reviewed the entire Code when she received it from UPS. Plaintiff and all other UPS employees were repeatedly told that they were obligated to comply with the Code, including the reporting and non-retaliation provisions. Plaintiff believed that the Code formed a contract between her and UPS. She relied on the representations in the Code that she was required to report and that she would not be retaliated against for doing so when she complained of discrimination.

UPS also presented plaintiff with a document entitled Professional Conduct and Anti-Harassment Policy ("Policy"), which prohibits harassment by UPS and its employees, and states

---

[36]Doc. 92, Ex. AS at 32.

[37]Doc. 92, Ex. AW at UPS3050RD.

that harassment on the basis of age or sex is a form of unlawful discrimination. Plaintiff signed this document and returned it to UPS. The Policy states that an employee who believes that she may be subject to objectionable conduct must report it immediately and that such employee will not be adversely affected or retaliated against. It further states that, in response to such a complaint, UPS will conduct a prompt and thorough investigation.

## IV. Discussion

The parties vehemently dispute the scope of plaintiff's claims of discrimination in this case; primarily, the extent to which the discrimination claims under the ADEA, Title VII, KAAD, and KADEA encompass wage discrimination claims. The Court must determine the extent of plaintiff's claims before it is able to consider the merits of the summary judgment motion. The Court observes that plaintiff's claims do appear to be a moving target, even within the response memorandum. This is evidenced by her discussion of pretext prior to any elucidation of exactly what adverse employment actions she claims to have been subjected to. For example, plaintiff discusses a failure to train claim, yet argues that the adverse employment action that is associated with this claim occurred years later when she was reassigned from her cover dispatch position.

In order to determine plaintiff's claims in this matter, the Court turns to the Pretrial Order, which superseded the prior pleadings.[38] Plaintiff states her contentions in the Pretrial Order as follows:

> based on her sex and/or age, she was continuously and repeatedly discriminated against and denied promotional, job placement or assignment, training, and other opportunities and with respect to the terms, conditions, and privileges of her employment. Ms.

---

[38]Doc. 84 at 1; *see Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 474 (2007).

Daniels also alleges she was unlawfully retaliated against for reporting such and engaging in related protected conduct. Further, Ms. Daniels alleges that, on the basis of her age and/or sex/gender, she has been discriminated against with respect to her job classification, pay, and other economic opportunities and benefits. Additionally, Ms. Daniels alleges that Defendant, through its related conduct, has breached and failed to comply with its related written agreements, obligations, and promises, as set forth in the Code.[39]

In plaintiff's list of her theories of recovery, she sets forth the elements of a standard disparate treatment claim of discrimination, as well as the elements of a wage discrimination claim. The Pretrial Order "'measures the dimensions of the lawsuit,' and 'control[s] the subsequent course of the action unless modified by a subsequent order.'"[40]

Rather than discuss the Pretrial Order, defendant focuses on the Amended Complaint. Defendant contends that plaintiff has alleged sex and age discrimination claims on the following grounds: (1) failure to promote in 2005 and 2006, (2) denial of training in approximately 2004 or 2005, and (3) removal from the cover dispatch specialist position in July 2008.[41] Plaintiff disputes defendant's characterization, and the Court has identified four possible theories of relief set forth in her response: (1) failure to promote, (2) discriminatory job classification, (3) denial of training, and (4) removal from the cover dispatch specialist position in July 2008. The Court finds that these four claims are found within the allegations and statements of claims in the Pretrial Order and proceeds to consider defendant's summary judgment motion in light of these

---

[39]Doc. 84 at 7.

[40]*Shaub v. Newton Wall Co/UCAC*, 153 F. App'x 461, 464 (10th Cir. 2005) (quotation omitted); Fed. R. Civ. P. 16(d).

[41]Defendant denies that plaintiff properly asserted a claim of wage discrimination based on her job classification, primarily relying on the Amended Complaint, which has been superseded. Defendant did address this purported claim on the merits, however, out of an abundance of caution.

claims. While it is unclear whether plaintiff asserts a stand-alone claim based on removal from the cover dispatcher position in July 2008, the Court proceeds to consider it out of an abundance of caution. As explained more fully below, the Court finds that plaintiff's failure to promote and denial of training claims are untimely. Summary judgment is granted with respect to plaintiff's job classification and shift reassignment claims on the merits.

### A.  *Timeliness of Discrimination Claims*

Defendant argues that summary judgment is appropriate on the discrimination claims because plaintiff did not file a timely charge of discrimination. Defendant argues that the failure to promote claim accrued in 2005 and 2006 and the denial of training claim arose in 2004 or 2005. Because plaintiff did not file her charge of discrimination within 300 days of these discrete employment actions, defendant argues that they are not timely. Plaintiff contends in the response that the promotion and denial of training claims accrued in July 2008. She also contends that the job classification and denial of training claims are based on a continuous pattern of discrimination that occurred with each paycheck.

The Supreme Court has held that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling."[42] The Tenth Circuit has distinguished between a plaintiff's failure to exhaust administrative remedies, which creates a jurisdictional bar to suit, and plaintiff's failure to timely exhaust administrative remedies, which is an affirmative defense subject to equitable tolling.[43]

As a general rule, an administrative charge must be filed with the EEOC within 180 days

---

[42]*Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).

[43]*Jones v. Runyon,* 91 F.3d 1398, 1399 n.1 (10th Cir.1996).

of the occurrence of the alleged unlawful employment practice.[44] But if a complainant "institutes proceedings with a state or local agency with authority to grant or seek relief from the practice charged, the time limit for filing with the EEOC is extended to 300 days."[45] Generally, "[t]he EEOC charging period is triggered when a discrete unlawful practice takes place."[46] Termination, failure to promote, denial of transfer, or refusal to hire are considered "discrete acts."[47] The Tenth Circuit has held that a discrete act accrues on "the date the employee is notified of an adverse employment decision by the employer."[48] "An employee receives notice of an 'adverse employment decision when a particular event or decision is announced by the employer.'"[49] "[N]otice or knowledge of discriminatory motivation is not a prerequisite for a cause of action to accrue . . . [o]n the contrary, it is knowledge of the adverse employment decision itself that triggers the running of the statute of limitations."[50] It is not necessary for an employee "to know all of the evidence upon which he will ultimately rely at trial in order to file a charge with the EEOC,"[51] and in fact, the purpose of the EEOC charge is to "initiate the

---

[44]*See* 42 U.S.C. § 2000e-5(e)(1).

[45]*EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 110 (1988).

[46]*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

[47]*Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 114).

[48]*Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1187 (10th Cir. 2003) (quoting *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)).

[49]*Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1206 (10th Cir. 2007) (quoting *Hulsey*, 43 F.3d at 557).

[50]*Davidson*, 337 F.3d at 1187 (quoting *Hulsey*, 43 F.3d at 558–59); *Clark v. Yellow Transp., Inc.*, No. 07-2072-JPO, 2009 WL 2710196, at *7 (D. Kan. Aug. 25, 2009).

