FILED
United States Court of Appeals
Tenth Circuit

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**December 11, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

_____

REGINA DANIELS,

        Plaintiff - Appellant,

v.

UNITED PARCEL SERVICE, INC.,

        Defendant - Appellee.

No. 11-3211
(D.C. No. 2:09-CV-02304-JAR)

_____

## JUDGMENT
_____

Before **TYMKOVICH**, **BALDOCK**, and **GORSUCH**, Circuit Judges.
_____

This case originated in the District of Kansas and was argued by counsel.

The judgment of that court is affirmed.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

FILED
United States Court of Appeals
Tenth Circuit

**December 11, 2012**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

REGINA DANIELS,

            Plaintiff-Appellant,

    v.

UNITED PARCEL SERVICE, INC.,

           Defendant-Appellee.

No. 11-3211

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 2:09-CV-02304-JAR)**

Dennis E. Egan, Popham Law Firm, Kansas City, Missouri (with Frederick D.
Deay II, Law Office of Frederick D. Deay II, Overland Park, Kansas, with him on
the briefs) for Appellant.

Thomas B. Weaver, Armstrong Teasdale LLP, St. Louis, Missouri (Jennifer
Arendes, Armstrong Teasdale LLP, St. Louis, Missouri and Laurence R. Tucker,
Armstrong Teasdale LLP, Kansas City, Missouri, with him on the brief) for
Appellee.

Before **TYMKOVICH**, **BALDOCK**, and **GORSUCH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

Regina Daniels, a former United Parcel Service dispatcher who worked in UPS's Kansas City, Kansas facility, brought suit against UPS alleging discrimination based on her sex and age.  The district court granted summary judgment in favor of UPS, and Daniels appeals.  We conclude the district court did not err in finding (1) most of Daniels's discrimination claims were untimely; and (2) the claims of discrimination and retaliation that were timely failed as a matter of law.

Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM.

# I.  Background

UPS is an international shipping company that maintains a nationwide network of distribution centers in the United States, including its James Street distribution center (James Street Station) in Kansas City, Kansas.  Regina Daniels, a woman born in 1952, began working for UPS in 1984.  In 1999, she became a full-time dispatch specialist at James Street Station.  Dispatch specialists coordinate the movement of truck drivers shipping packages between UPS's distribution centers.  Daniels held this position until she retired in 2009, at the age of 57.

There are three dispatch shifts—or "windows," in UPS jargon—at the James Street Station: day, twilight, and night.  The twilight window is the busiest and has the most functions.  Dispatch specialists are normally assigned to a single

shift, but sometimes a dispatch specialist is assigned to a "cover" position, filling in for absences or vacancies on any shift.

Daniels was assigned to the night window from 1999 to 2004. In 2005, she accepted a transfer to the cover position. This did not change her job classification or pay grade. While working the cover position, Daniels primarily worked the day and night windows. She occasionally worked on the twilight window, but never without supervision.

UPS classifies dispatch specialists as entry-level managers, a level below full-time supervisors. Dispatch specialists do not have formal supervisory authority, cannot discipline or fire employees, and are not responsible for training or evaluating employees. Despite this, Daniels says she performed some tasks normally performed by full-time supervisors, such as giving drivers instructions, hand-delivering certain packages, and supervising administrative assistants.

UPS has detailed salary guidelines setting pay grades and ranges for each position. Specialists and supervisors are different grades, and specialists receive lower pay than supervisors. Daniels's salary was within the range established by the UPS salary guidelines. She received a raise every year between 2006 and 2009.

Although subordinate to feeder supervisors, dispatch specialists report directly to the James Street Station feeder manager. Three feeder managers are relevant to this discussion. Mic Haynes held this position from 2004 to 2006, Joe

Dooley from 2006 to 2007, Allen Kirby from 2007 to 2008, and Joe Dooley again from 2008 onwards.  The feeder manager reports to the Kansas Feeder Division Manager.

In 2004 or 2005, Daniels began training on the twilight window.  Then Kansas Feeder Division Manager, Guy Albertson, instituted a policy that only full-time supervisors could cover the twilight window.  His stated reason for doing so was that the twilight window was the busiest and most complex shift, and requiring a supervisor to cover the shift would reduce the risk of service failures.  When this policy was implemented, all full-time supervisors in the James Street Station feeder department were men.  Thereafter, Daniels ceased training on the twilight window, having completed only a week of training.

In 2005 and again in 2006, Daniels submitted letters to Human Resources (HR) expressing interest in a promotion to a full-time supervisor position, as required by UPS's promotion policy.  HR notified Daniels it received her letters, and advised her that her supervisor or manager would contact her regarding further assessments.  It also informed her that her letter of interest would expire at the end of the year, and she would need to resubmit a letter each year if she wished to maintain her eligibility for a promotion.  HR did not receive an assessment of Daniels from her manager, at that time Mic Haynes, nor did UPS follow up with her regarding her applications.

-4-

Sometime in 2006, Daniels began covering the night window on a long-term assignment.  She completed this assignment in late 2006 or early 2007, but in October 2007, after the night dispatcher was on extended leave, she was again assigned to cover the night window until July 2008.  In July 2008, Daniels's supervisor, Joe Dooley, permanently assigned her to the night window.  At the same time, Dooley promoted a younger male, Jason Isabell, to dispatch specialist and assigned him to the cover position.  Isabell, who had been the yard control supervisor during the twilight window, had obtained informal dispatch training on the twilight window and was allowed to cover that window by virtue of that training, even though he was not a supervisor.  Daniels was unaware prior to this date that UPS was considering assigning her permanently to the night window and assigning someone else to the cover position.

On July 31, 2008, Daniels met with UPS Kansas District Human Resources Manager Gary Liberti to complain about her replacement by Jason Isabell and her permanent assignment to the night shift.  She also complained about the termination of her twilight window training in 2005 and told Liberti she believed she was transferred to the night window because she complained to HR in 2006 about an incident where Dooley came to her home to ask her to work an extra shift.