[51]*Davidson*, 337 F.3d at 1188.

process of uncovering" the facts surrounding the adverse employment action.[52]  And when a

plaintiff asserts multiple claims of discrimination "based on discrete discriminatory acts, the

limitations period will begin to run for each individual act from the date on which the underlying

act occurs."[53]  Therefore, the Court addresses whether each of plaintiff's claims are timely.

### 1.      Failure to Promote

Plaintiff claims that she was not promoted in 2005 and 2006 because of her age and/or

sex.  She suggests that she does not allege a traditional failure to promote claim, but a distinct

claim of  discrimination because UPS failed to properly process her promotion applications in

both instances.  The Court gleans no appreciable difference in these claims.  They both constitute

a decision not to promote plaintiff to a full-time supervisor position in 2005 and 2006.  The fact

that defendant did not consider her applications, or that it did not properly process her

applications, is evidence of her discrimination claim, not a claim unto itself.  While such

evidence would certainly be probative of pretext under a merits analysis, pretext is not at issue

when considering whether a charge was timely filed.  Plaintiff argues that her promotion claims

did not accrue until July 31, 2008, when she was notified by Liberti that the promotion

applications in 2005 and 2006 were not processed properly.  Plaintiff contends that this is when

she first became aware of the adverse employment decision on her failure to promote claims.

It is undisputed that plaintiff understood she had not been promoted by at least 2007,

when Kirby asked her if she would be applying for the 2007 promotion process.  She responded

to Kirby that applying in 2007 would be futile in light of not receiving promotions the previous

two years.  The MAPP policies and the Human Resources Managers' responses to her letters of

---

[52]*Hulsey*, 43 F.3d at 558.

[53]*Davidson*, 337 F.3d at 1185.

interest make clear that the promotion applications expire at the end of the calendar year and that she was required to resubmit her letter of interest the following year to be considered again. Indeed, plaintiff applied for a promotion in 2006, apparently understanding that she was not promoted the prior year. Plaintiff argues that she was not made aware of the full extent of the adverse employment decisions until she was provided with additional information during the July 31, 2008 meeting with Liberti that the applications had not been processed properly and that the managers' feedback had not been submitted. While there is a genuine issue of fact about whether Liberti told plaintiff at this meeting that her promotion applications were not processed properly, there is no genuine issue of material fact that plaintiff was aware that she was not promoted by at least 2007.

UPS' decisions not to promote plaintiff were clearly discrete employment acts that occurred in 2005 and 2006 and it is uncontroverted that plaintiff was aware of the decisions not to promote her in both instances more than 300 days before she filed her administrative charge in November 2008. Because these decisions constitute discrete acts of discrimination, plaintiff's notice of these decisions triggered the running of the statute of limitations. Whether the gravamen of this claim is the decision not to promote, or the failure to process her applications, plaintiff was made aware that she did not receive those promotions by at least 2007. Under clear Supreme Court and Tenth Circuit precedent, these claims accrued at the time she became aware of the decisions not to promote her, not at the time that she became aware of all of the facts in support of her claim. The Tenth Circuit has made clear that a plaintiff need not have all of the evidence necessary to make her case in order for the charging period to be triggered.[54] The

---

[54]*Id.* at 1188 (quoting *Hulsey*, 43 F.3d at 558); *Hulsey*, 43 F.3d at 559 (explaining that it is not necessary for the claimant to possess all of the evidence upon which the claim of discrimination relies in order to file a charge with the EEOC).

purpose of the EEOC charge is to begin the process of uncovering such evidence. Plaintiff had knowledge of the adverse employment action by at least 2007. Because plaintiff's failure to promote claims accrued more than 300 days before plaintiff filed her charge of discrimination, summary judgment is granted.

### 2. Denial of Training

Plaintiff contends that her failure to train claim did not accrue until she was removed from the cover dispatcher position in July 2008, thus, her charge of discrimination was timely filed in November 2008. Plaintiff urges that she suffered continuous discrimination that accrued with each paycheck, rendering her claims timely. Plaintiff appears to conflate three distinct issues: when plaintiff's denial of training claim accrued, what was formerly known as "the continuing violation theory," and the impact of the Lilly Ledbetter Act on her claims. The Court addresses these issues in turn and finds that none apply to plaintiff's denial of training claim in this case.

### a. Accrual

Plaintiff first argues that her failure to train claim did not accrue until she was removed from her cover position in July 2008. She contends that she was removed from this position due to her lack of experience; had she been provided with the appropriate training as similarly situated individuals were, she would not have been removed from the cover position. Again, the law is clear that a discrimination claim does not accrue when the full effects of a discriminatory act occurs, it is the discrete act itself that triggers the statute of limitations.[55] In this case, the discrete act constitutes the denial of training, not the decision to remove plaintiff from the cover

---

[55] *Davidson*, 337 F.3d at 1188; *Hulsey*, 43 F.3d at 559.

position.  Plaintiff repeatedly contends that removal from the cover position was the effect of the failure to train.  Again, plaintiff appears to conflate her evidence of pretext, which comes into play only on the merits, with the adverse employment actions that her claims are premised upon. Plaintiff claims that UPS discriminated against her by failing to provide her with a training opportunity that would qualify her for a promotion, or would have eventually prevented her removal from the cover position in July 2008.  Therefore, the accrual date is the date that the training was denied, 2005 at the latest, not the date that plaintiff felt the full impact of that decision.

### b.  Discrimination in Compensation

Plaintiff contends that she suffers from continuing and ongoing discrimination. The continuing violation doctrine was abrogated by the Supreme Court in *National R.R. Passenger Corp. v. Morgan*,[56] for claims against discrete acts of discrimination.  "[U]nexhausted claims involving discrete employment actions are no longer viable,"[57] and may not be asserted under a "continuing violation" theory.[58]  Therefore, "[a] party may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances."[59]

Plaintiff's response urges that her claims should be construed as claims of discrimination in compensation, therefore, they are not discrete acts of discrimination subject to the timeliness requirement set forth in *Morgan*.  Instead, plaintiff argues that the Lilly Ledbetter Fair Pay Act

---

[56]536 U.S. 101 (2002).

[57]*Id.*

[58]*Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003)  (citing *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1184 (10th Cir. 2003)).

[59]*Schroder v. Runyon*, 1 F. Supp. 2d 1272, 1274 (D. Kan. 1998) (quoting *Harrell v. Spangler, Inc.*, 957 F. Supp. 1215, 1219 (D. Kan. 1997)).

of 2009 ("FPA") applies to her claims and the statute of limitations accrued with each discriminatory paycheck she received. The FPA was passed in response to the United States Supreme Court's 2007 decision in *Ledbetter v. Goodyear Tire & Rubber Co.*,[60] which held that an employer's decision with respect to setting pay is a discrete act of discrimination and the relevant period of limitations begins to run when the act first occurs.[61] The FPA amended 42 U.S.C. § 629(d)(3) of the ADEA and 42 U.S.C. § 2000e-5(e)(3)(A) of Title VII by adding the following subparagraph, defining when an unlawful practice "with respect to discrimination in compensation" "occurs" for purposes of triggering the administrative filing period:

> (3) For purposes of this section, an unlawful practice occurs, with respect to discrimination in compensation in violation of this chapter, when a discriminatory compensation decision or other practice is adopted, when a person becomes subject to a discriminatory compensation decision or other practice, or when a person is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

Congress's purpose in passing the FPA was to reverse the Supreme Court's *Ledbetter* decision which, in Congress's view, unduly restricted the time period in which victims of wage discrimination could seek relief.[62] The FPA does not apply to unlawful practices that do not constitute "discrimination in compensation." The plain language of the statute, the legislative history, and the case law all support the conclusion that unless the claim involves a discriminatory compensation decision or a hostile work environment, a discrete discriminatory act is an immediately actionable unlawful employment practice upon which an administrative

---

[60] 550 U.S. 618 (2007).