Daniels and Liberti also discussed Daniels's job classification and her failure to receive a response to her 2005 and 2006 promotion applications.

-5-

Liberti reportedly asked Daniels why she was not classified as a full-time supervisor, given her duties. Liberti also admitted management should have conducted a follow-up interview to her promotion applications, but failed to comply with UPS policy. He promised to investigate her complaints and follow up with her.

In August of 2008, Daniels filled out an Equal Employment Opportunity Commission (EEOC) intake questionnaire. On November 21, 2008, having heard nothing from Liberti, Daniels filed an EEOC complaint. Soon after, she experienced a significant decrease in work-related communication from her supervisor, Dooley, although she admits this did not affect her job performance.

In February 2009, Daniels met with Dooley to discuss her EEOC complaint. At this meeting, Dooley informed Daniels there were discrepancies in her time records, and told her to properly record her time. Approximately one month before this meeting, UPS had audited the time records of several employees it suspected were not properly recording their time, including Daniels. Daniels claims she was often forced to work without taking breaks or lunch, and this affected the time she left.

Later that month, Daniels again met with Liberti. Liberti reportedly threatened to call the EEOC, and also warned Daniels about the discrepancies in her time records. Despite these warnings about the time records, UPS never took any disciplinary action against Daniels. Daniels later retired in 2009.

In June 2009, Daniels filed a complaint against UPS in United States District Court alleging sex and age discrimination and retaliation in violation of Title VII, the Age Discrimination in Employment Act (ADEA), and Kansas law.[1] She also alleged unequal pay in violation of the Equal Pay Act (EPA) and breach of contract pursuant to Kansas law.  In December 2010, the district court granted UPS's motion for summary judgment, finding Daniels failed to allege sufficient facts to support her claims.

This appeal followed.

## II.  Discussion

It is unlawful for employers to deprive an individual of employment opportunities based on his or her sex.  42 U.S.C. § 2000e-2(a)(2).  It is also unlawful for any employer to refuse to hire, fire, or otherwise discriminate in compensation or employment terms against any individual based on age.  29 U.S.C. § 623(a)(1).

When a plaintiff asserts a sex or age discrimination claim but cannot produce any direct evidence of discrimination, as here, the burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1972), applies.  Under this framework, a plaintiff must first establish a

---

[1]  We cannot discern from the record before us whether UPS requires its employees to take employment claims to mediation or arbitration before filing suit.  The copy of UPS's policy manual in the record does not discuss such a practice, nor do the parties mention it in their briefs.

prima facie case of discrimination by showing (1) membership in a protected class and (2) an adverse employment action (3) that took place under circumstances giving rise to an inference of discrimination. *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). If a plaintiff can establish a prima facie case, the burden shifts to the employer to assert a legitimate nondiscriminatory reason for its actions. If it can do so, the burden shifts back to the plaintiff to introduce evidence that the stated nondiscriminatory reason is merely a pretext for discriminatory intent. *Simmons v. Sykes Enters.*, 647 F.3d 943, 947 (10th Cir. 2011).

We review the district court's order granting summary judgment de novo. *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). In so doing, we must view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in his or her favor. *Id.* We must not judge witness credibility or weigh evidence. *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003). A grant of summary judgment is proper only if there is no genuine dispute as to any material fact, and the evidence is such that no reasonable jury could find in favor of the nonmoving party. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

With these legal standards in mind, we turn to Daniels's claims of error.

### A.  *Failure to Promote*

Daniels's first claim is that UPS discriminated against her on the basis of her age and sex when it failed to promote her in 2005 and 2006, after she filed letters with HR indicating her interest in receiving a promotion.  She asserts a cause of action accrued either at that time, or when HR manager Liberti told Daniels in 2008 that UPS violated its promotion policy by failing to follow up on her letters of interest.

"A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1); *see also* 29 U.S.C. § 626(d).  In states with a state agency that has authority over employment discrimination claims, including Kansas, employees have up to 300 days to file an EEOC charge if they first file a charge with the state agency.  *Id.*  A claim not filed within these statutory limits is time barred.  *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

"Each discrete discriminatory act starts a new clock for filing charges alleging that act."  *Id.* at 113.  Discrete unlawful practices include termination, failure to promote, denial of transfer, and refusal to hire.  *Id*. at 114.  The limitations period begins on "the date the employee is notified of an adverse employment decision by the employer."  *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1187 (10th Cir. 2003); *see also Del. State Coll. v. Ricks*, 449 U.S. 250 (1980).  An employee need not have notice of discriminatory motivation for the

limitations period to begin, merely notice of the adverse decision. *Davidson*, 337 F.3d at 1187.  When a complaint alleges multiple discrete acts, the limitations period runs separately for each act. *Id*. at 1185.

Daniels received a response to each of her letters of interest informing her they would expire on December 31 of the year they were filed.  Thus, Daniels was aware no later than January 1, 2006 she had received no promotion from her first letter, and January 1, 2007 for the second.  Daniels was required to file her claims with the EEOC within 180 days of each date, or within 300 days if she first filed a complaint with the relevant state agency.  She did not do so, but instead waited until November, 2008, more than 660 days after her second cause of action accrued and more than 1,000 days after her first.  Her claims therefore are time barred.

Daniels has two responses to the time bar.  *First*, she argues her cause of action accrued when Liberti told her in July 2008 that UPS failed to follow its promotion policies when it did not respond to her letters of interest.  She asserts her complaint was timely if this is the relevant trigger date.  But Daniels's conversation with Liberti did not inform her of an adverse employment action; it only suggests her failure to receive a promotion in 2005 and 2006 *might* have had a discriminatory motivation.  That kind of knowledge is not required under our case law for a cause of action to accrue, or for the statute of limitations to begin. *Id*.  Thus, no cause of action accrued in July 2008.