[61] *Id.* at 621.

[62] 42 U.S.C. §2000e-5, note (as amended by FPA § 2).

charge must be filed within 180 or 300 days.[63]  The FPA did not overturn *Morgan*.[64]

The District of Columbia Circuit Court of Appeals has explained the meaning of "discrimination in compensation" under the FPA as follows:

> [I]n employment law the phrase "discrimination in compensation" means paying different wages or providing different benefits to similarly situated employees, not promoting one employee but not another to a more remunerative position.  In contrast, a discriminatory failure to promote is actionable regardless whether it affects an employee's compensation. In context, therefore, we do not understand "compensation decision or other practice" to refer to the decision to promote one employee but not another to a more remunerative position.[65]

Of course, many employment decisions have some later effect on pay, even if they are not pay setting decisions. "But to include these myriad employment decisions within the 'other practice' language of the FPA would weaken Title VII's administrative exhaustion requirement. . . . [and] would potentially sweep all employment decisions under the 'other practice' rubric."[66]  The Court finds that plaintiff's denial of training claim is a discrete discriminatory act, not a "discrimination in compensation" decision that alleges different wages or benefits to similarly situated employees.  Instead, plaintiff essentially claims that the discriminatory act caused her <u>not</u> to be similarly situated to individuals who were promoted or given a preferable shift

---

[63]*See* H.R. Rep. No. 110-237 (2007); *Almond v. Unif. Sch. Dist. No. 501*, 749 F. Supp. 2d 1196, 1209–15 (D. Kan. 2010) (discussing legislative history and post-*Ledbetter* case law); *see also Noel v. Boeing Co.*, 622 F.3d 266, 272–75 (3d Cir. 2010); *Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 375 (D.C. Cir. 2010); *Tillman v. S. Wood Preserving of Hattiesburg, Inc.*, 377 F. App'x 346, 350 n.2 (5th Cir. 2010); *Russell v. County of Nassau*, 696 F. Supp. 2d 213, 226–29 (E.D.N.Y. 2010); *Tryals v. Altairstrickland, LP*, No. H-08-3653, 2010 WL 743917, at *7 (S.D. Tex. Feb. 26, 2010); *Rehman v. State Univ. of N.Y. at Stony Brook*, 596 F. Supp. 2d 643, 651 (E.D.N.Y. 2009); *Speer v. Mountaineer Gas Co.*, No. 5:06CV41, 2009 WL 2255512, at *7 (N.D. W. Va. July 28, 2009).

[64]*Noel*, 622 F.3d at 275.

[65]*Schuler*, 595 F.3d at 374–75.

[66]*Noel*, 622 F.3d at 275.

assignment.  Denial of training is a discrete act that is governed by *Morgan*, not by the FPA.[67]

Plaintiff claims that if she had been provided with certain training, she would may have been

eligible for promotions that would have led to higher pay and benefits.  This is not a pay-setting

decision, but instead, a discrete discriminatory act that merely could have had an ultimate effect

on pay.  Like plaintiff's failure to promote claim, this claim triggered the administrative clock at

the time plaintiff became aware of the adverse employment action, in either 2004 or 2005 when

her training was cut short, which was more than 300 days before her administrative charge was

filed.

### 3. Job Classification

Plaintiff explains she was discriminated against when UPS classified her job as a

dispatch specialist instead of a supervisor, which "resulted in her being unlawfully denied

greater pay and benefits, the negative effects of this are continuous and ongoing and realized

each time she received a discriminatory paycheck and was denied related benefits, and this is a

violation of Title VII and the KAAD."[68]  The Court construes this claim as a discrimination in

compensation decision that is subject to the FPA.  Plaintiff's job classification claim, unlike her

failure to promote and failure to train claims, is not based on a discrete employment action.

Instead, her claim is based on the allegation that her job was intentionally classified as a dispatch

specialist position, rather than as a supervisor, because of her sex and/or age in order to avoid

paying her a higher salary and benefit compared to similarly situated male and younger

---

[67]Indeed, *Morgan* considered, among other discrete acts of discrimination, a denial of training claim.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (finding only wrongful suspension, denial of training, and false accusation claims occurred within the 300 days prior to the plaintiff's EEOC charge and all prior discrete acts were untimely).

[68]Doc. 100 n.4.

employees. The gravamen of this claim is that the mis-classification was designed to be a hidden compensation decision, of the kind envisioned by Congress when it passed the FPA amendments. She alleges that she routinely performed supervisory duties, despite her job classification as a dispatch specialist, resulting in lower pay and benefits compared to similarly situated males who were classified as supervisors. The Court finds, therefore, that this claim was timely filed and will consider it as a claim of salary discrimination under Title VII, the ADEA, and their Kansas law statutory counterparts.

### 4.    Removal from Cover Dispatch Specialist Position

Plaintiff argues that she suffered discrimination when she was removed from the cover dispatch position in 2008. Because there is no dispute that this assignment occurred in July 2008, plaintiff filed a timely charge of discrimination with regard to that claim in November 2008.

The Court, therefore, proceeds to consider the merits of plaintiff's shift reassignment and job classification discrimination claims.

### B.    *Reassignment Discrimination Claim*

Title VII makes it an unlawful practice for an employer "to deprive any individual of employment opportunities . . .because of such individual's. . . sex."[69] The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."[70]  Plaintiff has not come forward with direct evidence of sex or age discrimination, so the Court evaluates her claims under the burden-shifting framework of *McDonnell Douglas Corp. v.*

---

[69]42 U.S.C. § 2000e-2(a)(2).

[70]29 U.S.C. § 623(a)(1).

*Green*.[71]  Under *McDonnell Douglas*, plaintiff initially bears the burden of production to establish a prima facie case of discrimination.[72]  To establish a prima facie case of age or sex discrimination, plaintiff must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination.[73]  If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nondiscriminatory reason for its actions.[74]  If defendant articulates a legitimate nondiscriminatory reason, the burden shifts back to plaintiff to present evidence from which a jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief."[75]

Defendant maintains that plaintiff did not suffer an adverse employment action when she was reassigned from the cover dispatcher position in July 2008.  The parties dispute whether plaintiff was working as a cover dispatcher at the time.  Defendant maintains that she was working as the night dispatcher, pointing to Dooley's testimony.  Plaintiff maintains that she was merely covering the night dispatch window, pointing to her own testimony as well as time

_____

[71]411 U.S. 792, 802-05 (1973); *Sanders v. S.W. Bell Tele., L.P.*, 544 F.3d 1101, 1105 (10th Cir. 2008) (applying *McDonnell Douglas* to both sex and age discrimination claims).