-10-

*Second*, Daniels disputes that the limitations period in these statutes applies to her failure-to-promote claim.  She asserts three theories in support of this argument: (1) she did not file any letters expressing her interest in a promotion after 2006 because she believed doing so would be futile; (2) UPS's failure to promote her was a compensation decision, so a cause of action accrued with each paycheck; and (3) Congress statutorily overruled *Morgan* by overturning the Supreme Court's decision in *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007), which applied *Morgan*.   Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 931 (2009).

## 1.  Futility

A plaintiff alleging discrimination need not show he applied for a job or promotion and was rejected if doing so would have been futile.  *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 367 (1977).  This doctrine applies in cases where the employer has a "consistently enforced discriminatory policy" that will deter applicants who are aware of the policy from applying because they know they face "certain rejection."  *Id.* at 365.  To take advantage of this rule, a nonapplicant must show he or she "would have applied but for accurate knowledge of an employer's discrimination and that he would have been discriminatorily rejected had he actually applied."  *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1228) (10th Cir. 2001) (internal citation omitted), *overruled on other grounds as explained in Boyer v. Cordant Techs., Inc.*, 316 F.3d 1137, 1140 (10th

-11-

Cir. 2003). "Only in the rare case where an employer has essentially foreclosed the interactive process through its policies or explicit actions will the futile gesture doctrine apply." *Davoll v. Webb*, 194 F.3d 1116, 1133 (10th Cir. 1999) (applying the futile gesture doctrine to Americans with Disabilities Act violations).

Futility does not apply here. Daniels contends she was unaware of a potential discriminatory basis for UPS's failure to promote her until at least July 31, 2008, when Gary Liberti acknowledged UPS had not followed its stated policy in handling her promotion requests. Thus, Daniels's failure to apply for a promotion in 2007 was not due to her knowledge she would be discriminatorily rejected had she applied.

Second, Daniels does not show UPS had a "consistently enforced discriminatory policy" or practice of discriminating against its older or female employees in a way that demonstrated it would be futile for her to continue seeking a promotion. *Int'l Bhd. of Teamsters*, 431 U.S. at 365. UPS's stated promotion policy was not discriminatory; on the contrary, Liberti's admission that UPS did not follow its stated policy is Daniels's principal evidence that UPS was motivated by discriminatory bias—but only as to her.

Third, Daniels has not pointed to evidence showing UPS engaged in a practice of discrimination against its older or female employees. While she points out there were no female supervisors in the James Street Station feeder

-12-

department, she admits there were female supervisors in other departments in James Street. She nonetheless argues female supervisors at James Street Station were far outnumbered by male supervisors. But the fact that UPS has more male than female supervisors at a single distribution facility is not probative of whether the company engages in a consistent practice of discrimination unless Daniels can show this statistic "compare[s] similarly situated individuals" and accounts for "nondiscriminatory reasons for the numerical disparities." *Doan v. Seagate Tech., Inc.*, 82 F.3d 974, 979 (10th Cir. 1996). Daniels has not made the requisite showing.

Finally, UPS submitted evidence that several women were promoted to full-time supervisor positions in the Kansas District in 2005 and 2006. It also submitted evidence that several Kansas District employees over age 40 were promoted to full-time supervisor positions during those years, including at least one woman.

Because Daniels cannot show UPS consistently discriminated against its older or female employees or that her failure to apply for a promotion after 2006 was based on her certainty she would be discriminatorily rejected, the futile gesture doctrine does not cure the untimeliness of Daniels's failure-to-promote claim.

-13-

2. *Compensation Decision*

Daniels next argues UPS's failure to promote her was a compensation

decision, and so a cause of action accrued with every paycheck she received after

she was denied promotion.  *See Goodwin v. General Motors Corp.*, 275 F.3d

1005, 1009–10 (10th Cir. 2002).  The Fair Pay Act amended Title VII and the

ADEA to add the following language:

> [A]n unlawful employment practice occurs, with respect to
> discrimination in compensation in violation of [Title VII and the
> ADEA], . . . when an individual is affected by application of a
> *discriminatory compensation decision or other practice*, including
> each time wages, benefits, or other compensation is paid, resulting in
> whole or in part from such a decision or other practice.

42 U.S.C. § 2000e-5(e)(3)(A), 29 U.S.C. § 626(d)(3) (emphasis added).  The

language creates a cause of action to challenge a "compensation decision or other

practice" after receiving any paycheck reflecting unequal pay resulting from

certain discriminatory employment decisions.  In effect, the language makes it

easier for plaintiffs to file timely claims of discrimination in compensation.

Daniels argues UPS's failure to promote her was an "other practice" subject

to the Fair Pay Act because it affected her compensation.  She asserts her failure-

to-promote claim is timely because a new cause of action arose with each

paycheck she received after UPS failed to promote her.

Daniels's reading of the statute is foreclosed by our decision in *Almond v.*

*Unified Sch. Dist. No. 501*, 665 F.3d 1174, 1181 (10th Cir. 2011), *cert. denied*,

-14-

133 S. Ct. 317 (2012). *Almond* examined the text and history of the Fair Pay Act and concluded that § 2000e-5(e)(3)(A) applies only to claims of "discrimination in compensation." *Id*. And while the phrase "other practice" does not expand the scope of the Fair Pay Act, it does help define when discrimination-in-compensation claims accrue. *Id*. at 1182. As the "other practice" language makes clear, "the accrual period for covered compensation discrimination claims is triggered not only when the pay-setting decision takes place . . . but *also* when other discriminatory employment practices . . . that result in compensation discrimination are 'adopted.'" *Id*. (emphasis in original).