[72]*McDonnell Douglas*, 411 U.S. at 802.

[73]*EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 & n.5 (10th Cir. 2007) (discussing how elements of prima facie case in discrimination cases vary depending on context.  In the Tenth Circuit, it is clear that the prima facie case no longer requires a "similarly-situated person" comparison.  *See Sorbo v. UPS*, 432 F.3d 1169, 11173 (10th Cir. 2005).

[74]*Id.*; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[75]*Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).  The Court addresses plaintiff's Title VII and ADEA claims together with her claims under the KAAD and the KADEA.  "Federal decisions applying Title VII are persuasive authority in construing KAAD claims because the statutory schemes are analogous."  *Allen v. Garden City Co-Op, Inc.*, 651 F. Supp. 2d 1249, 1257 n.23 (D. Kan. 2009) (quotation omitted).  Likewise, ADEA and KADEA claims are analogous. *See, e.g.*, *Wood v. City of Topeka*, 90 F. Supp. 2d 1173, 1183 (D. Kan. 2000); *Spicer v. RadNet, Inc.*, No. 10-4024, 2011 WL 2148651, at *6 n.6 (D. Kan. May 31, 2011).

records indicating she was covering for the regular night dispatcher.  Assuming as true that plaintiff was removed from the cover dispatcher position, defendant argues that this was not an adverse employment action because plaintiff's job classification and salary did not change. Furthermore, because plaintiff had been working the night dispatch window for months prior to Isabell's promotion, defendant urges there was no change in her shift in July 2008.

In order to constitute an adverse employment action, "the employer's conduct must be 'materially adverse' to the employee's job status."[76]  Job duty assignments are neither automatically actionable nor categorically non-actionable.[77]  Each case must be "'judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances,'"[78] and the inquiry does not "turn on a plaintiff's personal feelings" about the circumstances of the case.[79]

The Court assumes for purposes of this determination that plaintiff was in fact removed from the cover dispatcher position and reassigned to the night dispatch window in July 2008.  It is undisputed that her job classification as a dispatch specialist remained unchanged, as did her salary.  There was no job classification at UPS for cover dispatcher, night dispatcher, etc. Instead, the dispatch specialists were assigned to work one of the three dispatch windows, or as a cover dispatcher.  Moreover, the undisputed evidence shows that her job responsibilities did not meaningfully change in July 2008.  The role of cover dispatcher requires the dispatch specialist to fill in for absences and vacations on the various dispatch widows and plaintiff also covered for

---

[76]*Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1213 (10th Cir. 2003).

[77]*Semsroth v. City of Wichita*, 555 F.3d 1182, 1185–86 (10th Cir. 2009).

[78]*Id.* (quoting *Burlington N. Ry. v. White*, 548 U.S. 53, 71 (2006)).

[79]*Id.*

33

the part-time supervisor at the railyard.  Plaintiff had been covering the night dispatch window since October 2007.  Even in her role as a cover dispatcher, while plaintiff was able to perform certain twilight window duties, she was never able to cover the twilight dispatch window unsupervised.  Given that plaintiff had been primarily covering the night dispatch window, even if it was in her capacity as the cover dispatcher, her responsibilities did not change in July 2008, when she was merely permanently reassigned to the night dispatch window instead of floating between shifts.

Moreover, plaintiff has not pointed to any evidence to suggest an objective advantage to the cover dispatch position, compared to the night dispatch position.  The only evidence about the adverse nature of the reassignment is plaintiff's own subjective feelings that the cover position was preferable.  If plaintiff was qualified to cover the twilight dispatch window, this would likely constitute evidence that the cover dispatcher role, as applied to her, was objectively preferable.  But the undisputed evidence shows that she was not able to cover the twilight window unsupervised.  Therefore, the objective advantages to that assignment for a reasonable person in plaintiff's position is not apparent.  The Court finds that plaintiff is unable to establish a prima facie case of discrimination on this claim  because she did not suffer an adverse employment action when she was removed from the cover dispatch assignment and reassigned to work the night dispatch window.

### C.      *Salary Discrimination*

Plaintiff argues that she was discriminated against in her pay under Title VII, the ADEA, and the Equal Pay Act.  She maintains that UPS classified her job as a dispatch specialist rather than a supervisor, because of her age and/or sex, resulting in unequal pay between herself and

younger males performing substantially similar work.  Because the standards under the various statutes differ substantially, the Court addresses her salary discrimination claims separately.

### 1.  Title VII and ADEA

Under Title VII, the ADEA, and their Kansas law counterparts, the Court applies the *McDonnell Douglas* analysis to plaintiff's claim because it is based on circumstantial evidence.[80] In order to establish her prima facie case of discrimination in compensation, plaintiff must come forward with evidence that she is a member of a protected class and occupies a job similar to that of higher paid younger males.[81]  If the plaintiff is able to make this showing, then "the burden of production shifts to the employer to state a legitimate, nondiscriminatory reason for its adverse employment action."[82]  "If the employer meets this burden, then summary judgment is warranted unless the employee can show there is a genuine issue of material fact as to whether the proffered reasons are pretextual."[83]

Defendant argues that there is no evidence to suggest that plaintiff occupied a job similar to that of higher paid younger males, pointing to the differences in responsibilities between the jobs of dispatch specialist and full-time supervisor.  Plaintiff responds that she was regularly performing the duties and had the responsibilities of at least one full-time feeder supervisor.  She also points to evidence that there are more male than female employees in full time supervisory and managerial positions.  The parties dispute whether plaintiff in fact performed supervisory duties on a regular basis.  Plaintiff refers to Haynes deposition testimony that plaintiff performed

---

[80]*Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1311 (10th Cir. 2006).

[81]*Id.*; *Allen v. Garden City Co-Op, Inc.*, 651 F. Supp. 2d 1249, 1257–58 (D. Kan. 2009).

[82]*Mickelson* , 460 F.3d at 1311 (quotation omitted).

[83]*Id.* (quotation omitted).

the duties and had the responsibilities of a full-time supervisor. Plaintiff also relies on her own deposition testimony for this fact. Defendant points to the undisputed facts that plaintiff did not perform the supervisory duties of training and evaluating other employees, nor was she able to cover the twilight window without supervision. In contrast, full-time supervisors have experience working all three windows and have the added responsibilities of evaluating and training employees under their supervision.

The Court finds that plaintiff is unable to establish a genuine issue of material fact that she occupied a job similar to that of higher paid younger or male employees. Plaintiff compares her job to the jobs performed by male full-time supervisors in the feeders department. Plaintiff and one other dispatcher, Kathleen Carpenter, did perform some supervisory duties such as giving drivers instructions and orders, being left alone in the office without a supervisor, delivering packages in their own cars, and supervising administrative assistants. But it is undisputed that plaintiff did not perform formal supervisory duties in the feeder department, such as training, disciplining, and evaluating subordinate employees. Moreover, it is undisputed that plaintiff was not able to work as a dispatcher on the twilight window, one of three windows that the feeder supervisors were responsible for. In fact, the entire basis of plaintiff's untimely training and promotion claims is that she desired to be promoted to full-time supervisor because it had more responsibility than her dispatch specialist position, and that she was unable to perform the twilight window responsibilities because UPS ended her training after one week because it had determined that only a full-time supervisor could cover that window. Viewing the evidence in the light most favorable to plaintiff, while she did perform some of the same responsibilities as full-time supervisors in the feeder department, there were significant responsibilities that she did not perform. Therefore, the Court cannot find that there is a genuine

36

issue of material fact about whether plaintiff occupied a similar position as higher paid, younger or male employees.