This would apply to Daniels's failure-to-promote claim only if it were one of discrimination in compensation, but it is not.[2] As we recognized in *Almond*, the Fair Pay Act did not create a "limitations revolution for any claim somehow touching on pay." *Id*. Examining Justice Ginsburg's dissent in *Ledbetter*, which the court found Congress followed when drafting and passing the Fair Pay Act, *Almond* concluded that "hiring, firing, *promotion*, demotion, and transfer decisions, though often touching on pay, should and do accrue as soon as they are announced." *Id*. (citing 550 U.S. at 649) (emphasis added). "[T]he phrase 'discrimination in compensation' means paying different wages or providing different benefits to similarly situated employees, not promoting one employee

_____

[2] Daniels brings a separate claim for discrimination in compensation, which we address below.

but not another to a more remunerative position." *Schuler v. PricewaterhouseCoopers, LLP*, 595 F.3d 370, 374 (D.C. Cir. 2010). The argument Daniels advances would "potentially sweep all employment decisions under the 'other practice' rubric." *Noel v. Boeing Co.*, 622 F.3d 266, 275 (3d Cir. 2010).

In sum, because Daniels's failure-to-promote claim is not a compensation-related claim, the Fair Pay Act does not make it timely.

3. *Applicability of* Morgan

Finally, Daniels argues *Morgan's* holding—that a failure to promote is a discrete adverse employment action with a limitations period beginning on the date the employee learns of the action—was overruled by the Fair Pay Act. But she presents no good reason to disregard that decision. 536 U.S. at 113–14.

Our decision in *Almond* recognizes the continuing vitality of this holding, as does the Third Circuit in *Noel*, 622 F.3d at 275, and the D.C. Circuit in *Schuler*, 595 F.3d at 375. In addition to the reasons we discussed above, we note that had Congress intended the Fair Pay Act to overturn *Morgan*, it would have said so explicitly. *Noel*, 622 F.3d at 275 (citing *Astoria Fed. Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104, 109 (1991) (observing that "legislative repeals by implication will not be recognized, insofar as two statutes are capable of coexistence, absent a clearly expressed congressional intention to the contrary")).

-16-

Daniels cannot excuse the deadlines established by 42 U.S.C. § 2000e-5(e)(1) and 29 U.S.C. § 626(d)(1), which apply to her failure-to-promote claim. Accordingly, the district court did not err in finding her claim untimely.

## B.  Denial of Training

Daniels's second claim—that UPS discriminatorily denied her training on the twilight window, which impeded her ability to receive a promotion or perform cover dispatch duties—is untimely for similar reasons.  As with her failure-to-promote claim, the district court found Daniels's cause of action for denial of training accrued in 2004 or 2005, when she said UPS canceled her training on the twilight window and instituted a policy that only full-time supervisors could perform dispatch duties on that window.  The district court concluded her claim was untimely because she failed to file it before the statutory deadline.  42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1).

Daniels contends the district court erred for four reasons.  First, she claims she was denied training on the twilight window not only on these occasions, but on later occasions within the time limitation period.  Second, she reprises her Fair Pay Act argument, claiming the denial of training affected her pay and a new cause of action accrued with each paycheck.  Third, she argues the discriminatory effect of her denial of training—her assignment to the night window—was not apparent until 2008, and it would have been unreasonable to expect her to sue for discrimination before it actually occurred.  Fourth, she claims Jason Isabell was

-17-

provided training on the twilight window in 2008 while she was not, citing this as a specific denial of training giving rise to a timely cause of action.

### 1.  *Continuing Violation*

Daniels first contends UPS's denial of training was a continuing act of discrimination.  The continuing violation doctrine allows a plaintiff to recover "for discriminatory acts that occurred prior to the statutory limitations period if they are part of a continuing policy or practice that includes the act or acts within the statutory period."  *Davidson*, 337 F.3d at 1183 (internal quotation omitted). But the Supreme Court has rejected the continuing violation doctrine for claims against multiple discrete acts of discrimination, limiting its application to hostile work environment claims.  *See Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003) (citing *Morgan*, 536 U.S. at 114).  Thus, when bringing a claim alleging discrete acts of discrimination, "a claimant must file a charge . . . within the appropriate limitations period as to each such discrete act . . . that occurred." *Davidson*, 337 F.3d at 1184.

Nonetheless, Daniels disputes that she is barred from asserting a continuing violation claim.  She claims she was continuously denied training as part of a discriminatory pattern or practice that began after UPS imposed a policy that only full-time supervisors—all of whom were men—could work on the twilight window.  She argues that *Morgan* did not abrogate the continuing violation doctrine for pattern-or-practice claims.  *See* 536 U.S. at 115 n.9 ("We have no

-18-

occasion here to consider the timely filing question with respect to 'pattern-or-practice' claims brought by private litigants as none are at issue here.").

Before addressing the merits of Daniels's arguments, we must consider whether her pattern-or-practice claim is properly before us. Litigants who do not raise a claim or argument before the district court cannot do so on appeal. *Hicks v. Gates Rubber Co.*, 928 F.2d 966, 970 (10th Cir. 1991). Daniels alleged below that UPS had a companywide practice of discriminating against women and those over 40 and that all her claims arose from this policy. She also argued that her denial-of-training claim, as with her failure-to-promote claim, was part of a continuous pattern of discrimination that occurred with each paycheck. But she did not specifically characterize her denial-of-training claim as a pattern-or-practice claim, or cite UPS's policy of only allowing full-time supervisors to work the night window as pattern-or-practice evidence. In her brief opposing UPS's motion for summary judgment, Daniels argued only that her denial-of-training claim was timely because she experienced the effects of the denial—her transfer to the night window— during the limitations period.

We doubt that was sufficient to put the district court on notice Daniels was attempting to bring a pattern-or-practice claim. But even if this claim is properly before us, it does not help her. A number of circuits, including ours in an unpublished decision, have held individual plaintiffs cannot bring pattern-or-practice claims—only the U.S. Attorney General or a certified class can do so.

-19-

*Semsroth v. City of Wichita*, 304 F. App'x 707, 715–16 (10th Cir. 2008)

(*Semsroth I*).  *Semsroth I* is not binding, but we are persuaded by its reasoning, as

well as the reasoning of every other circuit that has considered this question.  *See*

*Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 149–50 (2d Cir. 2012); *Davis v.*

*Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 967 n.24 (11th Cir. 2008); *Bacon*

*v. Honda of Am. Mfg.*, 370 F.3d 565, 575 (6th Cir. 2004); *Celestine v. Petroleos*

*de Venez. SA*, 266 F.3d 343, 355–56 (5th Cir. 2001); *Lowery v. Circuit City*

*Stores, Inc.*, 158 F.3d 742, 760–62 (4th Cir. 1998), *vacated on other grounds*, 527

U.S. 1031 (1999); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 866 n.6 (7th Cir.