Assuming *arguendo*, that plaintiff could establish a prima facie case of discrimination in compensation, the Court would find that she is unable to establish a genuine issue of material fact about whether defendant's stated reasons for the unequal pay are a pretext for age or sex discrimination. Defendant maintains that the differences in salary are based on the following non-discriminatory reasons: (1) the supervisor position is a higher level position at UPS; (2) different salary ranges and grades apply to supervisor and dispatch job classifications; (3) the job duties, responsibilities, skills and requirements are different; and (4) the salaries depend in part on each employees prior work experience and salaries at UPS. Because defendant has come forward with non-discriminatory reasons for the pay differential, plaintiff must show that those reasons are merely a pretext for discrimination.

A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[84] The Court is to look to the facts as they appeared to the person making the decision.[85] Plaintiff points to the following evidence of pretext on the job classification claim: (1) Liberti asked plaintiff why her job was not classified as supervisory; (2) plaintiff's former manager stated that she was performing supervisory duties; (3) the only supervisors in the feeder department were male. Plaintiff also presented evidence that Carpenter performed supervisory duties at times. None of this evidence would allow a reasonable juror to conclude that defendant's stated reasons

---

[84]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

[85]*See, e.g.*, *Simmons v. Sykes Enters., Inc.*, –F.3d–, 2011 WL 2151105, at *3 (10th Cir. June 2, 2011).

for classifying plaintiff's job as a dispatch specialist, rather than a supervisor, are pretext for discrimination. As already discussed with respect to plaintiff's prima facie case, the evidence is undisputed that the dispatch specialist and supervisor positions were dissimilar in terms of responsibilities.

UPS has salary administration guidelines which set forth detailed procedures for determining starting pay and raises for full time specialists and supervisors. There are different salary grades and ranges for supervisors and specialists. Furthermore, plaintiff's salary as a dispatch specialist depended in part on her pay rate in her previous job at UPS. Plaintiff received a yearly salary increase every year between 2006 and 2009. As a dispatch specialist, plaintiff's raise each year was determined by the feeder division manager based on the salary administration guidelines. Plaintiff does not dispute that her salary was correct under these guidelines, but instead, relies exclusively on her contention that she performed the same work as full-time supervisors.

While the guidelines are certainly premised upon correctly classifying employees' jobs, the evidence presented by plaintiff does not present a genuine issue of material fact about whether she was performing similar job duties to a full-time supervisor. Plaintiff points to Haynes deposition testimony, but even Haynes acknowledged important differences between plaintiff's job responsibilities as a dispatcher and those of a full-time supervisor:

> Q. Okay. Well, tell me what -- why do you say that she was doing the job of a full-time supervisor?
>
> A. Well, I could see no difference in her responsibilities other than the only thing that would have separated that from a full-time is the part that discipline, and my specialists are not required to actually do the discipline, that is something that full-time MIP would do. But other than that, the -- her job requirements and duties on the night sort pretty much mirrored -- other than the

amount of volume that she handled, pretty much mirrored the MIP job on the twilight.

Q. Okay. Except that you said she couldn't discipline employees, and you testified earlier that the twilight was a busier and more complicated dispatch window, right?

A. That is correct.

Q. Okay. And that she was not able to actually do the twilight dispatch window by herself, is that right?

A. That is correct.[86]

It is uncontroverted that dispatch specialists cannot discipline or discharge employees, and are not held responsible for ensuring training, discipline and evaluations of drivers and various other employees. Plaintiff also repeatedly acknowledged that she was unable to work the twilight dispatch window by herself and was unfamiliar with all of the duties and responsibilities associated with that window.[87]

These important differences in job duties and responsibilities are not called into question by plaintiff's evidence of pretext. Liberti's question to plaintiff during their July 31, 2008 meeting does not suggest, even when viewed in the light most favorable to plaintiff, that her job was misclassified. Even if Liberti did believe plaintiff's job was misclassified, this question does not support an inference that UPS mis-classified her job based on sex or age discrimination.

Finally the Court is unable to find that plaintiff's statistical evidence regarding the number of female versus male supervisors at the James Street facility is probative of pretext in this case. Plaintiff points to evidence that there are no full-time female supervisors or managers

_____

[86]Doc. 100, Ex. 14 at 158. Moreover, Haynes supervised plaintiff for only about one year, in 2004 and 2005. Haynes does not have any personal knowledge about plaintiff's job responsibilities after 2005.

[87]Doc. 92, Ex. B at 61–62, 67–68, 131, 168, 189, 198–99; *see also* Doc. 27 at 2.

in the James Street feeder department and that, as of July 1, 2008, only thirteen out of fifty-one full-time supervisors and specialists at the James Street facility were female and seven out of forty full-time supervisors were female. In order to raise an inference of pretext, statistical evidence "must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals."[88] Here, plaintiff's bare statistics showing the numbers of male and female supervisors and dispatchers at James Street, many of whom do not work in the feeders department, do not tend to show that defendant's nondiscriminatory reasons for the difference in job classification are pretext for discrimination.[89] For all of these reasons, the Court would find no genuine issue of material fact that defendant's stated, nondiscriminatory reasons for the pay differential are not pretext for discrimination based on plaintiff's sex or age.

## 2. Equal Pay Act

The Court reviews plaintiff's salary discrimination claim under a very different analytical framework on her EPA claim. Under the EPA, plaintiff must first establish a prima facie case of discrimination "by demonstrating that employees of the opposite sex were paid differently for performing substantially equal work."[90] If plaintiff meets this burden, the burden of persuasion shifts to the defendant to show that the wage disparity was justified by one of four permissible reasons: "(1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality

_____

[88]*Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 746 (10th Cir. 1991).

[89]The Court also notes that this is not a disparate impact case. *See, e.g.*, *Thompson v. Weyerhauser Co.*, 582 F.3d 1125 (10th Cir. 1009). Even in a disparate impact, or pattern or practice case, "it is not the fact of separate genders in departments that is prohibited, it is the deprivation of opportunity or adverse effect on status that is prohibited." *Marion v. Slaughter Co.*, No. 98-6286, 1999 WL 1267015, at *6 (10th Cir. Dec. 29, 1999).