1985).

Pattern-or-practice claims derive from 42 U.S.C. § 2000e-6(a), which

empowers the Attorney General to bring a discrimination claim against an

employer on behalf of a protected class.  *Semsroth I*, 304 F. App'x 715.  The

Supreme Court extended these types of claims to private class actions, *Int'l Bhd.*

*of Teamsters*, 431 U.S. at 357–60, but it has never extended them to cases brought

by individuals.  Pattern-or-practice claims, "by their very nature, involve claims

of classwide discrimination, . . . and [Daniels], while attacking [a policy] that

would have affected all of [UPS's] women employees as a class, [has] stated only

[her] individual claims, not a class action."  *Babrocky*, 773 F.2d at 866 n.6.

In addition, the method of proof for a pattern-or-practice claim differs from

that used for individual discrimination claims, which are analyzed under the

burden-shifting *McDonnell Douglas* framework. *Bacon*, 370 F.3d at 575 (citing *McDonnell Douglas*, 411 U.S. at 802). The pattern-or-practice method of proof does not address individual employment decisions, but rather seeks to prove the existence of "a pattern of discriminatory decisionmaking." *Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1106 (10th Cir. 2001) (internal quotation omitted). Proving an employer had such a policy does not prove individual employment decisions were discriminatory, although such evidence might be relevant to individual claims under the *McDonnell Douglas* framework. *Bacon*, 370 F.3d at 575; *see also Jones v. UPS, Inc.*, 502 F.3d 1176, 1188 (10th Cir. 2007). Like these cases, we conclude individual plaintiffs such as Daniels may not bring pattern-or-practice claims.

Daniels argues this is inconsistent with our holding in *Jones*, which she claims allows individual plaintiffs to bring pattern-or-practice claims. But in that case, the plaintiff did not raise a pattern-or-practice claim. 502 F.3d at 1188 n.5. Rather, he attempted to introduce evidence of an allegedly discriminatory UPS policy to prove UPS was motivated by discrimination when it refused to allow him to return to work after an injury. *Id.* at 1188. Although *Jones* implied in dicta that the individual plaintiff might have been able to raise a pattern-or-practice claim, it did not actually address this question. *Id.* (suggesting that had the plaintiff raised a pattern-or-practice claim, the court might agree with the district court that the plaintiff had failed to exhaust his administrative remedies

for such a claim).  Instead, *Jones* held the plaintiff could introduce the policy as circumstantial evidence to support his claim of individualized discrimination.  *Id*. at 1188–89.  In other words, *Jones* supports Daniels's right to introduce evidence of a companywide policy against training women or older employees, but it does not support her attempt to raise a pattern-or-practice claim arising from her denial of training on the twilight window.

Because we hold Daniels is barred from raising a pattern-or-practice claim, she can employ the continuing violation theory only if her denial of training was not a discrete act.  But as the district court observed, one of the claims *Morgan* labeled a discrete act was a denial-of-training claim.  536 U.S. at 114–15.  Thus, Daniels cannot take advantage of the continuing violation theory to make her claim timely.

## 2.  *Compensation Decision*

Daniels's argument that her denial of training was a compensation decision that had continuing effect on her pay fails for the reasons we discussed above concerning her failure-to-promote claim.

## 3.  *Present Discriminatory Effects*

Daniels's third argument is that she was not required to file a claim challenging UPS's decision to deny her training on the twilight window until she experienced injury from that action.  She claims this occurred in July 2008, when UPS permanently assigned her to the night window and promoted Jason Isabell to

cover dispatch.  Daniels argues UPS promoted Isabell to this position because he knew how to run dispatch on the twilight window and she did not, as a result of her denied training.

Once again, a discrimination claim does not accrue when the plaintiff feels the full effects of the discrimination, but when the discrete act occurs.  *Davidson*, 337 F.3d at 1188; *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 559 (10th Cir. 1994). Daniels argues *Davidson* is distinguishable, but other than claiming the opinion involves a different factual scenario and is misguided, she does not explain how.

Daniels also argues the Supreme Court recently cast doubt on the rule that the present effects of past actions cannot lead to Title VII liability.  *See Lewis v. City of Chicago*, 130 S. Ct. 2191, 2199 (2010).  This is not correct.  *Lewis* affirmed the rule that the present effects of past actions cannot lead to Title VII liability for claims requiring discriminatory intent, including disparate treatment claims such as Daniels's failure-to-train claim.  *Id*.  For these claims, a plaintiff must still demonstrate a violation within the limitations period.  *Id. Lewis* abrogated this rule only for claims with no intent requirement, such as disparate impact claims.  *Id*.

Thus, it is irrelevant that Daniels did not experience the full effects of her denial of training until 2008.  The denial occurred in 2004 or 2005, and Daniels knew then that UPS had no female supervisors in the James Street Station feeder division who could run the twilight window under UPS's announced policy.

-23-

Daniels was required to file her EEOC complaint within 300 days of the policy change, not after she was assigned to the night window.

### 4. *Jason Isabell's Training*

Finally, Daniels argues Jason Isabell was provided training in 2008, while she was not, and argues her complaint was timely as to this event. UPS claims this argument was waived because Daniels did not raise it below.

Daniels argued in her response to UPS's summary judgment motion that Isabell was provided training that was denied to her. But she never argued Isabell was provided training in 2008, let alone that this was a specific instance of training denied to her, or that her complaint was timely as to this instance. Accordingly, this argument has been waived. *Hicks*, 928 F.2d at 970.