[90]*Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1311 (10th Cir. 2006).

of output; (4) a disparity based on any factor other than sex."[91]   The Tenth Circuit has explained:

> If the employer fails to convince the jury with its evidence of one or more of the "affirmative defenses" the plaintiff will prevail on her prima facie case.  This is not to say that an employer may never be entitled to summary judgment on an EPA claim if the plaintiff establishes a prima facie case.  But, because the employer's burden in an EPA claim is one of ultimate persuasion, in order to prevail at the summary judgment stage, the employer must prove at least one affirmative defense so clearly that no rational jury could find to the contrary.[92]

Defendant argues that plaintiff's EPA claim fails because plaintiff cannot establish a prima facie case.  The "equal work" component of plaintiff's prima facie case is not to be construed broadly.[93]  While the jobs need not be identical, they must be "substantially equal."[94]  The Court has already found that plaintiff did not perform similar work to the full-time male supervisors in the feeders department under the Title VII and ADEA analysis.  For the same reasons explained therein, plaintiff is unable to meet the more exacting standard of showing that she performed substantially equal work.  As already detailed in the previous section, the uncontroverted facts show that the differences in job duties and responsibilities between the dispatch specialist position and the full-time supervisor position were significant.  Importantly, dispatch specialists were not responsible for discharging, evaluating, training, or disciplining subordinate employees and full time supervisors were required to cover the twilight window.  Plaintiff concedes that she performed none of the duties.  While plaintiff did perform some of the

---

[91]*Id.* (quotation omitted); *see also* 29 U.S.C. § 206(d)(1).

[92]*Id.* (quotations omitted).

[93]*Miller v. Auto. Club of N.M., Inc.*, 420 F.3d 1098, 1119 (10th Cir. 2005), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *Lewis v. D.R. Horton, Inc.*, 375 F. App'x 818, 823 (10th Cir. 2010).

[94]*Lewis*, 375 F. App'x at 823.

same duties as full-time supervisors, she did not perform all of the duties of that job.[95]  Plaintiff

has not made a prima facie case that the jobs were substantially similar; thus, summary judgment

is appropriate on her EPA claim.

### D.    *Retaliation*

Title VII and the ADEA make it unlawful to retaliate against an employee because the

employee has opposed any practice made unlawful by Title VII or the ADEA, or because the

employee has "participated . . . in an investigation, proceeding or hearing."[96]  In the absence of

direct evidence of retaliation, the court assesses retaliation claims under the *McDonnell Douglas*

burden-shifting framework.[97]  Under this burden-shifting structure, plaintiff must first establish a

prima facie case of retaliation.  If she does so, the burden shifts to the employer to articulate a

legitimate nondiscriminatory reason for the adverse employment decision.  From there, the

burden returns to plaintiff to show that the stated reason is pretextual.[98]

### 1.    **Prima Facie Case**

The elements of a prima facie claim of retaliation under Title VII and the ADEA are: (1)

the employee engaged in protected opposition to discrimination; (2) the employee suffered an

adverse employment action during or after his protected opposition that a reasonable employee

would have found materially adverse; and (3) a causal connection exists between the protected

---

[95]*See Miller*, 420 F.3d at 1119 (acknowledging that the plaintiff performed some of the duties of jobs that were substantially similar, but finding that because the plaintiff did not perform all of those duties, she was unable to establish her prima facie case under the EPA).

[96]42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d).  The Court applies the same analysis to plaintiff's retaliation claims under their Kansas statutory counterparts.

[97]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Medina v. Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir. 2005).

[98]*Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).

activity and the materially adverse action.[99]

Defendant argues that plaintiff has failed to come forward with evidence that plaintiff suffered an adverse employment action after she complained of discrimination in 2008 and that she has failed to establish a causal connection between her complaint and any adverse employment action. The antiretaliation provisions in Title VII and the ADEA seek "to prevent employer interference with 'unfettered access' to [the statutes'] remedial mechanisms[] . . . by prohibiting employer actions that are likely to 'deter victims of discrimination from complaining to the EEOC,' the courts, and their employers."[100] The standard is objective; plaintiff must show that a "reasonable employee would have found the challenged action materially adverse."[101] This "avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine plaintiff's unusual subjective feelings."[102]

In approaching the question of whether an employer's actions were materially adverse, the Tenth Circuit recently explained,

> [W]e are obligated to bear in mind that "Title VII protects individuals 'not from all retaliation' but only from retaliation 'that produces an injury or harm'" that itself rises to a "'level of seriousness.'" *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)). To qualify under this standard, we held in *Williams* that a plaintiff must show "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quoting

---

[99]*Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1201–02 (10th Cir. 2008); *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006).

[100]*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

[101]*Id.*

[102]*Id.* at 68–69.

> *White*, 548 U.S. at 68) (internal quotation marks omitted).
> "Requiring this level of adversity . . . is necessary 'to separate
> significant from trivial harms.'" *id.* (quoting *White*, 548 U.S. at 68),
> "petty slights, minor annoyances, and simple lack of good
> manners," *White*, 548 U.S. at 68. "Otherwise, minor or even trivial
> employment actions that an irritable, chip-on-the-shoulder
> employee did not like would form the basis of a discrimination
> suit." *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1279
> (10th Cir. 2005) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437,
> 441 (7th Cir. 1996)).[103]

Plaintiff argues that she suffered the following adverse employment actions in retaliation for complaining to Liberti of discrimination in July 2008: (1) UPS managers confronted her about recording her time properly, (2) plaintiff suffered a decrease in business communication with Dooley, and (3) Liberti failed to investigate her complaints of discrimination.

### a.      Time Records

Plaintiff contends that the February 2009 meetings with Dooley and with Williams and Liberti, when these managers talked to her about the discrepancies between her time sheets and the surveillance cameras, were adverse employment actions. Defendant contends that these discussions did not amount to a materially adverse employment action because UPS did not discipline, discharge, or adversely impact plaintiff's employment in any way. At the February 18, 2009 meeting with Dooley, Dooley spoke to plaintiff about properly recording her time immediately after discussing plaintiff's EEOC questionnaire with her. Liberti also talked to plaintiff during a subsequent meeting about how she needed to document her start and finish times, as well as her meals and breaks, because there had been some discrepancies. In the month before this meeting, UPS audited the time records of plaintiff and other employees who UPS suspected were not accurately reporting their start and finish times, and discovered some

---

[103]*Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1216 (10th Cir. 2010).

discrepancies between the start and finish times that she recorded, and the information on surveillance cameras. According to plaintiff, she was often forced to work without taking a break or lunch, so this would effect the time of day she left. This conversation took place immediately after a discussion about plaintiff's previous complaints of discrimination.

It is undisputed, however, that no action was taken against plaintiff based on UPS' allegations that she improperly recorded her time. The Court agrees that these verbal warnings, standing alone, did not adversely impact her employment.[104] These conversations did not affect her salary, benefits, or working conditions and had no effect on her employment status.[105] There is no evidence that plaintiff was disciplined beyond these verbal warnings. There is no objective evidence in the record that such verbal warnings would deter a reasonable employee from complaining about discrimination.

Even if the Court found that plaintiff met her prima facie burden, it would find that there is no genuine issue of material fact on the issue of pretext. Defendant asserts that it counseled plaintiff about her time records, along with other employees, after conducting an audit, comparing employees' recorded start and finish times with the times recorded on surveillance cameras. Plaintiff has come forward with no evidence to suggest that this issue was brought to plaintiff's attention for a discriminatory reason, rather than in conjunction with this audit, especially considering her repeated claims that she first complained about discrimination more than six months before these meetings, on July 31, 2008.

   b.     **Decrease in Business Communication**

---

[104]*See Steele v. Kroenke Sports Enters., LLC*, 264 F. App'x 735, 746 (10th Cir. 2008) (finding verbal warning without any further discipline did not constitute a materially adverse action).