But even if this argument were properly before us, the record does not support Daniels's position. She cites to nothing in the record stating Isabell was trained in 2008.[3] On the contrary, there is evidence Isabell already knew how to perform the twilight window duties by 2006.

Daniels alleges she was denied training on the twilight window in 2004 or 2005. This was a discrete act, and she should have filed a claim challenging this within 300 days. Daniels does not allege she requested training after that date or

---

[3] The citation Daniels provides, to R. Vol. III at 503 ¶ 19, does not support her claim. This paragraph merely states Isabell was the twilight window yard control supervisor from 2003 until July 2008, and while Isabell held this position he worked with twilight dispatchers and attempted to learn their duties.

was specifically denied such training within the 300 days before she filed her EEOC complaint.

For all of these reasons, the district court correctly found the denial-of-training claim was untimely.

### C. *Reassignment*

Daniels also contends UPS discriminated on the basis of her sex and age by permanently assigning her to night dispatcher and assigning a younger male to the cover dispatch position.  UPS argues Daniels cannot establish a prima facie case of discrimination arising from this event because her assignment to the night window was not an adverse employment action.

"[R]eassignment of job duties is not automatically actionable." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006).  "Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* (internal quotation omitted).  An adverse employment action is a "*significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a significant change in benefits." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (internal quotation omitted) (emphasis added).  The question then is whether Daniels's reassignment was a sufficiently significant change to qualify.

Daniels claims to have introduced evidence showing the cover position was more prestigious, had better working conditions, and provided more advancement opportunities. She argues it is objectively reasonable to prefer working during the day or the evening to working at night. Further, she argues UPS has effectively conceded the cover position was meaningfully different from the night window because it required a full-time supervisor to work the twilight window.

The record citations Daniels provides to support her arguments are unhelpful. She cites several pieces of evidence showing she informed her various managers that she disliked working the night window and disliked working holidays. She cites to a statement by a former manager who, when asked whether Daniels was demoted by being moved to the night window, said what was done to her "wasn't right." R., Vol. V, at 884. And while she points to some evidence discussing the various duties of the different dispatch windows, all this shows is that dispatchers working the different windows had different duties. There may be some merit to the contention that the twilight window was more desirable in that UPS allowed only full-time supervisors to cover that window, but Daniels does not dispute that she could not perform all duties on the twilight window and did not work the twilight window when she was the cover dispatcher.

We acknowledge that many employees would find working the day shift preferable to the night shift. But this does not establish an assignment to the night shift is sufficiently material to constitute a *significant* change in

-26-

employment status or responsibilities.  In *McGowan v. City of Eufala*, 472 F.3d 736, 742–43 (10th Cir. 2006), we discussed an employee's claim that her employer's denial of a transfer to the day shift was a materially adverse employment action.  We reasoned that the shifts "offered no differences in pay and benefits, nor was the night shift more arduous" and found the employee desired the transfer "purely for personal reasons." *Id.* at 743.  We concluded the denial was not material.  *Id.*

As in *McGowan*, we cannot conclude Daniels suffered an adverse employment action when she was assigned to the night window.  Daniels's job classification did not change when she was assigned to the night window, nor was her salary decreased.  Although she claims she did not like working the night window, that preference is different from showing her assignment was an objective demotion. *Id.*  And though dispatchers working the different windows had different duties, Daniels did not introduce any evidence showing the dispatch duties differed significantly.  In addition, the record shows Daniels spent a good deal of her time as cover dispatcher actually working the night window, including most of the year before her assignment to that shift was made permanent.  Thus, when Daniels was permanently assigned to the night window in July 2008, her duties did not actually change in a material way.

Accordingly, Daniels did not suffer an adverse employment action when she was permanently assigned to the night window.

-27-

### D. *Discriminatory Job Classification*

Daniels next alleges she performed the same duties as full-time supervisors, all of whom were male and younger, but was classified as a dispatch specialist and paid at a lower rate, in violation of Title VII, the ADEA, and the EPA.  The district court analyzed her Title VII and ADEA claims separately from her EPA claims, but concluded that under either standard, Daniels failed to make out a prima facie case of wage discrimination because her duties were insufficiently similar to those performed by supervisors.[4]

The *McDonnell Douglas* framework also applies to wage discrimination claims under Title VII and the ADEA.  *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1311 (10th Cir. 2006).  Under that framework Daniels must make out a prima facie case of discrimination by showing (1) she is a member of a protected class, which is not disputed, and (2) she occupied a job similar to higher paid jobs occupied by younger or male employees.[5]  *Id.*  If she can make this showing, UPS

---

[4]  The district court concluded that because Daniels could not meet Title VII's requirement of showing she was paid less than males performing similar work, she also could not meet the EPA's stricter standard of showing she was paid less than males performing "substantially equal work."  *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1311 (10th Cir. 2006).  The parties do not dispute that if Daniels's Title VII discriminatory compensation claim fails for this reason, her EPA claim will fail as well.

[5]  Daniels argues the district court applied the wrong standard to her claim, holding she had to perform the same work as better-compensated younger males to make her prima facie case, whereas Title VII requires only that she perform similar work.  *County of Washington v. Gunther*, 452 U.S. 161, 178–79, 181

(continued...)

assumes the burden of articulating a legitimate, nondiscriminatory reason for the disparity. *Id.* If it can do so, Daniels assumes the burden of demonstrating UPS's stated reasons are pretextual. *Id.*

Daniels argues she should be compared to full-time supervisors because she performed the same or very similar duties. But if Daniels's duties were not sufficiently similar to those of full-time supervisors in her department, her position would compare only with other dispatch specialists, and she does not assert she was paid less than other dispatch specialists, let alone any who were younger or male.