[105]*See Haynes v. Level 3 Comm'cns, LLC*, 456 F.3d 1215, 1224 (10th Cir. 2006).

Plaintiff next claims she suffered an adverse employment action when Dooley decreased his business communications with her during the Fall 2008. Plaintiff claims that she received fewer emails and voicemails from Dooley after she filed her EEOC charge. Viewing the evidence in the light most favorable to plaintiff, Dooley did communicate less with her during this period, although he did not entirely stop communicating with her. The Court is unable to find that this constitutes an adverse employment action. Instead, this is merely a snub by her supervisor that admittedly did not affect her job performance.[106] Viewing the evidence in the light most favorable to plaintiff, this decrease in business communication constitutes a petty slight, or minor annoyance; it does not constitute a materially adverse action.

### c.      Failure to Investigate

Finally, plaintiff argues that she was retaliated against when Liberti failed to investigate the internal discrimination complaint she made in July 2008. First, the Court notes that there is a genuine issue of material fact about whether plaintiff explicitly complained of sex or age discrimination at the July 31, 2008 meeting—Liberti denies plaintiff's testimony that she connected her complaints about the promotion process, her lack of training, and job classification to discrimination on the basis of sex or age. Assuming that plaintiff did make such a complaint, she has come forward with no evidence to support an inference that Liberti failed to investigate plaintiff's complaints. Plaintiff has only come forward with evidence that Liberti did not follow up with her after she made her complaint. Defendant, on the other hand, has produced Liberti's declaration, where he attests that while he never told Dooley that plaintiff had complained to him about discrimination, he did speak to Dooley and Christie about their decision to assign Isabell to

---

[106]*See Steele*, 264 F. App'x at 746.

the cover dispatcher position and plaintiff to the night dispatcher position. Dooley and Christie told plaintiff that they believed Isabell was more qualified than plaintiff to work as a cover dispatcher because he was able to cover the twilight window.

Even if plaintiff produced evidence to support an inference that UPS failed to investigate her July 31, 2008 complaints, she does not explain how UPS' failure to investigate constituted a materially adverse change in the terms or conditions of her employment.[107] Indeed, some courts have held that, as a general rule, an employer's failure to investigate a discrimination complaint cannot be considered an adverse employment action that is taken in retaliation for filing the same complaint.[108] Instead, plaintiff seems to contend that because this fact could support an inference of discrimination at the pretext stage, it should also be sufficient to meet the adverse employment action requirement of her prima facie case.[109] Even if Liberti did not investigate plaintiff's complaints as discrimination complaints, the evidence shows that he discussed her underlying complaints with Dooley and Christie.

In sum, the Court finds no evidence in the record that, after plaintiff complained of

---

[107] *See Dean v. Boeing Co.*, 195 F. Supp. 2d 1280, 1292 (D. Kan. 2002), *aff'd*, 61 F. App'x 576 (10th Cir. 2003).

[108] *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) ("an employee's knowledge that her employer has declined to investigate her complaint will not ordinarily constitute a threat of future harm, recognizing, of course, that it would hardly provide a positive incentive to lodge a further challenge."); *Pilgrim v. McGraw-Hill Cos.*, 599 F. Supp. 2d 462, 478 (S.D.N.Y. 2009) (granting summary judgment because plaintiff produced no evidence that a reasonable person would not make a complaint in an exit interview if the employer would not investigate it).

[109] Plaintiff relies on *DeFreitas v. Horizon Management Corp.*, 577 F.3d 1151 (10th Cir. 2009), but this is a case brought under the interference provisions of the Family Medical Leave Act and for religious discrimination under Title VII. The Court finds no support in this case for the proposition that the failure to investigate an internal complaint constitutes a materially adverse employment action. Plaintiff also points the Court to *Sassaman v. Gamache*, 566 F.3d 307 (2d Cir. 2009). There, the Court assumed for purposes of summary judgment that plaintiff could establish her prima facie case. *Id.* at 312. The failure to properly investigate the plaintiff's charges of sexual harassment was probative of pretext. *Id.* Accordingly, this case provides no support for plaintiff's assertion that the failure to investigate constitutes an adverse employment action.

discrimination to Liberti on July 31, 2008, UPS took any adverse action against her that might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  As such, there is no genuine issue of material fact on an essential element of plaintiff's  claim and summary judgment is appropriate.  "[I]f an employee fails to present even the limited quantum of evidence necessary to raise a prima facie inference that his or her protected activity led to an adverse employment action, it can become pointless to go through the motions of the remainder of the *McDonnell Douglas* framework to determine that unlawful retaliation was not at play."[110]

### E.      Breach of Contract and Promissory Estoppel Claims

Plaintiff asserts a breach of contract and promissory estoppel claim based on the Code and the anti-retaliation Policy issued by UPS to its employees, including plaintiff.  Plaintiff maintains that UPS made promises and assurances in these documents that she reasonably relied on and that UPS breached.

Under 28 U.S.C. § 1367(c)(3), the Court may decline to exercise supplemental jurisdiction if it has "dismissed all claims over which it has original jurisdiction."  "Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary."[111]  Such compelling circumstances include "the nature and extent of pretrial proceedings, judicial economy, convenience, and [whether] fairness would be served by retaining jurisdiction."[112]  The Court determines that these considerations weigh in favor of exercising jurisdiction over plaintiff's remaining state law claims.  Exercising jurisdiction is in the best

---

[110]*Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1201–02 (10th Cir. 2008).

[111]*Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995).

[112]*Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 541 (10th Cir.1995) (quoting *Thatcher Enter. v. Cache Cnty. Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990)).

interest of judicial economy and convenience given that the facts on all claims asserted in this case are interrelated. Moreover, as described more fully below, Kansas law is settled on the principles raised by defendant's motion.[113]

Defendant first argues that plaintiff's common law claims are precluded under the alternative remedies doctrine, which provides that a state or federal statute would be substituted for a state retaliation claim if the substituted statute provides an adequate alternative remedy.[114] It has been held that the KAAD "provides an adequate and exclusive state remedy for violations of the public policy enunciated therein."[115] And this reasoning has been extended to the KADEA.[116] Plaintiff's common law claims in this case are based on the same facts that form the basis of her retaliation claims under federal and state law: UPS retaliated against her for complaining of discrimination. The only distinction between her claims is that she cites the statutes as a source of the violation on the retaliation claims; she cites the Code and the Policy as sources of defendant's violation or breach on the common law claims.

Plaintiff contends that the federal and state anti-retaliation statutes do not provide her with an adequate remedy because they are premised on different obligations and duties, but fails to explain how her claim differs from her statutory retaliation claims. The factual basis of her claims are identical. More importantly, plaintiff does not explain how the federal and state statutory remedies are inadequate in this case, other than to suggest they may be inadequate if she

---

[113]*See Ball*, 54 F.3d at 669 (explaining that it is particularly appropriate for courts to defer to the state courts where a state law cause of action is continuing to develop).