Were Daniels's duties the same or similar to those of full-time supervisors? Daniels's counsel conceded at oral argument they were not, and the record supports this. It is true Daniels performed some supervisory duties, including giving drivers instructions, performing dispatch duties without a supervisor, hand-delivering certain packages, and supervising two part-time administrative assistants. But UPS classified dispatch specialists as entry-level managers, so it follows that Daniels had *some* supervisory responsibilities. That minor overlap does not create substantial similarity. To the contrary, no evidence suggests she

---

[5](...continued)
(1981). But the district court recited the correct standard, finding Daniels's Title VII and ADEA claims failed not because she did not perform the same work, but because, "while she did perform *some of the same* responsibilities as full-time supervisors in the feeder department, there were *significant responsibilities she did not perform*." R. Vol. IX at 1809 (emphasis added).

performed other tasks assigned to UPS supervisors, including training and evaluating subordinates and working the twilight window.[6]

Daniels's former manager, Mic Haynes, also said she did not perform the same duties as a full-time supervisor. She handled a lower volume of traffic than full-time supervisors, could not discipline subordinates, and could not handle the twilight window by herself. While Daniels may have been able to work the twilight window had she been trained to do so, the focus of our inquiry is the duties Daniels actually performed, not the duties she could have performed had she received additional training. Daniels's counsel conceded this point at oral argument, admitting Daniels needed additional training to work the twilight window.

On this evidence, the work Daniels performed was not sufficiently similar to that performed by full-time supervisors because, while she performed some of the same duties, there were significant duties she did not perform. In *Sprague v. Thorn Ams.*, 129 F.3d 1355, 1363 (10th Cir. 1997), we considered a similar claim by an employee who alleged she performed the same work as assistant managers

_____

[6] UPS also claims there is no evidence Daniels disciplined subordinates. But William Sifuentes, a UPS driver, said in his deposition testimony that dispatchers could discipline him. The only example he provides is that on one occasion Jason Isabell told him not to file an injury report. He also admitted that he did not know Isabell's title, that Isabell never trained him or evaluated him, and that someone else was his actual supervisor. This evidence is conflicting, but construing it in Daniels's favor, it shows that dispatchers at least occasionally disciplined some subordinates.

but was paid less.  The employee in *Sprague* also performed tasks similar to those performed by assistant managers, but we concluded she had much less experience and fewer responsibilities than the assistant managers, and also did not perform all the functions in her department the assistant managers performed in theirs.  *Id.* We see no reason to reach a different result here.

Because Daniels cannot show she occupied a position similar to that of higher-paid males under Title VII and the ADEA, she also cannot meet the EPA's stricter standard of showing she was paid less than males performing substantially equal work.  And because Daniels did not establish a prima facie case of wage discrimination, we need not address whether UPS articulated a legitimate, nondiscriminatory reason for the disparity or whether Daniels introduced evidence this reason was a pretext for discrimination.

### E.  Retaliation

Finally, Daniels contends that after she filed her EEOC complaint in November, 2008, she suffered retaliation from her superiors at UPS.  Specifically, she alleges (1) UPS managers threatened her by claiming she was incorrectly recording her time; (2) her manager significantly decreased his business communication with her, making it difficult for her to do her job; and (3) UPS failed to investigate her internal complaint of discrimination.

As with Daniels's other Title VII and ADEA claims, we assess her retaliation claims under the *McDonnell Douglas* framework.  411 U.S. at 802–04.

To make out her prima facie case, Daniels must show (1) "she engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action." *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008).

To be materially adverse, an action must be sufficient to "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68 (internal citation omitted). This requires injury rising to a "level of seriousness." *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087 (10th Cir. 2007) (internal quotation omitted). While the employer's conduct need not affect the terms and conditions of employment, *White*, 548 U.S. at 64, the inquiry is an objective one, and not based on a "plaintiff's personal feelings." *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009) (*Semsroth II*).

### 1. Time Recording

Daniels's first contention is that her manager, Dooley, and HR manager Liberti falsely accused her of misrepresenting her hours in her time records. At a meeting discussing her EEOC complaint in February 2009, Dooley told Daniels that UPS was concerned she was not accurately recording her time. Later that month, Liberti called her into another meeting to discuss her EEOC complaint. During this meeting, Liberti informed her there were discrepancies in her time records and warned Daniels to keep accurate time records. He also reportedly

"slapped" Daniels's EEOC intake questionnaire during the meeting and asked her, "Well, do you want me to get the EEOC down here?"  R., Vol. V, at 831–32.

The district court found Liberti's statements were merely warnings and would not have dissuaded a reasonable employee from pursuing a discrimination claim.  The court reasoned Liberti's warnings had no effect on Daniels's salary, benefits, or working conditions and Daniels was not otherwise disciplined.  *See Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1224 (10th Cir. 2006) (holding a written warning is not an adverse employment action if it does not cause a significant change in employment status).

Daniels argues the district court applied the incorrect standard when it found she needed to show evidence of a materially adverse employment action.  She points out that under *White*, an employer's action need not affect the terms and conditions of employment to be considered retaliatory, contrary to the district court's analysis.  548 U.S. at 64; *see also Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 n.2 (10th Cir. 2006) (acknowledging *White* does not require an adverse employment action).

But even if the district court applied the wrong standard, we still must analyze her claim under the *McDonnell Douglas* burden-shifting framework.  Under that framework, her claim fails if UPS can articulate a legitimate, nondiscriminatory motive.  Here it did so.  It introduced evidence that a month before Daniels met Dooley and Liberti, the company audited the time records of a

number of employees suspected of keeping inaccurate time, including Daniels. This audit was part of a wider effort to get employees to take legally required breaks and had nothing to do with Daniels or her EEOC complaint.

Daniels admits her time records did not always reflect the time she actually worked.  And she admits she was never disciplined, demoted, or otherwise punished for these discrepancies.  But she claims her supervisors did not permit her to take breaks because there was no one to cover for her and also forced her to record break and meal times.  She claims this led to discrepancies in her timekeeping.

Because UPS has articulated a legitimate, nondiscriminatory motive for its actions, the burden shifts back to Daniels to show this reason was a pretext for discriminatory animus.  To show pretext, Daniels must produce evidence showing weakness, implausibility, inconsistency, incoherency, or contradiction in UPS's stated reasons, such that a reasonable jury could find them unconvincing.  *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

Daniels claims she introduced evidence of pretext by pointing out that UPS forced her and other employees to work through their breaks and inaccurately record their time.  She claims her situation is analogous to the facts in *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1158–60 (10th Cir. 2008).