[114]*See Polson v. Davis*, 895 F.2d 705, 709 (10th Cir. 1990); *Flenker v. Willamette Indus.*, 967 P.2d 295, 299 (Kan. 1998). Contrary to plaintiff's characterization of this argument, preemption is not at issue here. *See Flenker*, 967 P.2d at 299 (explaining the distinction between preemption and preclusion).

[115]*Polson*, 895 F.2d at 709–10.

[116]*Schartz v. Unifed Sch. Dist. No.l 512*, 953 F. Supp. 1208, 12129 (10th Cir. 1997);

cannot prevail.  But this is not the standard.  The standard is whether the statutes provide an adequate alternative remedy.[117]  Plaintiff cites *Flenker* for the proposition that a statutory scheme may not be adequate, but the Kansas Supreme Court determined in that case that, while Title VII provides an adequate remedy for violations of the public policy enunciated therein, OSHA did not provide an adequate remedy because it made no provision for an employee to bring a private action in federal court.[118]  Title VII, and not OSHA, is at issue in this case.

Title VII, the ADEA, the KAAD, and the KADEA all provide an adequate remedy for plaintiff to pursue her retaliation claim in this matter.  Plaintiff's implied contract and promissory estoppel claims are based on the same retaliation that she alleges in her statutory retaliation claims.  "Characteristics of an adequate statutory remedy include ample filing time, limits on the discretion of an administrative official in awarding relief, and an opportunity for the employee to pursue relief after administrative remedies are exhausted."[119]  *Flenker* explicitly referenced Title VII as an adequate statutory scheme.[120]  And, the Court finds that the KAAD and the KADEA are administered by a committee with a carefully stipulated membership composition,[121] plaintiffs are allowed to bring claims within six months,[122] and they provide plaintiffs with the right to bring suits on their own behalf after exhaustion of administrative remedies.[123]  Under these

---

[117]*Polson*, 895 F.2d 709–10; *Flenker*, 967 P.2d at 299.

[118]967 P.2d at 303.

[119]*Chapman v. Atchison Casting Corp.*, No. CIV. 99-2094-KHV, 2000 WL 1469315, at *2 (D. Kan. Sept. 25, 2000).

[120]967 P.2d at 303.

[121]K.S.A. §§ 44-1003(a), 44-1115.

[122]§ 44-1003(i).

[123]*Id.*

circumstances, the Court finds that federal and state antiretaliation statutes all provide plaintiff an adequate substitute for these state common law remedies.

Even if the Court did not find that these claims are precluded, it would grant defendant's motion for summary judgment on the merits. Kansas generally follows the employment-at-will doctrine, meaning "that, in the absence of an express or implied contract between an employee and employer regarding the duration of employment, either party is free to end the employment at any time for any reason."[124] Plaintiff claims that she entered into an implied-in-fact contract with UPS to refrain from retaliation and investigate any complaints of discrimination, based on the statements in the Code that required plaintiff to report any violations of the Code and the Code's promise that employees will not be retaliated against for making such reports. Defendant points to the clear disclaimer language in the Code, where it explicitly states that it is not a contract.

The existence of an implied contract "depends on the intent of the parties, divined from the totality of the circumstances."[125] The existence of a disclaimer in the employee handbook does not determine the issue as a matter of law.[126] While the existence of an implied contract for employment is normally a question of fact for the jury, summary judgment may be appropriate when the plaintiff fails to present evidence of "'anything above and beyond the terms of the personnel manual.'"[127] Standing alone, provisions of an employee handbook stating that employees will not suffer adverse action for reporting violations of the handbook are insufficient

---

[124]*Palmer v. Brown*, 752 P.2d 685, 687 (Kan. 1988); *see also, e.g.*, *Foster v. Alliedsignal Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002) (citing *Morriss v. Coleman Co.*, 738 P.2d 841, 846 (Kan. 1987)).

[125]*Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 537 (10th Cir. 1995).

[126]*Id.* at 538 (discussing *Morriss*, 738 P.2d at 849).

[127]*Id.* (quoting *Farthing v. City of Shawnee, Kan.*, 39 F.3d 1131, 1140 (10th Cir. 1994)).

as a matter of law to establish an implied contract of employment.[128]  Plaintiff comes forward with no evidence other than the Code, defendant's antiretaliation Policy that she signed, and her own subjective beliefs that there was a meeting of the minds.  This evidence is insufficient, as a matter of law, to establish an implied contract.

Moreover, even if there was a contract, the Court has already found that defendant did not breach that contract by violating its promise that a person who reports discrimination "will not be adversely affected or retaliated against."  As discussed on plaintiff's retaliation claims, she has not come forward with evidence to establish a genuine issue of material fact as to whether she suffered an adverse employment action in retaliation for complaining of discrimination.  For all of these reasons, the Court would grant defendant's motion for summary judgment even if plaintiff's claim was not precluded by alternative statutory remedies.

Alternately, plaintiff argues that the anti-retaliation provisions in the Code and Policy created a duty to investigate her discrimination claim and to not retaliate against her.[129]  Plaintiff identifies no authority under Kansas law that an employee may be entitled to relief under a promissory estoppel theory based on representations in an employee handbook.  Even if Kansas did recognize a cause of action under these circumstances, the Court would find summary judgment appropriate.  To invoke the doctrine of promissory estoppel, plaintiff must come forward with evidence that the "promise was made under circumstances where the promisor intended and reasonably expected that the promise would be relied upon by the promisee and

---

[128]*Id.*; *Zwygart v. Bd. of County Comm'rs of Jefferson County, Kan.*, 412 F. Supp. 2d 1193, 1200 (D. Kan. 2006), *aff'd*, 483 F.3d 1086 (10th Cir. 2007); *Litton v. Maverick Paper Co.*, 388 F. Supp. 2d 1261, 1293 (D. Kan. 2005); *see also Brown v. United Methodist Homes for the Aged*, 815 P.2d 72, 83 (Kan. 1991) (finding question of fact when employment at-will language added to manual after plaintiff's employment).

[129]533 F.3d 594 (7th Cir. 2008); *see also Darr v. Town of Telluride, Colo.*, 495 F.3d 1243 (10th Cir. 2007) (applying Colorado law).

further that the promisee acted reasonably in relying upon the promise."[130]  The Court finds that the disclaimer in the Code is clear evidence that defendants did not intend for the Code to constitute a promise or contract or agreement.  Furthermore, the Court has already found that there was no detriment to plaintiff's reliance on this policy, as she suffered no adverse employment action as a result of her internal complaint of discrimination.

The Court finds the plaintiff's state common law claims are precluded by the antiretaliation statutes; however, even if these claims were not precluded, it would grant summary judgment on the merits.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for Summary Judgment (Doc. 90) is granted.  Defendant's motions to strike (Docs. 112, 113, 123, and 124) are granted in part and denied in part consistent with this Order.

Dated: June 24, 2011

 S/ Julie A. Robinson_____
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[130]*Patrons Mut. Ins. Ass'n v. Union Gas Sys., Inc.*, 830 P.2d 35, 39 (Kan. 1992).