*Trujillo* is distinguishable.  In that case, we held the plaintiffs introduced sufficient evidence that their firing for timecard violations was pretextual.  *Id.* at

1159.  The primary evidence was that PacifiCorp had disciplined employees accused of other serious violations, but had terminated the plaintiffs.  *Id*. at 1158–59.  The court also credited evidence that the procedure PacifiCorp used to audit the plaintiffs' timecards was flawed.  *Id*. at 1159.

By contrast, Daniels was not fired or even disciplined.  This is unnecessary under *White*, but it distinguishes Daniels's case from *Trujillo*.  Daniels also introduced no evidence UPS used a flawed method to evaluate her time records.  On the contrary, she conceded UPS's conclusions were accurate.  And here, UPS audited a number of its employees' time records and did not single anyone out.

Furthermore, Daniels admits UPS not only told her to record her breaks, but also told her to actually take those breaks, telling her to get an administrative assistant to fill in for her if necessary.  This undermines her claim that she was forced to inaccurately record her time.  And many of the emails from UPS management to Daniels and other employees discussing timekeeping were sent before Daniels filed her EEOC complaint.

Daniels does not show she was singled out or treated differently from other employees who were told to take breaks, and whose time records were audited.  Nor does she introduce any evidence undermining UPS's explanation such that a reasonable jury could find UPS's efforts related to employee breaks and timekeeping was a ruse to cover for its retaliation against Daniels, rather than

what it claimed to be—an attempt to get employees to take legally required breaks.

In sum, Daniels fails to demonstrate UPS's legitimate explanation for its actions is a pretext for retaliation.

### 2. *Decrease in Communications*

Daniels next claims that immediately after she filed her EEOC complaint, she noticed a significant drop in business communications from her manager, Dooley. She claims this amounted to retaliation because it professionally isolated her and interfered with her ability to do her job. The district court found that even if Dooley reduced his communications with Daniels, this amounted to a mere snub or slight and was too minor to be actionable retaliation.

As a preliminary matter, we must address UPS's claim that Daniels cannot assert a retaliatory harassment claim on appeal because she did not raise this claim before the district court. Daniels did not raise a claim of retaliatory harassment below, merely a claim of retaliation. To the extent she attempts to raise such a claim for the first time on appeal, she is barred from doing so. *Hicks*, 928 F.2d at 970.

As for Daniels's pure retaliation claim, her arguments are without merit. She contends that just because she was able to continue performing her duties on the less-demanding night window, this does not show Dooley's actions were not isolating and coercive. But Daniels stated that Dooley's decrease in

communications did not affect her ability to do her job.  Even though, under *White*, a retaliatory action need not affect a plaintiff's employment status, 548 U.S. at 64, whether Dooley's decreased communications interfered with Daniels's ability to do her job is probative of whether the decrease was serious enough to dissuade a reasonable worker from filing or pursuing a discrimination claim. *Williams*, 497 F.3d at 1087.  The fact that Daniels continued to perform her duties satisfactorily is evidence Dooley's decreased communications were not materially adverse.

She also argues UPS did not provide a nondiscriminatory explanation for Dooley's behavior, but it was not required to do so because Daniels did not establish a prima facie case of retaliation related to this claim.  Accordingly, Daniels did not make out a prima facie case of retaliation because she did not establish that Dooley's decrease in communications rose above the level of a mere slight or snub.  *White*, 548 U.S. at 68.

### 3.  Failure to Investigate

Daniels's final retaliation claim is that UPS, specifically HR manager Liberti, did not investigate the internal discrimination complaint she filed in August 2008.  UPS denies she made such a complaint, but for purposes of this appeal we assume she did.  It is undisputed that Liberti never followed up with Daniels after she filed this complaint.  The district court found this was not retaliatory.

We agree that failure to investigate an internal complaint cannot be considered retaliatory in the circumstances here.  As the Second Circuit concluded in *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712 (2d Cir. 2010), a failure to investigate a complaint, unless it leads to demonstrable harm, leaves an employee no worse off than before the complaint was filed.  *Id.* at 721–22.  And, as the court noted, adopting a contrary rule and finding a failure to investigate establishes a prima facie case of retaliation would open employers to retaliation claims even where they failed to investigate because of a good faith belief the complaint was meritless.[7]  *Id.*

Daniels complains UPS's failure to investigate was intended to dissuade her from pursuing the complaint.  But she does not explain how this failure made it more difficult for her to pursue her claims with the EEOC or otherwise assert her rights.  And she does not allege she suffered any other harm from Liberti's failure to investigate her internal complaint.

Furthermore, the cases Daniels cites do not support her argument that a failure to investigate an internal complaint is in itself retaliatory.  In an unpublished case, *McInerney v. United Air Lines, Inc.*, the plaintiff filed an

---

[7]  We note *Fincher* was careful to distinguish the claim in that case—that failing to investigate a complaint was retaliation for filing the same complaint—from a case where a failure to investigate a complaint is alleged to be retaliation for a separate protected act.  604 F.3d at 722.  We have no occasion here to decide whether a failure to investigate a complaint in that context could be considered retaliatory.

internal discrimination complaint and was then terminated.  463 F. App'x 709, 718 (10th Cir. 2011).  But in that case the plaintiff alleged her *termination* was retaliatory, not that the failure to investigate was.  *Id*.  *McInerney* considered the defendant's failure to investigate only to the extent it supported the plaintiff's assertion that her termination was retaliatory— in other words, as pretext evidence.  *Id*.  That is not the case here.

Based on the foregoing, we hold Daniels cannot establish a prima facie case of retaliation for Liberti's failure to investigate.

## III.  Conclusion

For the foregoing reasons, we AFFIRM the order of the district court granting summary judgment to UPS.